**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| ROYCE SOLOMON, JODI BELLECI, MICHAEL LITTLEJOHN, and GIULIANNA LOMAGLIO, *individually and on behalf of all others similarly situated*, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN WEB LOAN, INC., AWL, INC., MARK CURRY, MACFARLANE GROUP, INC., THE MACFARLANE GROUP, LLC, SOL PARTNERS, MEDLEY OPPORTUNITY FUND II, LP, MEDLEY LLC, MEDLEY CAPITAL CORP., OAKMONT FUNDING, INC., DINERO INVESTMENTS, INC., CHIEFTAIN FUNDING, INC., DANT HOLDINGS, INC., DHI COMPUTING SERVICE, INC., SMITH HAYNES & WATSON, LLC, MIDDLEMARCH PARTNERS, and JOHN DOES 1-100, <br><br> Defendants. | Civil Action No. ___4:17cv145___ |

## CLASS ACTION COMPLAINT

Plaintiffs Royce Solomon, Jodi Belleci, Michael Littlejohn, and Giulianna Lomaglio (collectively, "Plaintiffs"), by and through their attorneys, on behalf of themselves and the Class defined below, allege the following based on the research of counsel, publicly available articles, reports, and other sources, a reasonable inquiry under the circumstances, and upon information and belief, except for those allegations that pertain to Plaintiffs, which are based on their personal knowledge:

## I. INTRODUCTION

1. This action is brought on behalf of individuals who have been victimized by an unlawful, predatory online lending scheme involving an entity called American Web Loan, defined herein. American Web Loan was created in a brazen attempt by Defendant Mark Curry ("Curry") to circumvent state and federal laws that protect American consumers from abusive short-term lending practices.

2. Under this scheme, people needing cash on an emergency basis or to meet other serious financial challenges have been, and continue to be, charged extortionately high interest rates for short-term loans of $300 to $2,500. The interest rates on these loans can be as high as 726.13%, which is far beyond legal limits. Shockingly, these astronomical and unlawful interest rates are not disclosed to borrowers during the loan application process.

3. Moreover, borrowers receive false, misleading, or no information regarding other key loan terms, including but not limited to the loan repayment schedule, finance charges, and total amount of payments due. Notably, borrowers are not informed of the applicable terms until *after* they receive a loan. People applying for a loan from American Web Loan also are not informed that disputes regarding their loans are subject to an unconscionable and unenforceable arbitration provision and choice of law provisions that disclaim the application of all state and

federal law in favor of the law of the Otoe-Missouria Tribe of Indians, a small Native American tribe located in rural Oklahoma that purports to own and run American Web Loan.

4.      On the surface, the various participants in this illegal lending scheme, including American Web Loan and its various financial and operational backers (including, but not limited to, entities and individuals identified among the Defendants below), might not look like the popular-culture image of a menacing "loan shark" from an old film noir or gangster movie.  Indeed, American Web Loan and the other participants in the scheme shroud themselves in a veneer of apparent business legitimacy suggested by, among other things: (a) a slick website and mobile app; (b) the use of electronic funds transfers; (c) an anonymous-looking office building in the suburbs of Kansas City, Kansas; (d) the involvement of at least one Wall Street hedge fund and other corporate investors; and (e) a series of complexly layered transactions and corporate structures that indicate the involvement of highly sophisticated corporate law firms and investment banks.

5.      Notwithstanding this attempt at corporate gloss, American Web Loan and its backers and affiliates have been perpetrating a scheme that preys on economically vulnerable individuals by charging unlawful triple-digit interest rates for short-term loans of $300 to $2,500 and otherwise engaging in deceptive and predatory practices that conceal the true terms of those loans and make it extraordinarily difficult for borrowers to escape their grip.  This is nothing less than high-tech loan sharking designed for the digital age.

6.      The unlawful online payday lending scheme that ensnared Plaintiffs and members of the Class is a prime example of what is known as a "rent-a-tribe" lending operation.  In "rent-a-tribe" schemes, payday lenders attempt to circumvent state and federal law by issuing high interest loans in the name of a Native American tribal business entity that purports to be shielded by the principle of tribal sovereign immunity.  As alleged herein, however, the tribal lending entity

is nothing but a front for the illegal lending scheme; all substantive aspects of the payday lending operation (*e.g.*, financial backing, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections) are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for "renting" its sovereign immunity to the individuals and entities running the payday lending scheme, the cooperating Native American tribe receives a fraction of the revenues generated, a mere 1% in the case of American Web Loan.

7.      Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted two individuals responsible for running a network of tribal lending operations, Scott Tucker and Timothy Muir, on all fourteen felony counts brought against them. In that case, *United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y) (the "Tucker Criminal Matter"), Tucker and Muir were convicted of, among other things, multiple counts involving participation in a $3.5 billion Racketeer Influenced and Corruptions Act ("RICO") enterprise through the collection of unlawful debts and violations of the federal Truth in Lending Act.[1] While the particular individuals and Native American entities at the heart of the Tucker Criminal Matter are different from the Defendants and other interested parties here, the underlying scheme in the Tucker Criminal Matter is substantially identical to what Plaintiffs allege herein: payday lenders taking advantage of people by charging unlawfully high interest rates, often exceeding 700%, through sham entities that purport to be operated by Native American tribes but, in reality, are controlled by non-tribal

---

[1] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (available at https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial-35-billion-unlawful-internet-payday).

individuals and entities that control and manage all substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation.

8.      The unlawful "rent-a-tribe" online payday lending model, including the enterprise alleged herein, exploits the financial vulnerability of people who find themselves with an urgent need for cash, generating enormous profits for payday lenders and their financial backers, which include Wall Street hedge funds, private equity funds, and Silicon Valley venture capital investors.

9.      Plaintiffs assert claims against the individuals and entities that participated in the RICO enterprise, referred to herein as the "AWL Payday Lending Organization" (defined below), through the collection of unlawful debts, and various co-conspirators that entered into agreements in furtherance of the collection of unlawful debts.  Plaintiffs also assert claims under the Electronic Funds Transfer Act in connection with the use of automatic funds transfers to receive loan funds and make loan payments and the Truth in Lending Act in connection with the failure to disclose multiple material loan terms to Plaintiffs and members of the Class during the loan application process.

## II.      PARTIES

### A.      PLAINTIFFS

10.     Royce Solomon ("Solomon") is a resident of Virginia who took out a loan from American Web Loan on or about December 19, 2016.  Mr. Solomon resides within this judicial district and division.

11.     Jodi Belleci ("Belleci") is a resident of Nebraska who took out a loan from American Web Loan on or about May 23, 2017.

12.     Michael Littlejohn ("Littlejohn") is a resident of South Carolina who took out a loan from American Web Loan on or about June 3, 2017.

13.     Giulianna Lomaglio ("Lomaglio") is a resident of California who took out a loan from American Web Loan on or about May 23, 2017.

**B.     DEFENDANTS**

14.     Defendant American Web Loan, Inc. purports to be a corporation formed under the laws of the Otoe-Missouria Tribe of Indians ("Otoe" or the "Tribe") with a principal place of business located in Red Rock, Oklahoma, which is the location where the Tribe is headquartered. According to its website (https://www.americanwebloan.com), American Web Loan, Inc. uses a different mailing address of 2128 N. 14th Street, Box 130, Ponca City, Oklahoma 74601.

15.     Defendant AWL, Inc. purports to be a corporation formed under the laws of the Tribe.  According to its website, AWL, Inc. maintains a place of business located at 112 Paradise Drive, Suite B, Red Rock, Oklahoma 74651.  Other public records indicate that Defendant AWL, Inc. maintains a business address at 8151 Highway 177, Red Rock, Oklahoma 74651, which is identified as the mailing address for the Tribe on its website.  According to Plaintiffs' loan agreements and other public records, AWL, Inc. maintains a place of business with the mailing address of 2128 N. 14th Street, Box 130, Ponca City, Oklahoma 74601, which is the address identified on the website https://www.americanwebloan.com.  As alleged herein, according to an October 11, 2016 UCC filing from the District of Columbia, three entities controlled by Defendant Mark Curry hold a security interest in "all assets" of Defendant AWL, Inc. (except for certain tribal trust property and equity interests in tribal entities) under a September 21, 2016 security agreement.

16.     Unless otherwise specified, Defendant American Web Loan, Inc. and Defendant AWL, Inc. are collectively referred to herein as "American Web Loan" or "AWL."  American Web Loan is the nominal lender on loans taken out by Plaintiffs and members of the Class (defined herein).  American Web Loan also was the nominal lender on loans marketed to and taken out by

members of the Class in the name of Clear Creek Lending, a fictitious or d/b/a entity of Defendant American Web Loan Inc.  As alleged herein, however, American Web Loan is not the lender-in-fact for those loans.  Rather, American Web Loan was created for the purpose of facilitating an unlawful online payday lending scheme devised by Defendant Mark Curry and operated, in fact, by Curry, various entities controlled by or affiliated with Curry, and other individuals and entities not affiliated with the Tribe.  According to the Westlaw database of business records, UCC filings and other sources indicate that "American Web Loan" has a business address of 6950 W. 56th Street, Mission, Kansas 66202, which is the same address as Defendants MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.

17.    Defendant Curry is a resident of San Juan, Puerto Rico.  According to public records, Defendant Curry maintains multiple additional residences in the United States, including in Henderson, Nevada, Washington, DC, Kansas City, Kansas, and Kansas City, Missouri.  Curry is the founder of and currently serves as the Chief Executive Officer ("CEO") of Defendant SOL Partners, and founded and served as the CEO of Defendant MacFarlane Group, defined below.  As alleged herein, Defendant Curry is the mastermind of the American Web Loan "rent-a-tribe" scheme and continues to be in *de facto* control of the online payday lending operation, personally and/or through entities that he owns or controls.  In addition to his role as CEO of Defendant SOL Partners—which controls key lending functions of the American Web Loan enterprise— Defendant Curry owns or controls three Delaware corporations, First Infinity Holdings, Inc., First Mountain Holdings, Inc., and First CM Holdings, Inc. (collectively, the "September 2016 Shell Corporations"), each of which were incorporated on September 13, 2016 and jointly hold security interests in virtually all of the assets of Defendant AWL, Inc. and another entity created by the Tribe called Red Stone, Inc., whose mailing address is identified in public records as the Tribe's

7

primary mailing address, 8151 Highway 177, Red Rock, Oklahoma 74651.  According to public filings made in the District of Columbia, the contact addresses for the September 2016 Shell Corporations is the same as Defendant SOL Partners: 53 Palmeras Street, Floor 14, San Juan, Puerto Rico 00901.

18.     Defendant MacFarlane Group, Inc. is a Nevada Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.

19.     Defendant MacFarlane Group, LLC is a Delaware limited liability company with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.

20.     Unless otherwise specified herein, Defendants MacFarlane Group, Inc. and MacFarlane Group, LLC are collectively referred to as "MacFarlane Group" herein.

21.     MacFarlane Group was founded by Defendant Curry to operate the illegal payday lending scheme alleged herein.  At times relevant to the claims herein, Defendant Curry served as MacFarlane Group's CEO.  Defendant MacFarlane Group handled virtually all aspects of American Web Loan's operations, including the financing and funding of the payday loans and the provision of all substantive lending functions, including but not limited to, loan marketing, application processing, underwriting, loan servicing, and collections.

22.     On October 12, 2016, the Tribe announced that it had acquired an entity called "MacFarlane Group," purportedly taking over certain "support services" used in connection with online payday lending, namely, "software development, marketing, and call center support."  The terms of the purported acquisition were not disclosed.  Based on records from the Nevada Secretary of State, the Tribe acquired an interest in Defendant MacFarlane Group, Inc. on September 22, 2016; the forwarding address for service of process was changed to an entity and address belonging to the Tribe: Red Stone, Inc., 8151 Highway 177, Red Rock, Oklahoma 74651.  Beyond this

nominal change, the Tribe did not acquire ownership of any particular MacFarlane Group business operations or functions, including but not limited to MacFarlane Group's roles with respect to financing, underwriting, loan servicing, and collections for the American Web Loan enterprise. Moreover, Nevada Secretary of State Filings indicate that Defendant Curry has ongoing positions of authority at MacFarlane Group, Inc.; specifically, Curry remains identified as the Secretary and Treasurer of Defendant MacFarlane Group, Inc. The price of the purported acquisition and the amount and source(s) of any financing used by the Tribe also were not disclosed.

23. Defendant SOL Partners ("SOL") was founded by Defendant Curry in 2012 and provides various consulting services to clients in the online financial services industry. SOL-controlled or -affiliated entities were, along with Defendant MacFarlane Group, responsible for providing financing and various lending functions to the American Web Loan unlawful debt scheme. According to its website, Defendant SOL is headquartered at the El Caribe Office Building, 53 Palmeras Street, Floor 14, San Juan, Puerto Rico 00901. The address of Defendant SOL's headquarters is the contact address for the September 2016 Shell Corporations (with Defendant Curry identified as the contact person).

