## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

**ROYCE SOLOMON, et al.,** *individually*
*and on behalf of all others similarly situated,*

     **Plaintiffs,**

  **v.**              **Civil Action No. 4:17cv145**

**AMERICAN WEB LOAN et al.,**

     **Defendants.**

### <u>OPINION & ORDER I</u>

These motions arise out of complicated lending scheme that appears to weave tribal immunity, forced arbitration, and several layers of corporate entities together in an attempt to avoid liability for allegedly usurious interest rates. The Court granted the parties additional time to complete extensive jurisdictional discovery. On February 5 and 6, 2019, the Court held a lengthy hearing to hear evidence and arguments concerning the various jurisdictional and related motions filed by Defendants. The Court ruled from the bench but hereby **ISSUES** this Opinion and Order, along with a companion Opinion and Order, to further explain its decisions.

At its core, this case involves a lending scheme envisioned by Mark Curry ("Curry"), whereby he and his corporate entities attempt to use the sovereign immunity of the Otoe-Missouria Indian Tribe (the "Tribe") to evade this lawsuit. Mindful of the strong federal policy favoring tribal immunity, self-governance, and a safe treasury, the Court cannot accept his arguments. Plaintiffs have produced enough evidence to show that Curry shifted all of the risk of his scheme to the Tribe and kept the lion's share of the revenue for himself, through a scheme that infringed upon the Tribe's self-governance and placed the Tribe's treasury at risk. In other words, Plaintiffs have made a sufficient showing that Curry was acting for himself, not for the Tribe.

In this Opinion and Order I, the Court will address the following:

1) Defendants American Web Loan, Inc., AWL, Inc., and MacFarlane's ("AWL Defendants'" or "AWL's") joint Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 72;

2) Defendant Curry's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 85;

3) Defendant Sol Partners' ("Defendant Sol's") Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 86;

4) AWL Defendants' Motion to Transfer Venue, Doc. 70;

5) Defendants Curry and Sol's Motion to Transfer Case, Doc. 83;

6) AWL Defendants' Motion to Compel Arbitration, Doc. 74; and

7) Defendants Curry and Sol's Motion to Compel Arbitration, Doc. 84;

For the reasons stated herein, the Court **DENIES** each of these motions.

## I.     BACKGROUND

Plaintiffs are four individuals who obtained loans from American Web Loan. ¶¶ 10-13. Plaintiffs allege that Defendant, Mark Curry, with the assistance of defendants American Web Loan, Inc. AWL, Inc., MacFarlane Group, Medley Management, Inc., Medley Group, LLC, Medley LLC, Medley Capital Corp., Medley Opportunity Fund II, LP (collectively "Medley" or "Medley Defendants"), Brook Taube, Seth Taube (collectively "the Taubes"), Middlemarch Partners, Inc. ("Middlemarch"), DHI Computing Service, Inc. d/b/a GOLDPoint ("GOLDPoint"), Sol Partners, Inc. ("Sol"), and John Doe Defendants (1-100), have pleaded the sovereignty of the Otoe-Missouria Indian Tribe (the "Tribe") as a defense to allegedly imposing usurious interest rates on short-term loans issued to individuals throughout the United States. Am. Compl. ¶¶ 1, 6.

Altogether, Plaintiffs' complaint alleges nine (9) different causes of action against the various defendants. In Count One, Plaintiffs allege that AWL, Curry, Sol, Medley and the Taubes engaged in the collection of unlawful debt in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Id. ¶¶ 209-22. In Count Two, Plaintiffs allege that the AWL, Curry, Sol, the Medley Defendants (which includes the Taubes), GOLDPoint, and Middlemarch engaged in a RICO conspiracy. Id. ¶¶ 223-27. In Count Three, Plaintiffs allege that the AWL Defendants, Curry, Sol, Medley, and GOLDPoint violated the Electronic Funds Transfer Act ("EFTA"). Id. ¶¶ 228-43. In Counts Four through Eight, Plaintiffs allege that Defendant AWL, Inc. committed several violations of the Truth in Lending Act ("TILA"). Id. ¶¶ 244-73. In Count Nine, Plaintiffs allege that Defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the putative class. Id. ¶¶ 274-276. Plaintiffs define the putative class of Plaintiffs as:

> All persons who took out loans from American Web Loan. Included in the Class are any persons who took out loans through the American Web Loan d/b/a entity known as Clear Creek Lending. The Class period begins on February 10, 2010 and continues through the present.

Am. Compl. ¶ 198.[1]

## II.    PROCEDURAL HISTORY

Plaintiffs initially filed their complaint on December 15, 2017. Doc. 1. An Amended Complaint was filed on March 9, 2018. Am. Compl. On April 9, 2018, the following motions were filed:

> (1) Medley Defendants and the Taubes' Motion to Dismiss for Failure to State a Claim and
>
> Failure to Join a Necessary Party, Doc. 62;

---

[1]Responses to Plaintiffs' Motion for Class Certification are due fifteen (15) days from the entry of this Opinion and Order. Docs. 379, 383.

(2) Medley Defendants and the Taubes' Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Doc. 64;

(3) AWL Defendants' Motion to Transfer, Doc. 70;

(4) AWL Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 72;

(5) AWL Defendants' Motion to Compel Arbitration, Doc. 74;

(6) AWL Defendants' Motion to Dismiss for Failure to State a Claim, Doc. 76;

(7) Middlemarch's Motion to Dismiss for Failure to State a Claim, Doc. 77;

(8) GOLDPoint's Motion to Dismiss for Failure to State a Claim, Doc. 81;

(9) Defendants Curry and Sol's Motion to Transfer Case, Doc. 83;

(10) Defendants Curry and Sol's Motion to Compel Arbitration, Doc. 84;

(11) Defendant Curry's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 85;

(12) Defendant Sol's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 86; and

(13) Defendants Curry and Sol's Motion to Dismiss for Failure to State a Claim, Doc. 87.

On June 8, 2018, Plaintiffs opposed each of the defendants' motions.[2] Docs. 109-115. On July 9, 2018, each defendant replied. Docs. 133-145.

On August 2, 2018, the Court held a status conference regarding this matter and then consolidated this action with Hengle v. Curry,[3] which had recently been transferred from the Richmond Division. Doc. 160.

Given the nature of the issues raised in the multiple jurisdictional and related motions, on August 2, 2018, the Court granted the parties time to conduct discovery on these issues. Id. The

---

[2] The Court had previously **GRANTED** Plaintiffs' Motion for extension of time to file opposition briefs. Doc. 92.

[3] This case was docketed as 4:18-cv-75. Now, both cases are under the primary number 4:17-cv-145.

4

Court allowed the parties approximately three (3) months to conduct discovery on the jurisdictional and venue matters. Doc. 201 (setting the jurisdictional discovery deadline at October 30, 2018). During this time, the parties took extensive discovery, including document production and depositions. Thereafter, the parties fully briefed their positions, attaching documents and deposition transcripts. See Docs. 223, 224, 226, 232, 246, 257, 265, 319. On November 6, 2018, Plaintiffs filed a supplemental brief opposing AWL Defendants' and Defendants Curry and Sol's Motions to Transfer. Docs. 221, 222. On November 13, 2018, AWL Defendants and Defendants Curry and Sol filed a supplemental brief in support of their Motion to Transfer. Docs. 231, 232, 235. On November 20, 2018, AWL Defendants and Defendants Curry and Sol, each filed a supplemental briefs in support of their Motions to Dismiss for Lack of Subject Matter Jurisdiction, and Plaintiffs filed a supplemental opposition to Defendants' Motions. Docs. 245, 246, 256, 257, 264, 265, 272, 273. On November 29, 2018, Plaintiffs filed a corrected supplemental opposition without objection.[4] Doc. 298-1. On December 11, 2018, AWL Defendants, Defendants Curry and Sol, and Plaintiffs each replied with supplemental briefs regarding subject matter jurisdiction. Docs. 309, 310, 314, 315, 316, 317, 318, 319.

In addition to the extensive briefing, the Court held an evidentiary hearing that spanned two days. Docs. 338, 345. At this hearing, Defendants called two witnesses, John Shotton, the Chairman of the Otoe-Missouria Tribal Counsel, and Mark Curry. Hearing Transcript, Day 1, at 7:4-5, 7:13-16, 70:16-117 (February 5, 2019). While Plaintiffs did not call any witnesses, they did present evidence through cross examination. Id. at pp. 35-68, 82-112. On the second day of the hearing, counsel for AWL Defendants, Medley Defendants, Middlemarch Defendants, DHI, and Plaintiffs presented oral arguments. Hearing Transcript, Day 2, (February 6, 2019). Having

---

[4] This corrected opposition dealt with clerical and typographical errors as well as correcting exhibit citations.

reviewed the papers and considered the evidence and arguments in this case, the Court **RULED** from the bench. It now provides this Opinion and Order to further explain its ruling.

## III.    MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A. Legal Standard

Federal district courts are courts of limited subject matter jurisdiction. Exxon Mobile Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Therefore, a court must generally dismiss a claim against a defendant if the Court lacks subject matter jurisdiction to hear the dispute. However, unlike a traditional motion to dismiss for lack of subject matter jurisdiction concerning diversity or federal question jurisdiction, a motion to dismiss based on sovereignty can be overcome by consent. Kiowa Tribe of Oklahoma v. Mfg Tech., Inc. 523 U.S. 751, 757 (2014). An assertion of sovereign immunity is appropriately addressed through challenging the Court's subject matter jurisdiction.[5] Smith v. Washington Metro. Area Transit Auth., 290 F.3d 201, 205 (4th Cir. 2002). The Court may accept evidence on any disputed jurisdictional facts without converting a motion to dismiss into a motion for summary judgment. See Richmond, Fredericksburg & Potomac R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).

### B. Background of Curry's Relationship with the Tribe and Formation of Tribal Entities[6]

#### i.    *The Tribe*

The Tribe is a federally-recognized Indian tribe located in Red Rocks, Oklahoma. Doc. 73-1 ("Shotton Decl.") ¶¶ 2, 13. Since the early 1700s, the Tribe has struggled to maintain its sovereignty due to western expansion, the spread of disease, and federal laws which forced the

---

[5] Plaintiffs argued that this Court should evaluate the issue of tribal sovereign immunity in the same manner as a motion to dismiss for failure to state a claim, taking their allegations as true, construing all facts in the light most favorable to them, and drawing all reasonable inferences in their favor. Doc. 111 at 24. However, the Court **REJECTS** this argument.

[6] The following facts constitute the factual findings of the Court insofar as they relate to the issue of subject matter jurisdiction, but may not be applicable to any other issue in this case.

Tribe to relocate and alter its primarily hunter-gatherer lifestyle. Id. ¶¶ 9-13. Because of the rural location of the Tribe, the Tribe has faced challenges employing its members and generating enough revenue to fund its government operations and provide services to its members.[7] Id. ¶ 19-20.

