IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

**ROYCE SOLOMON, et al.,** *individually*
*and on behalf of all others similarly situated,*

**Plaintiffs,**

**v.**

Civil Action No. 4:17cv145

**AMERICAN WEB LOAN, et al.,**

**Defendants**.

## OPINION & ORDER II

In Opinion & Order I, this Court addressed motions concerning subject matter jurisdiction, arbitration, and venue. In this Opinion and Order II, the Court addresses the remaining bases of Defendants' Motions to Dismiss.[1]

These matters come before the Court on Motions to Dismiss filed by American Web Loan, Inc. AWL, Inc., MacFarlane Group (collectively, "AWL Defendants" or "AWL"), joined by Defendants Mark Curry ("Curry"); Sol Partners ("Sol"); Medley Management, Inc., Medley Group, LLC, Medley LLC, Medley Capital Corp., and Medley Opportunity Fund II, LP (collectively, "Medley Defendants" or "Medley"); Brook and Seth Taube (collectively, "the Taubes"); Middlemarch Partners LLC ("Middlemarch"); and DHI Computing Service, Inc. d/b/a GOLDPoint ("GOLDPoints"), Docs. 62, 76, 77, 81, and 87, and Medley Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to Join a Necessary Party, Docs. 62, 64. The Court held a hearing regarding each of these motions and for the reasons stated herein, and on the bench the Court **RULES** as set forth below.

---

[1] This Opinion and Order II is issued in conjunction with its companion, Opinion and Order I. On February 5 and 6, 2019, the Court held a lengthy hearing on these motions. At that hearing, the Court ruled from the bench. These two Opinions and Orders are offered to further explain the Court's rulings.

## I.    BACKGROUND

Plaintiffs are four individuals who obtained loans from American Web Loan. Doc. 41 ("Am. Compl.") ¶¶ 10-13. The interest rates for each of Plaintiffs' loans are alleged to be more than two times the rate allowed under the laws of each of Plaintiffs' respective states. Id. ¶¶ 145, 158, 168, 184 (describing interest rate for each loan). Accordingly, Plaintiffs allege that Defendant Curry, with the assistance of Defendants AWL, Medley, the Taubes, Middlemarch, GOLDPoint, Sol, and John Doe Defendants (1-100), has used the sovereignty of the Otoe-Missouria Indian Tribe (the "Tribe") to personally profit from allegedly usurious interest rates on short-term loans issued to individuals throughout the United States. Am. Compl. ¶¶ 1, 6.

Altogether, Plaintiffs' complaint alleges nine (9) different causes of action against the various defendants. In Count One, Plaintiffs allege that AWL, Curry, Sol, Medley, and the Taubes engaged in the collection of unlawful debt in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). Id. ¶¶ 209-22. In Count Two, Plaintiffs allege that the AWL, Curry, Sol, Medley Defendants, the Taubes, GOLDPoint, and Middlemarch engaged in a RICO conspiracy. Id. ¶¶ 223-27. In Count Three, Plaintiffs allege that the AWL Defendants, Curry, Sol, Medley, the Taubes, and GOLDPoint violated the Electronic Funds Transfer Act ("EFTA"). Id. ¶¶ 228-43. In Counts Four through Eight, Plaintiffs allege that Defendant AWL, Inc. committed several violations of the Truth in Lending Act ("TILA"). Id. ¶¶ 244-73. In Count Nine, Plaintiffs allege that all defendants have been unjustly enriched by their continued possession of funds illegally taken from Plaintiffs and members of the class. Id. ¶¶ 274-276. Plaintiffs define the class of individuals as:

> All persons who took out loans from American Web Loan. Included in the Class are any persons who took out loans through the American Web Loan d/b/a entity known as Clear Creek Lending. The Class period begins on February 10, 2010 and continues through the present.

Am. Compl. ¶ 198.

## II. PROCEDURAL HISTORY

Plaintiffs initially filed their complaint on December 15, 2017. Doc. 1. Plaintiffs filed an Amended Complaint on March 9, 2018. Am. Compl. On April 9, 2018, the following motions were filed:

(1) Medley Defendants and the Taubes' Motion to Dismiss for Failure to State a Claim and Failure to Join a necessary party, Doc. 62;

(2) Medley Defendants and the Taubes' Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, Doc. 64;

(3) AWL Defendants' Motion to Transfer, Doc. 70;

(4) AWL Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 72;

(5) AWL Defendants' Motion to Compel Arbitration, Doc. 74;

(6) AWL Defendants' Motion to Dismiss for Failure to State a Claim, Doc. 76;

(7) Middlemarch's Motion to Dismiss for Failure to State a Claim, Doc. 77;

(8) GOLDPoint's Motion to Dismiss for Failure to State a Claim, Doc. 81;

(9) Defendants Curry and Sol's Motion to Transfer Case, Doc. 83;

(10) Defendants Curry and Sol's Motion to Compel Arbitration, Doc. 84;

(11) Defendant Curry's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 85;

(12) Defendant Sol's Motion to Dismiss for Lack of Subject Matter Jurisdiction, Doc. 86; and

(13) Defendants Curry and Sol's Motion to Dismiss for Failure to State a Claim, Doc. 87.

On June 8, 2018, Plaintiffs opposed each of the defendants' motions.[2] Docs. 109-115. On July 9, 2018, each defendant replied. Docs. 133-145.

On August 2, 2018, the Court held a status conference regarding this matter and then consolidated this case with the matter Hengle v. Curry, which had recently been transferred from the Richmond Division. Doc. 160. The Court ORDERED the parties to complete jurisdictional discovery on the matters of sovereign immunity and venue and propose a scheduling order for supplemental briefings. Id. On September 7, 2018, the Parties' submitted a Proposed Schedule, which the Court approved by separate Order. See Docs. 187, 201. On November 6, 2018, Plaintiffs filed a supplemental brief opposing AWL Defendants' and Defendants Curry and Sol's Motions to Transfer. Docs. 221, 222. On November 13, 2018, AWL Defendants and Defendants Curry and Sol filed a supplemental brief in support of their Motion to Transfer. Docs. 231, 232, 235. On November 20, 2018, AWL Defendants and Defendants Curry and Sol each filed supplemental briefs in support of their Motions to Dismiss for Lack of Subject Matter Jurisdiction and Plaintiffs filed a supplemental opposition to Defendants' Motions. Docs. 245, 246, 256, 257, 264, 265, 272, 273. On November 29, 2018, Plaintiffs filed a corrected supplemental opposition without objection.[3] Doc. 298-1. On December 11, 2018, AWL Defendants, Defendants Curry and Sol, and Plaintiffs each replied to their respective supplemental briefs regarding subject matter jurisdiction. Docs. 309, 310, 314, 315, 316, 317, 318, 319. These matters are now ripe for review.

## III.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a motion to dismiss tests the sufficiency of a complaint; it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).

---

[2] The Court had previously GRANTED Plaintiffs' Motion for extension of time to file opposition briefs. Doc. 92.
[3] This corrected opposition dealt with clerical and typographical errors as well as wrongly-cited exhibits.

4

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) ("In considering a motion to dismiss, we accept as true all well-pleaded allegations and view the complaint [or counterclaim] in the light most favorable to the plaintiff [or counterclaim plaintiff].") (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993)). A complaint establishes facial plausibility "once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). Therefore, the complaint need not include "detailed factual allegations" as long as it pleads "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." Id. Although a court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In deciding the motion, a court may consider the facts alleged on the face of the complaint as well as "'matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.'" Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (1990)). The court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004) (citations omitted); see also Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (observing that the court

may consider a document attached to a motion to dismiss "that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity.").

## IV.  MOTIONS TO DISMISS BASED ON RICO VIOLATIONS

### A. Factual Allegations[4]

#### i.  *Rent-A-Tribe Conspiracy*

Plaintiffs allege that a conspiracy began in or around 2009 when Curry began working with the Tribe to perpetuate a "rent-a-tribe" scheme. Am. Compl. ¶ 81. Plaintiffs claim that the "rent-a-tribe" scheme arose as federal regulators began cracking down on "rent-a-bank" schemes, in which payday lenders would associate with federal banks to charge higher interest rates on loans issued to out of state borrowers. Id. ¶¶ 78-80. While the bank would be listed as the "lender" the payday lender would control all substantive lending functions.[5] Id. ¶ 79.

#### ii.  *MacFarlane Group, American Web Loan, Inc., AWL, Inc. and Sol Partners*

As alleged in the complaint, MacFarlane Group is an entity that was wholly owned by Mark Curry until it was "acquired" by a tribal entity named Red Rock. Id. ¶ 18, 20. Sol Partners is a Puerto Rican company owned by Curry that provided "the necessary funding for the operation [of AWL] with their own capital and capital raised from other investors that were unaffiliated with the Tribe." Id. ¶ 21. Curry used a slide show (the "Geneva Roth Presentation") to illustrate the rent-a-tribe structure to potential Native American tribes and investors. Id. ¶ 85. At the top of a

---

[4] "In considering a motion to dismiss, [the Court] accept[s] as true all well-pleaded allegations and view[s] the complaint in the light most favorable to the plaintiff." Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) (citing Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir.1993)). The Court cautions, however, that the facts alleged by Plaintiff are recited here for the limited purpose of deciding the instant Motion to Dismiss. The recited facts are not factual findings upon which the parties may rely for any other issue in this proceeding.

