IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - -
                                    )
ROYCE SOLOMON, et al.,              )
individually and on behalf of       )
all others similarly situated,      )        CIVIL ACTION NO.
                                    )            4:17cv145
         Plaintiffs,                )
                                    )
v.                                  )
                                    )
AMERICAN WEB LOAN, INC.,            )
et al.,                             )
                                    )
         Defendants.                )
- - - - - - - - - - - - - - - - - - -


TRANSCRIPT OF TELEPHONIC PROCEEDINGS
**(Motion Hearing)**

Norfolk, Virginia

October 19, 2020


BEFORE:   THE HONORABLE HENRY COKE MORGAN, JR.
          United States District Judge


Carol L. Naughton, Official Court Reporter

APPEARANCES:   (Via teleconference)

          BERMAN TABACCO
          By:  Kathleen M. Donovan-Maher
                    - and -
          CONSUMER LITIGATION ASSOCIATES
          By:  Leonard A. Bennett
                    - and -
          GRAVEL & SHEA PC
          By:  Matthew B. Byrne
                    - and -
          MICHIE HAMLETT
          By:  David W. Thomas
                    Counsel for the Plaintiffs


          O'HAGAN MEYER PLLC
          By:  Charles K. Seyfarth
                    - and -
          WILMER CUTLER PICKERING HALE & DORR LLP
          By:  Jonathan Paikin
               Thomas L. Strickland
                    - and -
          WILLIAMS & CONNOLLY LLP
          By:  Robert M. Cary
               Simon A. Latcovich
                    Counsel for the Defendants


          THE SARRETT LAW FIRM PLLC
          By:  Drew D. Sarrett
                    - and -
          LANGER GROGAN & DIVER P.C.
          By:  Irv Ackelsberg
               John Grogan
                    Counsel for Interested Party Diana Butler


          BORDAS & BORDAS, PLLC
          By:  Jason Causey
                    Counsel for Interested Party Charles P.
                    McDaniel

(Proceedings commenced at 2:31 p.m.)

THE CLERK:  Civil Action Number 4:17cv145, Royce Solomon, et al. v. American Web Loan, et al.

Counsel, please identify yourself when you speak.

THE COURT:  This is a motion for a continuance of the hearing scheduled to be conducted over Zoom on Wednesday of this week.  It's a joint motion.  Who would like to speak first in support of the motion?

MR. BENNETT:  Your Honor, this is Leonard Bennett. We haven't coordinated with the other two objector teams --

THE COURT:  I'm sorry, I can't...

MR. ACKELSBERG:  Your Honor, I'm here, too.

MR. BENNETT:  This is Leonard Bennett, Judge.  I'm one of the attorneys representing one of -- the Virginia group of objectors.  We haven't coordinated who would speak with the other two objector teams.  We haven't spoken as a prelude to this hearing.  I can state our position, but I don't know that I can necessarily advocate on behalf of Pennsylvania and West Virginia.

MR. ACKELSBERG:  Your Honor, this is Irv Ackelsberg. I represent the Pennsylvania objector, Ms. Butler, and I'm able to speak this afternoon, as well.

THE COURT:  All right.  Well, the objectors -- who actually initiated this request?  I can't tell if it was the Solomon plaintiffs or the defendants or the objectors.

MR. ACKELSBERG:  Your Honor, it was the objectors that filed the request.  We're asking for discovery which has not been forthcoming from plaintiffs' counsel.  We're looking for certain data about the conflicts that we believe exist within the class.  So it was -- it was the objectors that asked that the hearing be briefly postponed just so that we could get the discovery that plaintiffs have, so far, not given us.

THE COURT:  Well, the Court is looking for some discovery in this case, too, which I sent an e-mail to the parties, and I haven't received any reply to that.  The Court outlined the discovery that it was seeking at the preliminary approval hearing, but it has not yet been received.  I believe it would have to come from counsel for the defendant.

So who is speaking for the defendant?

MR. PAIKIN:  Your Honor, this is Jonathan Paikin for AWL.  I actually think that the appointed class counsel have responded to Your Honor's question and are probably the best to respond.

THE COURT:  All right.  If you have the information, let me hear about it.

MR. THOMAS:  Your Honor, good afternoon.  This is David Thomas, and I represent -- I'm local counsel for the class, and we have that information, and I can provide it to the Court right now by telephone, or I can provide it in a

writing.  And I apologize, we were under the impression that the Court wanted that information at the final approval hearing, and that's why it had not been submitted in advance of that hearing.

THE COURT:  Well, I didn't ask you to present it in advance.  I just wanted to make sure you had it because we can't have a consideration of the approval until we have it.

MS. DONOVAN-MAHER:  Your Honor, if I may, this is Kathleen Donovan-Maher from Berman Tabacco on behalf of the plaintiffs.

And with regard to one of your questions, where you were asking about the total interest paid, we have provided that information in our final approval papers.  That was in ECF 423 at Page 24 and also at ECF 423-2 at paragraph 6, and so that does answer the question that the Court had raised at the preliminary approval hearing with regard to the total-interest figure.

Subsequent to submission of those final approval papers, we received the Court's request for information from your Deputy Clerk's e-mail, and as Mr. Thomas has said, we are prepared to provide that information to the Court at the final approval hearing on Wednesday.

