**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

|  |  |
|---|---|
| ROYCE SOLOMON, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN WEB LOAN, INC., et al.,<br><br>Defendants. | Civil Action No. 4:17-cv-0145-HCM-RJK<br><br>CLASS ACTION |

**SUPPLEMENTAL SUBMISSION IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**

Plaintiffs Royce Solomon, Jodi Belleci, Michael Littlejohn, and Giulianna Lomaglio, on behalf of themselves and the proposed Settlement Class[1] (collectively, "Plaintiffs" or the "Settlement Class Representatives"), respectfully submit this Supplemental Submission in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement.

## I.    PRELIMINARY STATEMENT

On October 19, 2020, the Court held a telephonic hearing on Objectors' motion to continue the Final Approval Hearing, allow for Objector discovery, and to compel mediation between the Parties and Objectors (the "October 19 Hearing").  ECF Nos. 458, 459.  On October 21, 2020, the Court issued an order continuing the Final Approval Hearing, denying Objectors' requests for discovery and to compel mediation, and allowing for supplemental briefing to aid the Court in determining whether the Settlement merits final approval.  ECF No. 460.

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Settlement Agreement filed with the Court on April 16, 2020 (ECF No. 414-1, the "Settlement Agreement").

Objectors have made certain arguments against final approval.  Plaintiffs have responded to each of these arguments, in detail, in various submissions.  *See* ECF Nos. 449, 453, 456.  This supplemental brief addresses questions from the Court and arguments raised by Objectors at the October 19 Hearing.

## II.      ARGUMENT

### A.      The Settlement Provides Adequate Cash Relief

At the October 19 Hearing, the Court questioned whether $65 million, a 13.8% recovery, is adequate cash relief given that nearly $472 million in interest was collected from Class Members above the principal amounts of their loans.  *See* Oct. 19 Hr'g Tr. at 37:3-7.  A 13.8% recovery in compromise is adequate on its own, in comparison to other tribal lending class action settlements approved by Courts in this District, and in light of the risks of continued litigation.  *See* Sections II.B and II.C., *infra*.  Indeed, a 13.8% recovery is at or above levels that courts regularly find to be a healthy compromise.  *See, e.g., In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 586 F. Supp. 2d 732, 804 (S.D. Tex. 2008) ("[t]he typical recovery in most class actions generally is three-to-six cents on the dollar."); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) ($65 million settlement fund ranging between 9.3% and 13.9% of damages is "consistent with those approved in other complex class action cases"); *Horton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 855 F. Supp. 825, 833 (E.D.N.C. 1994) (settlement amounting "to a recovery of approximately five percent of plaintiffs' loss" is adequate).  The 13.8% recovery is also, by far, the best percentage recovery of any similar private tribal lending class action in this District.  *See* Section II.C, *infra*.  Moreover, the Fourth Circuit has held that a cash settlement that, as here, "may only amount to a fraction of the potential recovery" does not "render the settlement inadequate or unfair."  *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173-74 (4th Cir. 1975).

Further, the Court previously deemed the Settlement's cash component to be adequate for purposes of preliminary approval by relying on an estimated amount of total interest of $492.7 million—a figure roughly $20.7 million greater than the actual figure of $471,980,254.92.  *See* ECF No. 420 at 11 (preliminary approval opinion noting that "the Court inquired of whether the parties had information regarding the amount of total interest paid by the settlement class."); ECF No. 423 at 24 (final approval brief providing the actual figure of $471,980,254.92).  Class Counsel did not have class member interest data available at the time of preliminary approval and instead "informed the Court with sufficient and comparable figures for the Court to find preliminary adequacy" in a June 26, 2020 email from David Thomas to Brandan Goodwin, which provided a $492.7 million estimate of interest collected based on actual and estimated AWL financial results shown in ECF No. 225-13.  ECF No. 420 at 11.  The Court should therefore find the Settlement's $65 million cash component adequate for purposes of final approval.

**B.**    **The Fourth Circuit *Big Picture* Decision Is Controlling Law And Substantially Increases The Risk Of Non-Recovery In This Action**[2]

At the October 19 Hearing, in a colloquy with Leonard A. Bennett, counsel to six of the eight Objectors, the Court questioned whether the Fourth Circuit's decision in *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 177 (4th Cir. 2019) ("*Big Picture*") is still good law and presented any risk of non-recovery in this Action.  *See* Oct. 19 Hr'g Tr. at 8:22-11:4. *Big Picture* continues to be the controlling law of this Circuit on "arm-of-the-tribe" sovereign immunity and presents a significant and imminent risk of non-recovery here. Indeed, if the Settlement is not approved, the parties will proceed immediately to argument in the Fourth Circuit on Defendants' pending, fully briefed appeals related to sovereign immunity.

---

[2] A summary of this argument is provided as Exhibit B hereto.

First, the Court questioned whether *Big Picture* in fact reversed Judge Payne's ruling denying tribal immunity or simply remanded the matter for further proceedings. *Id.* at 8:24-9:4. *Big Picture* did not remand for further proceedings. Rather it "*reverse[ed] the district court's decision* and remand[ed] the case with *instructions to dismiss the complaint*." 929 F.3d at 174 (emphasis added). Indeed, Judge Payne expressly acknowledged in a decision from July of this year that, "[o]n July 3, 2019, the United States Court of Appeals for the Fourth Circuit held that Big Picture and Ascension are entitled to sovereign immunity as arms of [the tribe] and therefore reverse[d] the district court's decision." *Pete v. Big Picture Loans, LLC*, No. 3:17-CV-461, 2020 WL 3979662, at *1 (E.D. Va. July 14, 2020).