24. Defendant Medley Opportunity Fund II, LP (the "Medley Fund") is a Delaware limited partnership with a principal place of business located at 375 Park Avenue, 33rd Floor, New York, New York 10152. The Medley Fund is a pooled investment fund that was launched in December 2010 to provide loans to "middle market private borrowers, with a focus on senior secured loans." According to public filings made with the U.S. Securities and Exchange Commission ("SEC"), as of June 30, 2017, the Medley Fund was fully invested and actively managed with $378 million in fee earning assets under management. The Medley Fund provides

financial backing for, and exerts financial control over, Defendant Curry's American Web Loan scheme.

25.     Defendant Medley LLC is a Delaware corporation with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017.  As disclosed in recent SEC filings, certain employees, former employees and former members of Medley LLC hold approximately 40% of the limited liability company interests in the entity that serves as the general partner of the Medley Fund.  Also, according to SEC filings, the management of the Medley Fund is under common control with Defendant Medley LLC.

26.     Medley Capital Corp. is a Delaware corporation with a principal place of business located at 280 Park Avenue, 6th Floor East, New York, New York 10017.  Medley Capital Corp. is a corporate parent and/or controlling entity of Medley LLC and the Medley Fund.

27.     Unless otherwise specified, Defendants Medley Opportunity Fund II, LP, Medley LLC, and Medley Capital Corp., which share significantly overlapping management and personnel, are collectively referred to herein as "Medley."  As alleged herein, Medley provides substantial financial backing for, and exerts financial control over, the American Web Loan enterprise.

28.     Defendant Oakmont Funding, Inc. ("Oakmont") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Defendant Oakmont is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Oakmont provides financing for American Web Loan's online payday lending operation with an investment of $2.9 million in a "'COL' [choice of law] loan portfolio."

29.     Defendant Dinero Investments, Inc. ("Dinero") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Defendant Dinero is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Dinero provides financing for American Web Loan's online payday lending operation with an investment of $287,000 in a "'COL' [choice of law] loan portfolio."

30.     Defendant Chieftain Funding, Inc. ("Chieftain") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Defendant Chieftain is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Chieftain provides financing for American Web Loan's online payday lending operation with an investment of $283,000 in a "'COL' [choice of law] loan portfolio."

31.     Defendant Dant Holdings, Inc. ("Dant") is a Delaware Corporation with a principal place of business located at 6950 W. 56th Street, Mission, Kansas 66202.  Defendant Dant is located at the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Dant provides financing for American Web Loan's online payday lending operation with an investment of $87,000 in a "'COL' [choice of law] loan portfolio."

32.     Defendant DHI Computing Service, Inc., d/b/a GOLDPoint Systems ("GOLDPoint"), is a Utah corporation with its principal place of business located at 1525 W. 820 N, Provo, Utah 84601.  GOLDPoint provides various software solutions to customers in the lending industry including a "lending suite" that facilitates online loan originations, loan servicing, collections, accounting, reporting, and marketing.  GOLDPoint provides various services to

American Web Loan and Defendants necessary to the operation of the American Web Loan online payday lending operation.  Among other things, the web page through which American Web Loan borrowers can access their accounts, check loan balances, and make online payments (https://myaccount.americanwebloan.com) states that it is "Powered By GOLDPoint Systems," and includes a link to the GOLDPoint website, goldpointsystems.com.  Based on the company's description of its business operations on its website, Defendant GOLDPoint provides additional services and support to the American Web Loan online payday lending operation, including but not limited to services that support American Web Loan in connection with loan originations, loan servicing, collections, accounting, and reporting.

33.     Defendant Smith Haynes & Watson LLC ("SHW") is identified in at least one investor presentation as the "Exclusive Collection Agency" serving the American Web Loan operation.  Defendant SHW has a principal place of business located at 6950 W. 56th Street, Mission, Kansas, 66202, which is the same address as Defendant MacFarlane Group, the Geneva Roth Companies, and several other entities affiliated with Defendant Curry.  Defendant Curry controls the operations of SHW.  According to the Westlaw database of business records, Defendant Curry is identified as having the following titles at SHW: Owner, CEO, Individual Manager, Treasurer, Assistant Treasurer, and Manager.

34.     Defendant Middlemarch Partners ("Middlemarch") is, according to its website, middlemarchllc.com, "a merchant banking firm that provides the capital raising and M&A advisory services of an investment bank and the investment capabilities of a private equity investor," which "focuses on financial services."  Middlemarch Partners provided assistance to Defendant Curry and/or Curry-controlled entities in connection with efforts to raise the lending capital necessary to finance unlawful loans made through American Web Loan.  Middlemarch

Partners authored, or assisted Defendant Curry and/or Curry-controlled entities in presenting, investor presentations including the 2013 Middlemarch Presentation (defined herein) and the Middlemarch Solicitation (defined herein).  Defendant Middlemarch Partners is headquartered at 125 Park Avenue, Suite 1700, New York, NY.

35.     Defendants John Doe 1 through John Doe 100 (the "John Doe Defendants") are individuals and entities whose identities and addresses are presently unknown to Plaintiffs.   In addition to Defendants and the non-defendant interested parties identified herein, the John Doe Defendants provide financial or operational support for the unlawful American Web Loan payday lending scheme described herein.

**C.      NON-DEFENDANT INTERESTED PARTIES**

36.     The Tribe is a federally recognized Native American tribe headquartered in Red Rock, Oklahoma.  The Tribe has approximately 3,000 enrolled members, the majority of which live off-reservation, in the state of Oklahoma.   As alleged herein, Defendant Curry's payday lending operation pays the Tribe 1% of the revenues generated by American Web Loan in exchange for the Tribe's enactment of tribal laws and creation of tribal business organizations that attempt to shield the online payday lending operation from state and federal law.

37.     John R. Shotton ("Shotton") is the Chairman of the Tribal Council of the Tribe and has held that position since 2007.  As the principal leader of the Tribe, Shotton was involved in the Tribe's cooperation with Defendant Curry regarding the creation of American Web Loan and the steps taken by the Tribe to enable and facilitate the online payday lending scheme through the creation of tribal laws and business entities.  Shotton nominally holds a position in the leadership of Defendant American Web Loan, having held the title "Secretary/Treasurer" of American Web Loan as of August 2013.  Shotton's status in the leadership of American Web Loan is further demonstrated by his role as a party (or the individual acting on behalf of the Tribe or its entities)

in various litigation and enforcement actions concerning the Tribe's involvement in American Web Loan.  Recently, the Connecticut Department of Banking imposed a civil penalty of $700,000 against Shotton in connection with unlawful lending by American Web Loan and another payday lending entity affiliated with the Tribe in the state of Connecticut.  Shotton is a resident of Oklahoma.

38.     Charles Moncooyea ("Moncooyea") served as the Vice Chairman of the Tribal Council of the Otoe-Missouria Tribe at the time the Tribe and Defendant Curry agreed to cooperate in the American Web Loan scheme in approximately late 2009 until early 2010.  In his capacity in the leadership of the Tribe, Moncooyea was involved in the Tribe's efforts to enable and facilitate the online payday lending scheme through the creation of necessary tribal laws and business entities.  At certain times relevant to the claims set forth herein, Moncooyea served as the nominal leader of American Web Loan.  According to a November 24, 2014 investigative report published by Bloomberg News (the "Bloomberg Report"), after the formation of American Web Loan in February 2010, Moncooyea was "put in charge of the company."  Moncooyea is a resident of Oklahoma.

39.     James Hopper ("Hopper") is the Vice President of Lending Operations at American Web Loan and has served in that position since July 2013.  According to an executive profile on Bloomberg, Hopper is identified as being "responsible for all core company operations" at American Web Loan and a former Tribal Council Treasurer for the Tribe.  Hopper is a resident of Oklahoma.

40.     The Geneva Roth Companies is a designation used by Defendant Curry to refer to various business entities that he owned or controlled in connection with his payday lending business, including Geneva Roth Ventures and Geneva Roth Capital (and potentially other entities

14

whose names include some iteration of "Geneva Roth").  The Geneva Roth Companies share or shared a common business address with Defendant MacFarlane Group, 6950 W. 56th Street, Mission, Kansas 66202.  As alleged herein, the name Geneva Roth Companies appears in an investor presentation that details the structure of the American Web Loan "rent-a-tribe" scheme. According to that presentation, the Geneva Roth Companies were the predecessors to Defendant MacFarlane Group and, as of 2010, the Geneva Roth Companies had transferred all of their employees and management to Defendant MacFarlane Group and "now only holds limited assets." The Geneva Roth Companies have not been named as Defendants only to the extent that they do not appear to be currently registered as legal business entities in any state.

41.    Centurion Funding is an entity identified in an investor presentation as providing an investment in the financing of American Web Loan through a "choice of law" loan portfolio of $1.8 million and an additional $2.3 million credit facility.  Centurion Funding is not named as a defendant in this action solely because Plaintiffs have been unable to determine if this is the name of a legal business entity or if this name was used by Defendant Curry as a pseudonym to conceal the identity of one of the investors in American Web Loan.

42.    TGI Investments is an entity identified in an investor presentation as providing an investment in the financing of American Web Loan through a "choice of law" loan portfolio of $2.7 million.  TGI Investments is not named as a defendant in this action solely because Plaintiffs have been unable to determine if this is the name of a legal business entity or if this name was used by Defendant Curry as a pseudonym to conceal the identity of one of the investors in American Web Loan.

### III. JURISDICTION AND VENUE

43.     This Court has jurisdiction over this dispute pursuant to 18 U.S.C. § 1965.  This Court also has federal question jurisdiction under 28 U.S.C. § 1331, and jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

44.     This Court has personal jurisdiction over Defendants because their activities in the Commonwealth of Virginia, conducted both directly and through their alter egos, as alleged herein, give rise to the claims in this action.  This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965(b)

45.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b) as Plaintiff Solomon is a resident of this District and this Division and a substantial part of Plaintiffs' claims occurred in Virginia.

### IV. FACTUAL ALLEGATIONS

#### A.     Usury Laws Generally

46.     Prohibitions on usury and other limitations on excessive interest rates can be traced back to the origins of human civilization, before the concept of money was invented.  According to University of Utah law professor and senior adviser to the Consumer Financial Protection Bureau ("CFPB"), Christopher Peterson, the ancient Babylonians set a cap on the amount of grain that could be charged as interest, recognizing the considerable danger to families from becoming trapped in debt that cannot be repaid.  Professor Peterson also observed, in a 2012 article published in the Washington & Lee Law Review, that "[e]arly American leaders held usurious lenders in contempt," and "[a]ll of the thirteen original American colonies aggressively regulated consumer loans with annual interest rate caps of between eight and five percent, with six percent being most typical."

47.     While public policy shifts in the twentieth century led to a relaxation of many state interest rate caps, most states still have strict laws against usury and regulate or prohibit high interest, short term consumer loans.  In addition, other federal and state laws protect consumers from excessive interest rates and other predatory lending practices.  The rationale underpinning these contemporary consumer protection laws parallels the ancient Babylonians' concern with excessive interest rates: people facing an urgent need for cash should be protected from lenders who would unfairly take advantage of a person's difficult financial situation and potentially trap that person in crushing debt.

**B.      Usury Law Avoidance Schemes**

48.     Predatory lenders, including "payday" lenders and other unscrupulous individuals and entities, have long sought ways around state interest rate caps and other laws intended to protect Americans from high-interest, short-term loans.[2]  Those efforts took off starting in the 1980s and 1990s, after a handful of states eliminated their interest rate caps.

**1.      Defendant Curry's Rent-a-Bank Scheme**

49.     Payday lenders devised a scheme to exploit those few states' permissive laws and make high-interest loans to borrowers throughout the United States at rates far greater than allowed in the borrowers' home states.  That scheme, known in the money lending industry as the "rent-a-bank" model, typically involved a partnership between a payday lender and a federally chartered bank located in a state with no interest rate cap.  While the payday lender or other "non-depository

---

[2] The terms "payday loan" and "payday lender" do not have set definitions.  *See, e.g.*, CFPB, *What is a payday loan*, available at https://www.consumerfinance.gov/ask-cfpb/what-is-a-payday-loan-en-1567/.  As used herein, the terms "payday loan" and "payday lender" are used in connection with relatively small, short-term loans made to individuals at interest rates that exceed other types of high cost consumer borrowing (for example, credit cards, which charge interest rates ranging from 12% to 30%).

institution" is subject to the laws of the state in which the borrower resides (including that state's interest rate cap), federal preemption allows a federally regulated bank to charge whatever interest rates are permitted in *the bank's* home state.