### ii.    Tribal Regulatory Structure

As a separate sovereign, the Tribe operates under its own constitution. In 1984, the Tribe adopted and ratified its constitution to establish a seven-member governing body, called the Tribal Council, to perform executive and legislative functions for the Tribe. Id. at ¶ 16; Doc. 73-2 ("Tribal Const."). The Tribal Council members serve three-year staggered terms, and elections are held each November. Id. ¶ 17. The Tribal Council has the authority to "transact business and otherwise speak on behalf of the Tribe . . . [and] appoint subordinate committees and representatives and delegate to them any of the Tribal Council's powers." Tribal Const. Art. VIII, Sect. 1. In 2006, the Tribal Council passed an act creating the Otoe-Missouria Development Authority ("OMDA"). Doc. 294-4. One of the purposes for creating the OMDA was, in relevant part, to "provide for the orderly creation and management of tribal business enterprises." Id. at 6.

### iii.    Beginning of Tribal Lending Operations and Creation of American Web Loan

After creating the OMDA, the Tribe began generating revenue by operating casinos. Doc. 250-5. However, the Tribe's revenue steadily dropped after other casinos, including one in a neighboring state, opened and began to increase competition. Doc. 246 at 3; Doc. 250-1 ¶ 37. The Tribe's chairman John Shotton ("Shotton") first learned about online lending through other tribes in Oklahoma. Doc. 250-3 ("Shotton Depo.") at 45-46, Depo. Tr. 176:15-177:8. In the beginning of 2009, Shotton was introduced to Mark Curry. Id. Approximately one year after his meeting with Curry, Shotton and the Tribal Council created the Consumer Finance Services Regulatory

---

[7] According to an expert report, forty-six percent (46%) of the Tribal Members over the age of 16 are unemployed. Doc. 250-1.

Commission to regulate the Tribe's lending operations. Doc. 249-7. Subsequently, the Tribal Council passed a resolution adopting the American Web Loan Act (the "AWL I Act"). Doc. 73-7 ("AWL I Act").

The stated purpose of the Act was to organize American Web Loan, Incorporated ("AWL I") and operate AWL I as a tribal corporation "for the purpose of providing revenues with which the Tribe may address other pressing matters of public health, safety, and welfare, or other tribal purposes." AWL I Act, at 4, § 201. The AWL I Act described AWL I as a "sub-agency of the Tribal Council and an agency of the Tribe" and created a separate Board of Directors of five (5) members, at least three (3) of whom were required to be members of the Tribe. Id. at 5, §§ 202-03. The Tribe entered into a contract with American Web Loan Holdings ("AWLH") to procure services necessary for its lending operations, and AWLH sometimes contracted with MacFarlane Group to perform those services. Shotton Depo. at 7, 24:23-25:12. During this time, Curry owned both AWLH and MacFarlane Group.

<i>iv.    Tribe's Acquisition of MacFarlane Group</i>

Toward the end of its contract with AWLH, the Tribe sent Curry a notice that they intended to renegotiate the contract. Shotton Depo. at 47, 181:4-9. Curry presented the tribe with three options, one of which included the sale of MacFarlane Group to the Tribe by way of "seller take back financing" by which "[t]he seller would structure the sale over a 5-year period and a 2nd [International Financing Entity] may provide debt funding for the tribe." Doc. 250-7. After lengthy negotiations, the Tribe elected this option and formed another tribal entity, Red Stone, to purchase MacFarlane Group, AWLH and a company named Bullet Hole (collectively the "Newcos") from Curry. Docs. 250-13 ("Promissory Note"). To obtain part of the funding for the purchase, Red Stone entered into a promissory note (the "Note") with three Delaware corporations,

8

all controlled by Curry: First Infinity CM Holdings, Inc.; First CM Holdings, Inc.; and First Mountain Holdings, Inc. (collectively the "Note Holders"). Id. The other portion of funding was provided by entering a consulting agreement with Sol Partners (the International Financing Entity referred to above), again controlled by Curry. Doc. 250-15. Simultaneously, Red Stone also entered into a Security Agreement with the Note Holders to provide Note Holders with a priority security interest in all of Red Stone's "right, title and interest in and to all of [Red Stone's] assets . . . whether now or hereafter existing . . . tangible or intangible . . . now owned or hereafter acquired." Doc. 250-14 at 2. Each of the Note Holder entities and Sol Partners is owned by Curry. After the merger, the Tribe renamed American Web Loan Incorporated, AWL, Inc. ("AWL II"), and Red Stone transferred the Newcos along with its rights and liabilities under the Note and Security Agreement to AWL II. Doc. 250-16.

### v.    Terms of Promissory Note

The Note ensures that the Note Holders are paid $2,018,154.86 monthly over the five-year term of the Note, plus ten percent (10%) interest. Promissory Note at 24. The Note also sets forth "Governing Covenants" whereby the note requires the Purchaser (now AWL II) "to be managed by a board of directors or managers . . . with six (6) members,"[8] of which three (3) are appointed by the majority of the Note Holders and the other three (3) are appointed by the Tribe. Id. at 13

The only way for the Tribe to appoint a majority of members on the board is for the Tribe to first pay off eighty-five percent (85%) of the Note. Id. This results in three (3) out of six (6) of the board members being appointed by the Curry-owned entities. Id. The Note also requires that actions taken by the board have the consent of at least four (4) members. Id. The Note considers

---

[8] The Note changes the governance from five (5) members in which three (3) must be Tribe members, to six (6) members, three (3) of whom are selected by Curry, and a majority of four (4) of whom must approve board actions. Prom. Note ¶ 8.1.

9

any change to this leadership structure, except as otherwise provided, a "default" under the loan. Id. at 13. Other events of default include "Adverse Tribal Government Action" and an "Adverse Change of Tribal Law."[9] Id. The Note also requires, as discussed in more detail, infra, that AWL II's Net Revenues are first paid toward operating expenses, which include the Note plus the amount due to Defendant Sol under the consulting agreement: $199,333.33 per month, wages and payroll taxes. Id. at 9. Further, without consent of the Board, the Tribe is prohibited from: increasing compensation to any employee, hiring any new employee making more than $50,000 a year, unless that employee is replacing someone who made less than $100,000 annually; incurring, assuming, or guaranteeing any debt except as permitted by the Budget approved by the Board; making capital expenditures or commitments in excess of $100,000 unless in accordance with the Budget; or assigning, transferring, or distributing any material portion of its assets or any of the Equity Interests as defined by the Merger Agreement. Id. at 7.

### vi. Tribe's Consulting Agreement with Sol Partners

Under the consulting agreement, Sol Partners agreed to provide advice to AWL II's executive management in regard to its operation of AWL II and other reasonable services,

---

[9] The Note defines an "Adverse Change of Tribal Law" as:
  (a) Enacting any bankruptcy law or similar law for the relief of debtors that would impair, limit, restrict, delay or otherwise adversely affect any of the rights and remedies of any [Note] Holder or its Affiliates under this Note or any other Transaction Document;
  (b) Adopting enacting, promulgating or otherwise placing into effect any Tribal Law which impairs or interferes in any manner, with any Holder's or its Affiliate's rights under, or ability to carry out the intentions of, this Note or any other Transaction Document, except as may be required to adhere to future changes in federal law;
  (c) Demanding, imposing or receiving any tax, charge, assessment, fee or other imposition, or imposing any regulatory or licensing requirement against any Holder or its Affiliates pursuant to either this Note or any other Transaction Document or any Holder or its Affiliates' rights and privileges hereunder or thereunder, except as may be required to adhere to future changes in federal law; or
  (d) Using its powers as a sovereign to take (through physical or regulatory taking) any property of any Holder or its Affiliates, including, without limitation its rights and entitlements under this Note and the other Transaction Documents.
Promissory Note at 3. The Note defines "Adverse Tribal Government Action" as "the Tribe or its members engaging in any takeover accomplished either with the use of force, including any actual disruption of the duly elected Tribal Counsel." Id.

including engaging in lobbying and advocacy efforts on behalf of AWL II, providing guidance and expertise in AWL II's lending operations, and advising AWL II's executive management team. Doc. 250-15 at 2. In exchange for their services, Sol Partners is paid a fee of $1,933,333.33 per month over the course of five years. Id. According to an e-mail sent by Mark Curry, the consulting agreement with Sol was "basically assigning part of the purchase amount to the SOL entity for tax purposes." Doc. 287-16 at 3.[10]

### vii.    Revenue from AWL II

The Note sets forth a structure for how revenues from AWL II would be disbursed. Specifically, priority for the use of net revenues shall be "to pay Operating Expenses for such Contract Month." Promissory Note at 10. These "operating expenses" include "fees payable pursuant to the consulting agreement; bad debt expense; lead verification costs; salaries, wages and payroll taxes." Id. at 7. The remaining money is split up in monthly tribal payments, and monthly holder payments, which are distributed in a manner such that "for every 60 cents . . . paid to all Holders in the aggregate as Monthly Holder Payments for any Contract Month, 40 cents shall be paid to the Tribe as a Monthly Tribal Payment for such Contract Month until such time as the Monthly Tribal Payment for such contract month has been paid in full." Id. at 9-10. Any payments in excess of this amount "shall be applied to the corresponding Monthly Holder Payments." Id. The Monthly Tribal Payments are limited to 1/12 of the "Annual Threshold."[11] Id. at 10. These monthly payments enable the Tribe to fund many beneficial initiatives, such as youth programs, language-education programs, tribal daycare, and the tribal government. Doc. 73-1 ¶¶ 40-46. In 2017, twenty-two percent (22%) of the funds distributed into the Tribe's general fund and seventy-

---

[10] Any such deal must have a valid business purpose and may not be directed to only saving taxes.
[11] The Annual Threshold is a set amount per year that steadily increases. In the first year, the Annual Threshold was $6,000,000 per year. This meant that the Monthly Tribal payment was a maximum of $500,000 per month.

eight percent (78%) of the funds distributed into the OMDA came from revenue generated by AWL, Inc. Doc. 250-1 at 46-48, Tables 16, 17.

*viii.    Current Management of AWL II*

After the Note, Security Agreement, and Consulting Agreement were executed, the Tribe adopted a resolution and appointed its three (3) board members. Curry also appointed his three (3) members, including himself. Doc. 73-9 ("AWL II Act") at 2. The Tribe also appointed Curry to serve as CEO of AWL II. Shotton Depo. at 5, 26:21-23. A majority of the employees and executives who work for AWL II are not members of the Tribe and are individuals who previously worked in some capacity with a Curry controlled entity, MacFarlane Group, before it was acquired by AWL II. However, AWL II's Oklahoma office does employ approximately ten (10) individuals who are members of the Tribe. Ex. 46. At least one tribal member has obtained a management position. Doc. 252-7 ("Hamilton Decl.") ¶ 5. Additionally, a large portion of jobs performed for AWL II are done by employees of RS LLC, a wholly owned subsidiary of Red Stone. However, these jobs are based in Kansas at the same address that was previously listed for MacFarlane Group. Doc. 280-2 at 7.