[5] One of Curry's former entities "LoanPoint USA" allegedly engaged in such a scheme with a bank in the State of Utah. Am. Compl. ¶ 80.

slide titled "Proposed Corporate Structure" is a heading that says "Mark Curry, CEO 100% Ownership or Control" beneath which is a structure listing several Curry owned entities as providing funding for the American Web Loan Tribal entity, who sells loans back to the Curry entities after 14 days. Id. ¶¶ 86-87. An exact date for the Geneva Roth Presentation is not given; however, Plaintiffs cite to an article by Bloomberg News (the "Bloomberg Report") which indicates that the slide show was shown to the Tribe in 2009. Id. ¶ 88-89.

### iii.    Medley's Funding of MacFarlane Group and Other Entities

The Medley Defendants are comprised of five (5) separate corporate entities: (1) Medley Opportunity Fund II, LP (the "Medley Fund" or the "Fund"), a Delaware limited partnership, id. ¶ 25; (2) Medley LLC, a Delaware corporation, id. ¶ 26; (3) Medley Capital Corp. ("MCC"), a Delaware corporation, id. ¶ 27; (4) Medley Management, Inc. ("MMI"), a Delaware corporation, id. ¶28; and (5) Medley Group, LLC ("Medley Group"), a Delaware limited liability company, id. ¶ 2.

Plaintiffs allege that Defendant Brook Taube, a resident of New York, and Defendant Seth Taube, a resident of California, co-founded Medley and exercise ownership and control over the Medley Defendants as "officer[s], director[s], and/or other controlling part[ies]." Id. ¶¶ 35-37.[6] Plaintiffs further claim that the Medley Defendants "share significantly overlapping management personnel . . . hold themselves out as part of a common corporate family or as otherwise functionally and operationally indistinguishable from one another." Id. ¶ 30.

---

[6] The Taubes are Managing Partners of the Medley Fund and members of the Fund's Investment Committee. Am. Compl. ¶ 25.  In a recent Form 10-K filing signed by the Taubes, they are also listed as "Co-Chief Executive Officers and Co-Chairmen" of Medley LLC, "Chief Executive Officer and Chairman" and "Director" of MCC, and "Co-Chief Executive Officers and Co-Chairmen" of MMI. Id. ¶¶ 26-28. The Taubes also wholly own Medley Group LLC. Id. ¶ 29.

In 2011, the Medley Fund provided an initial $22.9 million loan to MacFarlane Group and has continued to provide backing for Curry's entities. Id. ¶ 96. According to state filings, Medley Defendants have a secured interest in most of the Curry entities (the "Geneva Roth Entities") listed in the Geneva Roth Presentation.[7] Id. ¶¶ 43-49, 86. Each of the Geneva Roth Entities also shared the same principle place of business as MacFarlane Group before it was purchased and merged into AWL, Inc. in 2016. Id. ¶¶ 43-49.

### iv. Alleged Control Exercised by Medley

Plaintiffs allege that Medley Defendants identified its $22.9 million investment in MacFarlane Group as an investment in an "Online Consumer Finance Platform" in a presentation to Medley Fund investors. Id. ¶¶ 98-99. Plaintiffs claim that the presentation shows that Medley's investment process begins with "extensive evaluation, monitoring, and oversight" and "gaining a full understanding of the investment through the underwriting process, which includes review of business plans, financial, industry, legal, credit and regulatory analysis." Id. ¶ 100. They also allege that Medley engages in "extensive ongoing monitoring" for risk management purposes. Id. ¶ 101. This risk management includes "weekly calls with its borrowers, review of financial statements and cash reconciliation on a monthly bases and quarterly on-site visits." Id. Plaintiffs provide a copy of a slide from the personation illustrating Medley Fund's account management process. Id. ¶ 103. The slide indicates that Medley's account monitoring process employs a "hands-on" approach which includes "frequent interaction with management, attending board of directors' meetings, consulting with industry experts, working with third-party consultants and developing portfolio company strategy with equity investors." Id.

---

[7] In addition to the entities on the slideshow, Medley Fund allegedly has secured interests several other entities either owned by or associated with Curry. Each of these entities are alleged to share the same address as MacFarlane Group. See Am. Compl. ¶¶ 43-71.

*v. Medley's Alleged Knowledge of the Illegal Nature of the Scheme*

During the process of obtaining funding from investors, Plaintiffs allege that one investor walked away from a deal with MacFarlane Group because of "concerns about the nature of the loans being made by MacFarlane Group through American Web Loan," after which time "Medley Defendants stepped in to provide the necessary financing to MacFarlane Group and/or [AWL]." Id. ¶109. In 2013, a Medley Fund investor sent an e-mail requesting an explanation as to why it appeared Medley was "giving a reasonable loan to [AWL] which is charging an unreasonable rate [to the customer]," to which Seth Taube responded. Id. ¶ 110.

*vi. Involvement of GOLDPoint Systems*

In 2014, GOLDPoint entered into a contract to provide website services to AWL. Id. ¶ 111-12. The contract states that website content "shall be subject to approval by [GOLDPoint] and "allows potential customers to apply for loans and submit information in connection with the loan application process . . . [and] an account portal for customers to review their loan balances, make payments, and perform other loan-related functions." Id. In addition to setting up the website, GOLDPoint's systems generate reports and loan-related data for MacFarlane Group. Id. ¶ 112. According to the contract, the pricing schedule for GOLDPoint's services depends on the "volume of loans originated and the number of active loan accounts, including per application and per-closed loan fees, monthly fees based on the numbers of accounts." Id. After the 2016 merger of MacFarlane Group into Red Stone, the contract was reassigned to AWL, Inc. Id. ¶ 113. Plaintiffs allege that GOLDPoint is guilty of "providing the technology, systems, and services necessary to enable the [AWL] online payday lending scheme to collect unlawful debts through, among other things, the online interfaces and payment systems used by consumers." Id. ¶ 114.

9

### vii. Middlemarch Partners Involvement

Middlemarch is a merchant banking firm. <u>Id.</u> ¶ 23. In 2013, Middlemarch helped MacFarlane Group prepare a slide show MacFarlane Group showed to potential investors (the "Middlemarch Presentation"). <u>Id.</u> ¶ 93. The Middlemarch Presentation was provided to various hedge funds, private equity firms, and other potential investors to raise funding for the lending scheme. <u>Id.</u> ¶¶ 92-95. The slide show showed that loans between $500 and $1400 had to repaid within zero to six (0-6) months at an interest rate of 500-700%, and loans greater than $1400 had to be repaid within six to eighteen (6-18) months at an interest rate of 200-600%. <u>Id.</u> ¶ 94. Middlemarch is alleged to have assisted Curry in preparing another solicitation in 2017, which sought investments of up to $90 million to "refinance and expand [the American Web Loan payday lending scheme's] $45 million debt facility" to "double or triple its loan portfolio size over the next three to four years." <u>Id.</u> ¶ 108.

### B. Count One: Collection of Unlawful Debt Under RICO

The Racketeer Influenced and Corrupt Organizations Act ("RICO") makes it unlawful for any person "employed by or associated with any enterprise engaged in . . . interstate or foreign commerce to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of . . . collection of unlawful debt." 18 U.S.C. § 1962(c). RICO also makes it unlawful to conspire with a person "employed by or associated with an enterprise" to participate in the enterprise's affairs through the collection of unlawful debt. 18 U.S.C. § 1962(d). To establish a claim under RICO, a plaintiff must allege:

> [T]here was a RICO enterprise, (2) its activities affected interstate commerce, (3) the individual defendants were employed by or associated with the enterprise, (4) the [defendants] used, in the operation of the enterprise, income derived from the collection of unlawful debt, . . . (5) the individual defendants participated in the conduct of the affairs of the enterprise through collection of unlawful debt . . . within the meaning of RICO, . . . (6) the debt was unenforceable in whole or in part because of state or federal laws relating to

usury, (7) the debt was incurred in connection with the business of lending money at a usurious rate, and (8) the usurious rate was at least twice the enforceable rate.

Dillon v. BMO Harris Bank, N.A., 16 F. Supp. 3d 605, 618 (M.D.N.C. 2014) (alteration in original) (quoting Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 248 (2d Cir. 1985)). Before the Court addresses whether any defendants have conspired with an individual to participate in a RICO enterprise, there must first be an underlying violation of RICO. In Count One Plaintiffs allege that AWL, Curry, Sol,[8] Medley and the Taubes directly engaged in the collection of unlawful debt in violation of the RICO. Id. ¶¶ 209-22.

Medley Defendants and AWL make the following arguments in support of their Motions to Dismiss Count One of the Amended Complaint: 1) Medley Defendants and AWL argue that Plaintiffs have failed to allege a separate RICO enterprise; 2) AWL Defendants argue that Plaintiffs have failed to allege that there was an unlawful debt; and 3) Medley Defendants argue that Plaintiffs have failed to show that Medley associated with the RICO enterprise, participated in the conduct or affairs of the enterprise, or were the proximate cause of Plaintiffs' alleged injuries.