THE COURT:  Well, are you telling me -- I'm in a bit of a difficult situation because I no longer have a law clerk.  I had planned to retire some time back, but because

of the pandemic and the various delays, I haven't done that.

So are you saying you've already filed that information with the Court?

MS. DONOVAN-MAHER:  Yes, Your Honor, we have.

THE COURT:  Do we have that, Lori?

THE CLERK:  What was the ECF reference?

THE COURT:  ECF 423 at Page 24 and 423-2 at paragraph 6.

THE CLERK:  Thank you.

MS. DONOVAN-MAHER:  You're welcome.

THE COURT:  All right.  Well, unfortunately, I haven't seen that filing, but that does report the total interest that was charged during the related period.

Now, how have the claims come in as against the total money available to pay the claims?  Is there enough money to pay all the claims in the pool or not?

MS. DONOVAN-MAHER:  Your Honor, again, this is Kathleen Donovan-Maher.

The total-interest figure above the loan amount is $471-million-plus, and the cash component to the settlement is $65 million.

THE COURT:  Why is it so insufficient?  Have claims been made for -- how much interest has been claimed by the members of the Solomon group?

MS. DONOVAN-MAHER:  Your Honor, the process for

claims here in the case is an automatic process in the sense that there is no need for a claim form for loans that were taken out during the period January 2012 through June 26, 2020.  People who have made loan payments in excess of the principal amount of the loan will automatically be eligible for a cash award.

So that's where that $471 million figure comes from. Based on the data that AWL provided to the class administrator, AB Data, we've been able to determine, looking at the data, that the total payments in excess of the loan amount is the $471 million.

And that $65 million cash component here represents 13.8 percent of recovery for class members eligible just for the cash award, not factoring in the debt forgiveness piece and all the other nonmonetary benefits that the settlement brings to the class members.

THE COURT:  Well, the debt relief was around $70 million, wasn't it?

MS. DONOVAN-MAHER:  $76 million, Your Honor.

THE COURT:  Well, will the debt relief be applied -- well, of course, they've already paid that interest.  We're not talking that $471 million is going to include interest that might be otherwise due and owing that hasn't been paid. Is that what that 70 million is for, or is the 70 million going to be added to the cash?

Carol L. Naughton, Official Court Reporter

MS. DONOVAN-MAHER:  Again, this is Kathleen.

With regard to the $76 million in debt forgiveness, that is loans that were in default in AWL's loan portfolio.

I'm not sure that I understand the question, though, with regard to application.

David, if you did and you want to jump in, feel free.

MR. THOMAS:  Yeah, I think so.  Maybe -- Your Honor, this is David Thomas.

I think the answer to the Court's question is the $76 million is outstanding indebtedness that is being canceled, and so it does not impact either the $471 million in interest previously paid or the $65 million in cash to be -- or the cash component.

THE COURT:  Well, we're not here today on a hearing. That hearing is scheduled for Wednesday.  But why should the Court approve a settlement that's paying 13 cents on the dollar?

MS. DONOVAN-MAHER:  Your Honor, we can address that, if you'd like, now, or we can address that at the final approval hearing.

THE COURT:  You might as well address it now, I mean, because I don't know why the Court would consider that. I think things have changed since that one Fourth Circuit decision that was favorable to the defendant.  I believe that

case has been remanded to Judge Payne, and he's taking further evidence. I don't know the exact status of that case, but I think the landscape has changed since that decision. So I don't know why, considering the present status of the litigation, why the Court should approve such a proposed settlement.

MR. THOMAS: This is David Thomas, and I'll take a crack at it.

The case the Court is referring to, I think, is the *Big Picture* case in which the Fourth Circuit found in favor of the tribal lending defendants and, to massively oversimplify it, found that as long as they were, in fact, arms of the tribe, they were entitled to immunity, and so I think the landscape has changed to the defendants' -- arguably, the defendants' advantage.

And I think it's also worth noting to the Court that a $65 million cash component at this level of interest is well in line with, and, in fact, is towards the top end of, cash recoveries as and against prior interests that have been proved.

THE COURT: I don't believe that that resulted in final judgment, did it? Wasn't that case remanded?

MR. BENNETT: Judge, this is Leonard Bennett who was counsel in that case. It is remanded back before Judge Payne who then set a hearing, which we completed two months ago, on

whether the case was misrepresented to the Fourth Circuit, and he has ruled in favor of the consumer in a couple other cases since, but that also only dealt with the tribe.

The cases -- and Fourth Circuit has issued two other rulings since then, just this year, in cases with a comparable tribal lending model, with the same basic contracts here that were brought against the non-tribal investors, the moneyman like Mr. Curry, and the Fourth Circuit came out strongly rejecting the arguments that there was some tribal immunity that would extend to the non-tribal entities and the non-tribal people.  That came out this year.

And in addition, the settlements with the tribe ultimately have now settled with very significant debt relief even though the moneyman in that case, the *Big Picture* case, is still in full litigation mode, Mr. Martorello, the equivalent of the party here, Mr. Curry.

So that case was remanded back.  It was not a class, it was one plaintiff, has not been certified, and the other cases are cases called *Galloway* that are still pending before Judge Payne who has issued multiple rulings unfavorable to the tribe and the moneyman, the non-tribal Mark Curry equivalent, and the Fourth Circuit has now issued in a different tribal lending model the Hengle cases decisions -- I'm sorry, the cases involving *Think Finance* has issued decisions just this year rejecting the arbitration and the

11

jurisdictional challenges that are at issue here.