While plaintiffs in *Big Picture* subsequently "alleged that the Defendants made material misrepresentations and omissions . . . during the sovereign immunity phase of the litigation," *id.*, there is no indication whatsoever that Judge Payne has made any findings that there were in fact material misrepresentations or omissions or that any such misrepresentations would alter the Fourth Circuit's holdings regarding the tribal entities' immunity from suit. Nor is there any indication that the Fourth Circuit has withdrawn or revisited its ruling.[3] Indeed, earlier this year, Judge Jackson applied *Big Picture* to a tribal entity in another (non-consumer lending) action and found that it was immune from suit as an arm of the tribe. *See Applied Scis. & Info. Sys., Inc. v. DDC Constr. Servs., LLC*, No. 2:19-CV-575, 2020 WL 2738243 (E.D. Va. Mar. 30, 2020).

---

[3] Even if (1) Judge Payne were to find that there were material misrepresentations or omissions in the district court proceedings in *Big Picture* and (2) the Fourth Circuit were to at some future point reassess its decision finding the tribal defendants in *Big Picture* immune from suit, it would not necessarily alter the five-factor immunity test articulated by the Fourth Circuit in *Big Picture* that presents the risk of non-recovery to the Settlement Class here.

Second, Mr. Bennett asserted that the Fourth Circuit recently issued two decisions, without specifying the decisions, rejecting sovereign immunity defenses in connection with similar tribal lending schemes. *See* Oct. 19 Hr'g Tr. at 10:4-11. While Mr. Bennett did not identify what cases he was referring to, this appears to be simply false. The only Fourth Circuit tribal lending-related cases appear to be two decisions, issued on the same day, that addressed *only* the enforceability of arbitration clauses in tribal loan agreements. *See Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 335 (4th Cir. 2020) ("This appeal considers the enforceability of arbitration agreements included within the terms of payday loans issued by two online lenders."); *Gibbs v. Sequoia Capital Operations, LLC*, 966 F.3d 286, 288 (4th Cir. 2020) ("In this appeal, we again consider the enforceability of arbitration agreements included within the terms of payday loans issued by two online lenders."). This is an issue wholly separate and apart from tribal immunity. *See* ECF No. 449 at 22. In fact, the *Haynes* decision explicitly contrasted issues of tribal immunity, noting that plaintiffs there "do not contest" that there were no "specific claims against the lending operations themselves" because they "sought immunity as arms of their respective tribes[.]" 967 F.3d at 335 n.2. The *Sequoia* decision does not even contain the word "immunity." And neither of the Fourth Circuit opinions even mentions *Big Picture*.

Third, Mr. Bennett asserted that *Big Picture* has no effect on Plaintiffs' ability to sue Defendant Mark Curry. *See* Oct. 19 Hr'g Tr. at 10:4-11:1. This, too, is incorrect. If the Fourth Circuit deems AWL an arm of the Tribe, the Court will consider Curry's claim to official immunity from suit as CEO of an arm of the Tribe. Plaintiffs previously explained the risk of Curry being deemed immune from suit in their final approval briefing. *See* ECF No. 423 at 6, 18-19, 21-22; ECF No. 426 at 8-11; ECF No. 449 at 23. This risk is further enhanced by *Big Picture's* sweeping holdings that (1) "tribal immunity cannot and does not depend on a court's evaluation of the

5

respectability of the business in which a tribe has chosen to engage"; (2) "the potential merit of the borrowers' claims . . . [and] "the lack of a remedy for th[e] alleged wrongs [] does not sway the tribal immunity analysis"; and (3) "[i]t is Congress—not the courts—that has the power to abrogate tribal immunity." 929 F.3d at 185.

Moreover, no other tribal lending class action, including those Mr. Bennett has been involved in, has faced a defense of official immunity from suit raised by the alleged primary beneficiary of the lending operation similar to Curry's claims to immunity in this Action. Speculation on the outcome of an unsettled issue is not a basis on which to doubt Class Counsel's judgment. *See* ECF No. 449 at 12 (collecting cases); *Singletary v. Sterling Transp. Co., Inc.*, No. 2:12CV298, 2012 WL 12875517, at *3 (E.D. Va. Dec. 14, 2012) (Morgan, J.) ("a court should be hesitant to substitute its own judgment for that of counsel."); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1975) ("The trial court should not, however, turn the settlement hearing into a trial or a rehearsal of the trial nor need it reach any dispositive conclusions on the admittedly unsettled legal issues in the case.").

In short, the Court's finding at preliminary approval remains equally true today: "It is possible that the Fourth Circuit could render a decision adverse to the Plaintiffs, especially in light of . . . [*Big Picture*], which points to the uncertainty of the Plaintiffs case and, thus, weigh in favor of settlement approval." ECF No. 420 at 10 (emphasis added). If the Court denies final approval, the parties will immediately proceed to oral argument in the Fourth Circuit on Defendants' fully briefed appeals related to tribal immunity. The Fourth Circuit will render a decision on tribal immunity applying the controlling standards set forth in *Big Picture*. And if the Fourth Circuit deems AWL and MacFarlane arms of the Tribe and Curry immune from suit as CEO of an arm of

the Tribe, the Settlement Class's prospects of recovery in this Action are drastically reduced, potentially to zero.

### C.   Comparisons To Other Tribal Lending Settlements Approved In This District Are Favorable For The Settlement Here

At the October 19 Hearing, the Court stated that, "it would help if I got an update on other settlements which have been approved."  Oct. 18. Hr'g Tr. At 11:24-12:1. A table summarizing the basic terms of those settlements, *Gibbs* (or "*Think Finance*"), *ZestFinance*, *Big Picture*, and *CashCall*, is attached as Exhibit A hereto, and discussion of various aspects of those settlements was provided in Plaintiffs' Reply.  *See* ECF No. 449 at 3-4, 14-18, 20, 25-26.  Compared to the four other tribal lending class action settlements approved in this District, the $141 million Total Settlement Value comprised of $65 million in cash and $76 million in loan cancellation is, by any measure, an outstanding result and worthy of this Court's final approval.[4]