50.     The "rent-a-bank" scheme was predicated on a pretense that the bank would be acting as the "lender" when, in reality, the payday lender performed substantially all of the lending functions, including the marketing, funding, servicing, and collection of the loans.  The bank's role was to do nothing more than serve as the nominal lender, effectively "renting" its federal charter to the payday lender.  Significantly, the bank in the "rent-a-bank" scheme had no financial interest in the loan transactions other than the fees it received from the payday lender.  Since the payday lender funded the loans and bore the economic risk of loan defaults, it was the *de facto* lender.

51.     By the mid- to late-2000s, federal and state regulators were cracking down on "rent-a-bank" operations as improper attempts at an end-run around state interest rate caps and other restrictions on payday lending.  One of those unlawful operations involved an online lending entity called "LoanPoint USA," which sought to exploit the lack of an interest rate cap under Utah law and charge borrowers across the country triple-digit interest rates for short-term loans.  LoanPoint USA was created by Defendant Curry and run through entities called Geneva Roth Capital and Geneva Roth Ventures, two Curry-controlled companies that shared a name with a fictional shell company owned by the villain in the 1987 movie, "Wall Street," Gordon Gekko (known for the infamous line, "greed is good").  LoanPoint USA appears to have ceased operations after Curry and the Geneva Roth entities settled enforcement actions brought by regulators in at least six states.

### 2.     Defendant Curry's Rent-a-Tribe Scheme

52.     Starting in approximately 2009, as it was becoming clear that the days of the "rent-a-bank" scheme were numbered, Defendant Curry began to pursue a new strategy intended to keep

his illegal online payday lending operation one step ahead of law enforcement.  Under this new law avoidance scheme, which would become known as "rent-a-tribe," Defendant Curry, entities that he controlled, and other financial backers would attempt to cloak their online payday lending operation in the mantle of a Native American tribe's sovereign immunity.  Payday loans would be made in the name of an entity to be called American Web Loan that would be established by a cooperating Native American tribe.

53.    Although American Web Loan would serve as the nominal lender, Curry-owned and/or affiliated entities would provide all of the operational support for the enterprise including, among other things, marketing and lead generation, application processing, underwriting, technical support, electronic funds transfers, loan servicing, and collections.  Moreover, funding for the loans would be provided by Curry-owned and affiliated entities, as well as other investors.  In exchange for enacting tribal laws and creating the business entities required to enable and carry out this scheme, Defendant Curry's payday lending operation would provide the cooperating tribe with a cut of the revenues generated by American Web Loan.

54.    In concept, the "rent-a-tribe" scheme is substantially similar to the unlawful "rent-a-bank" model.  The key difference is that, rather than attempting to exploit an apparent loophole in federal preemption by lending in the name of a federally chartered bank located in a state with no interest rate cap, "rent-a-tribe" lending seeks to operate completely outside of state and federal law.  By making loans in the name of an entity that purports to be an instrumentality of a Native American tribe, the payday lending operation attempts to hide behind the principle of tribal sovereign immunity that, in certain instances, shields business operations of Native American tribes from the application of state and federal law.

55.    For American Web Loan, this pretense is belied by the fact that Defendant Curry, entities he controls, and other outside investors completely control and fund the payday lending operation.  Moreover, unlike the exploitation of existing federally chartered banks and existing state laws in the "rent-a-bank" model, Defendant Curry's "rent-a-tribe" scheme required a cooperating tribe to construct an entire legal and business system from scratch through the adoption of made-to-order tribal laws and the creation of business entities whose purpose was to enable and serve the payday lending operation.

56.    Defendant Curry outlined the structure of the American Web Loan scheme in a slide presentation with the names Geneva Roth Companies and American Web Loan on the cover page (the "Geneva Roth Presentation").  The Geneva Roth Presentation, which Curry used to pitch the scheme to potential investors and/or potential cooperating Native American tribes, indicates that the cooperating tribe and any specially created tribal entities would have no meaningful role in the operation of American Web Loan, similar to the bank in a "rent-a-bank" scheme.

57.    As shown in the slide below from the Geneva Roth Presentation, every aspect of the lending process would be controlled or directed by Curry-controlled entities, including Geneva Roth entities and Defendant MacFarlane Group.  Moreover, all of the financing behind the lending operation was to be provided by Curry-affiliated entities and other outside investors, with no financial backing from the tribe.  The sham nature of the operation was highlighted by the use of a particularly candid term in the Geneva Roth Presentation to describe the loans to be issued through American Web Loan: "Choice of Law Loans."



58.     Another slide in the Geneva Roth Presentation, shown below, indicates that Defendant MacFarlane Group (wholly owned by Defendant Curry) would have 100% ownership of or control over the venture capital financing for the operation, the loan servicing entity to be created, and the software needed to perform the necessary loan underwriting and approval functions.  Moreover, the slide shows an additional deceptive aspect of the scheme:  the tribal entity would "hold" the American Web Loan loans for a brief period, 14 days, before "selling" the loans to a Curry-controlled servicing entity that would bear the risk of losses associated with the loans.



59.     In late 2009, Defendant Curry approached the Otoe, a Native American tribe headquartered in the rural community of Red Rock, Oklahoma, to discuss Curry's payday lending business and his proposal for the establishment of American Web Loan.   According to the Bloomberg Report, the Otoe's former treasurer, Bat Shunatona, stated that Defendant Curry met with the Tribe's leadership in Oklahoma and "put on a dog-and-pony show about how good they [Curry's payday loans] are, how much money they were bringing in."

60.     To the economically struggling Otoe, who had few opportunities for economic development and were reliant upon income from casino operations that faced increasing competition – thereby threatening the Tribe's ability to continue making quarterly payments of approximately $800 to its members – Curry's offer had considerable appeal.  The Tribe was eager to receive whatever money Curry's payday lending operation might provide, and it would cost the Tribe essentially nothing to become involved.  As reported in the Bloomberg Report, the Tribe's

governing "council asked few questions during Curry's presentation and granted a license to American Web Loan in February 2010." In exchange for Defendant Curry's purchase of the Tribe's sovereignty to provide a front for his payday lending operation, the Tribe receives 1% of the revenues from the American Web Loan scheme.

61.     Just as Defendant Curry had outlined in the Geneva Roth Presentation, the Tribe and its specially created entities have no substantive involvement in the operation or funding of American Web Loan. According to the Bloomberg Report, Moncooyea, a former vice chairman of the Tribe who was involved in entering into the deal with Curry and who was "put in charge" of American Web Loan, stated that, "[a]ll we wanted was money coming into the tribe … [a]s time went on, I realized that we didn't have any control at all." Moncooyea, purportedly the head of a multi-million-dollar online lender, described the reality of his extremely limited role at American Web Loan: "I didn't do much at all, just looked at the checks and passed them on." Moreover, as described in the Bloomberg Report, Moncooyea became disappointed with the Tribe's lack of a substantive role in the operation, lamenting that rather than gaining experience in the lending business, "[w]e were just a pawn."

62.     Starting in 2010, after the Tribe took the steps necessary to launch American Web Loan, Defendant Curry's payday lending business began its migration under the umbrella of American Web Loan and another Otoe-established entity called Clear Creek Lending. As alleged herein, Clear Creek Lending was a fictitious or "d/b/a" business name used by American Web Loan that appears to have been discontinued or otherwise merged into American Web Loan at some point before January 2015.

63.     Promptly after it was set in motion, Defendant Curry's plan for the American Web Loan "rent-a-tribe" scheme proved to be incredibly successful. According to a September 2013

slide show presented to potential investors by Defendant MacFarlane Group, which was prepared and circulated with the assistance of Defendant Middlemarch Partners (the "2013 Middlemarch Presentation"), a New York-based merchant bank, Curry's payday lending operation increased loan originations by nearly 71% between 2010 and 2011, from $35 million in 2010 to $59.7 million in 2011. According to the 2013 Middlemarch Presentation, loan originations had risen to $63.1 million in 2012 and were on track to grow to $85.4 million in 2013 – an increase of 144% since implementation of the "rent-a-tribe" scheme. The 2013 Middlemarch Presentation also touted that Defendant MacFarlane Group's "rent-a-tribe" lending generated strong growth in revenues and pre-tax income, with combined annual growth rates of 12% and 20%, respectively, and projected 2013 revenues of $144.3 million and projected 2013 pre-tax income of $17.5 million.

64.     The 2013 Middlemarch Presentation was provided to various hedge funds, private equity firms, and other potential investors in an effort to secure $60 million in financing, an amount that would double the lending capital available to the American Web Loan payday lending scheme. The structure of the American Web Loan operation that was detailed in the 2013 Middlemarch Presentation was substantially identical to what Defendant Curry had outlined in the Geneva Roth Presentation: Curry-owned or affiliated entities providing all funding and lending functions for loans made through a nominal lender affiliated with the Tribe. By the time of the 2013 Middlemarch Presentation in September 2013, Defendant MacFarlane Group – and another Curry-owned company, Defendant SOL – had replaced various Geneva Roth entities (as their *de facto* or legal successors) in terms of providing the substantive functions for the American Web Loan lending operation, including loan marketing, origination, underwriting, and servicing. In addition, the MacFarlane Group and SOL provided the necessary funding for the operation with their own capital and capital raised from other investors that were unaffiliated with the Tribe. Below are

slides from the 2013 Middlemarch Presentation highlighting the limited nature of the Tribe's role in the scheme and the management and control over the payday lending operation by the MacFarlane Group, including with respect to loan marketing, origination, underwriting, servicing, and infrastructure that includes proprietary software and systems that support MacFarlane's capabilities.



**Company Capabilities**

STRICTLY PRIVATE & CONFIDENTIAL                    12                    MIDDLEMARCH PARTNERS

65.     As of September 2013, Defendants' online payday lending scheme had been
marketed to the public under two "brands" depending on the size and terms of the loans offered.
The "American Web Loan" brand (based on the name of the business entity established by the
Tribe in February 2010) offered relatively smaller loans of between $500 and $1,400, with
repayment terms of up to six months.  The "Clear Creek Lending" brand (using the name that the
Tribe established as a fictitious, d/b/a name of American Web Loan on September 4, 2013) offered
loans of greater than $1,400, with repayment terms of between six and eighteen months.  Those
and other terms, including the astronomically high interest rates charged in connection with those
loans, were provided to potential investors in the 2013 Middlemarch Presentation.  Moreover, the
2013 Middlemarch Presentation clearly revealed the sham nature of the "rent-a-tribe" online

payday lending scheme to potential investors by referring to the American Web Loan and Clear

Creek Lending loans as "MacFarlane Installment Loan Offerings" – *not* loan offerings of the Tribe.

### Summary of MacFarlane Installment Loan Offerings

|  | American Web Loan | Clear Creek Lending |
|---|---|---|
| Loan Size | Loan size range between $500-$1,400 | Loans greater than $1,400 |
| Term | 0-6 months with balloon payment | 6-18 months fully amortizing |
| Rate Structure/ payments | 500-700%/interest only and balloon principal payment | 200-600 %/fully amortizing |
| Refinance Options | Amortizing w/ balloon | Amortizing |

STRICTLY PRIVATE & CONFIDENTIAL                                    13                                    MIDDLEMARCH
PARTNERS

66.     Defendants discontinued using the brand name Clear Creek Lending in connection

with their unlawful online payday lending scheme sometime before January 2015 and have since

offered all of their online payday loans under the single name of American Web Loan.  This

decision coincided with the October 24, 2014 announcement of an enforcement action by the

Connecticut Department of Banking against Clear Creek Lending, Shotton, and another online

payday lending entity affiliated with the Tribe (the "Connecticut Enforcement Action").  The

Connecticut Enforcement Action sought to, among other things, stop American Web Loan and the

Tribe's other lending entities from offering loans in Connecticut at rates above the state's 12%

interest rate cap, and to impose financial penalties related to those unlawful loans.

a.   **Financial Backing and Control of Defendant Curry's Rent-a-Tribe Scheme**

67.     At least one major Wall Street investor has chosen to join in the financing and direction of Defendant Curry's "rent-a-tribe" online payday lending scheme.  As reported in the Bloomberg Report, Defendant Medley Fund, a New York hedge fund, has provided financial backing for American Web Loan since initially making a $22.9 million loan to the Curry-owned MacFarlane Group in 2011 to finance and grow the American Web Loan "Choice of Law" loan portfolio.  The Medley Fund continues to provide financing in support of the American Web Loan scheme.

68.     In providing initial financing for the scheme, Medley retained a first lien security on substantially all assets of the MacFarlane Group.  Consequently, Medley maintained control over the necessary funds to facilitate, carry out, and continue the American Web Loan scheme.