*ix.    AWL II's Lending Activities in Virginia*

One of the plaintiffs, Royce Solomon ("Mr. Solomon"), is a resident of Virginia who applied online for a loan from AWL II on or about December 19, 2016. Doc. 79-1 ("Solomon Loan Agreement"). The annual percentage rate for Mr. Solomon's loan is 726.13%, which is well above the maximum interest rate cap of 12% provided by Virginia law. Id; Am. Compl. ¶¶ 139, 142. Plaintiffs allege that neither American Web Loan nor any other Defendant has obtained a consumer finance license from Virginia. They further allege that no Defendant has received an exemption from Virginia's interest rate cap. Am. Compl. ¶¶ 144. Therefore, unless AWL

Defendants are entitled to sovereign immunity, or tribal law is applicable to the interest rate in the loan agreement,[12] they are subject to suit for the violations alleged in the Amended Complaint. Defendants Curry and Sol may also be subject to suit for their actions as agents of AWL II.

## A. Discussion

### i.    *Tribal Sovereign Immunity*

Indian tribes are federally recognized sovereigns that possess, subject to Congressional action, "common-law immunity from suit traditionally enjoyed by sovereign powers." Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 788 (2014) (internal quotations omitted). This immunity applies to commercial activities, even when they take place off tribal lands. Id. at 790 (citing Kiowa, 523 U.S. at 758). "Tribal sovereign immunity may extend to subdivisions of a tribe, including those engaged in economic activities, provided that the relationship between the tribe and the entity is sufficiently close to properly permit the entity to share in the tribe's immunity." Breakthrough Mgt. Group, Inc. v. Chukchansi Gold Casino and Resort, 629 F.3d 1173, 1183 (10th Cir. 2010); see also Thomas v. Dugan, 168 F.3d 483 (4th Cir. 1998) (unpublished opinion) (table decision) ("Tribal entities and individual tribal officers acting within their representative capacity within the scope of their authority are also shielded by sovereign immunity.").

To determine whether a commercial entity's relationship is sufficiently close to permit the entity to share the tribe's immunity, thereby acting as the "arm of the tribe," several courts have applied the factors set forth by the Tenth Circuit in Breakthrough Management. 629 F.3d at 1187; see also White v. Univ. of California, 765 F.3d 1010, 1025 (9th Cir. 2014) (applying Breakthrough factors); Williams v. Big Picture Loans, LLC, 329 F.Supp.3d 248, 269 (E.D. Va. 2018) (applying Breakthrough factors to determine whether tribal sovereign immunity extended to an alleged "arm of the tribe"); Howard v. Plain Green, LLC, 2017 WL 3669565 (E.D. Va. Aug. 7, 2017), report

---

[12] This issue is addressed infra, Section V.

and recommendation adopted, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017) (same). Among these factors are "(1) the method of creation of the economic entities; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) the tribe's intent with respect to the sharing of its sovereign immunity . . . (5) the financial relationship between the tribe and the entities;" and (6) "the policies underlying tribal sovereign immunity and its connection to tribal economic development, and whether these policies are served by granting immunity to the economic entities." Id. Put simply, the Court must determine whether a tribal entity is "analogous to a governmental agency, which should benefit from the defense of sovereign immunity" or whether it is more like "[a] commercial business enterprise, instituted solely for the purpose of generating profits for [its] private owners." Id. at 1184 (internal quotation and citation omitted).

ii.    *Functional vs. Formal Approach*

AWL Defendants contend that courts within this district are split as to whether an evaluation of the Breakthrough factors requires a formal or functional inquiry. Doc. 246 at 12 (citing Williams, 329 F. Supp. 3d 248 (E.D. Va. 2018); Howard v. Plain Green, LLC, 2017 WL 3669565 (E.D. Va. Aug. 7, 2017), report and recommendation adopted, 2017 WL 3669096 (E.D. Va. Aug. 24, 2017); Everette v. Mitchem, 146 F. Supp. 3d 720, 723 (D. Md. 2015)). They claim that Howard and Everette adopt a "formal" approach, which conducts the Breakthrough inquiry based on a review of the "readily available documents and analogous sources, such as the entities, articles of incorporation, financial documents, and tribal law." Doc. 246 at 12. In contrast, the Williams court applied a "functional" approach, examining not only the formal documents, but how the tribal entity operates. See Williams, 329 F. Supp. 3d, passim. The Court relied heavily on a case from the Supreme Court of California, People ex re. Owen v. Miami Nation Enters, 386

14

P.3d 357 (Cal. 2016), in which the court reasoned that the Breakthrough factors should be evaluated by "tak[ing] into account both formal and functional considerations—in other words, not only the legal or organizational relationship between the tribe and the entity, but also the practical operation of the entity in relation to the tribe." Miami Nation, 386 P.3d at 365.

The Tenth Circuit has cited Miami Nation in a manner that supports the functional approach. See Finn v. Great Plains Lending, LLC, 689 Fed. App'x. 608, 610-11 (10th Cir. 2017) ("We conclude that a more satisfactory showing regarding the actual workings of Great Plains and its financial relationship with the Tribe is necessary for a thorough consideration of the Breakthrough factors.") (citing Miami Nation in support of the importance of jurisdictional discovery). Further, the circumstances in Howard appear to be distinguishable from the circumstances in this case, as there is no indication that any jurisdictional discovery was taken, the plaintiff apparently failed to offer evidence to refute the tribal entity's sovereign immunity. See Howard, 2017 WL 3669565 at *2 n. 5. Therefore, this Court evaluates the issue of arm-of-the-tribe immunity by applying the Breakthrough factors from both a formal and functional standpoint.

### iii.  *Breakthrough Factors*

#### a.  Method of Creating Tribal Entities

"The first factor focuse[s] on the law under which the entity was formed. Formation under tribal law weighs in favor of immunity, whereas formation under state law has been held to weigh against immunity." Williams, 329 F. Supp. 3d at 271 (internal quotations and citation omitted). The Court should also look at the "circumstances under which the entity's formation occurred, including whether the tribe initiated or simply absorbed an operational commercial enterprise." Miami Nation, 386 P.3d at 371.

While it is true that AWL II was created by "resolution of the Otoe-Missouria Tribal Council under the Tribe's Corporation Act" and operates pursuant to tribal law "including the Tribe's Consumer Financial Services Ordinance," Doc. 73 at 14; Doc. 246 at 16, shortly before that resolution, AWL II absorbed several existing, non-tribal entities. Doc. 298-1 at 40. Here, MacFarlane Group, AWLH, and Bullet Hole were purchased by Red Stone and then merged into the newly formed entity AWL II, which was then formally adopted as a tribal entity by Tribal resolution. See Section III(B)(iv). In a similar case, Hunter v. Redhawk Network Sec., LLC, a pre-existing non-tribal entity was purchased and then merged with a subsidiary of the Tribe's Business Development Corporation and reformed as a limited liability company. Case No. 6:17cv962 2018 WL 4171612, at *2 (D. Or. Apr. 26, 2018). In finding that the purchase weighed against sovereign immunity, the court reasoned that the Tribe's Business Development Corporation acted primarily as a holding company for the Tribe's assets. Id. at *2-3 (internal quotations omitted). Therefore the Court was unable to determine whether the entity had been transformed from "a mere business holding into an arm-of-the-tribe." Id.

AWL asks this Court to focus on the resolution adopting AWL II. Doc. 73 at 14; 246 at 16. Plaintiffs, however, argue that while the AWL entities were "created" by the Tribe, they were created "as a means to help Defendants Curry and MacFarlane and other entities avoid liability" for issuing usurious loans. Doc. 298-1 at 39. In other words, Plaintiffs ask the Court to consider the facts leading up to the resolution as well. See Doc. 298-1 at 40.

While the purpose for which AWL II was formed may be called into question, that inquiry is better addressed under the second Breakthrough factor. See Williams, 329 F. Supp. 3d at 272-73 (noting that circumstances surrounding the tribal entity's creation, such as the pressure mounting against rent-a-bank schemes, "limits the extent to which [the first factor] weighs in favor

of sovereign immunity" and declining to examine under first factor). Therefore, the Court **FINDS** this factor is neutral at best as to whether it weighs in favor, or against, sovereign immunity.

### b. Purpose of Tribal Entities

The second factor considers both "the stated purpose for which the entity was created and the degree to which the entity actually serves that purpose." Miami Nation Enterprises, 386 P.3d at 372; Williams, 329 F. Supp. 3d at 273; Breakthrough, 629 F.3d at 1192-1193 (examining the allocation of revenue). Where an entity's "declared purpose is to further the tribe's economic development," it "may bolster its case by proving, for example, the number of jobs it creates for tribal members or the amount of revenue it generates for the tribe." Miami Nation, 386 P.3d at 372-73. However, evidence that the entity "operates to enrich primarily persons outside the tribe or only a handful of tribal leaders weighs against finding that the entity is an arm-of-the-tribe." Id. In Williams the court examined whether "the execution of that purpose" supports the stated purpose for the entities' formation. Williams, 329 F. Supp. 3d at 273.

Revenue distribution is critical to resolving how the second factor weighs. At the evidentiary hearing, Chairman Shotton testified that the Tribe's revenue before the acquisition of AWLH, MacFarlane Group and Bullet Hole amounted to only one percent (1%) of what Defendant Curry received. Additionally, Curry testified that before the Tribe acquired MacFarlane Group, he received an estimated total of $110 million in profits, while the Tribe received only $8 million. Based on the distribution of revenue and profits to the Tribe, it appears that the purpose of AWL II primarily serves to benefit Curry, rather than benefitting the Tribe.

Nevertheless, AWL argues that this factor should weigh in favor of sovereign immunity as the AWL I Act states that AWL II was established "to generate long-term and sustainable revenue . . . so that the Tribal Council may better provide essential government services to the Tribe's

membership." AWL II Act, § 204. AWL I had a similar purpose of providing revenue to address matters of public health, safety, and welfare for the Tribe. Doc. 73-7 §201. AWL contends that AWL II functions to serve this purpose. In support of this point, AWL indicates that fifty percent (50%) of the dividends that the Tribe receives goes to the Tribe's general fund to help fund various educational and social programs, and fifty percent (50%) of the funds goes to the OMDA, which helps run the Tribe's other economic activities that provide job opportunities and promote economic development for the Tribe. Doc. 246 at 19. AWL argues that the overall percentage of tribal employees employed by AWL II compared to outside employees is irrelevant to this consideration. Notwithstanding their argument, AWL notes that twenty percent (20%) of the employees that work from AWL II's Oklahoma location are "enrolled in or affiliated with the Otoe-Missouria Tribe." Doc. 246 at 20.