### i.    The RICO Enterprise

"[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). Thus, "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Myers v. Lee, 2010 WL 3745632, at *3 (E.D. Va. Sept. 21, 2010) (citing Reves v. Ernst & Young, 507 U.S. 170, 185 (1993)) (emphasis in original). Under RICO a "person" is defined as "any individual or entity capable of holding a

---

[8] As Defendants Curry and Sol have joined AWL's arguments in support of their motion to dismiss for failure to state a claim, as referenced in this Order, any reference to "AWL" or "AWL Defendants" also refers to Defendants Curry and Sol.

legal or beneficial interest in property." 18 U.S.C. § 1961. And, an "enterprise" is defined as an "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose." Boyle v. United States, 556 U.S. 938, 948 (2009); see also Chambers v. King Buick GMC, LLC, 43 F. Supp. 3d 575, 589 (D. Md. 2014) (citing United States v. Turkette, 452 U.S. 576, 583 (1981)). The term "association in fact" is broad and has a wide reach, encompassing "any ... group of individuals associated in fact." Id. at 944 (internal quotations and citations omitted) (emphasis in original). "[A] defendant can . . . be a person under the statute and also be part of the enterprise. The prohibition against the unity of person and enterprise applies only when the singular person or entity is defined as both the person and the only entity comprising the enterprise." United States v. Goldin Indus., Inc., 219 F.3d 1271, 1275 (11th Cir. 2000) (emphasis in original); see also Cedric Kushner Promotions, Ltd., 533 U.S. at 164 (noting that it is difficult to speak of a corporation as "employed by" or "associated with" an enterprise where "a corporation [is] the 'person' and the corporation, together with all its employees and agents, were the 'enterprise.').

Plaintiffs argue that the Amended Complaint alleges "an association-in-fact enterprise comprised of the RICO Defendants [those individuals named in Counts One and Two], other Defendants in this action, and a number of non-Defendant individuals and entities." Doc. 110 at 32. Further, Plaintiffs contend that each entity is a separate person who "participate[s] in the affairs of the associated-in-fact enterprise, which itself is not a legal entity." Id. at 32-33 (citing Boyle v. United States, 556 U.S. 938, 953 (2009)) (internal quotations omitted).

However, AWL and Medley Defendants claim that Plaintiff has failed to allege facts sufficient to support "showing an enterprise as a continuous unit that operates or functions in a

12

way distinct from the defendants themselves." Doc. 63 at 16 (citing Myers, 2010 WL 3745632 (E.D. Va. Sept. 21, 2010). In Myers, the plaintiff alleged that "[the organizations'] component entities share officers and directors and are otherwise interrelated," Myers, 2010 WL 3745632, at *3, and that the organization operated in a "top-down command and control . . . accomplished by defendants' acting through a series of interconnecting agency relationships, including . . . non-party participants." Id. Under those circumstances, the Court found that plaintiff failed to allege a distinct RICO enterprise because "[t]here [was] a complete overlap between the defendants, their alleged agents, and the enterprise" and there were no factual allegations in the complaint "that the affairs of the enterprise [were] any different from the affairs of the defendants." Id. at *4.

Plaintiffs aver that their case is distinguishable from Myers, as "there is not complete overlap between the [defendants named in Counts One and Two] and the alleged enterprise." Doc. 110 at 35. Plaintiffs point to the non-defendant entities and individuals and argues that the actions of each defendant show they were not simply engaged in "their own affairs" but were separately engaged specifically to associate with the RICO enterprise. Doc. 110 at 35. In support, Plaintiffs cite Chambers v. King Buick GMS, LLC, 43 F. Supp. 3d 575, 590 (D. Md. 2014). The court in Chambers found that its case was distinguishable from Myers because each defendant in its case was a separate incorporated entity, had its own business location and employees, and engaged in contractual or joint management activities. Id. at 590.

This Court **FINDS** that the enterprise alleged in this case is more analogous to the enterprise alleged in Chambers and is distinguishable from the enterprise alleged in Myers. Here, Plaintiffs have alleged that each of the defendants, as distinct entities, associated with each other and nonparties for the common purpose of exploiting the sovereignty of the Tribe to engage in the

13

practice of issuing usurious loans. Plaintiffs cite several facts from their Amended Complaint that support this association:

> American Web Loan Inc. and/or AWL, Inc. serves as the nominal lender of the illegal loans taken out by Plaintiffs and Class members and was created for the purpose of facilitating the illegal lending scheme and shielding it from state and federal law. Am. Compl. ¶¶ 16, 82, 85-86, 90, 93.

> Curry is the mastermind of the illegal lending scheme and continues to be in de facto control of the scheme's lending operations. Id. ¶¶ 17, 82, 84-86.

> The Medley Defendants provided, and continue to provide, financial backing to grow the illegal lending scheme. Id. ¶¶ 25, 30, 96. The Medley Defendants also control and direct the scheme through weekly calls with MacFarlane, American Web Loan, Inc., and/or AWL, Inc., quarterly on-site visits, frequent interaction with management, and board meeting attendance. Id. ¶¶ 97, 100-103. Moreover, as discussed in detail in connection with the Medley Defendants' participation in the affairs of the alleged enterprise . . . the Medley Defendants' own exhibits attached to their motion papers make clear that the Medley Defendants (1) made their financing contingent on the existence, validity, and enforceability of critical agreements underlying the illegal lending scheme; (2) had authority over changes to any of those agreements; (3) restricted Curry-controlled entities, including MacFarlane, from engaging in lines of business outside the illegal lending scheme; and (4) required weekly reporting on the financial performance of the illegal loans at issue in this case.

> The Tribe served to enact and maintain certain tribal laws and create tribal business organizations, including American Web Loan, Inc. and AWL, Inc., in furtherance of the illegal lending scheme and to help shield the illegal lending scheme from federal and state law. Id. ¶¶ 38, 83, 85-86, 88-90, 93. The Tribe did so in exchange for 1% of the proceeds from the illegal lending scheme. Id.

Doc. 110 at 34-35. Therefore, the Amended Complaint sufficiently alleges facts that support the identity of an enterprise separate and apart from the persons who take part in that enterprise.

### ii. Collection of Unlawful Debt

Under RICO an unlawful debt is defined, in relevant part, as a debt that is both: 1) unlawful under state or federal usury laws; and 2) that was incurred at a rate at least twice the state or federal usury rate. 18 U.S.C. § 1961(6).

14

AWL Defendants argue that the applicable law for determining whether the debt is unlawful is Otoe-Missouria tribal law, as each Plaintiff consented that tribal law would apply to his or her loan agreement. Defendants further claim that under Otoe-Missouria law the interest rates charged for Plaintiffs' loans are not usurious. Doc. 79 at 4, 14 (citing Doc. 79-7 ("2016 AWL Act") at 33, §1109). Because Plaintiffs' loans would not be considered usurious under tribal law, Defendants allege that Plaintiffs' Amended Complaint has failed to establish that AWL engaged in the collection of "unlawful debt." Id. at 14.

Plaintiffs aver that whether they assented to the illegal interest rates "has no bearing whatsoever on establishing a RICO claim for collection of unlawful debt as a matter of law." Doc. 110 at 25 (citing United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986) ("[A]ll that RICO requires is proof that a debt existed, that it was unenforceable under [the applicable state's] usury laws, that it was incurred in connection with the business of lending money at more than twice the legal rate, that the defendant aided collection of the debt in some manner, and that the defendant acted knowingly, willfully and unlawfully."); Arrington v. Colleen, Inc., No. CIV. AMD 00-191, 2000 WL 34001056, at *7 (D. Md. Aug. 7, 2000) ("The 'collection of unlawful debt' portion of section 1962(c) specifically targets loansharking and usurious lending.").

Plaintiffs have alleged facts supporting a claim that the choice of law provisions within AWL's loan applications should not apply to Plaintiffs loans. Specifically, Plaintiffs claim that they were "not advised of any purported choice of law" provision and that the choice of law provisions are unconscionable as they "seek to disclaim the application of federal and state law and impose the law of the Tribe as the sole governing law." Am. Compl. ¶¶ 138, 148, 160, 170, 186. Plaintiffs allege that the choice of law provisions were not disclosed to them before agreeing to the provisions, which supports an argument that the choice of law provisions would not apply.

Their legal argument of unconscionability is supported by citing language within the loan agreement which purportedly disclaims the application of federal and state law in favor of Tribal law. Id. ¶ 188. Further, the complaint clearly provides allegations that each loan was more than two times the interest applicable under each state's law. See Am. Compl. ¶¶ 145, 158, 168, 184 (alleging that respective loans were 60 times greater than the maximum allowed under Virginia law, 37 times greater than the maximum allowed under Nebraska law, 50 times greater than the maximum allowed under South Carolina Law, and 48 times greater than the maximum allowed under California law). As such, the Court **FINDS** that Plaintiffs' allegations of unconscionability are supported by facts in the complaint and Plaintiffs have alleged sufficient facts to satisfy the element that AWL Defendants, joined by Curry and Sol, engaged in the collection of unlawful debt.

### iii. Association with RICO Enterprise

Medley Defendants claim that, notwithstanding the existence of a distinct enterprise, Plaintiffs have failed to allege facts sufficient to support that they "associated with" the alleged RICO enterprise. Doc. 63 at 17. Specifically, Medley Defendants argue that Plaintiffs failed to provide factual allegations to support Medley's "role in the enterprise's functioning as a continuing unit," how they "participated in the enterprise's affairs rather than their own," or how they were "acting outside of the scope of their typical business affairs." Id. at 17-18 (emphasis in original) (citing Turkette, 452 U.S. at 583; Reves, 507 U.S. at 185; Levinson, 2006 WL 3337419 at *7). And, even if Plaintiffs could show such an association, Medley alleges that there is nothing linking Medley with Plaintiffs at the time that any unlawful debt was allegedly collected from Plaintiffs. Id. at 18 (citing Palmetto State Med. Ctr., Inc. v. Operation Lifeline., 117 F.3d 146, 148-49 (dismissing RICO complaint, in part, "because there is no evidence these defendants conducted

any of [the enterprise's] affairs whatsoever on the dates in question"). Medley also alleges that Plaintiffs' complaint impermissibly accuses Medley as a whole, when only one of their entities, Medley Fund, ever loaned money to Curry's entities. Doc. 63 at 17-18.