THE COURT:  Well, that was my understanding, and under such circumstances, I don't know why the Court would approve this proposed settlement.

MS. DONOVAN-MAHER:  Your Honor, if I may, it's Kathleen Donovan-Maher again from Berman Tabacco on behalf of the plaintiffs.

What might be helpful is if we had an opportunity to pull out highlights from all of our briefing in connection with final approval as it relates not just to the original motion for final approval but also our reply brief in support of final approval where we note other cases, tribal lending cases, that have received approval by the Court, that have not had anywhere near as significant a cash component alone that this case has.

Other cases in the Eastern District of Virginia have had cash components under $20 million and received.  They've been on behalf of -- in the *Gibbs* case, it was three different lenders.

THE COURT:  The briefs alone don't help me.  I need some comparison --

MR. SEYFARTH:  Your Honor, this is Chuck Seyfarth -- sorry, Your Honor.  Go ahead.

THE COURT:  I don't think we can resolve that today, but it would help if I got an update on other settlements

which have been approved.

MR. SEYFARTH:  Your Honor, this is Chuck Seyfarth.

You've beat me to the punch.  It sounds like you've identified a few things that would be helpful to you on Wednesday or that you feel are necessary on Wednesday at the final approval hearing, and so I feel certain the parties will be prepared to provide that on Wednesday as we go forward.

I think where we started was whether we were going to continue Wednesday, and I haven't heard any discussion of that or even to do that, and it sounds like you've given us plenty on the to-do list for Wednesday, but that we should push forward and get you what you need so you can give an "up" or "down" to the settlement approval.

THE COURT:  Well, I haven't heard anything from the objectors yet.  What I need is any other settlements that were approved in this same situation, that is, where we had this tribal situation with the same or similar controls exercised over it by the financier, Mr. Curry, and when those settlements were approved, because, as I said, at one point, the Fourth Circuit ruled in favor of the tribe, but it sounds like that ruling was not a final one, number one, and, number two, that there have been contrary rulings since then.

So the Court would have to know when these settlements were approved, that is, what the landscape was at

the time they were approved and, again, some comparison between the amount of outstanding interest there was as compared with the cash component of the settlement, but that doesn't mean -- I don't mean to suggest that I would agree with any of the prior settlements, but that would certainly be a factor that the Court would consider.

But I think we do need to find out what the nature of these objections is because, quite frankly, I've been working on several complex patent cases which I'm trying to wind up, and I haven't had the benefit of my law clerk to work on this case. So I need to hear something from the objectors.

Who wants to speak for the objectors?

MR. BENNETT: Judge, this is Leonard Bennett, and I'm sorry, if I could, on behalf of the Virginia folks.

So all of these other cases --

THE COURT: How many cases are in Virginia?

MR. BENNETT: I think we're five in Virginia or four in Virginia that -- I'm on the board of an organization, Virginia Poverty Law Center, and there's a whole bunch of consumers, but there's -- officially filed in the case, I believe we have four Virginia, we have one California, and one Connecticut, and then the Virginia Attorney General, without any coordination at all with me, despite the statement in the pleading, filed its own amicus objecting.

14

Most -- I want to say "all," but as a lawyer, I'll be safe and say "most" of the tribal lending settlements that have occurred in Virginia -- I think all in Virginia and most in the Fourth Circuit have been cases in which I was lead.

There's one being filed today related to *Think Finance* that Mr. Seyfarth, in this call, is involved in, and it settled for several-hundred-million dollars in debt relief and another $50 million from other related defendants in cash.

We would propose -- I would propose that we break this down into a chart. And we could do it first -- I would do it first. The objectors could file a joint pleading, and then the defendant or the plaintiffs could say, well, that's not right. We would -- I would provide the chart and a copy of the documents, settlement documents -- we have them all -- and the defendant and the plaintiffs could object and say that's not correct, that Mr. Bennett or Mr. Ackelsberg, or whoever, had misstated it -- I don't think they will -- but we would provide a chart, and we could break down amount, cost size, debt amount that's forgiven or waived, attorneys' fees breakdown, and any other relevant apples-to-apples details.

We had also suggested, in addition to that, the question for additional information, that -- basically that I have permission or get permission to ask our newest District

Carol L. Naughton, Official Court Reporter

Judge, our second-to-newest District Judge Novak, who has been active and has granted and denied motions in this area and who has settled a whole host of tribal lending cases including, even as District Judge, Judge Payne has asked him to help us with the ongoing settlement efforts in that *Big Picture* case that the Fourth Circuit had.

And assuming that Judge Novak, who has been generous with his time in other instances, would agree, we thought that that was a good idea to see if he could oversee an attempt to work this out, to try to save a deal and avoid appeal and avoid delay, because he had, in fact, already considered, related to this case, a motion where he found that the Solomon lawyers here were competent and could do a fine job defending -- or representing the plaintiff, and heard argument or received argument from the Williams & Connolly team on behalf of Mr. Curry.

So he was already somewhat indirectly involved in the issues here, and our idea was -- my idea was that this would avoid the need for further attorneys' fees on all sides, try to salvage the deal so that it wouldn't fall apart, and Judge Novak's familiarity with all these cases and all these issues could give him the context so he would have that apples-to-apples, "Well, this is what was done here, and this is what we've done in the different case" perspective, and if ultimately we can't structure a deal that makes the

16

consumers happy, that makes the plaintiffs' lawyers happy, and that makes the defendants happy, then you'll be back for it, but my thought is it doesn't have to take a really long time, and if you're able to resolve it this way, it avoids appeal.