### 1.   *Gibbs / Think Finance*: the High-Water Mark for Nationwide Pre-*Big Picture* Tribal Lending Class Action Settlements

The settlement in *Gibbs* resolved claims on behalf of a class of over one million borrowers who took out loans from *three separate* tribal lending entities that were alleged to have been formed and primarily operated by a non-tribal corporate "mastermind," a Texas-based payday lender called Think Finance.  *See*, *e.g.*, *Gibbs* 3:17-cv-00495-MHL (E.D. Va.) ECF No. 117-1 at 2.  The *Gibbs* settlement was reached before the Fourth Circuit's *Big Picture* decision.  *See id.* at 39-61.  The terms of the *Gibbs* settlement include, among other things:

- $16.75 million in cash obtained from defendants in actions brought in the Eastern District of Virginia, *see id.* at § IV, and an additional approximately $39 million in cash secured through a related global settlement among various parties in the Think Finance

---

[4] Moreover, the Total Settlement Value does not capture the significant non-monetary relief provided in this Settlement.  *See* Section II.E., *infra*.

Chapter 11 bankruptcy proceedings in the Northern District of Texas. *See id.* at 63-128 (the "Global Settlement and Restructuring Term Sheet" from Think Finance bankruptcy); https://www.thinkfinancesettlement.com/pdf/ClassNotice.pdf (court-approved class notice describing $39 million in settlement cash provided by "assets of Think Finance Bankruptcy").[5]

- Cancellation of certain loans that were "owned by" the tribal lenders (i.e., not sold to debt buyers) and issued in periods of up to nearly three years prior to the date of the settlement, including:

  o Cancelling only loans issued by the still-operating Plain Green issued "prior to June 1, 2016" (*see id.* at 12) (3 years prior to settlement);

  o Cancelling only loans issued by the still-operating Mobiloans "prior to May 6, 2017" (*see id.* at 13) (2 years prior to settlement); and

  o While nominally "all" Great Plains lending loans (that it owned) were to be canceled (*see id.* at 11-12), this lender had not issued any loans since approximately April 2017, more than two years prior to the *Gibbs* settlement, and was already in the process of being wound down (*see Gibbs* ECF Nos. 114-1 at 3, 135).[6]

---

[5] Earlier this week, on October 19, 2020, an additional settlement agreement was filed in a related *Gibbs* action (*Gibbs v. TCV V, LP, et al.*, No. 3:19-cv-00789-MHL, "*Gibbs v. TCV*") that, if approved by Judge Lauck would provide for an additional $50.05 million in cash to the *Gibbs* settlement class. *See Gibbs v. TCV* ECF No. 25.

[6] Put differently, *none of the loans* from likely tens of thousands (or more) of Plain Green and Mobiloans borrowers that were taken out *years* prior to the settlement were provided any debt cancellation under the *Gibbs* settlement. This is directly contrary to the representation Mr. Bennett made to the Court at the October 19 Hearing, when he said of *Gibbs* and his other settlements, "we got *complete debt relief, all debt*." Oct. 19 Hr'g Tr. at 13. Mr. Bennett made a similar incorrect assertion in his objection brief, when he asserted that "***all*** outstanding debt owned by the

- The *Gibbs* settlement, like the Settlement here, includes provisions whereby the tribal lenders agreed to "not sell personal identifying information" of their borrowers.  *See Gibbs* ECF No. 117-1 at 12-13.[7]

- The *Gibbs* settlement provides that the tribal lenders would "assist Think Finance" with the deletion of credit reporting information associated with loans taken out in the same period as the loans eligible for cancellation.  *See id.*  The *Gibbs* plaintiffs retained an expert who opined that the value of this benefit – similar to the one provided in the Settlement here – was worth unspecified billions of dollars to the class in that case.  *See Gibbs* ECF No. 135-3.  Contrary to Mr. Bennett's suggestion that there is no value to the deletion of credit reporting information provided to Clarity Services (the credit reporting agency that AWL used), *see* Oct. 19 Hr'g Tr. at 31:16-32:3, Clarity is one of the credit reporting agencies involved in the *same valuable credit reporting benefit* touted in *Gibbs*.  *See Gibbs* ECF No. 135-3 at ¶¶ 15-17, 20-25.

- Neither of the two then-operating tribal lenders, Plain Green and Mobiloans, were prohibited from lending or otherwise restricted in their operations in any state.  In fact, Plain Green continues to offer it high interest loans in Virginia to this day.  *See* https://plaingreenloans.com/services/faqs/.

While the question of how much interest class members paid was not addressed in the public filings in *Gibbs*, an approximation of that amount was provided in connection with the

---

Defendants . . . at the time of settlement" was canceled."  ECF No. 437 at 6 (emphasis in original). The plain language of the *Gibbs* settlement agreement says otherwise.

[7] Including this essentially identical provision in the Settlement here indicates that it is not, as the Bennett Objectors contend, "worthless."  *See* ECF No 437 at 18.  *See also* Oct. 19 Hr'g Tr. at 32:9-24 (suggesting that AWL's commitment not to sell customer information has no value).  If a commitment not to sell personal information had no value, there would have been no reason to include these provisions in *Gibbs*.

Think Finance bankruptcy: $1.33 billion. There, in the Global Settlement and Restructuring Term Sheet, the parties to that document agreed to value the pending claims of consumer borrowers against Think Finance at $1.33 billion (comprised of $1.13 billion for a nationwide class and $200 million for Pennsylvania only borrowers). *See Gibbs* ECF No. 117-1 at 88-89, 101 (describing value of consumer borrowers' claims "for purposes of voting and distribution under the [Chapter 11 Bankruptcy] Plan."). Based on this estimate of the total interest paid by members of the *Gibbs* class, the $16.75 million *Gibbs* settlement approved by Judge Lauck comprised 1.3% of the class's interest payments. Adding the $39 million achieved from the contemporaneous bankruptcy settlement (for a $55.75 million total cash amount) amounted to 4.2% of estimated interest payments. And even assuming that the recently-filed $50.05 million settlement in *Gibbs* is approved, this would result in a cash value in *Gibbs* of $105.8 million, less than 8% of the estimated $1.33 billion in total class interest there and substantially less than 13.8% of the total interest paid above the original loan amount here (*see* ECF No. 423 at 24-25).