69.     Other investors also provide financial backing to the MacFarlane Group for American Web Loan's "Choice of Law" loan portfolio, including eight entities that Defendant Curry listed in the Geneva Roth Presentation.  The investors identified in the Geneva Roth Presentation include: Centurion Funding, TGI Investments, Geneva Roth Capital, Oakmont, Dant, Chieftain, Dinero, and Geneva Roth Ventures.  Not all of those names appear to be legally registered business entities, and six of the entities (Defendants Oakmont, Dant, Chieftain, and Dinero, as well as the two Geneva Roth entities) are either controlled by Defendant Curry or share a common business address with the MacFarlane Group and other Curry-controlled entities in Mission, Kansas.  Since it is unlikely that Defendant Curry's personal funds are the sole source of the approximately $30 million in venture capital financing provided by the investor entities identified in the Geneva Roth Presentation, the most plausible explanation for those entities and

their close connections to Curry is that they are nothing more than shell companies created to mask the identities of other investors in the American Web Loan scheme.

70.     Additional investors beyond Defendant Medley and the Defendant entities identified in the Geneva Roth Presentation – individuals and entities among the as-yet unknown John Doe Defendants – likely have provided, and continue to provide, the necessary financial support for the American Web Loan online payday lending scheme.  Indeed, in early 2017, Defendant Curry, through Defendant Middlemarch, issued another investor solicitation for an investment opportunity with the code name "Project Palomino" (the "Middlemarch Solicitation"). Based on the description and history of "Project Palomino" set forth in the Middlemarch Solicitation, the investment opportunity clearly involves the MacFarlane Group or some Curry affiliated entity.

71.     The Middlemarch Solicitation "seeks up to $90 million of debt to refinance and expand [the American Web Loan payday lending scheme's] $45 million debt facility" in order to "double or triple its loan portfolio size over the next three to four years."  Moreover, the Middlemarch Solicitation notes explosive growth in Curry's illegal scheme since the 2013 Middlemarch Presentation, with revenues increasing from $154.7 million in 2014 to $183.4 million in 2016.  The Middlemarch Solicitation projects revenues from Curry's illegal scheme to climb from $234.3 million in 2017 to $272.1 million in 2020.

72.     Although Defendant Curry has succeeded in securing the necessary outside funding to finance American Web Loan's lending activity, at least one potential investor withdrew its interest in participating in the scheme.  In early 2011, Defendant MacFarlane Group worked with the Chicago-based investment banking firm Album Brown & Company to pitch an investment in the MacFarlane Group to dozens of hedge funds, private equity investors, and others including a

New-York based middle-market commercial lender, Cyan Partners, LP ("Cyan"). Cyan initially committed to making a $50 million debt investment in the MacFarlane Group in April 2011. However, Cyan wound up walking away from the deal later that year due to concerns about the nature of the loans being made by the MacFarlane Group through American Web Loan.

### b.  American Web Loan is not an "Arm of the Tribe"

73.    American Web Loan purports to be a "tribal lending entity wholly owned by the Otoe-Missouria Tribe of Indians . . . operating within the boundaries of the Otoe-Missouria Reservation." The Tribe has taken the position that since American Web Loan is a tribally created, wholly owned business entity of the Tribe, the principle of tribal sovereign immunity applies to shield American Web Loan from the application of state and federal law. For several reasons and as alleged herein, American Web Loan was devised by Defendant Curry to perpetrate an illegal lending scheme and is substantially operated and controlled by entities outside of the Tribe. Therefore, American Web Loan is *not* a legitimate arm of the Tribe and tribal sovereign immunity does *not* shield American Web Loan or any other Defendants from liability in connection with the unlawful online payday lending scheme.

74.    At least one state has examined the question of whether American Web Loan operates as a legitimate arm of the Tribe and has concluded that it is not. After nearly three years of administrative and judicial adjudication, the principal financial services regulator in the State of Connecticut has determined that American Web Loan is not an arm of the Tribe. On June 14, 2017, the Commissioner of the Connecticut Department of Banking issued a Restated Order and Ruling on Motion to Dismiss in the Connecticut Enforcement Action (the "Connecticut Ruling"). According to the Connecticut Ruling, neither American Web Loan's fictitious d/b/a entity, Clear

Creek, nor a separate online payday lender operated by the Tribe called Great Plains Lending, are

arms of the Tribe.  Among the Connecticut Ruling's Findings of Fact are the following facts:

> 13.   The Secretary of the Tribal Council of the Tribe issued a certificate of Incorporation to American Web Loan, Inc. on February 10, 2010 (AR 98).

> 14.   The Tribal Council approved a resolution registering "Clear Creek Lending" as a fictitious name of American Web Loan, Inc. on September 4, 2013 (AR 101-102).

> 75.   The Connecticut Ruling found, with respect to the question of whether American

Web Loan/Clear Creek is an "arm of the tribe," that:

> Respondent Clear Creek failed, by any reasonable measure, to satisfy its burden of proof and to provide any meaningful or reliable evidence that Clear Creek is an arm of the Tribe.  Even if the documents relating to Clear Creek that were submitted by Respondents outside the scope of a hearing are given consideration, there is no evidence that Clear Creek's relationship with the Tribe warrants the extension of tribal sovereign immunity to the entity Clear Creek.

> 76.   Notably, Connecticut's two federally recognized Native American tribes, the

Mohegan and Mashantucket Pequot tribes, support the Connecticut Enforcement Action.  The

tribes' chairmen appeared alongside the Governor of Connecticut and a key state legislator at an

April 13, 2015 press conference to condemn predatory rent-a-tribe online payday lending.  During

the press conference, the tribes' chairmen publicly stated that they had rejected similar offers by

outside payday lenders who wanted to exploit the tribes' sovereignty to issue illegal, high-interest

loans.  Kevin Brown, chairman of the Mohegan tribe, was blunt in his assessment that tribal

sovereignty provides no justification for the exploitation of consumers: "[d]enying this business

pursuit in the state of Connecticut is not about tribal sovereignty or welfare or business, it is about

protecting consumers in the state of Connecticut."

> 77.   While the documents submitted by the Tribe in response to the Connecticut

Enforcement Action (which were found not to support "arm of the tribe" status) are not publicly

available, Plaintiffs have identified numerous facts that demonstrate that American Web Loan

31

(including, specifically, Defendant American Web Loan, Inc. and Defendant AWL, Inc.) is nothing more than a sham "front" for the online payday lending operation created by Defendant Curry and operated by him, entities that he controls, and other financial backers.

78.     As alleged herein at ¶¶ 17, 49-60, 63-65 herein, Defendant Curry devised the American Web Loan online payday lending operation in 2009 and sought the cooperation of a Native American tribe to facilitate the scheme.  Shortly after presenting the idea to the Otoe, the Tribe created tribal laws and organizations for the purpose of enabling Defendant Curry's scheme. *See* ¶¶ 53, 55, 62; *see also* ¶¶ 36-38.

79.     The Tribe plays no substantive role in the operation of American Web Loan.  As alleged at ¶¶ 56-58, 63-65 herein, the Geneva Roth Presentation and the Middlemarch Presentation detail how Curry and Curry-controlled or affiliated entities provide all of the substantive lending functions for American Web Loan, with the Tribe-created AWL entity(ies) acting solely as the nominal lender.  Moreover, as Moncooyea, who had been "put in charge" of American Web Loan, stated in the Bloomberg Report, his role was limited to "just look[ing] at the checks and pass[ing] them on," with the Tribe.  (¶ 61.)  The sham nature of the Tribe's involvement is further evidenced by the fact that it receives a mere 1% of the operations' revenues.  *See* ¶¶ 6, 36, 60.  Moreover, the Tribe has sought to protect its own members from American Web Loan's predatory lending practices by making American Web Loan loans unavailable to members of the Tribe.  *See* ¶ 85.

80.     To the extent that Defendant AWL, Inc. purports to be a separately created entity that serves as the nominal lender in Plaintiffs' loan agreements, it also is not a legitimate "arm of the Tribe" for the same reasons that Defendant American Web Loan, Inc. is not an "arm of the Tribe."  There is no difference in the limited roles played by any of the American Web Loan entities.  Further, Defendant AWL, Inc. is not a legitimate "arm of the Tribe" because it is under

the control of Defendant Curry and/or entities owned by Curry.  As alleged at ¶¶ 15, 17 herein, the Curry-controlled September 2016 Shell Corporations hold a security interest in substantially all of the assets of Defendant AWL, Inc.  Defendant Curry is identified as the point-of-contact for the September 2016 Shell Corporations on UCC filings that describe their security interest in AWL, Inc., and the September 2016 Shell Corporations all share a common mailing address with the company where Defendant Curry currently serves as founder and CEO, and which is referenced in the Middlemarch Presentation as performing substantive lending activity on behalf of the American Web Loan scheme: Defendant SOL.  *See* ¶¶ 17, 23, 69.

81.     Similarly, to the extent that Defendant MacFarlane Group claims that it should be considered an "arm of the Tribe" following the Tribe's purported October 13, 2016 acquisition of "MacFarlane Group," Defendant MacFarlane Group should not be considered an "arm of the Tribe."  Among other things, there is no indication that the Tribe acquired any assets from Defendant MacFarlane Group and/or whether there were any other transactions that may have transferred ownership of any aspects of the MacFarlane Group's business to Defendant SOL or other Curry-controlled entities.  Moreover, to the extent that any operations of Defendant MacFarlane Group were nominally acquired by the Tribe or a tribal entity, Defendant Curry and/or entities controlled by Defendant Curry, continue to maintain control over Defendant MacFarlane Group and its operations – and/or whatever entity(ies) are currently performing the substantive lending functions for American Web Loan.

82.     Given the central role played by Defendant MacFarlane Group in Defendant Curry's "rent-a-tribe" scheme (as detailed in the Geneva Roth Presentation and the 2013 Middlemarch Presentation, as well as in the history of "Project Palomino" in the Middlemarch Solicitation), it is completely implausible that Curry would have simply given away the proverbial

"golden goose" that, in 2016 alone, generated more than $183 million in annual revenues and was projected to receive more than $270 million in revenues in 2020.  It is equally implausible that the Tribe, which was receiving only 1% of the operation's revenues and otherwise economically struggling, would have had sufficient capital to purchase the entirety of Defendant MacFarlane Group (and, by extension, the other Defendants' interests in the enterprise) without some source of substantial financing.  Moreover, it is implausible that sophisticated investors – including Defendants Medley, Oakmont, Dinero, Chieftain, Dant, and any other as-yet unknown entities providing financial backing to and/or exercising control over the enterprise – would allow the enterprise's chief architect, Defendant Curry, to walk away completely from the enterprise he founded.

83.     The timing of the formation of the September 2016 Shell Corporations, the September 21, 2016 security agreement(s) involving Defendant AWL, Inc. and the tribal entity called Red Stone, Inc., and the announcement of the Tribe's purported acquisition of the MacFarlane Group on October 12, 2016, demonstrates that any "acquisition" of the MacFarlane Group was a sham and that Defendant Curry and entities he controls continue to exert control over the substantive lending functions of American Web Loan.  The Middlemarch Solicitation further demonstrates this, noting, in 2017, after the purported acquisition, that: (a) Curry founded his company in 2002 "as a state rate exportation lender that later transitioned its entire business to a sovereign nation loan servicing model in late 2009"; (b) Curry's company is currently "a top-five fintech company" that "operates from three locations in the U.S." and uses "proprietary underwriting, loan origination and collections systems developed over the past decade"; and (c) Curry, "the owner of the business[,] is prepared to invest alongside interested investors to ensure alignment."  Nowhere does the Middlemarch Solicitation indicate that the MacFarlane

Group was acquired by the Tribe or that Defendant Curry has relinquished any control over the enterprise.

**C.    Defendants' Lending Practices Through the American Web Loan Enterprise**

84.    From American Web Loan's inception in February 2010 and continuing through the present, Defendants have made online payday loans in the name of American Web Loan to individual borrowers throughout the United States at unlawful triple-digit interest rates. According to the American Web Loan website, AWL currently offers loans to residents of 45 states and the District of Columbia. The only states in which AWL loans are not available are Arkansas, Connecticut, Georgia, New York, and Washington. At least three of those states, Connecticut, New York, and Washington, are states in which financial or banking regulators have sought to take various actions against American Web Loan's lending practices. Another of those states, Arkansas, previously targeted Defendant Curry and his Geneva Roth/Loan Point USA payday lending operation.

85.    There are two additional limitations that apply to the availability of online payday loans from American Web Loan. As stated by Moncooyea in the Winter 2010 issue of the Tribe's newsletter: "[American Web Loan] is not available to Otoe-Missouria tribal members or the military." The fact that members of the Tribe cannot take out a loan from American Web Loan is telling. The Tribe does not want its own members, even those who may be faced with an urgent need for cash, to be victimized by the American Web Loan scheme.

**1.    Deceptive Marketing of Loans**

86.    Defendants market American Web Loan loans to individuals in several ways, including through direct mail solicitations. AWL loans are presented to potential borrowers as a responsible, quick, and easy way for people to obtain cash on a short-term basis. For example,

Plaintiffs received a "pre-approval" notice in the mail from American Web Loan. The notice, designed to look like a check payable to the recipient, announces that the person has been "pre-approved" for a certain dollar amount that can be provided "in as little as 1 day."