Plaintiffs argue that while the tribal entities have a stated purpose to promote self-governance, the entities have generated little revenue for the Tribe compared to what non-members receive, there are few jobs for tribal members, and the entities "primarily serve to enrich Curry and other non-tribal individuals and entities." Doc. 298-1 at 42. Plaintiffs cite Williams, which found that this factor weighed against sovereign immunity when a tribal lending agency's promissory note limited the funds available to the tribe to five percent (5%) of the monthly revenue for the tribal entity, and the tribal entity did not employ many members of the Tribe. Williams, 329 F. Supp. 3d at 275-76. Similarly, Plaintiffs contend that the Tribe receives only 3.6% of the revenue generated by AWL II and that the Note ensures that the Curry entities (Sol and the Note Holders) receive $4,000,000.00 per month, not including any salary that Curry is separately paid as a board member or CEO of AWL II. This, Plaintiff argues, is in stark contrast to the Breakthrough entity, which provided one hundred percent (100%) of its revenue to various tribal

services. Plaintiffs also highlight that: AWL II employs fifty people, of whom only six are members of the Tribe; neither Red Stone nor RS, LLC, who collectively employ 137 employees, employ a single member of the Tribe; and that the three tribal board members receive substantially greater compensation than other individuals employed by AWL II.[13]

While it does appear that the Tribe receives some benefit, Plaintiffs' arguments are persuasive. The Tribe received a drastically smaller percentage of the revenue than Mr. Curry. Thus, the Court **FINDS** that this factor weighs heavily against sovereign immunity.

**c.    Structure, Ownership, Management, and Control the Tribe has over the Entities**

This factor examines the leadership structure of the entity claiming immunity, including the entity's governing structure, the extent to which it is owned by the tribe, and the entity's day-to-day management. Williams, 329 F. Supp. 3d at 277; see Breakthrough, 629 F.3d at 1193. Standing alone, the fact that a Tribe outsources part of its management to a nontribal member is not sufficient to tip the scales against sovereign immunity. Williams, 329 F. Supp. at 248.

In Williams, the lending agency was one hundred percent (100%) owned and operated by another tribal entity, which was 100% owned and operated by the Tribe. Williams, 329 F. Supp. 3d at 277. The lending agency was co-managed by two tribal members appointed by majority vote of the tribal council. Id. The managers had broad authority but were not allowed to waive the tribal lending agency's sovereign immunity unless they had a majority vote from the tribal council. Id. The tribe otherwise had a substantial role in operations, as a number of tribal members were employed by the tribal lending agency and the tribal lending agency conducted all of its operations on the reservation and the CEO of the tribal lending agency was also a member of the tribe. Id. Therefore, the general structure appeared to ensure that the lending agency was answerable to the

---

[13] This includes a $25,000 bonus that each board member received after the 2016 merger. Doc. 282-16 at 399.

tribe, which supported granting sovereign immunity. Id. However, where evidence revealed that in practice significant day-to-day responsibilities were being performed by another entity with little oversight by the tribal lending agency and that the other entity was making managerial decisions, the Court concluded that this factor weighed against sovereign immunity. Id. at 278.

Here, the structure of the board does not give the Tribe majority control. It gives Curry's entities equal power to operate and requires a majority vote of at least four members to make significant decisions. Compare Breakthrough, 629 F.3d at 1193 (structure of board weighed in favor of immunity where all seven members of board were directors but against immunity where twelve out of fifteen of directors of separate entity were not tribal members). Thus, the Tribe could not effect a change without having at least one Curry-appointed member agree. Moreover, the Note has several requirements that undermine any Tribal autonomy notwithstanding the presence of three members on the board. For example, the Note requires that the tribal entity appoint three members from Curry's entities until the loan is eighty-five percent (85%) paid off, or the entity would be considered in "default." Additionally, Curry, a non-tribal member, serves as both CEO and board member of AWL II; owns all the Note Holder entities that provided AWL II's loan; holds, through the Note Holder companies, a security interest in all of AWL II's assets; and owns Sol Partners with whom AWL II contracts to consult, at great expense, upon a substantial portion of AWL II's functions. All of these positions allow Curry to exercise authority over AWL II's day-to-day functions. The Tribe's autonomy is further limited by provisions in the Note which deem the tribal entity in default if there is any "Adverse Tribal Government Action" or "Adverse Change of Tribal Law." These provisions weigh against any argument that the Tribe exercises meaningful control over AWL II.

AWL argues that the Tribe "is [AWL II's] sole shareholder, operator, and regulator" and that the power shared between the tribal officials and "industry experts" is equal, such that at least one Tribal member must consent for board action to occur. Doc. 73 at 15. Furthermore, as the board Chair, Shotton is deemed responsible for the "general and active charge of the entire business and affairs of the Corporation." Doc. 246 at 21 (citing Ex. 23 at -067). The board meets monthly and has taken initiatives to support the Tribe such as relocating a portion of AWL II's office in Nevada to Red Rock. Doc. 246 at 23. AWL maintains that AWL II's reliance on others for "managerial oversight" is analogous to how the Tribe took fifteen years to gain the expertise necessary to fully manage its own casino business. Id. at 24.

AWL also avers that the Tribe has control over AWL II because it possesses the power to "amend AWL's Articles of Incorporation" and exercise other powers. Id. Additionally, they point to the provisions of the Consumer Financial Services Ordinance, which mandate consumer-protection provisions that are enforced by the Tribe's Financial Services Regulatory Commission, who has power to supervise and enforce against AWL II. Doc. 246 at 21-22.

Plaintiffs argues that the following pieces of evidence support the fact that the Tribe had little to no meaningful control over either AWL I, AWL II, or Red Stone: (1) the former president of AWL I, a member of the Tribe, testified regarding AWL I that the Tribe "didn't have any control at all;" (2) AWL II does not employ members of the Tribe in executive positions; and, (3) Red Stone, through RS, LLC and SOL perform virtually all of AWL II's substantive lending and executive functions off of the reservation and do not employ members of the Tribe. Doc. 298-1 at 45. Plaintiffs also contend that the structure of the board weighs against sovereign immunity, as does the fact that Curry is also the CEO of AWL II and principal owner of SOL. Id. at 46. Plaintiffs further allege that Curry and the former MacFarlane team do not include the Tribe in high-level

21

discussions. Doc. 298-1 at 32 (citing internal e-mails between Curry and Chief Marketing Officer in which no tribal member was included). Therefore, Plaintiff concludes that the Tribe is only a "passive owner." See Williams, 329 F. Supp. 3d at 729.

The Court **FINDS** that this factor weighs most heavily against sovereign immunity. The structure, control, management, ownership of AWL II, and the relevant documents show that Curry, directly or indirectly through his entities, exercises virtually total control over AWL II.

### c. The Tribe's Intent with Respect to the Sharing of its Sovereign Immunity

To determine the Tribe's intent, courts generally look to the ordinance that governed the entity's creation and whether the ordinance expressly stated that the Tribe intended for the entity to have sovereign immunity. Breakthrough, 629 F.3d at 1193; Williams, 329 F. 3d at 280; Miami Nation, 386 P.3d at 372. Here, the Tribe's ordinance expresses an intent that the tribal entity would share the Tribe's immunity as an arm-of-the-Tribe. AWL II Act at 12-13, §§ 301-06. However, in Williams while a formal inquiry showed that the tribe's intent was to share sovereign immunity with its entities, a functional inquiry revealed that "the Tribe's intent no doubt was, in part, to help the Tribe, but to do so by providing its immunity to shelter outsiders from the consequences of their otherwise illegal actions." Williams, 329 F. Supp. 3d at 280.

This factor weighs against sovereign immunity in this case. Here, as in Williams, it appears that the Tribe's intent to share its sovereign immunity with AWL II was to insulate Defendant Curry from the consequences of his otherwise illegal actions. This intent is highlighted by Defendant Curry's testimony regarding his request that the Tribe indemnify him for his legal fees related to the present litigation. Moreover, the Tribe waived its sovereign immunity as to Curry and his entities. Thus, Curry's scheme attempts to protect him from litigation on the loans, but make the Tribe to liable to him.

### d. Financial Relationship Between the Tribe and the Entities

The fifth factor examines whether the Tribe "may be financially liable for [the entity's] legal obligations." Breakthrough, 629 F.3d at 1187. "The starting point for this factor is whether a judgment against the entity would reach the tribe's assets." Williams, 329 F. Supp. 3d at 280 (quoting Miami Nation, 396 P.3d at 373) (internal quotations omitted). In Williams, the court found that "[t]he structure of the Note ensure[d] that the Tribe's monthly gains [would] only consist of, at most, five percent (5%) of [the lending entity's] revenue," which weighed against sovereign immunity. Williams, 329 F. Supp. 3d at 281. Much like the Williams note, the Note in this case grants the Tribe only 3.6% of the AWLII revenue.[14] Thus, a judgment would be more likely to reach Curry's revenue and that of his entities, rather than the revenue to the Tribe.

AWL claims that one hundred percent (100%) of the profits from AWL II go to the Tribe, as the Tribe is AWL II's sole shareholder. Doc. 246 at 26; see Cook v. AVI Casino Enters., Inc., 548 F.3d 718, 726 (9th Cir. 2008) (finding an entity operated as an arm of tribe where "the Tribe, as sole shareholder, enjoy[ed] all of the benefits of an increase in [the entity's] value"). In support of this claim, they argue that the Note's priority of payments—the first use for any revenue goes to paying operating expenses, then to payment on the Note, and then distribution to the Tribe—can be characterized as the payment of "overhead," followed by the distribution of "true profit." Because this "true profit" goes directly to the Tribe, AWL argues this factor weighs, in favor of sovereign immunity. Id.

---

[14] Congress has set benchmarks on the revenue sharing of other Native American commercial ventures. Cf. 25 U.S.C. § 2711(c) (providing that a tribe may approve a management contract providing a fee based on revenue, but that fee may not exceed thirty percent (30%) of the net revenues). This section serves to accomplish the goals of "promot[ing] tribal economic development, self-sufficiency, [] strong tribal governments," shielding tribes from "corrupting influences," and ensuring that the tribe is "the primary beneficiary" of their operations by keeping the majority of the net revenues of Native American casinos where they belong – with the Tribe. 25 U.S.C. § 2702(1), (2). While not exactly on point, the Court is mindful of these congressional declarations of federal policy.

Plaintiffs argue that the structure of monthly distributions and the Tribe's waiver of sovereign immunity puts the tribal distributions and treasury at risk, and that the overall percentage of total revenues inured to the Tribe is substantially low compared to AWL II's total revenue. Doc. 298-1 at 49.

Upon review of the testimony provided at the hearing and the supplemental materials, the Court **FINDS** that this factor also weighs against tribal sovereign immunity.

### e. Policies Underlying Tribal Sovereign Immunity

In setting forth the sixth factor, the Breakthrough court noted that federal policies "include protection of the tribe's monies . . . as well as preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians."[15] Breakthrough, 629 F.3d at 1188; see also Kiowa Tribe of Okla. v. Manuf'g Tech., Inc., 523 U.S. 751, 756-57, 118 S. Ct. 1700, 1703-04, 140 L.Ed. 2d 981 (1998) (noting that tribal immunity is "settled law" with its origins in judge-made law); Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 510, 111 S. Ct. 905, 910, 112 L. Ed. 2d 1112 (1991) ("Congress has consistently reiterated its approval of the immunity doctrine . . . These Acts reflect Congress' desire to promote the goal of Indian self-government, including its 'overriding goal' of encouraging tribal self-sufficiency and economic development.") (internal quotations and citations omitted).