Plaintiffs respond by arguing that acts done in furtherance of an unlawful scheme in violation of RICO cannot be deemed "ordinary or normal business activities," even if those "activities may seem legitimate on the surface." Doc. 110 at 39 (quoting Levine v. First Am. Title Ins. Co., 682 F. Supp. 2d 442, 461 (E.D. Pa. 2010); Mitchell Tracey v. First Am. Title Ins. Co., 935 F. Supp. 2d 826, 844 (D. Md. 2013) (holding title insurance company and agents' activities in furtherance of scheme to charge title insurance premiums in excess of that allowed under state law, in violation of RICO, "are not conducted in the ordinary course of business")).

When viewed in the light most favorable to Plaintiffs, the Amended Complaint alleges sufficient facts to support a reasonable inference that Medley Defendants intended to associate with the unlawful enterprise. Plaintiffs' complaint alleges that Medley Fund provided its $22.9 million investment to grow the illegal lending scheme despite another potential investor backing out, and that Medley continued funding American Web Loans even after a Medley investor raised concerns directly to Brook and Seth Taube about American Web Loans "charging an unreasonable rate." Am. Compl. ¶¶ 109-10. Plaintiffs' Amended Complaint also refers to a "Credit Agreement" that was entered into between American Web Loans Holdings ("AWLH") and Medley Fund. Id. ¶ 64. The Credit Agreement is dated December 22, 2011, and as a condition precedent to closing the Loan, Medley Fund required that it be provided with the "AWL Documents" which are defined as:

> [T]he AWL Loan and Security Agreement, the AWL Software Agreement, the AWL Service Agreement, the AWL Participation Agreements, the AWL Controlled Account Agreements, the AWL Termination Agreement, the AWL Promissory Note, the AWL Loan Purchase Agreement, and the Cash Advance Agreements.

17

Doc. 65-2 at 88.[9] As defined in the credit agreement "AWL" was understood to mean "American Web Loan Inc." which is the first entity that was ever incorporated by the Tribe. Id. Plaintiffs also point to the number of Curry entities in which Medley invests, and the fact that Medley Defendants continue to have security interests in those entities.[10] Several of the entities in which Medley Defendants have security interests are entities that agreed to provide "Choice of Law" loans to fund American Web Loan, Inc. Am. Compl. ¶¶ 44-49.

Considering those facts, Plaintiffs' arguments are persuasive that "while the Medley Defendants' acts in furtherance of the illegal lending scheme might overlap with those in furtherance of lawful enterprises, or otherwise seem legitimate on the surface, when they are aware of and contribute to [a scheme that violates RICO], they cannot argue that they have a routine commercial relationship." See Doc. 110 at 41 (citing In re Duramax Diesel Litig., 17-cv-11661, 2018 WL 949856, at *31 (E.D. Mich. Feb. 20, 2018)). The facts regarding Medley's continued security interest in Curry entities that fund the lending scheme support a reasonable inference that Medley has continued to fund Curry's participation in the lending scheme.

Finally, although Medley Fund was the only Medley entity named in the Credit Agreement, Plaintiffs' Amended Complaint alleges that the management of the Medley Defendants is overlapping, and that the Taubes serve in various leadership positions within Medley. Am. Compl. ¶¶ 25-29. Therefore, Plaintiffs have alleged facts which support that Medley and the Taubes can be held accountable as a unit for the activities engaged in by each separate entity.

---

[9] Medley Defendants attached the credit agreement in support of their Motion to Dismiss. As the Credit agreement is incorporated by reference in Plaintiff's Complaint, the court may look to documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004) (citations omitted).
[10] Plaintiffs allege that there are thirty-two (32) entities total, and while Medley Defendants allege that the loans were paid off in 2015, Plaintiffs allege that Medley still has a secured interest in at least sixteen (16) Curry entities as of the date of the amended complaint. Doc. 110 at 47; Doc. 65-1 ("Fredericks' Decl.").

### iv. *Participation and Conduct of the Enterprise's Affairs*

"[T]o conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs [under RICO] one must participate in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 185, 113 S. Ct. 1163, 1173, 122 L. Ed. 2d 525 (1993).

Medley Defendants next argue that the complaint fails to allege facts that show that the Medley Defendants or the Taubes directed the affairs of American Web Loans. Doc. 63 at 19. In support, Medley Defendants cite NCNB Nat. Bank of N. C. v. Tiller, 814 F.2d 931, 936 (4th Cir. 1987), overruled on other grounds by Busby v. Crown Supply, Inc., 896 F.2d 833 (4th Cir. 1990). In NCNB Nat. Bank, the Fourth Circuit noted that:

> The normal incidents of a borrower-lender relationship, including monitoring, protection and disposition of collateral, do not amount to control. Actual day-to-day involvement in management and operations of the borrower or the ability to compel the borrower to engage in unusual transactions is required for the purposes of showing that a lending institution had control over a borrower.

NCNB Nat. Bank, 814 F.2d at 936 (emphasis added); see also Parm v. Nat'l Bank of Cal., N.A., 242 F. Supp. 3d 1321, 1346 (N.D. Ga. 2017); Berry v. Deutsche Bank Tr. Co. Am., No. 07 Civ. 7634 (WHP), 2008 WL 4694968, at *6 (S.D.N.Y. Oct. 21, 2008).

Medley Defendants argue that Plaintiffs have not otherwise shown that they "participated" in the RICO enterprise by "merely extending credit" or by retaining "a first lien security interest" because they do not "participate in the operation or management of the enterprise itself." Doc. 63 at 20.

The Credit Agreement between Medley Defendants and American Web Loan Holdings, LLC, ("AWLH") supports Plaintiffs' factual allegations that Medley Defendants went beyond the normal incidents of a borrower-lender relationship and sought to be engaged in the day-to-day involvement in management and operations of the borrower. As a condition precedent to issuing

its loan, Medley required AWLH to provide the "AWL Documents" which outlined "the existence, validity, and enforceability of various critical agreements that underlie the illegal lending scheme." See Doc. 110 at 50.

The Credit Agreement also required AWLH to provide Medley with notice "of any (i) amendments, consents, waivers or modifications by any party to any AWL Documents, (ii) default, event of default or any other breach under any AWL Document, (iii) the termination of any agreement contained in any AWL Document, (iv) dissolution or termination of the AWL entity, or (v) any notices received under any AWL Document." Doc. 110 at 51 (internal quotations omitted); Doc. 65-2 at 39. Further, an event of default under the Credit Agreement takes place when "[a]ny AWL Document . . . for any reason, ceases to be in full force and effect, or any party thereto contests in any manner the validity or enforceability of any AWL Document, or any party denies that it has any or further liability or obligation thereunder, or purports to revoke, terminate or rescind any AWL Document." Doc. 65-2 at 61. The Curry affiliates were also required to indemnify Medley for any loss associated with "any investigation or proceeding . . . arising out of or in connection with . . . any of the AWL Documents." Id. at 62. The agreement also forbids "the charter, by-laws or other organizational documents of a [Curry Affiliate] or any Subsidiary [from being] amended or modified in any way which could reasonably be expected to adversely affect the interests of [MOFII] without the prior written consent of [MOFII]." Id. at 58.

### v. *Proximate Cause of Plaintiffs' Injuries*

Finally, Medley Defendants argue that Plaintiffs have failed to allege facts sufficient to show that they are the proximate cause of Plaintiffs' injuries. Doc. 63 at 10. Proximate cause "requires some direct relation between the injury asserted and the injurious conduct alleged.'" Hemi Group, LLC v. City of New York, 559 U.S. 1, 9 (2010) (quoting Holmes v. Secs. Inv'r Prot.

20

Corp., 503 U.S. 258, 268 (1992)). In Hemi, the city of New York (the "City") attempted to sue an out-of-state cigarette distributor for failing to report required customer information with the State. Hemi, 559 U.S. at 4. The City alleged that the distributor's failure to report customer information led to the City's loss of revenue. Id. The Supreme Court noted that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 10, 130 S. Ct. 983, 989, 175 L. Ed. 2d 943 (2010). Medley Defendants contend that their role bears "no direct, first-step relation to Plaintiffs' alleged injury," as they did not collect usurious interest from Plaintiffs.

Plaintiffs concur that in determining whether a RICO plaintiff has alleged proximate cause, "[t]he 'central question'" in this Circuit "is whether the plaintiffs' injuries were the direct result of the alleged predicate act." Doc. 110 at 58 (citing Walters v. McMahen, 684 F.3d 435, 444 (4th Cir. 2012)); see also Busby v. Crown Supply, Inc., 896 F.2d 833, 840 (4th Cir. 1990) ("[T]he inquiry is not whether the plaintiff has alleged a direct or indirect injury, but rather whether he or she has alleged an injury that 'flows from' the predicate acts."); Angermeir v. Cohen, 14 F. Supp. 3d 134, 149 (S.D.N.Y. 2014) (a plaintiff "need allege only that each defendant . . . participated in the scheme and could reasonably foresee that" the alleged predicate acts would be committed "in furtherance of the same" (quotation omitted)).