You have -- I'm coming at this -- we won the pro bono award at the State Bar last year.  We're not trying to make money on this from the Virginia people at all.  Mr. Ackelsberg, I know, was a long-time legal aid attorney, and his involvement was just representing the Attorney General for Pennsylvania.

So you don't have greenmailers or objectors trying to steal money or anything else.  If there's a way to take what the defendants are willing to offer, structure it in a way that solves the objections, that protects all the class, that distributes the money fairly to the class, then Judge Novak would be the one that we thought could do that.

I've never heard of the gentleman who handled their settlement.  He's never done one of these tribal lending cases, to my knowledge, but that seems to be the best way to avoid --

THE COURT:  The other gentleman in --

MR. BENNETT:  -- avoid further conflict, avoid further delay, avoid an appeal, and get everything established so that you could, if it can't resolve, make a

fair decision.  Either way -- sorry?

THE CLERK:  The judge is trying to speak.  Can you hear him?

MR. BENNETT:  I can now.

THE CLERK:  Thank you.

THE COURT:  Who is the other gentleman you're referring to?

MR. ACKELSBERG:  This is Irv Ackelsberg, Your Honor. I represent an objector in Pennsylvania -- her name is Diana Butler -- and we filed that objection, as Rule 23 allows, on behalf of a subset of the class.  It's not simply her.  We're seeking -- we proffered this objection based on not only the Pennsylvania members of the class, but all the members of the class who are still facing, after this settlement, debt collection on these illegal loans.

And our -- the biggest concern that we've raised here, Your Honor, is that there's 45,000 loans worth $76 million which are getting canceled.  But, Your Honor, it looks like, from the data that the -- the incomplete data that we have -- we're trying to get discovery so that we can be precise, but it appears that approximately four times that amount of borrowers and dollars are still going to be outstanding because we'll still be owing these illegal loans after the settlement goes through, and my client just really discovered that after -- I mean, she gets a notice, and it

says, you know, there's going to be this debt cancellation. It doesn't tell her, "By the way, you're not going to get it."

And that's -- you know, that -- really, the main reason for the objection -- I mean, there are various objections, but I would say that probably the most important is that it really cuts to whether this class can even be certified.  It's just very, very strong and distinct conflicts within the class that would not only suggest the settlement is not fair, but that the class shouldn't be certified, and we've been trying to get discovery so we can really highlight that for Your Honor, the fact that there are these conflicts, and we think that before there's a hearing, that all that information be made public.

MS. DONOVAN-MAHER:  Your Honor, may plaintiffs be heard?

THE COURT:  Well, it seems to me that what you're suggesting is that Judge Novak, in effect, act as a mediator.

MS. DONOVAN-MAHER:  And, Your Honor, this is Kathleen Donovan-Maher, plaintiffs' counsel.  We strenuously object to this case being delayed, the discovery being granted, and that there be additional mediation.  We've addressed this in our papers that were filed for support opposing this motion to continue.  That's at ECF 456.  That was filed on Friday.

We have mediated this case before the Retired Honorable Judge Layn R. Phillips, former District Court Judge in Oklahoma, former trial attorney, former U.S. Attorney; and Judge Phillips submitted a declaration where he said he would be more than willing to answer any questions the Court may have, ex parte, concerning the mediation process or the risk that the parties faced.

We had three in-person mediation sessions with Judge Phillips. We then had three telephonic mediation sessions with Judge Phillips. The objectors here represent a very small percentage of the class.

THE CLERK: Ms. Maher, who is Judge Phillips?

MS. DONOVAN-MAHER: Judge Phillips was the mediator that we hired to mediate this case.

THE COURT: Can you hear me?

MS. DONOVAN-MAHER: I can hear you now, Your Honor, I apologize.

THE COURT: Well, if you hear me, stop talking.

This is the judge from Oklahoma, a retired judge from Oklahoma, you say, who acted as a mediator?

MS. DONOVAN-MAHER: Yes, Your Honor.

THE COURT: Is he a retired state judge, federal judge? What kind of judge was he?

MS. DONOVAN-MAHER: Federal judge, Your Honor. He now has a mediation company, Phillips Mediation. He was with

20

Irell & Manella as a litigation partner there for years. Again, we can highlight this. We did state this in our final approval papers. We also submitted --

THE COURT: The thing is it's getting complicated.

Now, is the Solomon class all made up of Virginia plaintiffs?

MS. DONOVAN-MAHER: No, Your Honor. Settlement class is a nationwide class of all borrowers in the United States who took out --

THE COURT: Why can't -- these Pennsylvania people we're talking about, are they in a different class in a case in Pennsylvania? What is the connection here?

MS. DONOVAN-MAHER: No, they're not, Your Honor. They did not opt out by the opt-out deadline. So they are individual class members, and they represent less than a thousandth of a percent of this class. 99.99 percent of the class supports this settlement, has not objected, has not opted out.

The case law that we provided to the Court in our brief on Friday, ECF 456, notes that when you have a very small percentage of the class that's seeking discovery, that discovery request is denied over and over again.