A table summarizing comparisons to the *Gibbs* settlement and the Settlement here follows:

|  | *Gibbs* | Here |
|---|---|---|
| Class size | 1,045,248 | 606,318 |
| Cash | $55.75 million approved (potentially $105.8 million) | $65 million |
| Class Member "Interest" | $1,330,000,000.00 | $471,980,254.92 |
| Percent Recovery | 4.2% (potentially 7.95%) | 13.8% |

|  | *Gibbs* | **Here** |
|---|---|---|
| Scope of loan cancellation[8] | Limited to loans owned by the lenders, issued 2 to 3 years prior to the Settlement | All loans owned by AWL in its Collection Portfolio at the time the provision was negotiated |
| Number of Lenders | 3 | 1 |
| Timing | Agreement signed *before* 4th Circuit ruling in *Big Picture* | Agreement signed *after* 4th Circuit ruling in *Big Picture* |

The terms of the Settlement in this Action therefore compare very favorably to what Judge Lauck approved for a much larger class of borrowers from three separate tribal lenders in *Gibbs*.

### 2. *ZestFinance*: the Yardstick Against Which Comprehensive Post-*Big Picture* Settlements Should be Measured

On February 10, 2020, over six months after the Fourth Circuit decision in *Big Picture,* plaintiffs in *ZestFinance* filed a motion for preliminary approval of a settlement in that action. *See* 3:19-cv-00293-DJN (E.D. Va.), ECF No. 84. The *ZestFinance* settlement resolves the claims of a class of 366,494 borrowers with loans from the online tribal lender Blue Chip Financial, d/b/a Spotloan. *See ZestFinance* ECF No. 101 at 2. The settlement includes all defendants in that action, including Douglas Merrill, the alleged architect of the online lending scheme at issue there. Judge Novak approved the *ZestFinance* settlement on June 30, 2020. *See ZestFinance* ECF No. 111. The terms of the *ZestFinance* settlement include, among other things:

---

[8] To be clear, the settlement approved by Judge Lauck did not include **_any_** loan cancellation for borrowers whose loans were sold to third party debt buyers, the scope of which was significant in that case. As the recently-filed settlement with debt buyer National Credit Adjusters (not a defendant in the nationwide actions eventually consolidated in *Gibbs* at the time of the 2019 settlement) indicates, there were $383 million in loans sold to a debt buyer that were *not included* in the initial debt cancellation approved in *Gibbs*.

- $18.5 million in cash (*ZestFinance* ECF No. 101 at 6);

- Cancellation of loans issued between January 1, 2012 through October 31, 2018 (a period ending 16 months prior to the date on which the preliminary approval motion was filed) *and* "that has a balance due and that *is owned by* [the tribal lender] as of December 31, 2019" (*ZestFinance* ECF No. 88-1 at 9);[9]

- The tribal lender, like here, will request removal of negative credit reporting information (*id.* at 10); and

- Defendants, like here, will not "sell personal identifying information obtained from class members during the class period to third parties" (*id*. at 11).[10]

A table summarizing comparisons of the *ZestFinance* settlement to the Settlement here follows:

|  | *ZestFinance* | Here |
|---|---|---|
| Class size | 366,494 | 606,318 |
| Cash | $18.5 million | $65 million |
| Class Member "Interest" | Unknown | $471,980,254.92 |
| Percent Recovery | Indeterminable | 13.8% |
| Scope of loan cancellation | Limited to loans owned by the lender issued 16 months prior to the settlement | All loans owned by AWL in its Collection Portfolio at the time the provision was negotiated |

---

[9] As with *Gibbs*, the plain language of the settlement agreement in *ZestFinance* does not provide for the cancellation of "all" loans up to the date of settlement. *See* n. 5, *supra*.

[10] The inclusion of this provision in *ZestFinance* demonstrates the value of the substantially identical provision here. *See* n. 6, *supra*.

|  | *ZestFinance* | **Here** |
|---|---|---|
| Number of Lenders | 1 | 1 |
| Timing | Agreement signed *after* 4th Circuit ruling in *Big Picture* | Agreement signed *after* 4th Circuit ruling in *Big Picture* |

The question of how much interest was paid by the class in *ZestFinance* does not appear to have been raised by Judge Novak at either preliminary approval or final approval. Nonetheless, the substantial class size in *ZestFinance* (approximately 60.4% of the size of the class here) and the relatively modest cash recovery (28.5% of the cash component here) strongly suggests that the Settlement here provides a better recovery for Settlement Class Members than what was approved in *ZestFinance*.

### 3.   *Big Picture* (Preliminarily Approved): Example of Settlement With Tribally-Affiliated Defendants Post-*Big Picture*

On November 26, 2019, nearly five months after the Fourth Circuit decision in *Big Picture,* the plaintiffs in *Big Picture* filed a motion for preliminary approval of a settlement under the caption *Galloway v. Williams*, 3:19-cv-00470-REP (E.D. Va.). The *Big Picture* settlement would resolve the claims of 450,000 borrowers against the tribal affiliated defendants in the *Big Picture* litigation that prevailed in the Fourth Circuit on the question of tribal sovereign immunity. *See Galloway* ECF No. 18. Judge Payne granted preliminary approval of the *Big Picture* settlement on August 14, 2020. *See Galloway* ECF No. 97. Final approval in *Big Picture* is scheduled for December 15, 2020. *See Galloway* ECF No. 98. The terms of the proposed *Big Picture* settlement include, among other things:

- $8.7 million in cash (*Galloway* ECF No. 19 at 2);

- Loan cancellation limited to loans that "are currently, or become, more than 210 days in default" (*Galloway* ECF No. 18-1 at 34);[11] and

- Adjustment of interest due on all outstanding loans where the borrower has "not fully paid off his or her loan under the agreed terms," that requires the lender "to collect no more than 2.5 times the original principal amount of the loan in payments over the life of the loan (e.g., if the original principal amount of the loan was $500.00 then the Big Picture Defendants agree to cap collection at $1,250.00, including payments credited to either interest or principal reduction)" (*Id.*).[12]  *Big Picture* is not otherwise restricted in its ability to lend in any state in any way.