87.     The "pre-approval" notice is targeted at people who may find themselves short on cash due to unexpected situations and promises that American Web Loan can "help" with a short-term loan that can be used however the person wants. According to the "pre-approval" notice, all that the person has to do is go online and enter the "pre-approval code" provided, and the money he or she needs can be deposited in a bank account "as soon as tomorrow." The borrower is promised flexible terms, including the ability to "choose a monthly or bi-monthly term," no early repayment penalties, no hidden fees, and other choices in payment terms. There is, however, no information about the interest rate that would be charged on this "pre-approved" loan, nor is there any disclosure that that interest rate is illegal under the law of the borrower's home state. Moreover, the use of the term "bi-monthly" is deceptively ambiguous in that it implies the option of having a payment due every two months (and not, as borrowers have been surprised to find,

payments that are due every two weeks), particularly when following the term "monthly" in the particular sentence.



88.     Borrowers who go to the web address listed in the "pre-approval" notice, https://www.americanwebloan.com/money, are prompted to enter their pre-approval code and the last 4 digits of their Social Security number to "access your pre-approved offer."  Otherwise, borrowers who access the "home page" on the American Web Loan website are prompted to start their application by selecting the desired loan amount with a slider (in amounts from $300 to $2,500), entering their approval code (if applicable), and providing their last name, email address, and last 4 digits of their Social Security number.

**2.     Concealment of Critical Information About Class Members' Loans During the Application Process**

89.     The online loan application process on the American Web Loan website involves entering various details of the borrower's personal information and the account information for a bank account into which funds can be deposited – and from which payments to American Web

Loan can be withdrawn.   Prior to submitting the application, borrowers are directed to click through and verify certain information and to digitally "sign" for the loan using an electronic signature authorization.   At no point in the online application process are borrowers alerted to crucial facts concerning their loan including, for example: the annual percentage rate to be charged on the loan; the total amount of finance charges; and the total amount of payments to be made (principal plus interest) on the loan.   Further, while borrowers are informed about what the amount of their periodic payment will be, it is not made clear to the borrower how often those payments are due; for example, whether the amount is a monthly payment amount or a payment that is due weekly or every two weeks.   Borrowers also are not informed of language, discussed *infra*, purporting to require arbitration and the exclusive application of Otoe law.

90.   After receiving the loan from American Web Loan, Plaintiffs and members of the Class were surprised to find that they were expected to make payments every two weeks or on a weekly basis, not a monthly basis as they expected (and as suggested in AWL's marketing materials), significantly increasing their actual repayment burden.   For a borrower who saw a particular payment amount presented during the application process and understood that to be a monthly payment, the fact that the payment was actually due every two weeks would mean that their effective monthly payment was more than doubled.   This dramatic difference in the actual amount of the borrower's monthly debt burden is particularly problematic for people who are already stretched thin on their incomes and struggling to budget their monthly expenses – and who found themselves seeking short-term cash from American Web Loan in the first place.   Borrowers in this circumstance who call the telephone number provided by American Web Loan seeking to adjust their payment schedules to monthly payments are told that the loan terms cannot be changed.

91.     A principal reason for borrowers' confusion is that they only receive copies of the full loan agreements governing their loans *after* the loan is provided, if they receive them at all. Since the actual loan agreements are not shown to borrowers during the application process, borrowers could not have reviewed those agreements in their entirety before electronically "signing" them.  In fact, to the extent that the loan agreements purport to be "signed" using digital signatures from the borrowers, those signatures were not entered in a similar way to how one would sign in the appropriate blanks on a paper form.  Whatever the means of securing borrowers' authorization to use their digital signatures, those signatures were not "signed" on the actual loan documents in the places that they appear.

92.     In addition to concealing the terms of the AWL loan agreements during the application process, American Web Loan makes it difficult for borrowers to obtain the facts about their loans and the terms and conditions that govern them even after the loan is made.  While borrowers are provided with access to an online account access system, copies of their loan agreements are not made available through that system.  There is a "my documents" link within the online account access system.  However, no loan documents (including the purportedly signed loan agreement) can be found at that location.  In fact, Plaintiffs do not recall ever having seen copies of their loan agreements until after specifically requesting them from American Web Loan.

93.     Borrowers' loan agreements – which were not provided until after the loans were made – include a table with the title, "FEDERAL TRUTH-IN-LENDING DISCLOSURES" (a "TILA Box").  Federal law requires that credit terms be disclosed to consumers in a clear, conspicuous, and meaningful way *before any credit is extended* so that consumers fully understand the terms and costs of loans, and are otherwise protected against unfair or unlawful lending practices.  While the TILA Box included in borrowers' AWL loan agreements appears to provide

required information about the loan – including the interest rate as an annual percentage rate, the finance charge (*i.e.*, the total amount of the loan's costs), and the total amount of payments due under the agreement – that information was *not* provided to borrowers before they took out their loans. Borrowers' loan agreements also contain payment schedules for their loans, which show each payment due date and the amount due on that day. Those schedules, which indicate whether payments are due each month, every two weeks, or every week, also were not provided to borrowers before they took out their loans.

94. Additional material information in the loan agreements is withheld from borrowers during the loan application process. At no point during the loan application process are borrowers alerted to the fact that their legal rights would be severely limited as a result of taking out a loan from American Web Loan. For example, Plaintiffs were not informed that: (a) the loan was subject to the laws of the Tribe and that the law of the Tribe would be the *only* governing law; (b) consumer protections provided by the borrower's home state (including applicable interest rate caps) do not apply; (c) the borrower was waiving his or her rights to file a claim in state or federal court and could only assert his or her rights through arbitration or, if arbitration were waived, in a Tribal court located on the Tribe's land; and (d) the borrower was waiving his or her rights to participate in a class action.

**D. PLAINTIFF SOLOMON'S LOAN FROM AMERICAN WEB LOAN**

95. On or about December 19, 2016, Mr. Solomon went to the American Web Loan website and took out a $500 loan from American Web Loan. At the time he applied for the loan, Mr. Solomon was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments he would owe. Mr. Solomon also was not advised of any purported choice of law or arbitration provisions that might apply to the loan.

96.     After receiving his loan, Mr. Solomon was provided with a copy of his loan agreement.  He only received a copy of the loan agreement after calling to request it from American Web Loan.  Mr. Solomon had never seen this loan agreement before, and had not previously been informed that he was going to be charged an annual percentage rate of 726.13%, or that he would be expected to pay $1,543.16 in finance charges for a $500 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Mr. Solomon at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 726.13         % | $ 1,543.16 | $  500.00 | $ 2,043.16 |

97.     During the online loan application process, Mr. Solomon was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $500 that Mr. Solomon borrowed was deposited into his credit union account approximately one day after he completed his online loan application.

98.     On or about January 6, 2017, a first loan payment of $157.18 was automatically withdrawn from Mr. Solomon's credit union account via ACH transfer.  Thereafter, approximately five additional payments of $157.18 were automatically debited from Mr. Solomon's credit union account every two weeks.

99.     Absent certain exceptions, no one may make a loan to a resident of the Commonwealth of Virginia at an annual percentage rate greater than 12% unless the lender has obtained a consumer finance license from the Commonwealth.

100.    At the time Mr. Solomon took out his loan from American Web Loan, neither American Web Loan nor any other Defendant had obtained a consumer finance license from the Commonwealth of Virginia; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan.

101.    Under Virginia law, if a lender is not exempt from the 12% interest rate cap and has not obtained a consumer finance license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 12% per year, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

102.    Mr. Solomon's loan was unlawful and void under Virginia law, and the 726.13% interest rate charged was more than 60 times greater than the maximum allowable interest rate.

**E.     PLAINTIFF BELLECI'S LOAN FROM AMERICAN WEB LOAN**

103.    On or about May 23, 2017, Ms. Belleci was faced with an urgent need for $1,200. After running online searches, Ms. Belleci found the American Web Loan website, which offered instant approvals on loans that could be deposited into a bank account the next day.

104.    On or about May 23, 2017, Ms. Belleci submitted an online application through the American Web Loan website to request a $1,200 loan.   Shortly after submitting the online application, Ms. Belleci received a telephone call from a representative of American Web Loan on or about May 23, 2017.  Ms. Belleci was told that she was authorized to receive a loan of up to $1,500, but she confirmed her request to borrow only the $1,200 that she needed.

105.    At the time she applied for the loan, Ms. Belleci was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments she would owe. Ms. Belleci also was not advised of any purported choice of law or arbitration provisions that might apply to the loan.

106.    After receiving her loan, Ms. Belleci was provided with a copy of her loan agreement.  She only received a copy of the loan agreement after calling to request it from American Web Loan.  Ms. Belleci had never seen this loan agreement before, had not previously been informed that she was going to be charged an annual percentage rate of 595.06%, or that she would be expected to pay $4,085.55 in finance charges for a $1,200 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Ms. Belleci at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 595.06        % | $ 4,085.55 | $ 1,200.00 | $ 5,285.55 |

107.    During the online loan application process, Ms. Belleci was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.  The $1,200 that Ms. Belleci borrowed was deposited into her bank account on May 24, 2017, one day after she completed her loan application.

108.    When Ms. Belleci spoke with an American Web Loan representative on or about May 23, 2017, Ms. Belleci asked whether she could make loan payments manually through an online payment system instead of having loan payments automatically withdrawn from her bank account.  Ms. Belleci was told that she could not make online payments and that only automatic payments were permitted.

109.    On or about June 2, 2017, an initial loan payment of $264.32 was automatically withdrawn from Ms. Belleci's checking account via ACH transfer.  Thereafter, four additional payments of $264.32 were automatically debited from Ms. Belleci's checking account every two weeks, on June 16, June 30, July 14, and July 28, 2017.  The automatic withdrawals of $264.32 every two weeks were timed to match the frequency of Ms. Belleci's paychecks.

110.    On or about August 10, 2017, Ms. Belleci sought to pay off her loan from American Web Loan and close her account.  She was unable to pay off her loan online and had to call an American Web Loan telephone number to do so.  Ms. Belleci was shocked to learn that, on August 10, 2017, her loan payoff balance was $1,336.57 – *more than the amount she had borrowed two and a half months earlier*.  This was particularly infuriating since Ms. Belleci had made a total of $1,321.60 in payments (five payments of $264.32) and found herself still owing more than the amount she borrowed in the first place.  On or about August 10, 2017, Ms. Belleci authorized a payment of $1,336.57 to pay off her loan from American Web Loan and close her account.  Ms. Belleci paid a total of $2,658.17 for a $1,200 loan.

111.    Absent certain exceptions, no one may make a loan to a resident of Nebraska at an annual percentage rate greater than 6%, with a 16% annual percentage rate cap applicable to loans made pursuant to a valid contract.  Under Nebraska law, usury applies to loans with interest rates that exceed the 16% contractual maximum interest rate.

112.     While, in certain limited circumstances, Nebraska permits "payday lending" at interest rates that may exceed the state's usury cap, none of those circumstances apply to loans made by American Web Loan.  Among other things, only lenders that are licensed by the state may issue payday loans in Nebraska.

113.     At the time Ms. Belleci took out her loan from American Web Loan, neither American Web Loan nor any other Defendant had obtained a license from the state of Nebraska; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan.

114.     Under Nebraska law, if a lender is not exempt from the 16% interest rate cap and has not obtained a valid license, and nonetheless contracts to make a consumer loan and charges, contracts for, or receives interest or other compensation in excess of 16% per year, then the loan is deemed to be null and void and the lender is not able to collect, obtain, or receive any principal, interest, or charges on the loan.

115.     Ms. Belleci's loan was unlawful and void under Nebraska law, and the 595.06% interest rate charged was more than 37 times greater than the maximum allowable interest rate.

## F.     PLAINTIFF LITTLEJOHN'S LOAN FROM AMERICAN WEB LOAN

116.     An American Web Loan "pre-approval" notice was sent to Plaintiff Littlejohn via U.S. mail on or about June 1, 2017, informing Mr. Littlejohn that he had been "pre-approved" for a loan of $1,500.  The "pre-approval" notice indicated that the amount of Mr. Littlejohn's payment on the loan would "vary depending on if you choose a monthly or bi-monthly term."

117.     On or about June 3, 2017, Mr. Littlejohn went to the American Web Loan website and took out a loan from American Web Loan in the amount of $1,500.  In the process of applying for the loan, Mr. Littlejohn was not informed about the annual percentage rate of the loan, the

finance charge, or the total amount of payments he would owe.  Mr. Littlejohn also was not advised of any purported choice of law or arbitration provisions that might apply to his loan.

118.    At the time he applied for the loan, Mr. Littlejohn understood that he would be required to repay the loan through monthly payments in the amount of $170.38.