The record in this case indicates that Curry and his entities, rather than the Tribe, were in control of the lending scheme. The Curry Defendants prohibited the Tribe from taking adverse government action against them or adversely changing Tribal law. Promissory Note at § 6(*l*). By

---

[15] Protecting the Tribe's treasury is a key consideration. As the Ninth and Tenth Circuits have noted, protecting the sovereign's treasury, such as that of a tribe, is one of the historic purposes of sovereign immunity in general. Breakthrough, 629 F.3d at 1183 (quoting Allen v. Gold Country Casino, 464 F.3d 1044, 1047 (9th Cir. 2006)).

"adverse government action," the promissory note means "any takeover" including "any actual disruption of the duly elected Tribal Council." Id. at § 1. The term "adverse change of tribal law" is broadly defined to encompass "any bankruptcy law or similar law for the relief of debtors" that would adversely effect any rights and remedies of Curry, adopting "any Tribal law which interferes in any manner" with Curry's or Curry's affiliates' rights or ability to carry out the intent of the Note, and "any other Transaction Document," imposing a tax or "any regulatory or licensing requirement" against Curry or his entities, or "using [the Tribe's] power as a sovereign" to take Curry's property or that of his entities. Id. In other words, if the Tribe exercised its sovereign powers, it would breach its agreements. This point is further illustrated by the Note's waiver of the Tribe's sovereign immunity with respect to Curry. Id. at § 9.8.

Additionally, in Williams the ten percent (10%) of the Tribe's general fund came from the lending entity's revenue and was projected to increase to thirty percent (30%) in the next few years. Williams, 329 F. Supp. 3d at 282. Funds were used to provide social services and other benefits to the tribe and the lending entity appeared to "promote and fund Tribe's self-determination through revenue generation and the funding of diversified economic development." Id.

However, the Williams Court was unable to determine the extent to which granting immunity would directly protect the Tribe's treasury "which is one of the historic purposes of sovereign immunity." Id. at 282 (quoting Allen v. Gold Country Casino, 464 F.3d 1044, 1047 (9th Cir. 2006)); see also Alden v. Maine, 527 U.S. 706, 750 (1999) (noting that "[p]rivate suits against nonconsenting States . . . may threaten the financial integrity of the states . . . [and] levy upon the treasuries of the States"). This was mainly because it was unclear how much of the entity's funds were used by the tribe, and it appeared that even if the tribe had received some benefits, the lending entities' actions primarily enriched non-tribal entities and individuals. Id. at 283. The purchase

of an outside entity in <u>Williams</u> (similar to MacFarlane purchase in this case), resulted in a Note and Loan Agreement that yielded some benefits to the Tribe. <u>Id.</u> However, the court concluded that the Note had the effect of preventing the tribe from obtaining favorable terms in future business transactions as non-tribal entities would not be inclined to offer repayment above a certain rate. <u>Id.</u> The court found that the Tribe's monthly distribution was limited to a very small percentage and the Note forced the tribe to receive those benefits at a substantial cost—the sharp disparity in distributions received by the tribe and an outside entity since the tribal entity began repaying the loan. <u>Id.</u>

The facts of this case appear to be analogous to <u>Williams</u>. Here, the Tribe does receive some financial benefit; however, the Tribe's annual distributions are limited, and the only way the Tribe may receive greater revenue is after amounts are paid in full to each of Curry's entities under the Note or the Consulting Agreement. It also appears that the agreement is set up in such a way that AWL II operates primarily for the benefit of Curry and his entities as opposed to Curry and his entities primarily benefitting the Tribe. Therefore, this factor also weighs against sovereign immunity.

AWL avers that this factor weighs in favor of sovereign immunity, as the fact that the Tribe has sought an outside investor and technical expertise "is consistent with current federal Indian policy of self-determination." Doc. 73 at 21 (citing Native American Business Development, Trade Promotion, and Tourism Act of 2000, Pub. L. No. 106-464 (Nov. 7, 2000) (Congress recognized an "obligation" on the part of the United States to "encourage investment from outside sources" in Indian businesses and to "facilitate economic ventures with outside entities that are not tribal entities.")). AWL further contends that outside assistance to access capital should not weigh against sovereign immunity but is "a critical predicate for tribal economic development" and that

"penalizing tribes . . . for pursuing one of the only meaningful options available to them to increase government revenue would decimate their potential for self-determination." Id.

Plaintiffs attack AWL's reliance on the congressional provisions above, stating "there is no congressional declaration that [online lending is] closely linked to the well-being of a tribe." Doc. 298-1 at 51 (citation omitted). Instead, they urge this Court to examine Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014) (herein Otoe II). Id. In Otoe II the Second Circuit affirmed New York's decision to prohibit the Tribe's lending activities within its state, recognizing that the state could exercise its regulatory power to enforce laws against "Native Americans going beyond the reservation boundaries." Otoe II, 769 F.3d at 113. The Second Circuit noted that "a tribe has no legitimate interest in selling an opportunity to evade state law." Id. at 114 (citing Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 155 ("[W]hether stated in terms of pre-emption, tribal self-government or otherwise, "tribes did not have any legitimate interest in marketing an exception from state taxation to persons who would normally do their business elsewhere.").

Although the facts in this case are distinguishable from Otoe II, Plaintiffs argue that the language supports the Court's authority to exercise jurisdiction over off-reservation torts. Doc. 298-1.

After thoroughly examining the record and considering the Breakthrough factors, it appears that rather than AWL II being an arm-of-the-Tribe, the Tribe is an arm of AWL II and its acquired and related entities. Significantly, the agreements that seek to indemnify Curry for his intentional bad acts and waive immunity with respect to Curry and his entities would have a substantial impact on Tribe's governance and treasury. Accordingly, as the Breakthrough factors weigh against extending sovereign immunity to Curry and his AWL Defendants, the Court **FINDS** that American

Web Loan, Inc., AWL, Inc. and MacFarlane Group are not entitled to sovereign immunity as an arm of the Otoe-Missouria Tribe. The following factors indicate that Curry and his entities, as opposed to the Tribe, have exercised control over the allegedly usurious loans:

1. The Tribe passed laws to promote Curry and the related entities. See AWL I Act; AWL II Act.

2. The Tribe waived its sovereign immunity in its dealings with Curry and the entities he controlled, thereby placing the Tribe's treasury at risk. See Promissory Note at 19 § 9.8 (Tribe waived sovereign immunity regarding amounts it received or acquired from a tribal entity that resulting from the entity's default); Doc. 250-17 ("Merger Agreement") at 34, § 8.16 (waiving immunity for suits arising under the Merger).

3. AWL II agreed to indemnify Curry and the entities he controls against defense costs in this and other litigation, again exposing the Tribe's treasury to risk. Doc. 250-37 at 2.

4. The occasion of default on the Tribe's Note to Curry included a prohibition against changes in Tribal Law adverse to Curry and his entities, as well as Tribal Government Action adverse to Curry and his entities, thereby invading the Tribe's self-determination. Promissory Note at 2.

5. Curry and his entities are attempting to use the Tribe's sovereign immunity as a device to fend off claims against it by borrowers, such as in this case, while using the absence of immunity as a benefit in any dispute between him or his entities and the Tribe.

Accordingly, the Court **DENIES** AWL Defendants' Motion to Dismiss for Lack of Jurisdiction based upon sovereign immunity.

## B. Curry's Claim of Official Immunity

"In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself. . . . The real party in interest is the government entity, not the named official." Lewis v. Clarke, 137 S. Ct. 1285, 1291 (2017). To identify the real, substantial party in interest, one factor that the court examines is "the substance of the claims stated in the complaint, positing inquiries such as . . . [whether] the actions of the state officials [were] taken to further personal interests distinct from the State's interests . . ." Martin v. Wood, 772 F.3d 192, 196 (4th Cir. 2014). Other factors include: whether the unlawful actions of the officials were "tied inextricably to their official duties," whether the burden of the relief would be borne by the sovereign if the official had authorized the relief at the outset, whether a judgment would be "institutional and official in character" so as to operate against the sovereign, and whether the official's actions were ultra vires. Id.

In this case, the evidence illustrates that Curry's actions were motivated by his own personal interests, rather than the interests of the Tribe. In addition to the facts articulated supra at 31-32, Curry's profits dwarfed those of the Tribe. While the Tribe was given a substantial sum of money from this scheme, it was a comparatively small percentage of the scheme's total revenue or the money distributed to Curry and his entities.

Moreover, Plaintiff has made clear that the claims here run against Curry as an individual. Any judgment will not be "institutional and official in character" so as to implicate the Tribe. Id.; see also cf. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 109 n.17 (1984) (relief against state officials was improper because it "so plainly ran against the State"). As Plaintiffs argue, a judgment against Curry and his entities will be against him personally. The Tribe's

agreement to indemnify Curry is not before the Court. However, it is probable that the Tribe would not have to indemnify him for his intentional bad acts or for actions that violate federal or state law, as such a result would be against public policy, as well as unconscionable. Doc. 111 at 48; see also, e.g., Globus v. Law Research Serv., Inc., 418 F.2d 1276, 1288-89 (2d. Cir. 1969) ("It is well established that one cannot insure himself against his own reckless, willful or criminal misconduct."). Plaintiffs seek to sue Curry individually based on the "reality of Curry's role as the architect of the lending enterprise, as well as his overlapping, conflicting duties and obligations." Doc. 317 at 7 (citing Pennachietti v. Mansfield, No. CV 17-02582, 2017 WL 6311646, at *2-4 (E.D. Pa. Dec. 11, 2017) (holding that manager of tribal lending organization sued under RICO was sued in his individual capacity and not entitled to sovereign immunity), appeal dismissed, No. 18-1070, No. 18-1070, 2018 WL 3475602 (3d Cir. Jan. 31, 2018)). Similarly, the burden of relief would not be borne by the Tribe, as any relief granted to the Plaintiffs can be shaped so as to avoid taking from the Tribe. See Opinion and Order II at 39-43.

Further, the manner and degree of control of the entire lending function by Curry also renders his indemnity of dubious enforceability. See, e.g., Globus, 418 F.2d at 1288-89.

Defendant Curry argues that he is entitled to official immunity because AWL II is the real party in interest regarding Plaintiffs' loans and that he was acting "within the scope of his authority to act on behalf of AWL as its Chief Executive Officer and director." Doc. 257 at 3; Doc. 314 at 2. Curry highlights the responsibilities of a director of the board, which include "full power and authority to manage and operate AWL" and to "[e]stablish budgets for operating expenses and maintenance of financial records . . . [a]pprove . . . monthly reports . . . annual reports . . . financial statements . . . annual audits . . . budgets . . . [and] financial policies." Doc. 79-7 §§ 701, 706. Defendant Curry also points to his role as CEO of AWL II and avers that he was at all times

"subject to the control of the Board of Directors." Doc. 257 at 4. Defendant Curry therefore argues that any interaction he had with Plaintiffs' loans was in direct service of AWL as its CEO and Director. Curry also contends that the Tribe would "bear the financial impact" of a judgment against him. Doc. 257 at 5. In support, Defendant cites language from the AWL I Act, which states that AWL agrees to indemnify Curry "for any claims against [Curry] which arise directly from the scope of his duties." Id. (citing AWL I Act § 901).