Here, Plaintiffs have alleged that Medley Defendants' participated in extensive ongoing monitoring and rigorous oversight regarding its loan to AWLH. As indicated above, Plaintiffs' allegations support that Medley's monitoring included a thorough knowledge of the lending scheme between AWLH and American Web Loan, and sufficient control over AWLH's relationship with American Web Loan, Inc. For instance, Plaintiffs alleged that a board member of Medley's California Fund e-mailed Medley on May 7, 2013, and said, "[i]t appears we are

giving a reasonable loan to group which is charging an unreasonable rate." Am. Comp. ℙ 110. Such facts tend to show that Medley Defendants' actions serve as a direct and foreseeable cause of Plaintiffs' injuries. Plaintiffs would not have been subjected to the allegedly usurious loans if Medley did not incentivize the profitability of those loans. This is equally true for the members of the putative class; as Plaintiffs' Amended Complaint alleges, the putative class includes "[a]ll persons who took out loans from American Web Loan . . . [and] through the American Web Loan d/b/a entity known as Clear Creek Lending. The Class period begins on February 10, 2010 and continues through the present." Id. ℙ 198.

### C. Count Two: RICO Conspiracy

In Count Two Plaintiffs allege that the AWL, Curry, Sol, the Medley Defendants, the Taubes, GOLDPoint, and Middlemarch engaged in a RICO conspiracy. Id. ¶¶ 223-27. Defendants Middlemarch, GOLDPoint, and Medley each allege that Plaintiffs' complaint has failed to establish the requisite knowledge of the criminal activity.

#### i. Standard for Conspiracy

"A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." Salinas v. United States, 522 U.S. 52, 63 (1997). However, conspirators "must agree to pursue the same criminal objective." Id. RICO does not "criminalize mere association with an enterprise." United States v. Mouzone, 687 F.3d 207, 218 (4th Cir. 2012) (citations omitted). Instead, liability only attaches to "the knowing agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." Id. (internal quotations and citations omitted). Accordingly, to prove a RICO conspiracy, two things must be established: "(1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO

22

offense." United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998); see also Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990) ("Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint must, at the very least, allege specifically such an agreement."). Proof of an agreement to commit the overall objective of the RICO offense "may be established solely by circumstantial evidence." Id.

### ii. Medley

Medley Defendants allege that there is no evidence in Plaintiffs complaint which tends to show that they knew of, intended to, or agreed to provide funds to AWLH or Curry's entities "for the collection of unlawful debt." Doc. 63 at 27. Medley also argues that the actions of the individual Medley entities cannot be imputed on one another. Doc. 63 at 23.

Similarly, Plaintiffs argue that there is circumstantial evidence that Medley Defendants and the Taubes knew of the RICO conspiracy and that they continued to provide funding in support of the conspiracy. Doc. 110 at 68 (citing United States v. Baker, 598 F. App'x 165, 170 (4th Cir. 2015) (finding that "a single conspiracy may be shown by direct or circumstantial evidence that a defendant knew its essential object by demonstrating a tacit or mutual understanding between the defendants and other conspirators even where the connection is slight," and that an issue of multiple conspiracies arises "only in separate conspiracies unrelated to the overall conspiracy") (emphasis omitted); United States v. Tello, 687 F.3d 785, 793 (7th Cir. 2012) ("Ordinary conspiracy principles require only that the conspirators embrace a common criminal objective.").

As noted above, the Court **FINDS** that Plaintiffs have alleged facts sufficient to support a reasonable inference that Medley Defendants knew of the unlawful nature of the RICO enterprise and agreed to further it.

### iii.    *Middlemarch and GOLDPoint*

Unlike Medley, Middlemarch's only connection to the RICO conspiracy is that it aided MacFarlane Group in preparing a slideshow for a presentation to investors. Am. Compl. ¶¶ 224-227. Middlemarch contends that this engagement is entirely consistent with lawful conduct in the typical relationship between its clients as a service provider. Doc. 78 at 12. Therefore, Middlemarch claims that Plaintiffs have failed to allege that Middlemarch – as a third-party service provider – purposefully and knowingly directed or facilitated the alleged criminal enterprise. See Smith v. Berg, 247 F.3d 532, 537 n.11 (3d Cir. 2001).

Similarly, GOLDPoint argues that there are no facts in the complaint alleging that they knowingly pursued or intended to further endeavors that would constitute an unlawful objective. Doc. 82 at 13. As noted in the complaint, and shown in their software agreement, GOLDPoint's only connection with the lending scheme is that they provided "software and software support services" to MacFarlane Group, who agreed to pay for those services." Id.

Plaintiffs argue that any such lack of knowledge by Middlemarch is undermined by the fact that it helped prepare the details of the presentation, which show flow charts of the "essential rent-a-tribe" lending scheme. Doc. 110 at 64. For GOLDPoint, Plaintiffs point to the portions of GOLDPoint's agreement with AWLH that makes pricing contingent upon "the volume of illegal consumer loans originated and the number of active loan accounts, including certain per-application and per-closed loan fees." Doc. 110 at 73. Plaintiffs do not dispute that their allegations deal with GOLDPoint's services in this manner but allege that they "knowingly adopted the goal of furthering or facilitating the illegal lending scheme" by providing those services. Doc. 110 at 73.

The Court **FINDS** that these are insufficient allegations of an intent to agree to participate in a RICO scheme. As Middlemarch notes, the law requires Plaintiffs to allege facts showing that Middlemarch Partners "objectively manifested an agreement to participate directly or indirectly in the affairs of the enterprise" through the collection of an unlawful debt and "had knowledge of the essential nature of the plan" of the conspiracy. Tillett, 763 F.2d at 632. The sole act of preparing a slideshow, the contents of which are unclear, may have been done as a regular part of Middlemarch's business. Similarly, the Court **FINDS** that Plaintiffs' allegations as to GOLDPoint fall short of alleging the requisite knowledge of the criminal scheme. Unlike Medley, it appears that GOLDPoint was acting within the scope of an agreement to provide website services and there are no facts that show GOLDPoint had knowledge of or agreed to engage in the practice of aiding the allegedly unlawful issuance of AWLH's loans.

Accordingly, the Court **GRANTS** Middlemarch and GOLDPoint's Motions to Dismiss as to Count Two. It further **GRANTS** Plaintiffs leave to further amend their complaint if they do so within ten (10) days of this order.

## V. MOTION TO DISMISS COUNT THREE: EFTA CLAIMS

In Count Three Plaintiffs allege that the AWL Defendants, Curry, Sol, Medley, the Taubes, and GOLDPoint violated the Electronic Funds Transfer Act ("EFTA") by conditioning the extension of a line of credit upon the consumer's repayment by means of preauthorized electronic fund transfers. Am. Compl. ¶¶ 228-43.

### A. EFTA

The EFTA provides, in relevant part, that "no person may . . . condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers." 15 U.S.C. § 1693k.

## B. Arguments

### i. *AWL, Curry, Sol*

AWL Defendants argue that Plaintiffs have failed to state a claim under the EFTA because Plaintiffs fail to allege facts sufficient to support the allegation that their receipt of credit was conditioned upon agreeing to accept electronic funds transfers for repayment of loans. Doc. 79 at 17. As such, AWL Defendants argue that there is no violation of the EFTA. In support, AWL Defendants cite portions of the complaint which acknowledge that borrowers had "the option to receive their loan payments promptly via wire transfer" or "via paper check." Id.; Am. Compl. ¶¶ 238, 239. AWL Defendants also dispute Plaintiffs' arguments that they violated the EFTA because such options were "slower" than an electronic funds transfer, making them meaningless alternatives.

Plaintiffs argue that the terms of their loan agreements, including any funding and payment options, were not disclosed to them before agreeing to accept the loan. Doc. 113 at 15. Plaintiffs urge the Court to find that AWL Defendants violated the EFTA as alleged: that Plaintiffs were not given meaningful alternatives other than an electronic funds transfer because that was "the only way for a person to obtain the needed funds quickly." Doc. 113 at 16. Plaintiffs cite Gingras v. Rosette, 2016 WL 2932163 at \*24 (D.Vt. May 18, 2016) in support of their argument. In Gingras, the plaintiffs alleged that "the choice offered to consumers between funding 'as soon as the next business day' which [was] conditioned on electronic fund authorization and the much longer process offered for people electing to pay by mail [was] a false choice." Gingras, 2016 WL 2932163 at \*24. The defendants moved to dismiss the EFTA claim and the court denied the motion, stating:

> It is possible that Plaintiffs are correct that Defendants have so obstructed the choice of repayment by check with delay ("up to 7 to 10 days" plus the expiration of a "right of

26

rescission") that the option is a false choice. Given the nature of the loan itself—immediate cash at very high interest rates—it seems unlikely that Defendants ever funded a loan to any borrower with repayment by check. It remains for discovery and for fact-finding to determine if the loan agreement is drafted so as to skate around the restrictions of EFTA.