Most recently, there's a Fourth Circuit case that talks about the concern when you have a small number of objectors who want to come forward and seek discovery and how

Carol L. Naughton, Official Court Reporter

21

that can cause a delay to the case, can harm the majority of the class members, and should be denied.

THE COURT:  Well, I don't know why it would harm anything to give them discovery.

MS. DONOVAN-MAHER:  Well, it's irrelevant.  Let's look at that, Your Honor.  The discovery that they're requesting, it relates to debt buyers.  They are looking for information related to who bought a loan that AWL may have sold to a debt buyer.  Their original concern was that released parties included debt buyers or credit reporting agencies.  We've told them it does not.

They are free to go sue a debt buyer if they want.  Debt buyers were not named as a party in this case.  We have no allegations against debt buyers.  If they think they have a viable claim against a debt buyer, then they are free to go sue that debt buyer.  There are no debt buyers released here.

MR. ACKELSBERG:  Your Honor, this is Mr. Ackelsberg again.

Ms. Donovan-Maher actually is counsel to not only the people in the class who are getting debt relief, whose loans are being canceled, but the 15.7 percent of the class whose loans they sold off to somebody else is still collecting on these debts, and Ms. Donovan-Maher is their counsel, too.

She's saying, oh, you know, that 16 percent of the

22

class, they can go and file some other suit, but we're here to determine whether Ms. Maher's settlement that she negotiated is fair and adequate for the people that she represents.  And this is not 1 percent of the class; we're talking about 16 percent of the class had loans that were sold to other people that are still collecting.  These are illegal loans.

MS. DONOVAN-MAHER:  And as we set forth in our final approval papers, Your Honor, when debt relief is granted in these tribal lending cases, it relates to debt that is owned by the defendant.

AWL has forgiven the debt that it owned, and we can highlight for the Court, if you want, the specific cases that have debt relief components, and in case after case after case, the relief is granted as it relates to debt that is owned by the defendant.  AWL does not own any of the debt that it sells to debt buyers.  It has no interest in that.

THE COURT:  Well, there's a big difference between less than 1 percent and 16 percent.  Which is it?  One of you is telling me it's 1 percent, and somebody else is telling me it's 16 percent.  I want to know the answer to that question.

MS. DONOVAN-MAHER:  Your Honor, it's Kathleen.  I'm sorry.  Can you clarify for me what you mean by the 1 percent?

THE COURT:  Well, somebody just talked about that

23

99-point-something percent of the class approved the settlement, and now I'm being told that 16 percent didn't approve it.  Which is right?

MS. DONOVAN-MAHER:  No, I think what Mr. Ackelsberg was referencing -- and that would be if we looked at Mr. Schachter's declaration that was submitted, his supplemental declaration that was submitted on October 7th, which is ECF 449-1, and in paragraph 5 of Mr. Schachter's declaration, he sets out that 77 percent of the loans are closed, that 15.7 percent are charged off.

And what that means is that AWL had sold it to a debt buyer or isn't collecting on the loan because of the age of the loan.  So I think that's what Mr. Ackelsberg is referencing.

What I reference with the 99.99 percent is that that's the percentage of the class who has not come forward and objected to the settlement or opted out, as Mr. Ackelsberg's client did, Mr. Bennett's clients have. There's another objector, Mr. McDaniel, who we have not heard from yet today, and you look at all our reply papers, our responses to this motion to -- our opposition to this motion to continue, and the case law out there supports that when you have a small number of objectors, the Court denies discovery and moves forward with the determination of the final approval of the hearing.

Carol L. Naughton, Official Court Reporter

THE COURT:  Let me ask you this:

Why is $65 million a good settlement of a case where $472 million, to round it off, has been paid?

MS. DONOVAN-MAHER:  Because, Your Honor, this case is a lot more than $65 million in cash.  We're standing before the Court -- and we will on Wednesday, but right now we'll argue, as well -- that there are many components to this settlement:  There's a cash component; there's a loan-forgiveness component; and there's all this nonmonetary relief that we submitted in a declaration.

THE COURT:  What nonmonetary relief?

MS. DONOVAN-MAHER:  I'm sorry?

THE COURT:  What nonmonetary relief goes to the class members?

MS. DONOVAN-MAHER:  With regard to the 45,000 class members in the collection portfolio, they will have negative tradelines associated with their defaulted loans.  They will be eliminated.  That is through the -- pardon me?

THE COURT:  70 million of them?

MS. DONOVAN-MAHER:  It's $76 million in debt forgiveness.  That is comprised of 45,000 class members, 45,305 loans.

And plaintiffs' expert, Professor Listokin from Yale Law School, values that component alone, with regard to the nonmonetary piece -- he values the deleting of negative

tradelines for class members at $108 million.

There are other nonmonetary pieces that deal with no longer selling personal identifying information. Professor Listokin values that at $33 million.

There are enhanced disclosures now in AWL's loan agreements having them comply with TILA, the Truth in Lending Act.  He values that at $300 million.

We also negotiated enhancement as it relates to compliance with the Electronic Fund Transfer Act so that AWL can no longer condition payment on access to a borrower's bank account.  Professor Listokin values that at $260 million.