A table summarizing comparisons of the *Big Picture* settlement to the Settlement here follows.

|  | *Big Picture* | Here |
|---|---|---|
| Class size | 450,000 | 606,318 |
| Cash | $8.7 million | $65 million |
| Class Member "Interest" | Unknown | $471,980,254.92 |
| Percent Recovery | Indeterminable | 13.8% |

---

[11] This settlement therefore also does not provide loan cancellation to "all" borrowers from this tribal lender.  *See* n. 5, *supra*.

[12] The *Big Picture* agreed-upon interest rate cap of 2.5 times the original loan amount appears to provide for an amount of interest that would otherwise be illegal in any state with an interest rate cap (i.e., other than Nevada and Utah).

|  | *Big Picture* | Here |
|---|---|---|
| Scope of loan cancellation | Loans more than 210 days in default.  Borrowers otherwise liable to continue paying. | All loans owned by AWL in its Collection Portfolio at the time the provision was negotiated |
| Number of Lenders | 1 | 1 |
| Timing | Agreement signed *after* 4th Circuit ruling in *Big Picture* | Agreement signed *after* 4th Circuit ruling in *Big Picture* |

The question of how much interest was paid by the class in *Big Picture* does not appear to have been raised by Judge Payne at preliminary approval.  The substantial class size in *Big Picture* (approximately 74.2% of the size of the class here) and the cash recovery (only 13.4% of the cash component here) strongly suggests that the Settlement here provides a better recovery for the Settlement Class Members than what was preliminarily approved in *Big Picture.*

**4.** ***CashCall*: Virginia-Only Settlement With the Intervention of the Attorney General That Did Not Involve Immunity Issues Relevant to *Big Picture***

The Virginia *CashCall* settlement was part of a series of actions brought by more than a dozen state Attorneys General, the federal Consumer Financial Protection Bureau, and private class action plaintiffs in state class actions against purportedly tribal lending entities and their non-tribal partners.[13]  The *CashCall* settlement resolved claims on behalf of 15,126 Virginia residents (*see* 3:14-cv-00258-JAG, ECF No. 198-1 at ¶ 8) against the key defendants in the action, including J. Paul Reddam, the CEO and owner of the CashCall entity that engaged in lending through a

---

[13] As noted in Plaintiffs' Reply, the lending entity in the *CashCall* actions was organized under the laws of South Dakota – not tribal law – and thus did not present the same issues associated with "arm-of-the-tribe" immunity that are at issue here.  *See* ECF No. 449 at n.5.

purportedly tribal entity called Western Sky Financial.   With the weight of the Attorney General's intervention, the terms of the Virginia *CashCall* settlement included, among other things:

- $9.435 million in cash to Virginia borrowers (*see* https://www.oag.state.va.us/media-center/news-releases/877-january-31-2017-cashcall-to-refund-millions-to-va-consumers-over-illegal-online-lending-scheme, the "VA AG Release");

- $5.9 million in debt relief (*see id.*), characterized in the final approval papers as the "eliminat[ion] of all Outstanding Loans"[14] (*Hayes,* 3:14-cv-00258-JAG, ECF No. 198 at 3);

- Agreement to an injunction whereby CashCall (the non-tribal lender behind the scheme) was "permanently barred from violating the Virginia Consumer Protection Act" and lending in Virginia above the usury cap (*see* VA AG Release).

A table summarizing comparisons of the Virginia *CashCall* settlement to the Settlement here follows.

|  | *CashCall* (VA) (AG A Party) | Here |
|---|---|---|
| Class size | 15,126 | 606,318 |
| Cash | $9.435 million | $65 million |
| Class Member "Interest" | Unknown | $471,980,254.92 |
| Percent Recovery | Indeterminable | 13.8% |

---

[14] "Outstanding Loans" was defined to mean loans "that are owned by one or more of the defendants and have not been paid-off by a Settlement Class Member[.]"  *Hayes,* ECF No. 185-1 at 5, 9.

|  | *CashCall* (VA) (AG A Party) | Here |
|---|---|---|
| Scope of loan cancellation | All "Outstanding Loans" with outstanding debt; lender was precluded from operating in Virginia | All loans owned by AWL in its Collection Portfolio at the time the provision was negotiated |
| Number of Lenders | 1 | 1 |
| Timing | Agreement signed *before* 4th Circuit ruling in *Big Picture* | Agreement signed *after* 4th Circuit ruling in *Big Picture* |

The result in the Virginia *CashCall* settlement was certainly favorable for the class of 15,126 Virginia borrowers who were part of the class in that action.  However, the Virginia Attorney General's intervention and active participation in the action (along with the Attorneys General of a dozen other states and the federal Consumer Financial Protection Bureau) renders the Cashcall settlement a poor comparison to the Settlement here.