119.    After receiving his loan, Mr. Littlejohn was shocked to learn that he was expected to make *weekly* payments of $170.38 to American Web Loan for 51 weeks, with an additional, final payment of $156.31 due in the 52nd and final week of the loan term.  As a result of this materially different loan repayment schedule, Mr. Littlejohn's loan repayment obligations would have been the equivalent of a monthly payment of approximately $737.14.

120.    After receiving his loan, Mr. Littlejohn was provided with a copy of his loan agreement.  He only received a copy of the loan agreement after calling to request it from American Web Loan.  Mr. Littlejohn had never seen this loan agreement before, and he had not previously been informed that he was going to be charged an annual percentage rate of 597.35%, or that he would be expected to pay $7,345.69 in finance charges for a $1,500 loan.  Those and other key terms are shown in the following TILA Box that, while included in the loan agreement received from American Web Loan, was not provided to Mr. Littlejohn at any point during the loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 597.35       % | $ 7,345.69 | $  1,500.00 | $ 8,845.69 |

121. During the online loan application process, Mr. Littlejohn was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer. The $1,500 that Mr. Littlejohn borrowed was deposited into his bank account on or about Tuesday, June 6, 2017, two business days after he completed his loan application.

122. On or about June 9, 2017, an initial loan payment of $170.38 was automatically withdrawn from Mr. Littlejohn's bank account via ACH transfer. This initial payment was withdrawn only four days after Mr. Littlejohn received the loan funds in his bank account. Thereafter, approximately six additional payments of $170.38 were automatically withdrawn from Mr. Littlejohn's bank account on a weekly basis, on or about June 16, June 23, June 30, July 7, July 14, and July 21, 2017. The unexpected weekly automatic withdrawals drained Mr. Littlejohn's bank account and continued until a $500 overdraft limit was reached on Mr. Littlejohn's account. The overdrafts caused Mr. Littlejohn to incur substantial bank penalties and fees.

123. Under South Carolina law, the maximum interest rate that could have applied to any loan made to Mr. Littlejohn was 12% by a lender that, like American Web Loan, is not a "supervised lender" in South Carolina.

124. At the time that Mr. Littlejohn took out his loan from American Web Loan, neither American Web Loan nor any other Defendant was licensed to make loans in the State of South Carolina as a supervised lender; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan or otherwise comply with laws applicable to supervised lenders in South Carolina.

125.    Mr. Littlejohn's loan was unlawful and void under South Carolina law, and the 597.35% interest rate charged was nearly 50 times greater than the maximum allowable interest rate.

**G.    PLAINTIFF LOMAGLIO'S LOAN FROM AMERICAN WEB LOAN**

126.    An American Web Loan "pre-approval" notice was sent to Plaintiff Lomaglio via U.S. mail in approximately May 2017, informing Ms. Lomaglio that she had been "pre-approved" for a loan of $2,500.  The "pre-approval" notice indicated that the amount of Ms. Lomaglio's payment on the loan would "vary depending on if you choose a monthly or bi-monthly term."

127.    On or about May 23, 2017, Ms. Lomaglio went to the American Web Loan website and applied for a loan from American Web Loan in the amount of $2,500.  At the time she applied for the loan, Ms. Lomaglio was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of payments she would owe.  Ms. Lomaglio also was not advised of any purported choice of law or arbitration provisions that might apply to her loan.

128.    Minutes after Ms. Lomaglio completed the online loan application on May 23, 2017, she received a notification that her loan had been approved.  However, on next day, May 24, 2017, she received a telephone call from a representative from American Web Loan who told her that there was a problem with her loan application, specifically with respect to information regarding the frequency of Ms. Lomaglio's paychecks.  The American Web Loan representative pressed Ms. Lomaglio for information about how frequently Ms. Lomaglio was paid in connection with a part-time job, specifically asking whether she was paid weekly or every two weeks.

129.    Ms. Lomaglio submitted additional information to American Web Loan in connection with her loan application on or around May 26, 2017.  Ms. Lomaglio again was not informed about the annual percentage rate of the loan, the finance charge, or the total amount of

payments she would owe.  Loan funds in the amount of $2,500 were deposited in Ms. Lomaglio's

bank account on May 30, 2017, the next business day following the Memorial Day holiday.

130.    At the time she applied for the loan, Ms. Lomaglio understood that she would be

required to repay the loan through monthly payments in the amount of $249.35.

131.    After receiving her loan, Ms. Lomaglio was shocked to learn that she was expected

to make *weekly* payments of $249.35 to American Web Loan for 51 weeks, with an additional,

final payment of $248.42 due in the 52nd and final week of the loan term.  As a result of this

materially different loan repayment schedule, Ms. Lomaglio's loan repayment obligations would

have been the equivalent of a monthly payment of approximately $1,080.44.

132.    After receiving her loan, Ms. Lomaglio was provided with a copy of her loan

agreement.  She only received a copy of the loan agreement after calling to request it from

American Web Loan.  Ms. Lomaglio had never seen this loan agreement before, and had not

previously been informed that she was going to be charged an annual percentage rate of 481.60%,

or that she would be expected to pay $10,465.27 in finance charges for a $2,500 loan.  Those and

other key terms are shown in the following TILA Box that, while included in the loan agreement

received from American Web Loan, was not provided to Ms. Lomaglio at any point during the

loan application process.

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 481.60        % | $ 10,465.27 | $ 2,500.00 | $ 12,965.27 |

133.    During the online loan application process, Ms. Lomaglio was asked to provide, and did provide, bank account information to enable a prompt transfer of the loan funds via direct deposit/ACH transfer.   The $2,500 that Ms. Lomaglio borrowed was deposited into her bank account on May 30, 2017, the next business day after she submitted the additional information requested by American Web Loan, and one week after she initially submitted her online loan application.

134.    On or about June 1, 2017, an initial loan payment of $249.35 was automatically withdrawn from Ms. Lomaglio's bank account via ACH transfer.   This initial payment was withdrawn only one day after the loan funds were deposited in Ms. Lomaglio's bank account. Thereafter, ten additional payments of $249.35 were automatically debited from Ms. Lomaglio's checking account on June 8, June 15, June 29, July 6, July 13, July 20, July 27, August 3, August 10, and August 17, 2017.   The weekly automatic withdrawals of $249.35 were timed to match the frequency of the pay periods at Ms. Lomaglio's part-time job.

135.    In addition to the eleven payments made through weekly automatic withdrawals of $249.35, Ms. Lomaglio made two additional payments through the American Web Loan website to pay down the balance on her loan: a $300 payment on June 19, 2017 and a $600 payment on June 23, 2017.

136.    On August 21, 2017, Ms. Lomaglio sought to pay off the outstanding balance on her American Web Loan loan.   She logged in to her American Web Loan account on the site, https://myaccount.americanwebloan.com (which states that it is "powered by" Defendant GOLDPoint).   According to the "Loan Details" on the site, Ms. Lomaglio's loan then had a current balance of $250.56 with a "Current Pay Off Amount" of $264.26.   As shown in the following screenshot, Ms. Lomaglio's next scheduled payment was due on August 24, 2017.



137.    When Ms. Lomaglio clicked on the appropriate links to initiate the final payment and pay off her loan in full, she found that the payoff amount had *increased* to $271.11 from the amount that had been shown on the "Loan Details" page, $264.26.   Defendants' system did not allow Ms. Lomaglio to execute a payment in the amount of the "Current Pay Off Amount" as of the then-current date, August 21, 2017.   Rather, Defendants' system forced her payoff to be delayed until the final day in the current period, August 23, 2017 (the day before the next scheduled payment was due), resulting in an additional interest expense to Ms. Lomaglio of $6.85.



138.    On or about August 21, 2017, Ms. Lomaglio authorized a payment of $271.11 to pay off her loan from American Web Loan and close her account.  Ms. Lomaglio paid a total of $3,913.96 for a $2,500 loan (11 automatic withdrawals of $249.35, two additional payments totaling $900, and a final payment of $271.11).

139.    Under California law, the maximum annual interest rate that could have applied to any loan made to Ms. Lomaglio was 10%.  The 10% annual percentage rate cap applies to any loans that are not made by a licensed financial institution.

140.    At the time Ms. Lomaglio took out her loan from American Web Loan, neither American Web Loan nor any other Defendant was licensed to make loans in California; no Defendant has ever attempted to obtain such a license in connection with loans made in the name of American Web Loan.

141.    Ms. Lomaglio's loan was unlawful and void under California law, and the 481.60% interest rate charged was more than 48 times greater than the maximum allowable interest rate.

## H.    PURPORTED ARBITRATION CLAUSES IN PLAINTIFFS' LOAN AGREEMENTS ARE VOID AND UNENFORCEABLE

142.    Because American Web Loan is not licensed to make loans in any state in which Plaintiffs and members of the Class reside and/or because the loans were made through an illegal scheme, the loan agreements that purport to govern any online payday loans made by American Web Loan were void *ab initio*.

143.    Plaintiffs' purported loan agreements with American Web Loan not only violate the usury laws or applicable interest rate caps in the borrowers' home states, they include unconscionable choice of law and arbitration provisions that unlawfully seek to disclaim the application of federal and state law and impose the law of the Tribe as the sole governing law.

144.    Plaintiffs were not informed about these purported choice of law and arbitration provisions during the loan application process or otherwise prior to taking out loans from American Web Loan.  Moreover, Plaintiffs were not provided with copies of their purported loan agreements (that include the purported choice of law and arbitration provisions) at the time they took our their loans, nor were copies of the loan agreements made available to Plaintiffs through the American Web Loan online account access system at the website https//myaccount.americanwebloan.com.  Plaintiffs first learned about these terms after they

contacted American Web Loan to request copies of their loan documents, and were provided with copies of documents purporting to be their loan agreements, in approximately August 2017.

145.    The language in the purported form American Web Loan loan agreement states the following regarding the applicable governing law (emphasis added below):

> 23.  **Governing Law**: You understand that this Agreement is ***governed only by Tribal law*** and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution.  We operate solely in the Indian country of the Otoe-Missouria Tribe of Indians and have no operations in any state.  As such, ***neither we nor this Agreement are subject to any other federal or state law or regulation***, nor the jurisdiction of any court, unless so stated in this Agreement.  If any provision of this Agreement is held unenforceable, including any provision of the Waiver of Jury Trial and Agreement to Arbitrate, the remainder of this Agreement shall remain in full force and effect.  The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services.  Such voluntary use does not represent acquiescence of the Tribe to any federal law unless found expressly applicable to the operations of the Tribe.  You and we agree that the transaction represented by this Agreement involves interstate commerce for all purposes.

146.    The purported American Web Loan loan agreement also includes a purported arbitration provision (paragraph 22 of the agreement), under the heading "WAIVER OF JURY TRIAL AND AGREEMENT TO ARBITRATE" (the "Purported Arbitration Clause").  The Purported Arbitration Clause also expressly disclaims the application of state and federal law.  In the subsection concerning the location of arbitration and the description of the borrower's option to have the arbitration conducted within thirty miles of his or her residence, the Purported Arbitration Clause states (emphasis added): "this accommodation for you ***shall not be construed in any way*** (a) as a relinquishment or waiver of the sovereign status or immunity of the Tribe, or (b) ***to allow for the application of any law other than Tribal Law***, or (c) to constitute a transaction of business in any place other than the Indian country of the Tribe."

147.    The Purported Arbitration Clause also includes a subsection describing the exclusive application of Tribal law and exclusive judicial review by a Tribal court (emphasis added below):

**APPLICABLE LAW AND JUDICIAL REVIEW OF ARBITRATOR'S AWARD THIS AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW.** *The arbitrator shall apply Tribal Law and the terms of this Agreement*, including this Agreement to Arbitrate and the waivers included herein. The arbitrator may decide, with or without a hearing, any motion that is substantially similar to a motion to dismiss for failure to state a claim or a motion for summary judgment. The arbitrator shall make written findings and the arbitrator's award may be filed with a Tribal court. The arbitration award shall be supported by substantial evidence and *must be consistent with this Agreement and Tribal Law, and if it is not, it may be set aside by a Tribal court upon judicial review*. During the arbitration, the amount of any settlement offer made by us or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or we are entitled. *The parties will have the right to judicial review in a Tribal court* of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the *conclusions of law are erroneous under Tribal Law*. Judgment confirming an award in such a proceeding may be entered *only if a Tribal court determines that the award is supported by substantial evidence and is not based on legal error under Tribal Law*.

148.    Additional language in the "EFT Authorization Agreement" that is included within the purported American Web Loan loan documents also states that Tribal law is the only law to be applied under that section. That section (paragraph 10 of the "EFT Authorization Agreement") is substantially identical to the Governing Law paragraph in the main loan agreement (paragraph 23, quoted above in ¶ 145).