The Court **REJECTS** Defendants' arguments. Plaintiffs have alleged facts that target Defendant Curry in his individual capacity and the profit that he financially gained through his entities' involvement with AWL II. Accordingly, the Court **DENIES** Defendant Curry's Motion to Dismiss for Lack of Jurisdiction based on sovereign immunity.

### C. Derivative Governmental Immunity for Sol Partners

Sol Partners make similar arguments to invoke sovereign immunity based on AWL II's relationship as contractor with an arm of the tribe. Doc. 86 at 4. This argument fails for two reasons. First, AWL II is not an arm-of-the-Tribe. As the Court described at length above, AWL II is an entity separate from the Tribe, and is therefore not entitled to assert tribal immunity. Supra, at 12-28. There is no immunity for Sol Partners to invoke, derivative or otherwise. Second, as a self-declared independent contractor, doc. 86 at 1, Sol Partners cannot assert tribal immunity even if it did exist. Pettus v. Servicing Company LLC, 2016 WL 7234106, 3:15-cv-479, at *2 (Feb. 9, 2016 E.D. Va.) (holding that an independent contractor with a tribal entity could not assert derivative or direct tribal immunity). Because this Court **FINDS** that AWL II is not an arm-of-the-Tribe, Sol Partners' argument fails even if they were somehow entitled to sovereign immunity based on their contractual relationship with AWL II. Accordingly, the Court **DENIES** Defendant Sol's Motion to Dismiss based on Lack of Jurisdiction.

31

### III. MOTION TO TRANSFER

#### A. Legal Standard

If venue is proper within its district, the Court may nonetheless transfer a case "[f]or the convenience of the parties [and] in the interest of justice . . . to any other district or division where it might have been brought." 28 U.S.C. 1404(a). "[I]n considering whether to transfer venue, a district court must make two inquiries: (1) whether the claims might have been brought in the transferee forum, and (2) whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum." Pragmatus AV, LLC v. Facebook, Inc., 769 F.Supp.2d 991, 994 (E.D. Va. 2011) (quoting Agilent Tech., Inc. v. Micromuse, Inc., 316 F. Supp. 2d 322, 324–25 (E.D.Va.2004)). With respect to the second prong, "a district court typically considers: (1) plaintiff's choice of forum, (2) convenience of the parties, (3) witness convenience and access, and (4) the interest of justice." Bluestone Innovations, LLC v. LG Elecs., Inc., 940 F. Supp. 2d 310, 313 (E.D. Va. 2013). Although "[t]he decision whether to transfer an action under the statute is committed to the sound discretion of the district court . . . [t]he party seeking transfer bears the burden of proving that the circumstances of the case are strongly in favor of transfer." Id. (internal citations and quotations omitted) (emphasis in original).

#### B. Analysis

##### i. Whether Plaintiffs' Claims Could Have Been Brought in Transferee Venue

Before the Court can consider whether transfer is appropriate under 28 U.S.C. § 1391, the Court must first determine whether venue and jurisdiction would be proper as to each defendant in the proposed transferee district. Koh v. Microtek Int'l, Inc., 250 F. Supp. 2d 627, 630 (E.D. Va. 2003). Venue is proper in any jurisdiction in which "a substantial part of the events or omissions

giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). Plaintiffs do not appear to contest that the matter may otherwise have been brought in the Western District of Oklahoma. See Docs. 114, 222. It appears that venue would be proper in the Western District of Oklahoma, as the tribal entity was formed in Oklahoma and at least some of the tribal entity's operations occur there. However, even assuming that venue is proper in the Western District of Oklahoma, the Court **FINDS** that the circumstances in this case do not strongly weigh in favor of transferring this matter to the Western District of Oklahoma.

### ii.    *Plaintiffs' Choice of Forum*

Plaintiffs argue that the critical witnesses to this action are:

> [I]ndividuals that have knowledge of the lending scheme, including . . . the design of the scheme before it was pitched to [the Tribe] . . . the structure, function and operation of the scheme and [the lending enterprise] . . . funding of the scheme . . . roles and relationships among [the participants in the lending enterprise] . . . substantive lending functions [and its] executive functions.

Doc. 222 at 10.

Plaintiffs contend that several key witnesses do not reside in Oklahoma, making it no more convenient than Virginia. See Doc. 222 at 11. Particularly, Defendant Curry resides in Puerto Rico and Sol Partners is also located in Puerto Rico. The individuals allegedly involved in funding the lending scheme, Medley Defendants and Defendant Middlemarch, are primarily located in New York. Employees of AWL Defendants, RS, LLC, and Sol work in either Kansas or Nevada, with the exception of four Oklahoma-based employees who have the roles of help desk technician, HR generalist, and call center manager. Id. at 11-13. The Note holder entities, who collectively receive guaranteed payments of approximately $2,000,000 per month, plus $1,999,333.33 monthly distributions to Sol Partners, are all Delaware corporations wholly owned and controlled by Curry.

33

Id. at 13. Finally, all the senior executives at AWL II are located outside of Oklahoma. Id. Plaintiffs also point to the fact that the three tribal members of AWL II's board "regularly travel outside of Oklahoma for board meetings." Doc. 222 at 11 (citing Doc. 226-13 ("Pl. Ex. 16") (Minutes from board meeting in Texas and minutes from another board meeting indicating that the next meetings would occur in Puerto Rico and Florida)). Further, Plaintiffs highlight that a majority of the Oklahoma employees are individuals "working in a call center providing non-substantive support to the AWL lending operation." Doc. 222 at 15. Plaintiffs also point to a document showing that Defendant Curry is a current member of the board of directors for Online Lenders Alliance, which is based in Virginia. See http://onlinelendersalliance.org/about/board-of-directors/ (listing "Mark Curry, AWL, Inc." as a member of the board of directors). In discovery for the Motion to Dismiss for lack of subject matter jurisdiction, only three (3) out of twenty (20) document custodians resided in Oklahoma. Doc 222 at 18.

AWL argues that Plaintiffs' choice of forum should not receive great deference because this is a class action lawsuit and "there will be numerous potential plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class' claim." Doc. 71 at 3 (quoting Byerson v. Equifax Info. Serv., LLC, 467 F. Supp. 2d 627, 633 (E.D. Va. 2006). AWL claims that this proposition is supported by the Supreme Court's decision in Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518 (1947). Id. at 4.

In Koster, the Supreme Court considered a class action suit that was brought in the home state of a shareholder in a derivative action. Koster, 330 U.S. 518 at 519. The corporate defendant moved to dismiss based on forum non conveniens, as its directors lived in a different state where all the records for the business were kept and all the witnesses lived. Id. The Court reasoned that in a derivative action, "although the plaintiff may have a substantial interest of his own to protect,

34

he may also be a mere phantom plaintiff with interest enough to enable him to institute the action and little more." Id. at 525. AWL also avers that Plaintiffs' choice of forum should not be afforded deference, because there is not a sufficient connection between Plaintiffs' actions and the forum state. Id. (citing U.S.A. ex rel. Advance Concrete, LLC v. T.H.R. Enters., Inc., 2016 WL 3002408, at *3 (E.D. Va. May 19, 2016)).

In its supplemental memorandum, AWL focuses on a recent case decided in the Richmond Division. In King v. Corelogic Credco, LLC, a class action plaintiff was not entitled to deference where the evidence regarding the subject matter of plaintiff's complaints did not exist in Virginia, only 2.73% of defendants' total reports issued by defendant were issued in Virginia, and the defendant had no offices or employees in Virginia, and a vast majority of the defendant's employees were located in the requested forum. 2018 WL 2977393 at *4.

Plaintiffs contend that, as an online borrower, most of the Virginia Plaintiff's commercial activity took place in his home state. Doc. 114 at 9 (citing Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105, 115 (2d Cir. 2014) ("Much of the commercial activity at issue takes place in New York. That is where the borrower is located; the borrower seeks the loan without ever leaving the state, and certainly without traveling to the reservation.")). Plaintiffs also cite the number of loans issued to individuals in Virginia, who will become plaintiffs if the class is certified. Doc. 222 at 7. Specifically, Plaintiffs present the following statistics: (1) in 2014 alone, Virginia residents made up 3.42% of AWL's entire loan portfolio and was the 11th highest ranked state among states where AWL offered loans; (2) in a 2016 marketing campaign; AWL sent 818,720 direct mail solicitations to Virginia residents; and (3) over a period of two weeks, in 2016 AWL issued 452 loans to individuals with Virginia area codes and only 167 loans to individuals with Oklahoma area codes. Id.

While a plaintiff's choice of forum is generally accorded less weight in a class action suit, Plaintiffs' arguments regarding the number of potential plaintiffs in Virginia is also persuasive. Moreover, Plaintiff is a resident of Virginia, Plaintiff entered his loan in Virginia, and Virginia seems to be more heavily targeted than the would-be transferee forum. Accordingly, this District is an appropriate forum for this litigation.

### iii. Convenience of the Parties and Witnesses

As previously noted, the key defendants are not headquartered in Oklahoma and the Tribe's records are readily available from the Curry entities, which are headquartered in Puerto Rico, Florida, Kansas and Nevada. Curry himself controls all of the entities with which the Tribe did business and functionally controls the Tribe himself. Further, the Tribe is not a party to this action, and few tribal members occupy key offices or exert any control over the lending operations.

Nevertheless, AWL contends that Oklahoma is more convenient because the Tribe and key witnesses are in Oklahoma. Doc. 71 at 5. AWL cites key witnesses including John Shotton, Chairman of the Tribal Council. AWL also points to other key witnesses who, though not in Oklahoma, otherwise reside in the Midwest. Id. at 5-6. Additionally, AWL cites language from Hengle v. Curry. 2018 WL 3016289 at *6. There, the Richmond Division transferred a related case to the Newport News division for potential joinder with Solomon and in doing so noted: "Because the acts allegedly constituting the RICO enterprise and the collection of unlawful debt may have occurred in a number of places, an obvious nucleus of operative facts does not present itself here. To the extent that there is one, it is most likely in the Western District of Oklahoma, where the AWL Defendants have their operations and where the Tribe is located."[16] Hengle v. Curry, 2018 WL 3016289 at *6.

---

[16] Judge Payne went on to say "Nonetheless, as discussed at some length, AWL has clearly engaged in conduct in Virginia-including in the Richmond Division, as the loans obtained and paid by Plaintiffs reflect. Accordingly, this

Based on the facts cited by Plaintiff, it appears that even if Oklahoma is another forum in which the action may be brought, any added convenience to the witnesses appears to be slight.