Id. (also citing Daye v. Cmty. Fin. Serv. Centers, LLC, 233 F. Supp. 3d 946, 969 (D.N.M. 2017) (finding that the lender violated the EFTA by making electronic funds transfer the default method of payment.); F.T.C. v. PayDay Fin. LLC, 989 F. Supp. 2d 799, 808 (D.S.D. 2013) ("All of the Defendants who issued loans used loan agreements that contained clauses authorizing electronic fund transfers ("EFT") from consumer accounts to repay loans . . . Many of those loan agreements allowed consumers to opt out of the EFT authorization.")).

The Court **FINDS** that Plaintiffs have alleged sufficient facts to support their EFTA claims. Plaintiffs have alleged that the borrowers did not have access to their loan agreements until <u>after</u> they accepted the loan agreements. Therefore, any alleged meaningful alternatives would not have been known by them. Accordingly, the Court **DENIES** AWL's motion to dismiss Plaintiffs' EFTA claim.

### ii.    *GOLDPoint*

Plaintiffs allege that GOLDPoint has violated the EFTA by providing a "lending suite that facilitates online loan originations, loan servicing, collections, accounting, reporting and marketing." Am. Compl. ¶ 22. GOLDPoint argues that Plaintiffs have failed to state a claim against them because Plaintiffs do not allege that GOLDPoint had any knowledge of the terms of the loans issued to Plaintiffs. Further, the agreement between AWL (formerly, MacFarlane Group) and GOLDPoint shows that GOLDPoint was merely a software provider. Doc. 82 at 14.

Additionally, GOLDPoint contends that Plaintiffs' complaint fails to allege that GOLDPoint "in fact conditioned the extension of credit to a consumer on the consumer's repayment by means of preauthorized electronic fund transfers." Id. Accordingly, GOLDPoint

27

urges the Court that it should not interpret the language of 15 U.S.C. § 1693k to extend so broadly as to encompass a passive service provider. Id.

The Court finds GOLDPoints' arguments persuasive. Accordingly, the Court **GRANTS** GOLDPoints' Motion to Dismiss Plaintiffs' EFTA claims, but **GRANTS** Plaintiffs leave to amend their complaint if they do so within ten (10) days of this order.

### iii.    *Medley Defendants and the Taubes*

Similarly, Medley argues that the EFTA claims against it cannot survive because Plaintiffs have not alleged that Medley Defendants directly issued any credit to the consumer. Rather, they urge that the issuance of credit was made by American Web Loan. Doc. 63 at 28 (citing Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 175-77 (1994)).

In response, Plaintiffs argue that Medley should be liable directly as a "financial institution" under the EFTA. The EFTA defines a financial institution as "a bank, savings association, credit union, or any other person that directly or indirectly holds an account belonging to a consumer, or that issues an access device and agrees with a consumer to provide electronic fund transfer services." Doc. 113 at 19 (citing 12 C.F.R. § 1005.2(i)) (emphasis added). Therefore, Plaintiffs allege that Medley is implicated not because they "aided and abetted" but because they controlled and manipulated the scheme.

As noted in Medley Defendants' Motion to Dismiss for failure to allege a claim for collection of unlawful debt under RICO, Plaintiffs have alleged sufficient facts to demonstrate that Medley participated in the conduct of the RICO enterprise, which supports a reasonable inference that they indirectly held the accounts belonging to Plaintiffs. Therefore, the Court **DENIES** Medley's Motion to Dismiss the EFTA claim.

28

## VI.    MOTION TO DISMISS COUNTS FOUR THROUGH EIGHT: TILA CLAIMS

The TILA requires, in relevant part, that a creditor "clearly and conspicuously" disclose 1) the "annual percentage rate and finance charge more conspicuously than other terms, data, or information provided in connection with a transaction;" 2) the identity of the creditor who is required to make the disclosure; 3) the total number of payments; 4) the schedule of payments; and 5) that any required disclosures be made before credit is extended. 15 U.S.C. §§ 1632(a), 1638(a)-(b).

Counts Four through Seven allege that AWL violated TILA by not disclosing particular information before extending credit to the named plaintiffs—specifically, the applicable finance charge (Count Four), the finance charge expressed as an annual percentage rate (Count Five), the total of payments (Count Six), and the schedule of payments (Count Seven). See Am. Compl. ¶¶ 248, 254, 260, 266. Particularly, Plaintiffs allege throughout their Amended Complaint that no plaintiff and the members of the class was not provided with or shown copies of their loan agreements until after they received their loans. Am. Compl. ¶¶ 134, 139, 149, 163, 175, 248, 254, 260, 266.

AWL attempts to show that Plaintiffs have failed to state a claim under Counts Four through Seven of the TILA violations based on external evidence that the website contained a box which required Plaintiffs to assent that they had reviewed the terms of their loan agreement prior to signing their loan agreement. Doc. 79 at 5-6, 19.

AWL's evidence regarding these claims creates a factual dispute, but it does not rebut the fact that Plaintiffs, by asserting that they were not provided copies of their loan agreements, have stated claims for relief under the cited portions of the TILA.

In Count Eight, Plaintiffs allege that AWL failed to disclose the "true creditor on the loans" because AWL was not the "lender in fact." A "creditor" is defined under the TILA as "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." 15 U.S.C. § 1602(g). AWL contends that Plaintiffs' allegation under Count Eight is contradicted by Plaintiffs' Amended Complaint, which alleges "Defendant AWL, Inc. is a 'creditor' for purposes of TILA." Doc. 79 at 20. AWL contends that Plaintiffs' theory that AWL had to disclose the identity of the "lender in fact"—the person who performed key lending functions—finds no basis in law. Id.

To support their argument Plaintiffs cite Consumer Fin. Prot. Bureau v. CashCall, Inc., No. CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *5 (C.D. Cal. Aug. 31, 2016). In CashCall I the plaintiff alleged that defendants engaged in unfair practices under the Consumer Financial Protection Act. See CashCall I, 2016 WL 4820635 at *4. In order to conduct its analysis, the Court had to determine who was the "true lender" or "de facto lender" under the loan for purposes of establishing liability under the contract. Id. In doing so, the court relied on the substance of a loan agreement, rather than its form. Id. at *6 (citing Ubaldi v. SLM Corp., 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (conducting an extensive review of the relevant case law and noting that, "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); Eastern v. Am. West Financial, 381 F.3d 948, 957 (9th Cir. 2004) (applying the de facto lender doctrine under Washington state law and recognizing that "Washington courts consistently look to the substance, not the form, of an allegedly usurious action"); CashCall, Inc. v. Morrisey, No. 12-1274, 2014 WL 2404300, at *14 (W. Va. May 30, 2014) (unpublished) (viewing the substance, not form, of the transaction to determine if the loan was usurious under West Virginia law); People

ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del., 846 N.Y.S.2d 436, 439 (N.Y. App. Div. 2007) ("It strikes us that we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function.").

Plaintiffs argue that AWL and AWL II serve as a nominal creditor as it receives only 1% of the revenues from the loans, and the actual lenders/creditors are Curry-controlled entities because they perform all substantive lending functions and bear the economic risk. Doc. 113 at 14. Plaintiffs allege that the loans only remain with AWL for a period of fourteen (14) days before they are "sold" to Curry's entities. Am. Compl. ¶ 87.

Accordingly, the Court **FINDS** that Plaintiffs have alleged sufficient facts to support their claim that the Curry-controlled entities are the lenders in fact and that AWL II is only a "nominal lender."

## VII. MOTION TO DISMISS COUNT NINE: UNJUST ENRICHMENT CLAIM

### A. Legal Standard

Unjust enrichment "rests upon the doctrine that a man shall not be allowed to enrich himself unjustly at the expense of another." Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 165 (4th Cir. 2012) (quoting Kern v. Freed, 299 S.E.2d 363, 365 (Va. 1983)). A plaintiff asserting unjust enrichment must establish "(1) he conferred a benefit on [the defendant]; (2) [the defendant] knew of the benefit and should reasonably have expected to repay [the plaintiff]; and (3) [the defendant] accepted or retained the benefit without paying for its value." Id. at 165–66 (applying Virginia law) (internal quotations and citation omitted).

## B. Analysis

### i. *AWL Defendants, Curry, and Sol*

AWL Defendants argue that the benefit conferred upon them was pursuant to a valid contract and therefore the unjust enrichment claims must fail. Doc. 79 at 21 (citing case law from each plaintiff's state indicating that where an express contract exists, an unjust enrichment claim cannot lie).

AWL's argument is unavailing. As noted above, Plaintiffs have alleged sufficient facts challenging the validity of their contract with AWL that supports a cause of action against AWL for unjust enrichment. Additionally, it is clear that Plaintiffs have alleged facts sufficient to support a claim that they conferred a benefit on AWL, that AWL had knowledge that the benefit was being conferred on them, and that AWL accepted the benefit. The same arguments apply to Defendants Curry and Sol. Though Curry and Sol did not contract directly with plaintiffs, the Amended Complaint sufficiently alleges their involvement in the lending scheme.

### ii. *Medley Defendants and the Taubes*

Medley Defendants argue that they are too far removed from the transactions for Plaintiffs to have conferred a benefit on them. See Doc. 63 at 29. As the Court has indicated above, Plaintiffs seek class certification for individuals who obtained loans from AWL during the timeframe in which Medley engaged in the Contract Agreement with AWLH to finance AWL's participation in obtaining usurious loans from the class of plaintiffs.