So there's all these pieces as it relates to the totality of the settlement.  It isn't just the $65 million; it's also the loan forgiveness component, and it's these nonmonetary benefit components, and those together, along with the risk that the parties faced here, the risk that AWL, after the Fourth Circuit decision in *Big Picture* -- the risk that AWL could be found to be immune from suit, the risk that Mr. Curry's argument for derivative immunity would then have to be addressed and potentially he could be immune from suit. And we also --

MR. CAUSEY:  Your Honor, this is Jason Causey.  I represent the McDaniel/West Virginia class action.  If now is a good point, I'd like to just have a few minutes to address

the arguments.

THE COURT:  All right.

MR. CAUSEY:  Thank you, Your Honor.

We represent -- my firm -- first of all, I've been practicing consumer law in West Virginia for 15 years, and my firm represents a putative class that's on file in state court in West Virginia where we've not filed any federal causes of action.  We pursue only state and statutory claims.

And just -- what our big objection is, Your Honor, is essentially that West Virginians, the people in my class, and my client, they don't care about enhanced disclosures going forward.  They care about the fact that they have been inundated by these loans with 600 percent interest rates, and they want to know what real compensation is to them.  And under West Virginia law, there is stout remedies available under the statute.

For instance, under the Consumer Credit Reporting Act, a $1,000-flat penalty exists for each and every violation.  Now, we know there's multiple violations here, but if you only had one violation, making a loan at 600 percent interest when the statute is 18 percent maximum, that's $1,000.  And that's not a scale; it doesn't go from 100 to 1,000.  It's a $1,000-flat penalty that they're entitled to.

They're also entitled to every dollar they paid --

both principal and interest -- back, and that's one of the things we want in discovery, because we want to be able to show this Court that the class damages are 12 million, but yet 4,000 West Virginians are receiving 80 bucks -- or maybe it's 40 million. I don't know what the numbers are until they give them to us.

But, for example, Mr. McDaniel, he paid $1,600, and he gets a $1,000 penalty. That's $2,600. And he's entitled to cancel his debt, and he's entitled to fee shifting, and yet they want to give him $80.

And they talk about deleting a tradeline for some obscure credit reporting agency. We're not talking about Experian, TransUnion, or Equifax.

THE COURT: I don't understand what this 300 million and 250 million --

MR. CAUSEY: Those seem like --

THE COURT: -- you're talking about -- I'm addressing this to counsel for the plaintiffs.

What is this professor saying that something is worth 300 million, and something is worth -- what is it that's worth that?

MS. DONOVAN-MAHER: Your Honor, Kathleen Donovan-Maher.

This addresses the nonmonetary portions of the settlement, and so plaintiffs hired a professor,

Professor Listokin from Yale Law School, to provide a quantification as it relates to these nonmonetary pieces, to be able to show to the Court that these other aspects of the settlement, when you look at all the provisions in total, that these other aspects provide benefit to the class.

THE COURT:  What form are these benefits?

MS. DONOVAN-MAHER:  Well, we can take the negative tradelines.  So the --

THE COURT:  I don't even know what that term means. What does that term mean?

MS. DONOVAN-MAHER:  Okay.  So the collection portfolio which represents the $76 million in loan forgiveness, that component of the settlement, those are loans that were in default at AWL.  So those class members have potentially negative information reported to credit reporting agencies.

And as a result of the settlement, that negative reporting is going to be wiped out, so that if a class member who had a loan in the collection portfolio, in the future is going to get a -- apply for a mortgage, this negative information would not be showing up in their credit reporting history that would result in a less favorable credit reporting.

THE COURT:  How much is that supposed to be worth?

MS. DONOVAN-MAHER:  Pardon me?

THE COURT:  How much is that supposed to be worth?

MS. DONOVAN-MAHER:  That is worth $108 million.

THE COURT:  All right.  What is the next one?

MS. DONOVAN-MAHER:  Then the agreement not to sell personal information, that is worth $33 million.  The enhanced disclosures in the loan agreements --

THE COURT:  Enhanced disclosures, what is that?

MS. DONOVAN-MAHER:  That means that now AWL has already modified their loan agreements to comply with what we negotiated for compliance with TILA, the Truth in Lending; what is the interest rate, what is the loan payment, information like that.

And Professor Listokin values that at $300 million, because these AWL borrowers, 36 percent of these class members that are eligible for a cash award are repeat customers of AWL.  One of the objectors alone had 12 loans with AWL.  So this prospect of relief going forward is very significant to these class members.

THE COURT:  Well, they're not getting any money; they're getting an explanation of the interest they're paying?  That's worth $300 million?

MR. CAUSEY:  Your Honor, this is Jason Causey again for the West Virginia class.

They're attributing $300 million to complying with the statute; "We agree to comply with the statute."  And

that's worth $300 million to these plaintiffs?  They should be complying with the statute, period.  The other thing is --

THE COURT:  Let her finish.

MR. CAUSEY:  Okay.

MS. DONOVAN-MAHER:  Another aspect of our lawsuit related to the fact that AWL would go and take a borrower's -- have access to the borrower's bank account and the loan was conditioned upon having access.  We allege that violated the Electronic Fund Transfer Act.

As a result of that allegation, we reached a resolution that no longer can AWL condition access to the borrower's bank account as far as being granted a loan.

Professor Listokin values that --

THE COURT:  Future loans?

MS. DONOVAN-MAHER:  Correct, Your Honor, future loans.

And that component Professor Listokin values at $260 million.

But with regard to these aspects of the nonmonetary benefits that Professor Listokin values conservatively at a billion dollars, plaintiffs' counsel are not seeking a fee on that, but we just wanted to point out to the Court that there is a bigger component to this case than just the cash.  We're not just asking for the Court to approve a case that consists of $55 million in cash.