### D.    Other Inaccurate Contentions Made By Objectors At The October 19 Hearing

In addition to Objectors' inaccurate contentions described above, Objectors made various other assertions and arguments at the October 19 Hearing that are either factually inaccurate or wholly contrary to authority.  These include the following:

- Counsel to Objector Butler, Mr. Ackelsberg, erroneously suggested, attempting to justify Objector discovery into the irrelevant issue of loan sales by AWL, that the Notice provided to Settlement Class Members was somehow misleading to borrowers concerning the loan cancellation provided by the Settlement.  *See* Oct. 19 Hr'g Tr. at 17:24-18:3 ("my client just really discovered that after -- I mean, she gets a notice, and it says, you know, there's going to be this debt cancellation. It doesn't tell her, 'By the way, you're not going to get it.'").  This is demonstrably false.  The Court-approved

Notice states that loan cancellation is to be provided to "45,305 AWL loans in the company's 'Collection Portfolio'" (*see* https://awlsettlement.com/documents/AWL_Long_Form_Notice.pdf) and the Settlement Agreement and Exhibit 6 thereto (identifying each of the 45,305 loans to be canceled) have been posted on the settlement website, www.AWLSettlement.com, since July of this year. Moreover, since July, the Settlement website has had a "portal" whereby Settlement Class Members could inquire into whether they are eligible for cash recoveries or debt cancellation. *See* ECF No. 423-2 at ¶ 12. Objector Butler and other Settlement Class Members were therefore fully informed of the scope of debt cancellation provided in this Settlement, whether they were eligible for it, and that they had the option to opt-out of the Settlement if they so chose.

- Ackelsberg also argued that the Settlement Class was not receiving adequate relief because the Settlement does not cancel loans that AWL sold to debt buyers. *See* Oct. 19 Hr'g Tr. at 17:16-18:14. As made clear in Plaintiffs' Reply, (1) the Settlement does not release claims against debt buyers; (2) AWL has no ability to forgive loans sold to debt buyers; and (3) ample authority holds that complaints that a settlement fails to account for particular claims that have not been released, such as those against third-party debt buyers here, are improper as a matter of law. ECF No. 449 at 12-13, 15-16.

- Counsel to the Objector McDaniel argued that West Virginia Class Members were receiving inadequate relief because they purportedly have enhanced statutory remedies under state law. *See* Oct. 19 Hr'g Tr. at 26:3-27:6. Plaintiffs' Reply cites to ample authority squarely rejecting this precise argument as a basis for an objection, while Objector McDaniel cites to nothing. *See* ECF No. 449 at 26-28. Moreover, other tribal

18

lending settlements approved by this Court have not afforded West Virginia borrowers any enhanced recovery beyond those of other states. *See* ECF No. 449 at 2-3. In addition, Objector McDaniel had the option to opt out to pursue his state law claims—filed after preliminary approval here—and chose not to do so.[15]

- Mr. Bennett erroneously criticized the debt cancellation in the Settlement as involving "debt that was already written off as uncollectable." Oct. 19 Hr'g Tr. at 31:5-15. This ignores what Plaintiffs said in their Opposition to Objectors' Motion to Continue and in the correspondence to Mr. Acklesberg attached thereto, which describes the "Collection Portfolio" loans to be cancelled as being loans that AWL owns, intends to collect upon, and moved into AWL's internal collections process. *See* ECF No. 456 at n.9, ECF No. 456-3 at 2. Moreover, Mr. Bennett's criticism of the collectability of the loans to be cancelled rings hollow in light of the fact that multiple settlements he has advocated include debt cancellation for loans issued *years* prior to the date of those settlements (*see* Section II.C, *supra*) and likely are of questionable collectability (if not already repaid). Indeed, in the case of the *Big Picture* settlement, if final approved is granted, debt cancellation would be limited to loans that are "more than 210 days in default" (*see* § II.C.3, *supra*) a period of default that begins much later than the loans to be cancelled here. *See* ECF No. 456-3 at 2.

- Mr. Bennett argued at the October 19 Hearing that the Hon. Layn R. Phillips, who mediated the Settlement here, is an unknown mediator who has never handled a tribal lending class action. *See* Oct. 19 Hr'g Tr. at 16:18-21. Not so. Judge Phillips is one

---

[15] Objector McDaniel's AWL loan is in the Collection Portfolio and will be forgiven if the Court approves the Settlement. Also, he is eligible for a cash recovery if the Settlement is approved.

of the country's preeminent mediators who is recognized by courts nationwide, including this Court.[16]  Indeed, this Court found at preliminary approval that the Parties engaged in "intensive mediation with a *well-respected mediator, Former United States District Judge Layn R. Phillips*."  ECF No. 420 at 9 (emphasis added).  Moreover, Judge Phillips has in fact mediated settlements in tribal lending class actions that received final approval.  *See, e.g.*, *MacDonald, et al. v. CashCall, Inc., et al.*, 2:16-cv-02781 (D.N.J.), ECF No. 112-1 at 1, 7, 19, ECF No. 125.

### E.   The Settlement Provides Significant Non-Monetary Relief

At the October 19 Hearing, the Court directed Class Counsel to be prepared to provide further explanation of the value of the Settlement's non-monetary benefits at the final approval hearing.  *See* Oct. 19 Hr'g Tr. at 39:19-25.  The following provides further explanation consistent with the Court's direction.[17]

The Settlement provides the following non-monetary terms (ECF No. 414-1 at 16-17):

- Requiring Defendant Mark Curry—the alleged mastermind and primary beneficiary of the lending scheme—to "leave the business of AWL in all managerial and operational

---

[16] *See e.g.*, *In re Genworth Fin. Sec. Litig.*, 210 F. Supp. 3d 837, 841 (E.D. Va. 2016) (deeming Judge Phillips an "experienced mediator" who "left the parties and their counsel 'fully informed of all pertinent factual and legal issues' and demonstrate that the Settlement is fair and reasonable."); *In re LandAmerica 1031 Exch. Servs., Inc. Internal Revenue Serv. § 1031 Tax Deferred Exch. Litig.*, No. 3:09-CV-00054, 2012 WL 13124593, at *3 (D.S.C. July 12, 2012) (noting that Judge Phillips is "a mediator recognized for his expertise in complex civil disputes"); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *6 (N.D. Ga. Mar. 17, 2020) (noting that Judge Phillips is "a retired federal judge with a wealth of experience in major complex litigation"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 CV 5450 (NRB), 2016 WL 7625708, at *1 (S.D.N.Y. Dec. 21, 2016) (Judge Phillips is a "renowned mediator[]").