149.    The Purported Arbitration Clause includes a section with the heading, "RIGHT TO OPT OUT," which describes specific procedures that a borrower would be required to follow if he or she were to seek to opt out of the Purported Arbitration Clause. This supposed opt-out "right" is, however, completely illusory and unconscionable. Among other things, a borrower seeking to opt out of the Purported Arbitration Clause would need to provide written notification within 60 days of the "origination date" for the loan. Because borrowers were not notified of the choice of law and arbitration provisions in the loan agreements prior to or at the time of their taking out the loan from American Web Loan, they could not have been notified of this "right" unless they happened to request a copy of their loan agreements within the applicable time frame. Thus, for

the vast majority of borrowers, the 60-day opt-out window likely would close without the borrower ever having seen this provision.

150.    The purported opt-out "right" also is illusory and unconscionable because the *sole* alternative available to the borrower (assuming that he or she receives notice of this "right" and takes the necessary steps within the opt-out period provided) is to have his or her claim heard by a Tribal judge, in a Tribal court, on Tribal land located in rural Oklahoma.  The purported opt-out language states: "IN THE EVENT YOU OPT OUT OF THE AGREEMENT TO ARBITRATE, ANY DISPUTES SHALL NONETHELESS BE GOVERNED UNDER TRIBAL LAW AND MUST BE BROUGHT WITHIN THE COURT SYSTEM OF THE OTOE-MISSOURIA TRIBE."

151.    The Purported Arbitration Clause is unconscionable and unenforceable for the same reasons articulated by the U.S. Court of Appeals for the Fourth Circuit in *Hayes v. Delbert Services Corp.*, 811 F.3d 666, 673 (4th Cir. 2016), and *Dillon v. BMO Harris Bank, N.A.*, No. 16-1362, 2017 WL 1903475, at *4 (4th Cir. 2017).  Specifically, the Purported Arbitration Clause is invalid because it "purports to renounce wholesale the application of any federal law to plaintiffs' federal claims."  *Hayes*, 811 F.3d at 673.  Further, arbitration agreements like the Purported Arbitration Agreement are invalid when they provide that an "arbitrator shall not allow for the application of any law other than tribal law."  *Dillon*, 2017 WL 1903475, at *4.

152.    Like the arbitration provision invalidated in *Hayes*, the Purported Arbitration Clause here was created by Defendants (including Defendants Curry, American Web Loan, MacFarlane Group, and SOL) in a deliberate attempt to avoid the application of federal and state law through the use of unconscionable choice of law and arbitration provisions.  The use of arbitration as a means of circumventing the application of federal and state law, particularly in a

law avoidance scheme like the one engaged in by Defendants here, is not permitted under controlling law in this judicial circuit.

153.    Moreover, under controlling authority in this Circuit, no part of the unlawful Purported Arbitration Clause may be severed to preserve the remainder of Defendants' integrated scheme to contravene public policy.  *See Hayes*, 811 F.3d at 675-76.

154.    Plaintiffs are therefore entitled to a declaratory judgment that the governing law, forum selection, and Purported Arbitration Clause provisions of the American Web Loan loan agreements are unenforceable in their entirety.

## V.    CLASS ALLEGATIONS

155.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure ("Rule") 23(a) and 23(b)(1), (b)(2), and (b)(3), as representatives of the following Class:

> All persons who took out loans from American Web Loan.  Included in the Class are any persons who took out loans through the American Web Loan d/b/a entity known as Clear Creek Lending.  The Class period begins on February 10, 2010 and continues through the present.

Plaintiffs reserve the right to redefine the Class prior to certification.

156.    This action is brought, and may properly be maintained, as a class action pursuant to Rule 23.  This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.  The members of the Class are readily ascertainable from records maintained by Defendants.

157.    Numerosity.  Members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, based on information and belief, including information contained in the 2013 Middlemarch Presentation and other publicly available sources, Plaintiffs

believe that there are likely tens of thousands of individuals who are members of the Class. The exact number of Class members and their identities are known by Defendants or are readily ascertainable in Defendants' records.

158. <u>Typicality</u>. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs' claims are based on the same facts and legal theories as each of the members of the Class. Plaintiffs and all Class members were charged interest rates on online payday loans from American Web Loan that exceeded the lawful interest rate caps in their states of residence. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants in connection with the operation of the American Web Loan online payday lending scheme.

159. <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Class. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the other members of the Class. Plaintiffs have retained counsel that are competent and experienced in the prosecution of complex class action litigation and have experience with class action litigation involving tribal lending schemes. Plaintiffs' counsel will undertake to vigorously protect the interests of the Class.

160. <u>Commonality</u>. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual Class members. The claims of all Class members originate from the same misconduct and violations of law perpetrated by Defendants. The common questions include, but are not limited to:

  a. Whether the AWL Payday Lending Organization (defined below) is an enterprise under 18 U.S.C. § 1961(4);

  b. Whether Defendants Mark Curry, MacFarlane Group, SOL, and Medley, engaged and/or are engaging in the collection of unlawful debt in violation of 18 U.S.C. § 1962(c);

    c.   Whether Defendants Medley, Oakmont, Dinero, Chieftain, Dant, Middlemarch, DHI, and John Doe Defendants conspired with the AWL Payday Lending Organization in violation of 18 U.S.C. § 1962;

    d.   Whether American Web Loan is an arm of the tribe of the Otoe-Missouria Tribe of Indians;

    e.   Whether the purported arbitration agreement in Plaintiffs' and the Class' loan agreements is void and/or unenforceable.

    f.   Whether Defendants are liable for the failure to disclose material loan terms to Plaintiffs and members of the Class before Plaintiffs and members of the Class took out loans from American Web Loan;

    g.   Whether Defendants unlawfully required Plaintiffs and members of the Class to consent to the use of ACH transactions in connection with their loans;

    h.   Whether Defendants are liable to Plaintiffs and members of the Class for disgorgement or other remedies and, if so, in what amount; and

    i.   Whether Defendants are liable to Plaintiffs and the Class for reasonable attorneys' fees and expenses.

161.   <u>Superiority</u>.  Under Rule 23(b)(3), class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would entail.  The benefits of proceeding through the class mechanism, including providing injured persons with a method for obtaining redress on claims that could not

practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

162.     This action is also maintainable as a class action under Rule 23(b)(2) because Defendants have acted on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

163.     With respect to Rule 23(b)(1)(B), the prosecution of separate actions by each Class member would create a risk of adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

164.     Finally, class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

165.     Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VI.     CLAIMS FOR RELIEF

### COUNT ONE
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c), COLLECTION OF UNLAWFUL DEBT
### (AGAINST DEFENDANTS AMERICAN WEB LOAN, CURRY, MACFARLANE GROUP, SOL, and MEDLEY)

166.     Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

167.     At all relevant times, Defendants American Web Loan, Curry, MacFarlane Group, SOL, and Medley (the "RICO Defendants") were members and associates of an internet payday

lending enterprise (the "AWL Payday Lending Organization"), whose members and associates engaged in the collection of unlawful debt.

168.    The AWL Payday Lending Organization, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) – that is, a group of individuals and entities associated in fact.  In addition to the RICO Defendants, the AWL Payday Lending Organization has included Defendants Oakmont, Dinero, Chieftan, Dant, GOLDPoint, SHW, and John Does 1-100, as well as Non-Defendant Interested Parties the Tribe, Shotton, Moncooyea, Hopper, Geneva Roth Companies, and the September 2016 Shell Corporations.

169.    The enterprise is engaged in, and its activities affect, interstate commerce.  The AWL Payday Lending Organization has leadership based in Mission, Kansas and San Juan, Puerto Rico, and operates throughout the United States, including the Eastern District of Virginia.

170.    The AWL Payday Lending Organization constitutes an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

171.    The AWL Payday Lending Organization is led, controlled, and managed by the RICO Defendants.

172.    The purpose of the enterprise was and continues to be the enrichment of the RICO Defendants, and other members and associates of the AWL Payday Lending Organization through the collection of unlawful debt.

173.    RICO defines an "unlawful debt" as debt incurred in connection with "the business of lending money or a thing of value at a usurious rate under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).  The RICO Defendants

have violated RICO through the "collection of unlawful debt" as that term is defined in RICO, 18 U.S.C. § 1962(c).

174.    The means and methods by which the RICO Defendants and other members and associates conducted and participated in the conduct of the affairs of the AWL Payday Lending Organization was and continues to be the operation, direction, and control of the payday loan companies in the business of lending money at usurious rates under the laws of numerous states, including without limitation California, South Carolina, Virginia, and Nebraska, where the usurious rates were at least twice the enforceable rate.

175.    In operating and conducting the affairs of the AWL Payday Lending Organization, the RICO Defendants used proceeds from the collection of unlawful debt to further the operations and objectives of the AWL Payday Lending Organization.

176.    The RICO Defendants' leadership, management, and participation in the AWL Payday Lending Organization began at some point as early as February 2010, following the formation of Defendant American Web Loan, Inc. and continues to date to the detriment of individual consumers throughout the United States.

177.    The predicate acts of collection of unlawful debt are described herein and in particular in ¶¶ 95-141 herein.  The debts incurred by Plaintiffs and all other members of the Class are unlawful and unenforceable.

178.    As a result of the unlawful collection of illegal debt, Plaintiffs and members of the Class have been injured in their property in that they paid extortionate and illegal interest rates.

179.    As a direct and proximate cause of the RICO Defendants' violations of RICO, the RICO Defendants are jointly and severally liable to Plaintiffs and the putative members of the

Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT TWO
### VIOLATIONS OF RICO, 18 U.S.C. § 1962(d), RICO CONSPIRACY
### (AGAINST DEFENDANTS CURRY, AMERICAN WEB LOAN, MACFARLANE GROUP, SOL, MEDLEY, OAKMONT, DINERO, CHIEFTAIN, DANT, SHW, GOLDPoint, and MIDDLEMARCH)

180.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

181.    Beginning as early as February 2010, the RICO Defendants, as defined in Count One, being persons employed by and associated with the AWL Payday Lending Organization, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate 18 U.S.C. § 1962(c)—that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the AWL Payday Lending Organization through the collection of unlawful debt.  In addition, Defendants Medley, Oakmont, Dinero, Chieftain, Dant, Middlemarch, and GOLDPoint knowingly entered into agreements to facilitate the RICO Defendants' participation and management of the affairs of the AWL Payday Lending Organization and engaged in overt acts in furtherance thereof.

182.    Specifically, the RICO Defendants, along with other participants not yet known to Plaintiffs, violated § 1962(d) of RICO by entering into a series of agreements to violate § 1962(c). These agreements, include, *inter alia*: (a) agreements between and among Defendants Curry, MacFarlane Group, SOL, Shotton, and Moncooyea to create the necessary legal frameworks and entities to conduct the affairs of the AWL Payday Lending Operation; (b) agreements between and among Defendants Curry, MacFarlane Group, and SOL and Medley, Oakmont, Dinero, Chieftain, Dant (and other individuals and entities not presently known to Plaintiffs) to provide the necessary funds to conduct and expand the affairs of the AWL Payday Lending Operation; (c) agreements

between and among Defendants Curry, MacFarlane Group, and SOL and Middlemarch to solicit investors to provide the necessary funds to conduct and expand the affairs of the AWL Payday Lending Operation; (d) agreements between and among Defendant GOLDPoint and American Web Loan (and/or other Defendants) for the purpose of creating online account access mechanisms through which borrowers' unlawful debts were collected in furtherance of the AWL Payday Lending Operation; (e) agreements between and among Defendant Curry, Defendants MacFarlane Group and SOL, American Web Loan, and Shotton and others, to purportedly arrange for the sham "acquisition" of Defendant MacFarlane Group by the Tribe in approximately October 2016 in an attempt to further insulate the AWL Payday Lending Operation from state and federal law.

183.    Each of the agreements identified in the above paragraph contemplated that a conspirator would commit at least one collection of unlawful debt in the conduct of the affairs of the enterprise.

184.    As a result of the RICO Defendants' participation in the enterprise and the violations of RICO, the RICO Defendants are jointly and severally liable to Plaintiffs and the putative members of the Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**COUNT THREE**
**VIOLATIONS OF THE ELECTRONIC FUNDS TRANSFER ACT**
**(AGAINST DEFENDANTS CURRY, AMERICAN WEB LOAN, MACFARLANE**
**GROUP, SOL, MEDLEY, OAKMONT, DINERO, CHIEFTAIN, DANT, and GOLDPoint)**

185.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

186.    Defendants are "persons" as that term is defined in Section 1005 of Regulation E, 12 C.F.R. § 1005.2(j).

187.    Section 913(1) of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693k(1), provides that no person may condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers.

188.    Section 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1), provides that "[n]o financial institution or other person may condition the extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers, except for credit extended under an overdraft credit plan or extended to maintain a specified minimum balance in the consumer's account."