<em>iv.     Interests of Justice</em>

The interests of justice factor "encompasses public interest factors aimed at 'systemic integrity and fairness,'" Virginia Innovation Scis., Inc. v. Samsung Elecs. Co., 928 F. Supp. 2d 863, 872 (E.D. Va. 2013), including the interest in having local controversies decided at home. Id. The interest of justice consideration is "an analysis encompassing those factors unrelated to witness and party convenience." Koh v. Microtek Int'l, Inc., 250 F. Supp. 2d 627, 639 (E.D. Va. 2003) (citation omitted). Such factors include "the pendency of a related action, the court's familiarity with the applicable law, docket conditions, access to premises that might have to be viewed, the possibility of unfair trial, the ability to join other parties, and the possibility of harassment." Id.

Plaintiffs argue that the interests of justice weigh in their favor, as Virginia has a substantial connection to the controversy based on the amount of loans entered into in Virginia and the targeting of Virginia customers. Doc. 222 at 21. Plaintiffs also respond to AWL's argument, that Oklahoma has a greater interest in this action by virtue of AWL's presence in Oklahoma, by pointing to the many offices located outside of Oklahoma.

AWL argues that the interests of justice weigh in favor of transferring the case to the Western District of Oklahoma, as the Tribe has an interest in the suit, the Tribe is located in Oklahoma, and a trial in Virginia would prevent members of the Tribe's general council and Tribal council from attending and participating in the proceeding. Doc. 71 at 6.

---

factor still weighs in Plaintiffs' favor even if the bulk of the underlying events happened elsewhere." Hengle, 2018 WL 3016289 at *9.

The Court **FINDS** that the interests of justice weigh in favor of trying the matter in Virginia. After reviewing discovery on the motion to dismiss for lack of subject matter jurisdiction, the Court has become familiar with the facts of the case and the extent of the alleged scheme. Upon considerations of the factors listed above, the Court further **FINDS** that AWL has failed to prove that the circumstances of the case weigh strongly in favor of transfer. Although some of the evidence seems to support that Oklahoma is a more convenient for some witnesses in Oklahoma, many of the relevant key witnesses and documents are not located in Oklahoma. Therefore, this factor does not strongly support transfer. In addition, Virginia appears to have a strong interest in the case as it appears that AWL II targeted Virginia more heavily than Oklahoma and many other states. Therefore, the Court **DENIES** AWL Defendants' and Defendants Curry and Sol's Motions to Transfer Venue.

## IV. MOTION TO COMPEL ARBITRATION

### A. Legal Standard

Under the Federal Arbitration Act ("FAA"), an agreement within a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A party seeking to enforce an arbitration agreement may petition the United States District Court for an order directing that the arbitration proceed in the manner provided for in such agreement. 9 U.S.C. § 4. Where a party challenges the validity of an arbitration agreement, the federal court must consider the challenge before ordering compliance with the arbitration agreement under 9 U.S.C. § 4. Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 71 (2010). The "grounds" upon which "law or . . . equity" permit an arbitration agreement to be invalidated are general contract defenses such a fraud, duress, or unconscionability. AT&T

38

Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011). Further, the grounds given for revocation of an arbitration agreement must concern the validity of the arbitration agreement in particular, not simply the validity of the contract as a whole. Hayes v. Delbert Servs. Corp., 811 F.3d 666, 671-72 (4th Cir. 2016) (citing Rent-A-Center, W., Inc., 561 U.S. at 70); See also Snowden v. CheckPoint Check Cashing, 290 F.3d 631, 637 (4th Cir. 2002) (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, (1967)).

## B. Analysis

AWL Defendants[17] argue that Plaintiffs are prevented from bringing their class action suits because of a binding arbitration provision that was present in each of the representative Plaintiffs' loan agreements. Doc. 75. AWL Defendants allege that the arbitration provisions in Plaintiff Royce Solomon's loan agreement is representative of the arbitration agreements that were found in all the putative Plaintiffs' loan agreements (the "Loan Agreements"). Id. at 2.

## C. Terms of Loan Agreement and Arbitration Provision

The Loan Agreements for each of the Plaintiffs begins at page 6 of the "Loan Agreement." Doc. 75-2 ("Ex. A") at 6. Midway down is a paragraph heading titled "**IMPORTANT DISCLOSURE.**" Id. (emphasis in original). Just below that heading a paragraph reads:

> **PLEASE READ THIS DISCLOSURE CAREFULLY BEFORE SIGNING THIS AGREEMENT. LENDER IS AN ARM OF THE TRIBE, IT IS A COMMERCIAL ENTITY FORMED PURSUANT TO TRIBAL LAW, IT IS OWNED AND OPERATED BY THE TRIBE AND IT FUNCTIONS AS A NON-PROFIT COMMERCIAL ENTITY OF THE TRIBE, FORMED FOR THE EXPRESS PURPOSE OF ECONOMIC DEVELOPMENT. BOTH THE LENDER AND THE TRIBE ARE IMMUNE FROM SUIT IN ANY COURT UNLESS THE TRIBE, THROUGH ITS TRIBAL COUNCIL, EXPRESSLY WAIVES THAT IMMUNITY THROUGH A FORMAL, WRITTEN RESOLUTION OF THE TRIBE'S TRIBAL COUNCIL. THE LENDER IS REGULATED BY THE TRIBE'S CONSUMER**

---

[17] Defendants Curry and Sol seek to incorporate the AWL Defendants' arguments in support of the AWL Defendants' Motions to Compel Arbitration as their own. Doc. 84. Accordingly, as referenced in this portion of the Opinion, the AWL Defendants' arguments are also the arguments of Defendants Curry and Sol.

**FINANCE SERVICES REGULATORY COMMISSION (THE "COMMISSION"). YOUR RIGHT TO SUBMIT COMPLAINTS IS LIMITED TO THE DISPUTE RESOLUTION PROCESS SET FORTH IN THIS AGREEMENT AND TO THE COMMISSION IN ACCORDANCE WITH THE TRIBE'S CONSUMER LENDING CODE AND ACCOMPANYING REGULATIONS, IF ANY.**

Id. (emphasis in original).

The following paragraph indicates, also bolded in all capital letters, that the "loan is made within the Tribe's jurisdiction and is subject to and governed by Tribal law and not the law of your resident state." Id. (emphasis omitted). At the end the final paragraph of that section, in regular, non-bolded font, is a statement that AWL's "inclusion of any disclosures does not mean that [AWL] consents to the application of federal law to any Loan or to this Agreement." Id. at 7.

Paragraph 22 of the Loan Agreements begins on the bottom of page 14 and is entitled **"WAIVER OF JURY TRIAL AND AGREEMENT TO ARBITRATE"** (the "Arbitration Agreement"). Id. (emphasis in the original). The Arbitration Agreement is further broken into various subparagraphs.[18] Id. at 14-17. The subparagraph titled "Applicable Law and Judicial Review of the Arbitrator's Award" states, in bold capital letters, **"THIS AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW,"** and goes on to explain that "the arbitrator shall apply Tribal Law and the terms of this Agreement, including this Agreement to Arbitrate and the waivers included herein." Id. at 17 (emphasis added). The "Applicable Law and Judicial Review" subparagraph further explains that the parties have a "right to judicial review in a Tribal court of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the conclusions of law are erroneous under Tribal Law." Id. (emphasis added).

The Arbitration Agreement also contains a subparagraph entitled "right to opt-out" through which an individual is given the opportunity to opt-out of Arbitration Agreement by notifying

---

[18] Each subparagraph is bolded in all capital letters.

American Web Loan in writing within sixty (60) days of entering the agreement. Id. at 15. However, the "right to opt-out" provision also states, in all capital letters, that "in the event that you opt out of the agreement to arbitrate, any disputes shall nonetheless be governed under Tribal Law and must be brought within the court system of the Otoe-Missouria Tribe." Id. at 15 (emphasis omitted).

The subparagraph of the Arbitration Agreement titled "Location of Arbitration," indicates that the arbitration may be conducted "within thirty (30) miles of [the borrower's] current residence." Id. at 16-17.   however, it also provides that the accommodation to conduct the arbitration at a more convenient location "shall not be construed in any way . . . to allow for the application of any law other than Tribal Law." Id.

Paragraph 23 of the Loan Agreement, entitled "Governing Law," indicates that the:

[Loan] Agreement is governed only by Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution . . . neither we nor this Agreement are subject to any other federal or state law or regulation, nor to the jurisdiction of any court, unless stated in the Agreement . . . . The Lender may choose to voluntarily use certain federal laws as guidelines for the provision of services. Such voluntary use does not represent acquiescence . . . to any federal law unless found expressly applicable to operations of the Tribe."

Id. at 18 (emphasis omitted).

Additionally, Paragraph 14 of the Loan Agreement (the "ESIGN Provision") provides that the parties intend for the "federal Electronic Signatures in Global and National Commerce Act ("ESIGN") will apply to . . . this Agreement." Id. at 12. The ESIGN Provision also contains a subparagraph entitled "YOUR ELECTRONIC SIGNATURE," which indicates that the borrower "acknowledge[s] and agree[s] that when [the borrower] click[s] the submit button, [the borrower is] providing [the borrower's] electronic signature on this document . . . [The Borrower]

41

agree[s] that [the borrower's] electronic signature shall have the same force and effect and shall bind [the borrower] to this [Loan] Agreement." Id. at 13.

## D. Applicability of Arbitration Provision

Plaintiffs make two arguments against enforcement of the Arbitration Agreement. First, Plaintiffs argue that they were never shown the loan documents, nor were they advised of key terms, including the purported arbitration provisions, prior to signing their loan agreements. Second, Plaintiffs allege that the Arbitration Agreement is invalid and unenforceable. Docs. 75, 112. With regard to the validity of the Arbitration Agreement, Plaintiffs argue that American Web Loan's Arbitration Agreement is unconscionable for the same reasons articulated by the Fourth Circuit in Hayes v. Derbert Servs. Corp, 811 F.3d 666 (4th Cir. 2016) and Dillon v. BMO Harris Bank, N.A., 856 F.3d 330 (4th Cir. 2017), where the Fourth Circuit found that an arbitration provision nearly indistinguishable from American Web Loan's Arbitration Agreement was invalid and unenforceable. Id. at 12. Plaintiffs also argue that, even if this Court finds the facts in Hayes and Dillon distinguishable from the facts of this case, the Arbitration Agreement is otherwise procedurally and substantively unconscionable. Doc. 112 at 22-30.

AWL Defendants argue that the Court should grant their Motions to Compel Arbitration (and consequently that of Defendants Curry and Sol) for two reasons: (1) the Plaintiffs each electronically signed the Loan Agreement, and thereby consented to be bound by a valid Arbitration Agreement;[19] and (2) the present dispute falls within the scope of the Arbitration Agreement. Doc. 75 at 7 (citing Chorley Enters. Inc. v. Dickey's Barbecue Restaurants Inc., 807 F.3d 553, 563 (4th Cir. 2015).

---

[19] Plaintiffs allege in their complaint that they never saw the Loan Agreement and were not provided with a copy of the Loan Agreement until after they clicked the agree button. Am. Compl. ¶ 134. However, as discussed in greater detail below, this factual dispute need not be addressed, because even if the Plaintiffs did in fact sign the Arbitration Agreement, the Arbitration Agreement is otherwise invalid.