Plaintiffs allege that, as one of the initial financers of the AWL scheme, Medley Defendants gained a first lien security interest on substantially all of MacFarlane Group and/or American Web Loan. Am. Compl. ¶ 97. Plaintiffs further allege that Medley "maintained control" of the funds

needed to carry out AWL's goals. Id. In a similar case, the Gingras court found that the retention of allegedly illegal wealth by a company involved in a scheme similar to the one at issue here, was a sufficient "benefit" to one of its substantial investors for unjust enrichment purposes. 2016 WL 2932163, at * 26. Thus, accepting Plaintiff's allegations as true for the purposes of this motion, Plaintiffs have conferred a benefit onto Medley by enriching assets over which Medley retains control and lien interests.

Moreover, Plaintiff alleges that Medley engaged in "extensive and ongoing monitoring" of each of its investments, which presumably would include its $22.9 million investment in AWL. Am. Compl. ¶¶ 100-01. Additionally, Plaintiffs cited an email which purports to show that Medley was at least on notice of AWL's unreasonable interest rates. Id. ¶ 110. With that evidence, Plaintiffs have pleaded facts indicating that Medley was aware of its benefit, that Medley retained such benefits, and that it would be inequitable for Medley to retain the benefits without the Plaintiffs being made whole. Such allegations are sufficient to survive a motion to dismiss.

Accordingly, Plaintiffs have alleged facts sufficient to support a claim that Plaintiffs conferred a benefit on Medley, that Medley had knowledge that Plaintiffs were conferring the benefit, and that Medley accepted the benefit under circumstances that render it inequitable for Medley to retain the benefit. Therefore, the Court **DENIES** AWL Defendants and Medley Defendants Motions to Dismiss for failure to state a claim for unjust enrichment.

### iii. *GOLDPoint and Middlemarch*

The Court **SUSTAINS** GOLDPoint and Middlemarch's objections to Plaintiff's Amended Complaint as to Plaintiffs unjust enrichment claim against them. As indicated above, Plaintiffs have not alleged sufficient facts to support a reasonable inference that GOLDPoint and Middlemarch knowingly agreed and assented to profit from an unlawful lending scheme.

Therefore, the Court **GRANTS** GOLDPoint and Middlemarch's Motions to Dismiss Plaintiffs' Unjust Enrichment claims but **GRANTS** Plaintiffs leave to amend their complaint if they do so within ten (10) days of this order.

## VIII.  MOTION TO DISMISS FOR LACK OF JURISDICITON AND IMPROPER VENUE

Medley Defendants make two arguments in support of their Motion to Dismiss for lack of personal jurisdiction.  First, Medley argues that the Court lacks personal jurisdiction under Virginia's long-arm statute. Second, Medley Defendants and the Taubes (collectively, "Medley Defendants") argue that Plaintiffs have failed to show a colorable RICO claim against them and therefore, they cannot establish personal jurisdiction over them.  Doc. 65 at 15.  Additionally, Medley Defendants argue that exercising personal jurisdiction under RICO would offend due process under the facts of this case.  Id.

### A. Personal Jurisdiction

"[A] federal court's exercise of jurisdiction over a person is closely linked to effective service of process."  ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 622 (4th Cir. 1997).

> Rule 4(k) enumerates five sources authorizing service to effect *in personam* jurisdiction: (1) state law; (2) Federal Rules of Civil Procedure 14 and 19 (relating to third party practice and joinder), provided service is effected "not more than 100 miles from the place from which the summons issues;" (3) the federal interpleader statute, 28 U.S.C. § 1335; (4) federal statute; and (5) Federal Rule of Civil Procedure 4(k)(2) itself, to enforce claims "arising under federal law" on defendants who are not subject to the jurisdiction of any state.

Id.

#### i.    Jurisdiction Under RICO

Under the RICO statute there are two approaches to determining whether the Court has jurisdiction.  Doc. 65 at 15.  The majority view, adopted by the Second, Seventh, Ninth, and Tenth

Circuits, holds that nationwide service of process in RICO suits is governed by section 1965(b), which provides that "[i]n any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof." 18 U.S.C. § 1965(b). On the other hand, the minority view adopted by the Fourth Circuit provides for nationwide service under 18 U.S.C. § 1965(d), which states that service of process is appropriate "in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965. The Fourth Circuit has noted that:

> The RICO statute authorizes venue for civil actions in any district in which the defendant resides, is found, has an agent, or transacts his affairs. . . [a]nd it authorizes service of process in any judicial district in which such person resides, is found, has an agent, or transacts his affairs . . . evidencing Congress' desire that "[p]rovision [be] made for nationwide venue and service of process.

ESAB Grp., Inc., 126 F.3d at 626 (internal quotations and citations omitted).

Accordingly, under the Fourth Circuit's test, jurisdiction is proper as to Medley so long as the Plaintiffs have alleged a colorable RICO claim against them. See Sadighi v. Daghighfekr, 36 F. Supp. 2d. 267, 274 (D.S.C. 1999).

Although Defendants urge the Court to apply the majority view, the Court declines to do so, as there is binding Fourth Circuit precedent on point. As noted above, Plaintiffs have alleged sufficient facts to support a colorable RICO claim against Medley Defendants.

Notwithstanding that Plaintiffs have alleged a colorable RICO claim against Medley, Medley Defendants argue that "the exercise of personal jurisdiction over them under § 1965 would be constitutionally unreasonable under the Fifth Amendment." Doc. 65 at 22. Medley Defendants argue that this Court should dismiss claims by Plaintiffs who do not reside in Virginia under the

Supreme Court's decision in Bristol-Myers Squibb Co. v. Superior Court of California, 137 S. Ct. 1773 (2017). In Bristol, more than 600 plaintiffs—most of whom were not California residents— sued Bristol-Myers Squibb ("BMS") in California state court for alleged injuries arising from their use of BMS's product. Id. at 1777. The Supreme Court held that non-resident plaintiffs could not establish specific personal jurisdiction over BMS under the Fourteenth Amendment, stating that personal jurisdiction requires an affiliation between the forum and the controversy, and "[w]here there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." Id. at 1780-81. The Supreme Court left open the question of whether the Fifth Amendment imposes the same restrictions. Id. at 1784.

Plaintiffs note that a violation of due process occurs when the litigation in the chosen forum is "so gravely difficult and inconvenient" as to put defendants "unfairly . . . at a severe disadvantage in comparison to [their] opponent." Doc. 115 at 21 (citing D'Addario v. Geller, 264 F. Supp. 2d 367, 387 (E.D. Va. 2003) (citation omitted)). Plaintiffs argue that exercising jurisdiction against Medley Defendants and the Taubes is proper as the Medley entities are "well-heeled financial institutions that operate and invest throughout the United States." Doc. 115 at 21. Further, Plaintiffs cite case law from the Fourth Circuit and other courts that have found that "when a defendant is a United States resident, it is [only in] 'highly unusual [cases] that inconvenience will rise to a level of constitutional concern.'" Doc. 115 at 22 (citing Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc., 791 F.3d 436, 444 (4th Cir. 2015) (quoting ESAB, 126 F. 3d at 627)); Republic of Pan. v. BCCI Holdings (Lux.) S.A., 119 F.3d 935, 947 (11th Cir. 1997) (same).

Plaintiffs also distinguish Bristol, arguing that in Bristol "the claim was brought by a non-resident and "involve[d] no harm in California and no harm to California residents." Doc. 115 at

36

24. Here, Medley Defendants are alleged to have engaged in and conspired to engage in a RICO conspiracy that has reached into Virginia by AWL offering loans to a Virginia resident. Additionally, Plaintiffs cite case law from this Court raising doubts as to the applicability of Bristol to class actions. Doc. 115 at 25 (citing Branch v. Gov't Emps. Ins. Co., 323 F.R.D. 539, 553 n.10 (E.D. Va. 2018) (stating in dicta that a class action defendant's "rather unique" attempt to use Bristol to challenge the Court's exercise of personal jurisdiction was "based on a rather strained reading of [Bristol] that has been soundly rejected by other courts.").

The Court finds Plaintiffs' arguments persuasive. Accordingly, the Court **DENIES** Medley Defendants' Motions to Dismiss for Lack of Personal Jurisdiction. As the Court **FINDS** that personal jurisdiction is proper under the RICO statute, there is no need to separately address whether the Court has personal jurisdiction over Medley under the Virginia Long Arm Statute.

## B. Motion to Dismiss Improper Venue

Medley Defendants argue that "even if Plaintiffs could establish RICO jurisdiction over at least one Defendant, the ends of justice neither require nor permit MOF II LP, Medley LLC, MCC, MMI, Medley Group, or the Taubes to be hailed into this District." Doc. 65 at 25. Specifically, Defendants allege that venue is not proper under section 1391(b)(1) because Plaintiffs do not allege any Defendant resides in Virginia. Am. Compl. ¶¶ 14-37. Further, Medley Defendants aver that venue is not proper under 1391(b)(2) because "a substantial part of the events or omissions giving rise to [each of Plaintiffs'] claim[s]" did not occur in this District." Doc. 65 at 26.

Second, Medley Defendants argue that venue is improper under 18 U.S.C. § 1965. Doc. 65 at 27. Section 1965(a) provides an action against a person may commence where such person "resides, is found, has an agent, or transacts his affairs." § 1965(a). Section 1965(b) provides that where an action is commenced and where "the ends of justice require that other parties residing in

any other district be brought before the court," such other parties may be served in any judicial district. Id. Section 1965(d) provides that "other process" in a RICO proceeding may be served on a person where that person "resides, is found, has an agent, or transacts his affairs." Id. Medley Defendants argue that Plaintiffs have failed to allege facts showing that any Defendants reside, are found, have agents, or transact their affairs in this District. They further argues that even if venue were proper as to another Defendant under section 1965(a), the ends of justice do not require Medley Defendants to be brought before this Court. Doc. 65 at 29.