Carol L. Naughton, Official Court Reporter

MR. BENNETT:  Your Honor, this is Len Bennett.

THE COURT:  And who do you represent?

MR. BENNETT:  I represent the Virginia consumers, Judge.  This is -- just a couple short points as to each.

The debt forgiveness, the problem that we have with it is that the debt that is being forgiven is only debt that was already written off as uncollectable, or was in a category that could not be collected, so they're simply acknowledging that they're not going to be able to collect the debt.

In any of these other cases, these tribal lending cases, there's not a single one where we -- almost every one we got complete debt relief, all debt, and in none of those did we seek fee based on trying to price or value waiving the collection of this debt.

The second issue is the tradelines.  And I know that it's because she doesn't have a lot of background in this field, but the agency that is being -- the credit reporting agency where the negative reporting is coming out of -- it's only one company.  It's called Clarity.

And notwithstanding what counsel just said, Clarity is not used for mortgages.  It's not Equifax, TransUnion, or Experian.  Clarity is a marketing or a lead-generation agency.  It's used primarily by payday lenders seeking to find new targets.  It is never used for mortgages.  It

doesn't sell FICO credit scores.  It's not that kind of agency, and negative tradelines don't matter when they're a part of Clarity because it's a marketing agency.

And the next issue is --

THE COURT:  Well, I mean, it's just commonsense that consumers taking payday loans are not going to be buying homes with a mortgage on it, so to put any value on that seems a stretch, to use a kind word.

MR. BENNETT:  And it also, Judge -- I'm sorry.  The other issue, the next one is the promise not to sell the personal information.

The problem is, because all these people have -- all these consumers have already had all their information provided by the defendant to Clarity, to that agency, Clarity is the lead-generation agency, so it's -- it doesn't matter whether American Web Loan said it's not going to, in the future, give out the name of our clients to someone, because Clarity -- the cat is already out of the bag -- has all that information already, and that's the -- that's who you want to keep it from.

And so the fact that American Web Loans says sometime next year it won't sell the data, it doesn't matter. It's not in the business of selling data; Clarity is, and they already have it.

The other issues, Judge, the disclosures and the

electronic funds transfer point, there are two laws. Disclosures -- Your Honor is familiar with the Federal Truth in Lending Act, which requires that you tell someone their interest rates, and the Electronic Fund Transfer Act, which has a very unambiguous provision that says you cannot -- a lender cannot condition agreement to the loan on agreeing to the electronic fund transfer, and so the plaintiffs say that's still valuable because we're now getting the defendant to agree to comply with the law, but maybe -- maybe that's because five years ago, before our cases, my firms' cases in tribal lending, the Fourth Circuit had not ruled yet, but the Fourth Circuit has ruled that federal law applies to tribal loans.

So that issue is irrelevant now.  Maybe in the past the contract that American Web Loans had, it disclaimed federal law and said we don't have to comply with state or federal law.  Now the Fourth Circuit ruled in the *Hayes* case, for example, or *Delbert* case -- *vs. CashCall*, federal law applies.  And so those truly are valueless.

The debt forgiveness isn't affecting a lot of the objectors.  Most consumers, those people that are paying their loans, zero of those people are getting debt forgiveness.  There's nobody getting debt forgiveness who was paying on their loan, Judge -- no one.  By terms of the settlement, the debt forgiveness is only going to people who

34

aren't and -- aren't paying their loans.  So that's it's.

THE COURT:  It's not worth very much, if that's the case.

Well, the whole thing looks like it's a settlement that I would not consider approving on Wednesday, and to just put the value of $550 million on future loans, I think is absurd, frankly.

MR. THOMAS:  Your Honor, this is David Thomas for the plaintiffs.

If I could maybe make a suggestion, because I think many of the points that have been argued here today have been addressed early in the papers, and my suggestion would be that because of the particular --

THE COURT:  Well, I have a law clerk assigned to this, but I haven't gotten a report from that law clerk on the papers yet.  We are having to substitute another law clerk because my law clerk's term is up, because I'm supposed to already be retired.  So I don't know what is in the papers, as is obvious.

MR. THOMAS:  Yes, sir --

THE COURT:  I've heard enough to know that there's zero chance that I would ever approve this settlement on Wednesday.  So the question is where we go from here.

MR. THOMAS:  Well, Your Honor, and that's what I was going to address because I think when the Court gets an

opportunity to look at the papers and, more importantly, the case law, Fourth Circuit and otherwise, I think the Court may have a different view on it, because what the Court has heard today is argument of eight objectors. I know they keep saying they're class objectors, but they're not. They are eight individuals out of 606,000 class members, and I think when the Court looks at --

THE COURT: Well, if it's $70 million in debt forgiveness that's going to people from whom that's uncollectable, that's absurd.

MR. THOMAS: Yes, Your Honor. And that's my point --

THE COURT: I do not understand. I mean, if that's true -- is that true?

MR. THOMAS: It's not, Your Honor, and that's why I was suggesting that a review -- that is an argument the objectors have made, and the papers address how that is just flatly not true, and in fact, the numbers that the Court is now hearing being tossed around in an effort to obfuscate and push off a resolution do not hold up, and what the Court will see in the papers is that --

THE COURT: Where did this $550 million in value for future loans come from?