[17] To be clear, as significant this relief is to the Settlement Class, Class Counsel is ***not*** seeking attorneys' fees based on the value of the non-monetary relief in this case.  *See* Oct. 19 Hr'g Tr. at 30:19-22; ECF No. 425.

capacities on or before December 28, 2020," including by resigning as CEO and Director of AWL on or before date of Preliminary Approval Order.  Curry resigned effective June 26, 2020.

- AWL will request that Clarity Services delete negative credit reporting information for loans in the Collection Portfolio.

- AWL will not sell class members' personally identifying information, other than as may be required for debt collection

- AWL loan agreements shall (1) comply with federal law; (2) not waive federal law; (3) fully disclose loan terms to consumers, including the interest rate (APR), total finance charges, and loan payment schedules; and (3) not condition making loans on borrowers' consent to automatic withdrawals from their bank accounts.

The significance of these terms is that they directly address allegations of wrongdoing in Plaintiffs' Second Amended Complaint (ECF No. 355).  For example, requiring Curry to leave AWL addresses this Action's central allegations that AWL is not a tribally controlled or operated lending business since Curry exercises near-total control over AWL's business to shield the alleged illegal, non-tribal lending business.  ECF No. 355 ¶¶ 1, 6-7, 87-88, 96-97, 133.  Requiring AWL loan agreements to accept federal law addresses allegations that the AWL choice of law and arbitration provisions helped shield Defendants' unlawful conduct by depriving borrowers of their rights under federal law.  *Id.* ¶¶ 206-209, 212-213.  Requiring enhanced disclosures to borrowers addresses key allegations that AWL failed to disclose interest rates, finance charges, and payment schedules to borrowers in violation of TILA.  *Id.* ¶¶ 3, 150-151,153-155, 157, 166, 178-180, 190-192.  And requiring AWL to not condition loans on electronic fund transfers addresses allegations that AWL conditioned loans to borrowers on the preauthorization of automatic withdrawals from

borrowers' bank accounts, in violation of EFTA.  *Id.*  ¶¶ 254-258.  These terms are also of great significance to Plaintiffs themselves who, among other things, were not informed of key loan terms[18] and were required to preauthorize automatic withdrawals from their bank accounts.

Mr. Bennett argued at the October 19 Hearing that future compliance with federal law is of no value because the Fourth Circuit has previously ruled that federal law applies to tribal loans.  *See* Oct. 19 Hr'g Tr. at 32:25-33:19.  This is beside the point.  Just because a defendant is *subject to* a particular law does not mean that the defendant is in *compliance* with that law.  *See* ECF No. 449 at 19.  Indeed, that is what Plaintiffs alleged in the Second Amended Complaint: AWL is subject to federal law and failing to comply with it.  Likewise, non-tribal lenders are undoubtedly subject to federal law but routinely face lawsuits for failing to comply with TILA and EFTA.  This is why settlements that achieve future compliance with a particular law are widely valued by courts, including in the common instance where the defendants are already subject to that law.  *See* ECF No. 449 at 18-19.

### 1.    Professor Listokin's Valuation of the Non-Monetary Relief

Professor Yair J. Listokin was retained by Class Counsel as an expert on the economics of consumer borrowing to evaluate the real world economic benefits and related value of the Settlement to the Settlement Class.   Professor Listokin utilized well accepted valuation methodologies in calculating the substantial *economic benefits* to the Settlement Class as well as the valuable *societal benefits* of the Settlement.  ECF No. 426-1.  Professor Listokin is a professor at Yale Law School and Yale School of Management.  He received his undergraduate degree from Harvard University, a Ph.D. in economics from Princeton University, and a law degree from Yale Law School.

---

[18] Objector Butler likewise notes that she was not informed of the annual interest rate on her AWL loan.  ECF No. 428 at 1.

### i.     AWL's Agreement Not to Sell Personal Information is Worth Approximately $33 Million

The personal information of prospective non-prime borrowers is bought and sold in a robust online market.[19]  According to an FTC settlement, "online lenders paid ... between $10 and $150 per lead."[20] A prominent industry blog notes, "active" leads command a premium in the payday loan lead market, "payday loan leads sell at an average of about $50 per lead, but can go for much higher [over $150] depending on the quality of the leads."[21]  Professor Listokin conservatively estimates that if future leads generated by Settlement Class Members eligible for a cash award ("Cash-Eligible Borrowers") are worth an average of $75 (a conservative estimate given the high loan amounts, high APRs, and long terms secured by Cash-Eligible Borrowers), then the Settlement provision forbidding AWL from selling the personal information of Settlement Class Members is worth approximately $33 million.  ECF No. 426-1 at ¶¶31-32.

### ii.     AWL's Agreement To Disclose Key Loan Terms Is Worth Approximately $300 Million

Professor Listokin cites to studies showing the effect that enforcement of the interest rate and loan term disclosure requirements of TILA has on the interest rates paid by different types of borrowers.  ECF No. 426-1 at ¶¶33-36.  Specifically, weak TILA enforcement means that low credit score borrowers pay "6% to 8%" more in interest than they would with stronger TILA enforcement. ECF No. 426-1 at ¶34.[22]  Enhanced future AWL loan disclosures are thus likely to

---

[19]   See, e.g., https://paydayloanindustryblog.com/Payday%20loan%20industry/payday-loan-leads/; https://www.boberdoo.com/payday-leads, https://www.arrowshade.com/sell-payday-loan-leads-earn-now/.

[20]   https://www.ftc.gov/news-events/press-releases/2014/12/ftc-charges-data-broker-facilitating-theft-millions-dollars?utm_source=govdelivery.

[21] https://www.arrowshade.com/sell-payday-loan-leads-earn-now/.