189.    The Official Interpretation of Regulation E, Section 1005.10(e)(1), 12 C.F.R. § 1005.10(e)(1)-1, Supp. I, provides that creditors may not require repayment of loans by electronic means on a preauthorized recurring basis.

190.    Under § 918(c) of the EFTA, 15 U.S.C. § 1693o(c), every violation of the EFTA and Regulation E constitutes a violation of the Federal Trade Commission ("FTC") Act.

191.    In connection with offering online payday loans to consumers, Defendants have conditioned the extension of credit on recurring preauthorized electronic fund transfers, thereby violating § 913(1) of the EFTA, 15 U.S.C. § 1693k(1), and § 1005.10(e)(1) of Regulation E, 12 C.F.R. § 1005.10(e)(1).

192.    Defendants' violations of the EFTA are ongoing.

193.    Defendants conditioned the online payday loans on the acceptance of "automated clearing house" ("ACH") electronic fund transfers as the transaction method.  To the extent that borrowers were, in fact informed of their funding and payment options during the loan application process or immediately thereafter (and, as alleged herein, it is likely that they were not since borrowers were not provided with a full copy of their loan agreement prior to or promptly after

receiving their loans), Defendants exploited borrowers' economic situation to compel their acceptance of ACH transfers.

194.    As alleged herein, American Web Loan loans are marketed to consumers as a way to obtain needed cash fast, specifically touting how the "pre-approved" amount of money could be in the borrower's bank account "in as little as 1 day!"  The only way for a person to obtain the needed funds this quickly without additional cost to the borrower, would be to enroll in electronic funds transfer via ACH.

195.    While American Web Loan purported to offer borrowers the option to receive their loan funds promptly via wire transfer, the loan documents stated that the borrower "will be responsible for any fees incurred from your financial institution for receiving a wire transfer credit, if any."  Incoming wire transfer charges vary at each financial institution, but many banks charge up to $20 for incoming wire transfers from a U.S. bank.  This is not an insignificant amount for someone who finds him- or herself in desperate need of short-term cash.  Moreover, unlike ACH authorization, which requires a borrower only to provide the ABA/routing number and account number from the bottom of an ordinary personal check, a wire transfer is not a transaction used by ordinary consumers.  Before electing to use a wire transfer, a borrower likely would need to take additional time and effort to obtain his or her bank's particular wire transfer instructions, inquire regarding applicable fees, and comply with the bank's paperwork or other administrative requirements associated with receiving a wire transfer.  Taking such additional steps to receive a wire transfer would, compared to the relative simplicity of ACH authorization, add delay to the process of getting the needed funds deposited into the borrower's bank account.

196.    American Web Loan also purports to offer borrowers the option of receiving their loan via paper check.  If the loan recipient requests that their loan be provided via a paper check,

the borrower could expect delivery of the check via U.S. Mail in 7-10 days. The American Web Loan loan documents indicate that interest begins accruing on the date that the lender issues the check. Depending on the payment terms of a borrower's loan, a borrower with weekly payments could have an amount due (including a payment of principal) before he or she actually receives the check. A borrower with payments due every two weeks could have their first payment due as little as two business days after receiving the check, with the first payment due date coming before the loan check can be deposited and cleared by the receiving bank.

197.     The purported loan documents also include a significant late payment penalty of $20 for any payment not received by AWL by the due date. If a payment is received after the due date, the loan documents contemplate the debiting of the $20 late fee before application to the outstanding balance. Further, the loan documents contemplate that a late payment can provide a basis for AWL to deem the borrower in default as a result of a single missed payment, causing the borrower's entire balance, including any fees, penalties, and accrued interest ("all sums due under this agreement") to become due immediately.

198.     To the extent that borrowers were provided with the terms of the loan agreement and its provisions regarding electronic funds transfer options, any choices with respect to opting for ACH or other methods were false choices, compelling the borrower to accept transfers by ACH, which is prohibited by the EFTA.

199.     By engaging in the violations of the EFTA and Regulation E set forth herein, Defendants have violated the FTC Act.

200.     As a result of Defendants' violations of the EFTA, Plaintiffs were damaged.

**COUNT FOUR**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(3)**
**FAILURE TO DISCLOSE FINANCE CHARGE**
**(AGAINST DEFENDANT AWL, INC.)**

201.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

202.    The Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA"), requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction.  Among these required disclosures is disclosure of the "finance charge."  15 U.S.C. §§ 1638(a)(3), 1638(b)(1).

203.    TILA creates a system of strict liability with respect to the statute's disclosure requirements.  If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

204.    TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g).  Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

205.    As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "finance charge" prior to extending credit to Plaintiffs and members of the Class.  As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension

of credit. Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

206.     As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(3) and disclose the applicable finance charge, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation. *See* 15 U.S.C. § 1640(a).

**COUNT FIVE**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(4)**
**FAILURE TO DISCLOSE FINANCE CHARGE EXPRESSED AS AN ANNUAL**
**PERCENTAGE RATE**
**(AGAINST DEFENDANT AWL, INC.)**

207.     Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

208.     TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction. Among these required disclosures is disclosure of the "finance charge expressed as an 'annual percentage rate,' using that term." 15 U.S.C. §§ 1638(a)(4), 1638(b)(1).

209.     TILA creates a system of strict liability with respect to the statute's disclosure requirements. If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

210.     TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

211. As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "finance charge expressed as an 'annual percentage rate,' using that term," prior to extending credit to Plaintiffs and members of the Class. As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit. Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

212. As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(4) and disclose the applicable finance charge expressed as an "annual percentage rate," using that term, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation. *See* 15 U.S.C. § 1640(a).

**COUNT SIX**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(5)**
**FAILURE TO DISCLOSE THE TOTAL OF PAYMENTS**
**(AGAINST DEFENDANT AWL, INC.)**

213. Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

214. TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction. Among these required disclosures is disclosure of the "sum of the amount financed and the finance charge, which shall be termed the 'total of payments.'" 15 U.S.C. §§ 1638(a)(5), 1638(b)(1).

215. TILA creates a system of strict liability with respect to the statute's disclosure requirements. If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

216.     TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g).  Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

217.     As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "total of payments," calculated as the sum of the amount financed and the finance charge, prior to extending credit to Plaintiffs and members of the Class. As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit. Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

218.     As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(5) and disclose the applicable "total of payments," calculated as the sum of the amount financed and the finance charge, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation.  *See* 15 U.S.C. § 1640(a).

**COUNT SEVEN**
**VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(6)**
**FAILURE TO DISCLOSE NUMBER, AMOUNT, AND DUE DATES OR PERIOD**
**PAYMENTS SCHEDULED TO REPAY THE TOTAL OF PAYMENTS**
**(AGAINST DEFENDANT AWL, INC.)**

219.     Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

220.     TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated

from all other terms or information provided in connection with the transaction. Among these required disclosures is disclosure of the "number, amount, and due dates or period of payments scheduled to repay the total of payments." 15 U.S.C. §§ 1638(a)(6), 1638(b)(1).

221. TILA creates a system of strict liability with respect to the statute's disclosure requirements. If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

222. TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

223. As alleged herein, Defendant AWL, Inc. violated TILA by failing to make the required disclosure of the applicable "number, amount, and due dates or period of payments scheduled to repay the total of payments," prior to extending credit to Plaintiffs and members of the Class. As further alleged herein, Plaintiffs were not provided with copies of their purported loan agreements during the loan application process or otherwise prior to the extension of credit. Plaintiffs only were provided copies of their purported loan agreements, which include key loan terms required to be disclosed pursuant to TILA, *after* Plaintiffs took out their loans.

224. As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(4) and disclose the applicable finance charge expressed as an "annual percentage rate," using that term, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation. *See* 15 U.S.C. § 1640(a).

## COUNT EIGHT
## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1638(a)(1)
## FAILURE TO DISCLOSE THE IDENTITY OF THE CREDITOR
## (AGAINST DEFENDANT AWL, INC.)

225.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

226.    TILA, 15 U.S.C. § 1601, *et seq.*, requires that lenders provide certain disclosures to borrowers before credit is extended and that those disclosures be conspicuous and segregated from all other terms or information provided in connection with the transaction.  Among these required disclosures is disclosure of the "identity of the creditor required to make disclosure."  15 U.S.C. §§ 1638(a)(1), 1638(b)(1).

227.    TILA creates a system of strict liability with respect to the statute's disclosure requirements.  If a "creditor" does not make a required disclosure before extending credit to a borrower, the "creditor" is liable for a violation of TILA.

228.    TILA narrowly defines "creditor" to refer to a person or entity who (a) regularly extends consumer credit payable in more than four installments or for which payment of a finance charge is or may be required and (b) is the person or entity to whom the debt "is initially payable on the face of the evidence of indebtedness."  15 U.S.C. § 1602(g).  Because Defendant AWL, Inc. is the nominal lender on Plaintiffs' loan agreements to whom the debt purports to be "initially payable," Defendant AWL, Inc. is a "creditor" for purposes of TILA.

229.    Here, given the nature of the unlawful online payday lending enterprise alleged herein, Defendant AWL, Inc. is not a "lender in fact," since it performs virtually no role in key lending functions, for example, the financing, marketing, origination, underwriting, servicing, or collection of loans made in the name of American Web Loan.  Moreover, as alleged herein, American Web Loan (including Defendant AWL, Inc.) is a sham front for the unlawful online

payday lending enterprise described herein.  Defendant AWL, Inc., as the nominal lender on Plaintiffs' loans, and thus the nominal "creditor" as that term is defined under TILA, had an obligation to inform Plaintiffs and members of the Class who the actual lender(s)/creditor(s) were on their American Web Loan loans.  Defendant AWL, Inc. failed to make such a disclosure, or any disclosure of the true nature of the online payday lending enterprise, prior to extending credit to Plaintiffs and members of the Class.

230.    As a result of Defendant AWL, Inc.'s failure to comply with 15 U.S.C. § 1638(a)(1) and disclose the true creditor on the loans taken out by Plaintiffs and members of the Class, Plaintiffs and members of the Class are entitled to recover actual or statutory damages in connection with this violation.  *See* 15 U.S.C. § 1640(a).

**COUNT NINE**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

231.    Plaintiffs reassert and incorporate by reference each of the preceding paragraphs as if set forth fully herein.

232.    Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the Class who were experiencing financial difficulties and taken advantage of through the American Web Loan online payday lending scheme.

233.    In equity and good conscience, those funds should be returned to the people victimized by Defendants' unlawful scheme.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully seek the following relief:

A.    Certification of this action as a class action and appointing Plaintiffs and their counsel (listed below) to represent the Class;

B.    A declaration that loans made in the name of American Web Loan are unlawful, unenforceable, and void.

C.    A finding that the Defendants have violated § 1962(c) of RICO through the collection of unlawful debt;

D.    A finding that Defendants have violated § 1962(d) of RICO through their conspiracy to engage in the collection of unlawful debt under § 1962(c) of RICO;

E.    A finding that Defendant AWL, Inc. violated TILA through the failure to disclose: (1) the "finance charge," 15 U.S.C. § 1638(a)(3); (2) the finance charge expressed as an "annual percentage rate," 15 U.S.C. § 1638(a)(4); (3) the "total of payments," 15 U.S.C. § 1638(a)(5); (4) the total, number, amount, and due dates or period of payments scheduled to repay the total of payments, 15 U.S.C. § 1638(a)(6); and (5) the identity of the creditor, 15 U.S.C. § 1638(a)(1).

F.    Awarding Plaintiffs and the Class equitable relief to the extent permitted by the above claims, including but not limited to: an accounting; a return of all unlawful interest and finance charges paid in connection with the loan; disgorgement of profits; a constructive trust; restitution; and/or any other remedy the Court deems proper;

G.    Treble damages under 18 U.S.C. § 1964.

H.    An injunction against further violations of law;

I.    An order awarding attorneys' fees and costs; and

J.    An award of any such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated:  December 15, 2017                     Respectfully submitted,

**MICHIE HAMLETT**
David W. Thomas
500 Court Square, Suite 300
P.O. Box 298
Charlottesville, VA 22902
Telephone: (434) 951-7200
Fax: (434) 951-7218
Email: dthomas@michiehamlett.com

**BERMAN TABACCO**
Kathleen M. Donovan-Maher (*pro hac vice* forthcoming)
Steven J. Buttacavoli (*pro hac vice* forthcoming)
Steven L. Groopman (*pro hac vice* forthcoming)
One Liberty Square
Boston, MA  02109
Telephone: (617) 542-8300
Fax: (617) 542-1194
Email: kdonovanmaher@bermantabacco.com
        sbuttacavoli@bermantabacco.com
        sgroopman@bermantabacco.com

**GRAVEL & SHEA PC**
Matthew B. Byrne (*pro hac vice* forthcoming)
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT  05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email: mbyrne@gravelshea.com

*Counsel for the Plaintiffs and the Class*