For the reasons discussed below, this Court **FINDS** that the facts of this case are virtually indistinguishable from those in Hayes and Dillon, and that the instant arbitration agreement is unenforceable.

### E. Fourth Circuit Precedent

In both Hayes and Dillon, the Fourth Circuit declined to enforce arbitration agreements that amounted to an "unambiguous attempt to apply tribal law to the exclusion of federal and state law." Dillon, 856 F.3d at 336.

In Hayes, the Court examined an arbitration provision that was contained in a payday loan agreement between a borrower and an online payday lender organized under the laws of the Cheyenne River Sioux Tribe. Hayes, 811 F.3d at 668. The loan agreement stated that it was "subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe" and that "no other state or federal law or regulation shall apply to this Loan Agreement." Id. at 669. In a section titled "GOVERNING LAW" (the "choice of law" provision), the agreement further provided that "[n]either this Agreement nor Lender is subject to the laws of any state of the United States of America . . . You also expressly agree that this agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe, and that no United States state or federal law applies to this Agreement." Id. at 669-670.

The language in the arbitration provision of the loan agreement provided that the arbitration "shall be governed by the law of the Cheyenne River Sioux tribes. The arbitrator will apply the laws of the Cheyenne River Sioux Tribal Nation and the terms of this Agreement." Id. at 670. It further stated that the arbitrator will not apply "any law other than the law of the Cheyenne River Sioux Tribe of Indians to this Agreement." Id. Viewing the language in the arbitration provision in conjunction with the loan agreement's choice of law provision, the Fourth Circuit held that the

43

arbitration agreement was unenforceable because it took the "forbidden step" of "flatly and categorically renounc[ing] the authority of the federal statutes to which it is and must remain subject." Hayes, 811 F.3d 675. In so concluding, Fourth Circuit cited to Supreme Court precedent which indicates that, while an arbitration agreement is valid where it delegates federal statutory rights to an arbitrator, it has cautioned that the freedom "does not extend to a 'substantive waiver of federally protected civil rights' in an arbitration agreement." Id. at 674 (citing Penn Plaza LLC v. Pyett, 556 U.S. 247, 273 (2009)).

In Dillon, the Fourth Circuit affirmed the reasoning in Hayes, indicating that where an arbitration agreement operates "as a prospective waiver of a party's right to pursue statutory remedies" it violates public policy. Dillon, 856 F.3d at 334 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 637 n.19, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); Am. Express Co. v. Italian Colors Rest., —— U.S. ——, 133 S.Ct. 2304, 2310, 186 L.Ed.2d 417 (2013); 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 273–74, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 28, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)). The Dillon court further noted that a key part of its reasoning in Hayes dealt with the "animating purpose of the arbitration agreement . . . to ensure that [the lender] could engage in lending and collection practices free from the strictures of any federal law." Dillon, 856 at 335 (quoting Hayes, 811 F.3d at 676) (internal quotation marks omitted). The fact that the underlying loan agreement contained a disclaimer that "no United States state or federal law applies to this Agreement" supported its conclusion that the arbitration agreement was part of an "integrated scheme to contravene public policy." Id. Applying this reasoning, the Fourth Circuit affirmed that a different arbitration agreement was unenforceable.[20] Id.

---

[20] The loan agreement in Dillon stated:

AWL Defendants argue that their Arbitration Agreement and Loan Agreement is distinguishable from the arbitration agreements and loan agreements in <u>Hayes</u> and <u>Dillon</u> and does not require Plaintiffs to "renounce wholesale the application of any federal law to the plaintiffs' federal claims." Doc. 75 at 11-13 (citing <u>Hayes</u>, 811 F.3d at 673; <u>Dillon</u>, 856 F.3d at 335). In support of their argument, AWL Defendants cite the "Governing Law" provision in their contract, which provides that the agreement is "governed only by Tribal Law <u>and such federal law</u> as is applicable under the Indian Commerce Clause of the United States Constitution." <u>Id.</u> AWL Defendants argue that the "Governing Law" provision would apply to the Arbitration Agreement because the Arbitration Agreement instructs the arbitrator to apply "Tribal Law and the terms of this Agreement" which would include "such federal law as is applicable under the Indian Commerce Clause." <u>Id.</u> Therefore, AWL Defendants contend that the reasoning in <u>Hayes</u> and

---

THIS AGREEMENT TO ARBITRATE IS MADE PURSUANT TO A TRANSACTION INVOLVING THE INDIAN COMMERCE CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA, AND SHALL BE GOVERNED BY THE LAW OF THE OTOE-MISSOURIA TRIBE OF INDIANS. The arbitrator will apply the laws of the Otoe-Missouria Tribe of Indians and the terms of this Agreement....

<u>Dillon</u>, 856 F.3d at 335. Additionally, a section titled "GOVERNING LAW," provided that "[t]his Agreement and the Agreement to Arbitrate are governed by [tribal law]" and "[n]either this Agreement nor the Lender is subject to the laws of any state of the United States." <u>Id.</u>

Other terms in the Loan Agreement in <u>Dillon</u>, which the Court found evinced an explicit attempt to disavow the application of federal or state law to any part of the contract or its parties were terms that stated:

By executing this Agreement, you hereby . . . further agree that no other state or federal law or regulation shall apply to this Agreement, its enforcement or interpretation.

Our inclusion of these disclosures does not mean that we . . . consent to application of state or federal law to us, to the loan, or this Agreement.

Neither this Agreement nor the Lender is subject to the laws of any state of the United States.

I further understand, acknowledge and agree that this loan is governed by the laws of the Otoe-Missouria Tribe of Indians and is not subject to the provisions or protections of the laws of my home state or any other state.

<u>Id.</u> at 336.

Dillon does not apply because the Arbitration does not amount to a prospective waiver of federal substantive law. Id.

Plaintiffs contend that the language in the "Governing Law" provision must be viewed alongside other language in the Loan Agreement, including the Arbitration Agreement, which appears to evince an intent that the arbitrator not apply federal substantive laws. Doc. 112 at 17. For example, the same "Governing Law" paragraph further states that "neither we [AWL] nor this Agreement [are] subject to any other federal or state law or regulation, nor to the jurisdiction of any court, unless so stated in this agreement . . . AWL] may choose to voluntarily use certain federal laws as guidelines . . . Such voluntary use does not represent the acquiescence of the Tribe to any federal law unless found expressly applicable to operations of the Tribe." Id. (citing Ex. A at 18). Plaintiffs also point to language indicating that any appeal of the arbitrator's award must be made to the Tribal court, which will review the matter for "legal error [solely] under Tribal Law." Id. at 18 (emphasis in original).

Plaintiffs highlight an analogous case in the Third Circuit where the choice of law provision similarly contained language that the agreement was "governed by the Indian Commerce Clause of the Constitution . . . and the laws of the Cheyenne River Sioux Tribe" but found that a reference to the Indian Commerce Clause was an irrelevant constitutional provision. Id. at 19 (citing Jackson v. Payday Fin., LLC, 764 F.3d at 778) (internal quotations omitted) (emphasis omitted). Likewise, Plaintiffs urge this Court to find that the reference to the Indian Commerce Clause is irrelevant because the Indian Commerce clause simply provides a mechanism by which Congress has exclusive power to regulate commerce with Indian tribes. Doc. 112 at 19, n.4.

This case is analogous to the previous cases decided by the Fourth Circuit, and Plaintiffs' arguments on this point are persuasive. While the Loan Agreement does contain a solitary mention

that it is governed by "Tribal Law and such federal law as is applicable under the Indian Commerce Clause of the United States Constitution," the subparagraph titled "Applicable Law and Judicial Review of the Arbitrator's Award" states, in bold caps, **"THIS AGREEMENT SHALL BE GOVERNED BY TRIBAL LAW,"** and goes on to explain that "the arbitrator shall apply Tribal Law and the terms of this Agreement, including this Agreement to Arbitrate and the waivers included herein." Doc. 75-2 at 17. The "Applicable Law and Judicial Review" subparagraph explains that the parties have a "right to judicial review in a Tribal court of (a) whether the findings of fact rendered by the arbitrator are supported by substantial evidence and (b) whether the conclusions of law are erroneous under Tribal Law." Id. Even within its opt-out provision, the Loan Agreement provides that "in the event that you opt out of the agreement to arbitrate, any disputes shall nonetheless be governed under Tribal Law and must be brought within the court system of the Otoe-Missouria Tribe." Id. at 15. Considering the provisions cited, it appears, that here, as in Hayes, that the Plaintiffs were forced to "renounce wholesale the application of any federal law to plaintiffs' federal claims."

There are three additional factual grounds for invalidity of the arbitration clause. First, the Court has found that AWL II, Curry, and the entities he controls are not arms of the Tribe, as set forth in the contract document. The degree of control exercised by Curry individually, as CEO of AWL II and through the other entities that he controls, renders the Tribe an arm of Curry in the functioning of the lending scheme.

Second, while the contract documents state that Tribal law applies universally to the exclusion of Federal (and State) law, it adopts the Federal ESIGN statutes in support of electronic signatures' role in the enforcement of the loans. This is another example of Curry's misplaced attempts to use the sovereign immunity at once as a sword and as a shield.

Third, there is clear conflict between the functioning of the arbitration clause and the provision in the promissory note that a change in Tribal law or adverse governmental action, as broadly defined in the Promissory Note, is a condition of default upon the Note. An arbitrator's decision or an appellate process that results in a decision in favor of a borrower likely constitutes a change in Tribal law or adverse Tribal government action that would trigger a default on the Tribe's Note payable to the Curry entities. See Promissory Note at 2. Thus, the Note creates a clear conflict of interest for a tribal arbitration process.

Accordingly, the Court **DENIES** the Motion to Compel Arbitration as it appears that the Arbitration Provision is unconscionable under Fourth Circuit precedent, invades the governance of the Tribe, and creates a conflict of interest.

## IV. CONCLUSION

The evidence presented shows that instead of acting as an "arm of the tribe," Curry and his entities were merely paying a contingent royalty to use the Tribe's immunity. The degree of control that Curry wielded over the scheme demonstrates that this was truly his scheme, rather than one controlled by the Tribe. While the Tribe was required to waive its immunity as to Curry, Curry seeks to use this immunity against the Plaintiffs. Such intentional avoidance of federal and state law is not a legitimate use of tribal immunity. Any argument by Defendants that they are otherwise entitled to tribal immunity is without merit. Accordingly, the Court:

1) **DENIES** AWL Defendants' and Defendants Curry and Sol's Motions to Dismiss for Lack of Subject Matter Jurisdiction, Docs. 72, 85, 86;

2) **DENIES** AWL Defendants' and Defendants Curry and Sol's Motions to Transfer, Docs. 70, 83; and,

3) **DENIES** AWL Defendants' and Defendants Curry and Sol's Motions to Compel

Arbitration, Docs. 74, 84.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.
                                        /s/
                            Henry Coke Morgan, Jr.
                            Senior United States District Judge

                            _____
                            HENRY COKE MORGAN, JR.
                            SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 20, 2019