Plaintiffs respond by contending that Medley Defendants' participation in the RICO conspiracy provides a substantial basis for venue being proper under 1965(a), and even if venue is not proper under 1965(a), venue is proper under 1965(b), because venue is proper as to the AWL Defendants. Doc. 15 at 40 (citing R.J. Reynolds Tobacco Co. v. Mkt. Basket Food Stores, Inc., No. 5:05CV253-V, 2006 WL 2417269, at *4 (W.D.N.C. Aug. 21, 2006) ("[S]ection 1965(b) endeavors to ensure that at least one forum is available to a plaintiff litigating RICO conspiracy claims.")). Specifically, Plaintiffs allege that American Web Loan has sufficient contacts with the state of Virginia as it "transacted its affairs in Virginia, offering loans to Virginia residents, including Mr. Solomon." Id. (citing Gingras, 2016 WL 2932163, at *19 (finding venue proper in factually similar tribal lending scheme based on illegal loan transactions with district residents, which satisfied 'transacts his affairs' prong of section 1965(a))).

In its Order denying AWL's Motion to Transfer Venue, the Court **FOUND** that venue is proper in the Eastern District Virginia regarding the underlying RICO claims against AWL Defendants, Curry, and Sol. Opinion & Order I at 38. The Court also **FOUND** that Plaintiffs have sufficiently alleged facts supporting Medley's engaged in the RICO conspiracy. Supra at 22-24.

Therefore, Court **DENIES** Medley Defendants' Motion to Dismiss for lack of personal jurisdiction and improper venue.

## IX.    MOTION TO DISMISS FOR FAILURE TO JOIN A NECESSARY PARTY

Medley Defendants also argue that the Tribe is a necessary and indispensable party to this action, and that the case must be dismissed because joining them to the action would deprive the Court of subject matter jurisdiction. Doc. 62.

### A.  Joinder of a Necessary Party

Under Federal Rule of Civil Procedure 19(a), a party is necessary in two situations. First, where "the court cannot accord complete relief among the existing parties" in that person's absence, Fed. R. Civ. P. 19(a)(2)(A), and second, where "that person claims an interest relating to the subject of the action" and is so situated that disposing of the matter without that person may "impair or impede the person's ability to protect the interest" or "leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Id. at R. 19(a)(1)(B). If a party is necessary, but joining that party would deprive the Court of subject matter jurisdiction, the Court must further inquire as to whether that party's involvement is "indispensable" to the action such that "in equity and good conscience" the court cannot proceed without them. See Fed. R. Civ. P. 19(b). In determining whether the party is "indispensable" the court considers:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>      (A) protective provisions in the judgment;
>      (B) shaping the relief; or
>      (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

39

Fed. R. Civ. P. 19(b). Dismissal of an action is required only if a non-joined party is both "necessary" and "indispensable." Home Buyers Warranty Corp. v. Hanna, 750 F.3d 427, 433 (4th Cir. 2014). Otherwise, "if a person has not been joined as required, the court must order that the person be made a party." Fed. R. Civ. P. 19(a)(2). The burden of proof regarding whether a party should be joined to an action rests on the party raising the defense. Am. Gen. Life & Accident Ins. Co. v. Wood, 429 F.3d 83, 92 (4th Cir. 2005).

## B. Discussion

In support of their motion, Medley Defendants claim that "[t]he role of the Tribe is central to Plaintiffs' allegations, as are corporations owned by and formed under the Tribe's laws" and "[t]he Complaint focuses on the Tribe as the medium through which Mr. Curry allegedly 'masterminded' an illegal payday lending scheme." Doc. 63 at 30-31.

In opposition, Plaintiffs argue that the Tribe is not a necessary or indispensable party based on two factors. First, they argue it is not clear that the Tribe has affirmatively indicated that it claims an interest in the action. Doc. 109 at 4; see Am. Gen. Life & Acc. Ins. Co. v. Wood, 429 F.3d 83, 92 (4th Cir. 2005) (affirming district court's conclusion that (a) party was not necessary for complete relief and (b) "had not claimed an interest in the" action); Virginia Int'l Terminals, LLC v. Keystone Transp. Sols., LLC, No. 2:17cv537, 2018 WL 2054578, at *8 (E.D. Va. Apr. 5, 2018) (finding absent party had not "claimed an interest in the subject matter of this action" where absent party had not "affirmatively indicated" interest to this Court), report and recommendation adopted, No. 2:17cv537, 2018 WL 2050144 (E.D. Va. May 1, 2018).

Plaintiffs cite Commonwealth of Pennsylvania v. Think Finance, Inc., No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016) to support their argument. The factual circumstances in Think Finance are analogous to this case. In Think Finance, a plaintiff sued an entity engaged

in a "rent-a-tribe" scheme and defendants moved to dismiss for failure to join the Indian tribe as a necessary party. Think Finance, 2016 WL 183289 at *4. While the Tribe claimed contractual and sovereign interests in the litigation, the court concluded that the relief sought only impacted the defendants and not the Tribe as "the tribes are free to continue making loans" even if the Court found against the Defendants. Id. at *7.

As in Think Finance, the Court **FINDS** that it can accord complete relief among the existing parties. Plaintiffs request the following relief: (1) certification as a class; (2) declaration that AWL's loans are unlawful, unenforceable and void; (3) a finding in their favor on all counts; (4) an award to plaintiffs and the class of equitable relief, including but not limited to: an accounting; return of all unlawful interest and finance charges paid in connection with the loan; disgorgement of profits; a constructive trust; restitution; and/or any other remedy the Court deems proper; (5) treble damages; (6) an injunction against further violations of the law; (7) an order awarding attorney's fees and costs; and (8) any such other relief that the court deems just and proper. Am. Compl. at 108-09 ¶¶ A-J. As the supplemental materials provided in the parties' jurisdictional discovery illustrate, while the Tribe is nominally involved in this action through creating the alleged tribal entity, the Court can accord complete relief to plaintiffs without implicating the Tribe. Plaintiffs' relief under RICO deals primarily with Mark Curry's manipulation and control of the tribal lending entity, not with the Tribe's actions of engaging in online lending.

The Court also **FINDS** that disposing of this action in the Tribe's absence will not "as a practical matter impair or impede [the Tribe's] ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19. If the Court were to ultimately grant the relief which Plaintiff seeks, it would not have to order the Tribe to do or refrain from doing

anything. Indeed, even if Plaintiffs ultimately prevail on the merits, the Tribe would be free to continue issuing loans on the reservation. Put another way, resolving the claims brought by Plaintiffs would not place obligations on the Tribe. There is no relationship between the Tribe and Plaintiffs; moreover, the Tribe's relationship to this suit – if one exists – is marginal at best. As explained above – Plaintiffs only seek redress from the named Defendants and bring no contract claims which may otherwise implicate the Tribe.

The overall lending scheme at issue here uses the Tribe as a conduit through which the named Defendants seek to escape liability. The Tribe was not involved in granting the loans or collecting them. Furthermore, AWL has no liability to the Tribe, because the property of the Tribe, Directors, and officers are "exempt" from the liabilities of AWL. Doc. 73-9 at 13. While the promissory note contains a clause which purports to require the Tribe to indemnify Curry, it seems dubious to argue that that provision is enforceable, given the substantial impact that would have on the Tribe's treasury. The cost of this litigation is sure to be substantial, and to require the Tribe to pay the Curry Defendant's bills – or worse, join the Tribe as a Defendant – would drain the Tribe's apparently limited resources. In other words, the Tribe likely cannot afford to be a party to this litigation, and their joinder is not necessary to give complete relief to the Plaintiffs. Therefore, the Tribe need not be joined under Rule 19.

To the extent that the Tribe's absence may impede their ability to protect the interest in funds that are distributed to the Tribe through AWL II's revenue, the Court notes that Plaintiffs have sufficiently alleged that the revenues primarily benefit Curry. Therefore, even if the Tribe was a "necessary" party, it would not be indispensable because the "extent to which a judgment rendered in [the Tribe's] absence" effects the Tribe's interest, and any resulting prejudice to the Tribe, can be avoided. The Court may shape the relief in such a manner that any judgement by the

42

Court attaches to revenues inured to Curry in his individual capacity or Curry's entities, rather than those of the Tribe. Plaintiffs would also be highly prejudiced if the case was dismissed for nonjoinder, which weighs strongly against joinder in this case due to the minimal percentage of the revenue that inures to the Tribe.

Accordingly, the Court **DENIES** Medley Defendants' Motion Dismiss for Failure to Join a Necessary party.

## X. CONCLUSION

For the reasons stated herein, the Court **DENIES** AWL Defendants, Defendants Curry and Sol's and Medley Defendants' Motions to Dismiss, Docs. 62, 64, 76, and 87, in their entirety, and the Court **GRANTS** GOLDPoint and Middlemarch's Motions to Dismiss, Docs 77, 81, in their entirety. The Court **GRANTS** Plaintiffs further **LEAVE TO AMEND** their complaint as to GOLDPoint and Middlemarch within ten (10) days of this order.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March **20**, 2019

43