MR. THOMAS: Yes, Your Honor. That was an attempt to quantify for the Court the value of the nonmonetary

Carol L. Naughton, Official Court Reporter

36

portion of the settlement, to rely and put a number on something.

THE COURT:  That doesn't sound very persuasive, Counsel.

MR. THOMAS:  I understand, Your Honor, and that's why I would encourage the Court to read the affidavits from the experts, and what the Court will see is that there is -- in terms of the record before the Court, there is evidence from the plaintiffs, and there is nothing but argument and incorrect supposition from the objectors, and that is all laid out very clearly.  So everything that you heard from objectors' counsel, there's no evidence to that.

There's not a single affidavit.  There's not a single expert that they have submitted, even though they've had since the end of June to come up with that, if they wanted to.  They had the opportunity to opt out.  If they felt like there was real value to the arguments they are now making to the Court, they had the opportunity to opt out of the settlement and bring this case themselves or bring a separate case or continue the case or bring a state class action, if that's what they wanted to do.

And so all I was going to suggest to the Court is that -- and I think this format is very difficult to follow in a Zoom where at least the Court can say --

THE COURT:  Well, let's see what happened with the

Carol L. Naughton, Official Court Reporter

37

settlement that was sent when the Fourth Circuit made a ruling in favor of private jurisdiction, which now it appears it will not be sustained, and there just isn't enough money here. It's falling short of it. Defendants made millions, hundreds of millions of dollars in illegal interest, and it's coming up with a fraction of that, and it just looks like it's totally inadequate.

MR. THOMAS: Yes, Your Honor, and all I would ask is that before the Court --

THE COURT: So somebody needs to go back to the drawing board.

MR. THOMAS: Yes, Your Honor. But before the Court makes its mind up on that, I would just ask that the Court read through the papers.

THE COURT: I'm going to have the papers reviewed and the transcript of this hearing reviewed.

Let's see. Today is the 19th of October. So I'll have another hearing on October 28th.

What time was the hearing scheduled for?

THE CLERK: 11:00 a.m.

THE COURT: We'll schedule the hearing for 11:00 a.m. on October 28th, at 11:00 a.m., and whoever wants to submit something for consideration at that hearing will have to submit it by the close of business on October -- this Friday, October 23rd.

Carol L. Naughton, Official Court Reporter

MR. SEYFARTH:  Judge Morgan, this is Chuck Seyfarth. Just a point of clarification, is what the Court is doing just moving the final approval hearing to the 28th, or do you have different expectations of that day?

THE COURT:  I really don't know what to say in response to that question.  It's certainly a good question.

MR. SEYFARTH:  Knowing the Court, I know you're going to want us to be prepared, and so I thought to ask to make sure we're prepared.

THE COURT:  Well, I don't know what to tell you because I just feel that these so-called nonmonetary considerations and maybe -- sounds like a lot of smoke to me. It's just somebody agreeing to do something the law already requires them to do with people who have already paid illegal interest.  I just don't understand why somebody thinks that's worth $550 million.  It just sounds like a lot of smoke to me.

MR. SEYFARTH:  Judge, this is Chuck Seyfarth again --

THE COURT:  These nonmonetary considerations are fine and they're good, but to say they're worth that as far as what is before the Court now is going to take a lot of persuasion.

MR. SEYFARTH:  Judge, this is Chuck Seyfarth again. That will be part of what you expect to hear from us on the

Carol L. Naughton, Official Court Reporter

28th, correct?

THE COURT:  What's that?

MR. SEYFARTH:  That would be part of what you at least want to hear from us on the 28th, is to be able to address those issues?

THE COURT:  Right.  Any of the parties can file whatever supplements they want to do by the 23rd.  I have a substitute clerk working on this case, and he was tasked to be ready for the hearing on the 21st.  He wasn't tasked to be ready for anything today, because I just got the motion for continuance at the end of last week.  So I haven't even had a chance to discuss it with him.

So I'm going to give him the transcript of this hearing, and he will have finished reviewing the papers that you've already filed, and he was going to give me a report prior to the 21st, but this hearing came up unexpectedly.  So what is going to happen on the 28th?  I have no idea at this point.

All I can say is you better be prepared to defend your position on the adequacy of the payments and the value of the so-called nonmonetary relief, and beyond that, I can't say.  I just don't have enough information before me at the time.  I don't want to keep putting this off indefinitely.  I would like to resolve it, if it can be resolved, as soon as possible --

MR. GROGAN:  Your Honor, it's John Grogan from Pennsylvania --

THE COURT:  -- or determine if it should be referred to a different government agency.  But we'll see.

As I say, if anybody wants to file anything, they can file it on the 23rd.  That's this Friday.  We'll have another hearing at 11:00 on the 28th.  I'm as anxious to resolve this case as anyone is, and I understand the longer it goes on, the more cost everyone accrues, which could otherwise go toward settlement, is going to go toward increased attorneys' fees if it keeps getting postponed and it gets appealed and so forth, and money goes to attorneys rather than to the victims.  So I want to get the matter resolved as soon as possible.

Now, I also will contact Judge Novak myself and see what he has to say about the situation.

All right.  We'll terminate the hearing at this point.

(Off the record at 3:40 p.m.)

Carol L. Naughton, Official Court Reporter

CERTIFICATION


    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.



_____/s/_____

Carol L. Naughton

October 20, 2020