[22]   See Victor Stango & Jonathan Zinman, "Fuzzy Math, Disclosure Regulation, and Market Outcomes: Evidence from Truth-In-Lending Reform," 24 Review of Financial Studies 506 (2011).

lower the interest rates paid by future AWL borrowers by approximately 7%.  ECF No. 426-1 at ¶35.  A 7% reduction in this APR would yield a savings to the Settlement Class of approximately $93 million.  ECF No. 426-1 at ¶35.

Professor Listokin cites to the *Journal of Finance* finding that better disclosure of true payday loan costs "reduce[s] borrowing amounts" by 16% relative to a control group of payday loan applicants.  ECF No. 426-1 at ¶36.  If members of the Settlement Class reduce their future AWL borrowing by 16% as a result of the enhanced disclosures provided by the Settlement, then they will benefit from a total savings of approximately $210 million.  ECF No. 426-1 at ¶36.  Thus, the total future interest savings to Settlement Class Members from the enhanced TILA disclosures is roughly $300 million.  Approximately $90 million of this value comes from lower future average interest rates caused by better disclosure, and the remaining $210 million stems from reductions in overall borrowing and thus lower total interest burden.  ECF No. 426-1 at ¶¶35-37.

### iii.   *AWL's Agreement Not To Condition Loans On A Borrower's Authorization To Use Electronic Fund Transfers Is Worth Approximately $260 Million.*

Nonprime lenders that do not condition the provision of loans on automatic electronic funds transfers ("EFTs") instead offer inducements to borrowers to persuade them to authorize automatic EFTs.  A prominent Texas nonprime lender, for example, charges a daily loan fee of 1.780% to borrowers "without recurring electronic payment authorization" and a reduced fee of 1.424% per day to borrowers "with recurring electronic payment authorization."  ECF 426-1 at ¶39.   The 20%[23] reduction in APR induces borrowers to authorize recurring electronic payments.  If AWL offers similar inducements for EFT authorization to future borrowers, then average APRs for those

---

[23] .2=(1.780-1.424)/1.780, where 1.78% is the APR without recurring EFT payments and 1.424% is the APR with recurring EFT payments.

borrowers would decline by 20%, reducing the average APR from 567% to approximately 454%. This would save the average borrower approximately $692. As a result, the total value of the Settlement's EFT provisions to members of the Settlement Class is approximately $260 million. ECF No. 426-1 at ¶39.

> ### iv.   Deleting Negative Credit Reporting Information Is Worth, Conservatively, $108 Million.

For the portion of the Settlement Class that comprises the Collection Portfolio, this provision offers a clear benefit over and above loan cancellation. The deletion of a default notice will raise a Settlement Class Member's FICO credit score. In turn, a higher credit score translates into lower interest rates on all of that individual's borrowing. ECF No. 426-1 at ¶40. Professor Listokin notes that according to the Urban Institute, "a delinquency—a payment 30 or more days late on a credit card or installment loan—lowers credit scores by 100 points or more." ECF No. 426-1 at ¶42.

To keep his estimate conservative, Professor Listokin assumes that the AWL loan defaults lowered the defaulting Settlement Class Members' credit scores by 50 points. ECF No. 426-1 at ¶42. Based on research, Professor Listokin estimates that the average Settlement Class Member in the Collection Portfolio has $18,900 in non-mortgage debt and with the removal of defaults from their records, they will save approximately $800 annually with a total annual value of approximately $36 million. ECF No. 426-1 at ¶44. Professor Listokin recognizes that the benefits of deleting defaults from a Settlement Class Member's credit record lasts conservatively for a 3-year period, which yields a total value of $108 million (3 years * $36 million).[24] This opinion is

---

[24] In addition to providing expert opinions as to the valuation of the non-monetary relief, Professor Listokin also opines on the value of the monetary components of the Settlement (ECF No. 423-1 at ¶¶ 49-55) which, when combined with the non-monetary relief, is conservatively estimated to have a value of over $1 billion to the Settlement Class (id. at ¶ 59).

consistent with the expert declaration submitted in support of the proposed settlement in *Gibbs*, which concluded that deletion of negative credit reporting was a benefit valued in the billions. *See supra* at 9; *Gibbs* ECF No. 135-3.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter the Proposed Final Approval Order and (1) find that the Settlement is fair, reasonable, and adequate, (2) finally certify the Settlement Class for settlement purposes, and (3) award attorneys' fees, reimbursement of expenses, and Service Awards to the Settlement Class Representatives.

DATED:  October 23, 2020

**MICHIEHAMLETT**

 _/s/ David W. Thomas_____
David W. Thomas
E. Kyle McNew
310 4th Street NE, 2nd Floor
P.O. Box 298
Charlottesville, VA 22902
Telephone: (434) 951-7200
Fax: (434) 951-7218
Email: dthomas@michiehamlett.com
           kmcnew@michiehamlett.com

*Local Settlement Class Counsel*

and

**BERMAN TABACCO**
Kathleen M. Donovan-Maher (*pro hac vice*)
Norman Berman (*pro hac vice*)
Steven J. Buttacavoli (*pro hac vice*)
Steven L. Groopman (*pro hac vice*)
One Liberty Square
Boston, MA  02109
Telephone: (617) 542-8300
Fax: (617) 542-1194
Email:
kdonovanmaher@bermantabacco.com
nberman@bermantabacco.com
sbuttacavoli@bermantabacco.com

sgroopman@bermantabacco.com

*Settlement Class Counsel*

**GRAVEL & SHEA PC**
Matthew B. Byrne (*pro hac vice*)
76 St. Paul Street, 7th Floor
P.O. Box 369
Burlington, VT  05402-0369
Telephone: (802) 658-0220
Fax: (802) 658-1456
Email:  mbyrne@gravelshea.com

*Settlement Class Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of October, 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing to all counsel of record.

*David W. Thomas*
David W. Thomas