```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF VIRGINIA
 2                    Newport News Division

 3

 4    - - - - - - - - - - - - - - - - - - -
                                        )
 5    ROYCE SOLOMON, et al.,            )
      individually and on behalf of     )
 6    all others similarly situated,    )      CIVIL ACTION NO.
                                        )         4:17cv145
 7         Plaintiffs,                   )
                                        )
 8    v.                                )
                                        )
 9    AMERICAN WEB LOAN, INC.,          )
      et al.,                           )
10                                      )
           Defendants.                  )
11    - - - - - - - - - - - - - - - - - - -

12

13         TRANSCRIPT OF VIDEO TELECONFERENCE PROCEEDINGS
                         (Motion Hearing)
14
                       Norfolk, Virginia
15
                      November 4, 2020
16

17

18

19

20    BEFORE:  THE HONORABLE HENRY COKE MORGAN, JR.
                United States District Judge
21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

```
1    APPEARANCES:   (Via Zoom.gov)

2            BERMAN TABACCO
             By:   Kathleen M. Donovan-Maher
3                  Steven J. Buttacavoli
                        - and -
4            CONSUMER LITIGATION ASSOCIATES
             By:   Leonard A. Bennett
5                  Amy L. Austin
                        - and -
6            GRAVEL & SHEA PC
             By:  Matthew B. Byrne
7                        - and -
             MICHIE HAMLETT
8            By:   David W. Thomas
                        Counsel for the Plaintiffs
9


10
             O'HAGAN MEYER PLLC
11           By:   Charles K. Seyfarth
                   Elizabeth S. Turner
12                      - and -
             WILMER CUTLER PICKERING HALE & DORR LLP
13           By:   Jonathan Paikin
                   Molly Jennings
14                      - and -
             ROSETTE, LLP
15           By:   Robert A. Rosette
                   Saba Bazzazieh
16                      - and -
             WILLIAMS & CONNOLLY LLP
17           By:   Robert M. Cary
                   Kathryn E. Hoover
18                 Simon A. Latcovich
                        - and -
19           PROSKAUER ROSE LLP
             By:   Christopher E. Ondeck
20                      - and -
             FAEGRE DRINKER BIDDLE & REATH LLP
21           By:   Matthew J. Fedor
                        Counsel for the Defendants
22

23

24

25
```

```
1    APPEARANCES (Continued):  (Via Zoom.gov)

2            THE SARRETT LAW FIRM PLLC
             By:  Drew D. Sarrett
3                      - and -
             LANGER GROGAN & DIVER P.C.
4            By:  Irv Ackelsberg
                  John Grogan
5                      Counsel for Interested Party Diana Butler

6

7            MOUNTAIN STATE JUSTICE, INC.
             By:  Bren J. Pomponio
8                      Counsel for Interested Party Charles P.
                       McDaniel
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings commenced at 12:00 p.m.)

 2          THE COURT:  Counsel, this is Judge Morgan.  We have,

 3     at last count, 26 people on this line.  The plaintiffs may

 4     designate one person to speak in their behalf, and the

 5     defendants may do the same, and I'm going to ask Mr. Bennett

 6     to speak for the objectors, and we'll go in that order.

 7          So the plaintiffs can select whomever they want to

 8     speak.  I don't want anybody else breaking in without the

 9     permission of the Court.  So whoever is going to be the

10     spokesperson for the plaintiffs may make their presentation

11     of why the Court should approve the settlement.

12          MR. THOMAS:  Your Honor, good afternoon.  My name is

13     David Thomas, and I've been designated to speak for the

14     plaintiffs in this matter.

15          THE COURT:  All right.  And you are with?

16          MR. THOMAS:  I'm with MichieHamlett, Your Honor, in

17     Charlottesville.

18          THE COURT:  Okay.

19          MR. THOMAS:  Your Honor, settlements inherently mean

20     compromise.  In fact, in the words of this Court, inherent in

21     compromise is a yielding of absolutes and abandoning of

22     higher hopes.  Those were this Court's words in *Singletary*

23     *vs. Sterling Transportation*, and they remain true today.

24          Any settlement has to be evaluated in the light of

25     not only the best-case scenario, but also the worst.  That
```

1    means counterbalancing the judgment that plaintiffs could

2    receive if they went to trial and prevailed on all counts,

3    assuming, of course, collectability, with the possibility

4    that if the Court denies approval of this settlement, the

5    defendants will proceed on appeal, and the Fourth Circuit

6    will follow its own precedent in *Big Picture* and declare the

7    defendants an arm of the tribe, which could include extending

8    immunity to Mark Curry.

9         The settlement presented to the Court for final

10   approval is the same one to which the Court granted

11   preliminary approval and consists of two significant parts.

12        THE COURT:  Well, when the Court granted preliminary

13   approval, it warned counsel that that didn't mean that it was

14   a step in the direction of final approval.  I asked for

15   additional information before I would even consider final

16   approval.  So the preliminary approval, I did grant, in order

17   to move the case along.

18        You may proceed.

19        MR. THOMAS:  Yes, sir.  And that turns, I think,

20   maybe, to the $65 million cash component of the award.  The

21   Court granted preliminary approval based on an interest

22   number that the parties believed to be $492 million based on

23   the closest calculation they could perform at the time.

24        We have since determined and have put before the

25   Court that the total interest number was actually slightly

1    below that, 472 million.  So the ratio of cash --

2           THE COURT:  What period of time does that cover,

3    that figure?

4           MR. THOMAS:  That covers the class period, Your

5    Honor.

6           THE COURT:  Which is what?

7           MR. THOMAS:  January 1, 2010 until June 26, 2020.

8           THE COURT:  And you're saying the total interest

9    paid on all the loans in the class was 472 million for that

10   period?

11          MR. THOMAS:  Yes, Your Honor.  It was 471,900,000

12   and change but...

13          THE COURT:  Okay.  You may proceed.

14          MR. THOMAS:  And, Your Honor -- yes, sir.  And

15   that's a recovery of 13.8 percent, which is well within the

16   bounds of what courts have approved for class action

17   settlements generally, but mindful of the Court's instruction

18   during our October telephonic hearing, it is also at or above

19   every other tribal lending settlement approved in this

20   district.

21          And we filed, as an Exhibit A to our supplemental

22   brief, a table which lays out the other tribal lending

23   settlements that other courts within this district have

24   approved.  Of, I would say, primary importance or comparison

25   are three.  The first is *Zest Finance,* officially

1    *Turner, et al., v. Zest Finance, Inc.,* which was a settlement

2    that Judge Novak approved --

3          THE COURT:  You needn't go through those.  I'm

4    familiar with those.

5          MR. THOMAS:  Yes, sir.  Well, then, I'll skip right

6    over and simply note that in all cases -- *Zest Finance*, *Big*

7    *Picture*, and even *Gibbs*, with the inclusion, assuming that

8    the $5.5 million additional payment is approved by Judge

9    Payne -- the settlement here is above, by percentage of

10   interest or by recovery per class member where interest isn't

11   available -- this settlement is better than all three of

12   those which have been granted approval.

13         THE COURT:  Well, if you don't know how much

14   interest was paid in the other cases, how do you figure that

15   the percentage is higher?  Because you've said in your chart

16   that this is the only Court that required that you disclose

17   what the interest was for the class period.

18         MR. THOMAS:  Yes, sir.  Well, we have what we

19   believe is a close approximation in *Gibbs* because that matter

20   proceeded in part into bankruptcy, and so there was an

21   approved claim of $1.33 billion which was agreed to be an

22   approximation for the total amount of interest paid in that

23   case; 1.13 billion for the nation as a whole, plus

24   200 million for the Pennsylvania subclass.

25         And that is where we say in that, assuming that's

1    correct, assuming the bankruptcy court got it right, the
2    total recovery in that case, which, if Judge Payne approves
3    the most recent portion of the settlement, would amount to
4    right about $100 per class member, 105.75 million as against
5    the class of 1,045,000 and change.  The settlement here,
6    65 million is against the class of 606,000.
7          And so whether you do it as a percentage of interest
8    or on a per-class-member basis, which is all we have in *Zest*
9    *Finance* and *Big Picture*, the percentage or the average is
10   above all of those settlements.
11         And, Your Honor, we have to look at it in light of
12   what happens if the settlement here isn't approved.  If the
13   Court denies final approval, this case will proceed
14   immediately on appeal.  It already is.  Appeal has been
15   stayed.
16         THE COURT:  Now, why do you say that it would
17   proceed immediately to appeal if the Court does not approve
18   this settlement?  The fact that the Court may or may not
19   approve this settlement doesn't mean that the case couldn't
20   be settled.  It may be that it just may not be settled on the
21   particular terms before the Court at this point.  Why
22   couldn't the Court refer it to somebody else for mediation,
23   for example?
24         MR. THOMAS:  Well, Your Honor, that makes a couple
25   of assumptions.  One, the Fourth Circuit, as I understand it,

1    has stayed the appeal because approval was being sought in

2    this Court, preliminary and then final.  So that assumes that

3    the Fourth Circuit would continue to stay the appeal while

4    this case was sent to a settlement conference.

5            THE COURT:  And of course, your statement assumes

6    that they wouldn't.  So we don't know what the Fourth Circuit

7    will do, do we?

8            MR. THOMAS:  You are right, Your Honor; we don't.

9            THE COURT:  Well, I was wondering what the basis was

10   for your saying in your brief that it would automatically go

11   to the Fourth Circuit if the Court didn't approve the

12   settlement before it today, and that is based on the fact

13   that you're assuming that the Fourth Circuit would end the

14   stay if the Court did anything other than approve the

15   settlement, and I don't think that assumption is necessarily

16   correct.  I don't think it's necessarily incorrect either.

17   But let's move on.

18           MR. THOMAS:  Yes, sir.  And it also requires an

19   assumption that the defendants would agree to go to further

20   mediation, and of course, the Court will have the opportunity

21   to address that question to counsel for the defendants, but

22   if the defendants decline to go to mediation and tell the

23   Court, essentially, we offered everything we were prepared to

24   offer in the three days of mediation that have already

25   occurred, the defendants may very well decide, in light of

1   *Big Picture,* to take their chances on appeal, and if that

2   happens --

3           THE COURT:   I wouldn't put too much stock in *Big*

4   *Picture*.   I don't want to hear an argument based on *Big*

5   *Picture*.   Let's talk about other things.

6           MR. THOMAS:   And I take the Court's direction.   The

7   part I can't get away from, Your Honor, is that at this point

8   in time, *Big Picture* is controlling law, and while I know the

9   Court has heard some language that maybe it's not or maybe

10  it's subject to reversal, the fact of the matter is there is

11  nothing pending out of Judge Payne's court or anywhere else

12  that indicates that the Fourth Circuit is likely to revisit.

13  In fact, other courts within this district have since applied

14  *Big Picture*, now, in non-tribal lending cases.

15          THE COURT:   As I said, I'm not interested in hearing

16  any more about *Big Picture*.

17          MR. THOMAS:   Yes, sir.

18          So looking at the cash component, especially in

19  comparison to the other settlements within this district,

20  looking also at the monetary relief with respect to the

21  arguments I anticipate you're going to hear, the reality of

22  it is that the debt relief obtained in this case is at least

23  as valuable, if not more valuable, than those other cases.

24          THE COURT:   I think the objectors pointed out that

25  all of the debt relief, the whole 70 million, applied to

```
 1   loans which were quite delinquent and probably uncollectable.
 2   The parties denied that, but it appears that that was an
 3   accurate assessment of the $70 million, I think it was, in
 4   so-called debt relief.  So let's not talk about the value of
 5   debt relief either.
 6               MR. THOMAS:  Your Honor, I'll admit --
 7               THE COURT:  I think calling that "debt relief" is
 8   very misleading.  That would never be collected anyway beyond
 9   a few cents on the dollar.  So that's not of any value.
10               MR. THOMAS:  Your Honor, and with apologies, there
11   is absolutely nothing in the record to indicate that is so.
12   Objectors' counsel has even submitted an affidavit to put the
13   actual weight of sworn testimony behind that argument, and
14   the reality is --
15               THE COURT:  Have you?
16               MR. THOMAS:  Yes, Your Honor, we did.  There are
17   affidavits attached to the motion --
18               THE COURT:  How old are these debts?  How many days
19   delinquent are they?
20               MR. THOMAS:  Your Honor, it varies within the
21   collection portfolio, but they are, I believe, all more
22   recent than the 210-day-old debt that is sought to be
23   released in, I believe it is *Gibbs*.  And therefore -- sorry,
24   *Big Picture*, Your Honor.  It would be *Big Picture* in which
25   the loans had to be in default for more than 210 days before
```

1    they were eligible for relief.

2              And the parties in that case, including some of the

3    objectors' counsel and Judge Payne, accepted that there was a

4    value to the debt relief in that particular case.

5              THE COURT:  Well, I don't accept it.

6              MR. THOMAS:  While I understand --

7              THE COURT:  I don't accept it.

8              MR. THOMAS:  Your Honor, the third portion of this

9    settlement, then, is the non-monetary relief, which is to say

10   the changes in practice that the settlement requires of the

11   defendants, and the primary one of which, Your Honor, is that

12   it exits Mark Curry from the business of American Web Loans

13   in its entirety.  The outsider is out.

14             THE COURT:  Does he give up any right to receive any

15   payments as a stockholder in American Web because of his

16   resignation?  Does he still own stock in it?  If it makes any

17   money, will he get paid?

18             MR. THOMAS:  I will confirm that, Your Honor, but I

19   do not -- I believe the answer is no.  The entirety of the

20   payments he was receiving from American Web Loans were a

21   consulting contract and a promissory note, both of which the

22   Court heard evidence on during the hearing that we had, and

23   in both cases, his consulting contract has been suspended or

24   canceled, and his note has been suspended as of the

25   settlement and will be extinguished if the Court grants final

1    approval.

2              THE COURT:  Who owns the stock in the company?

3              MR. THOMAS:  The Otoe-Missouria Tribe, Your Honor.

4              THE COURT:  They own all the stock in the company?

5              MR. THOMAS:  With Mr. Curry's exit, yes, Your Honor.

6              THE COURT:  With his exit.  Did he formerly own

7    stock?  Has he transferred stock as well as resigned?

8              MR. THOMAS:  Your Honor, I don't know if he ever

9    formally owned stock.  I believe -- and I'll check on that as

10   we talk, but I believe the answer is he did not because one

11   of the ways they were depending on an arm-of-the-tribe

12   argument was that Mr. Curry was not an owner of American Web

13   Loans; he simply received payments pursuant to the consulting

14   contract and the promissory note.

15             And so with the final approval of this settlement,

16   all of those payments stop; Mr. Curry is out of the business.

17   And I'm not going back to *Big Picture*, Your Honor, but

18   Mr. Curry's departure improves American Web Loan's argument

19   that it is truly an arm of the tribe with no outsiders

20   involved in the ownership or operation of the company.

21             THE COURT:  When did he resign?

22             MR. THOMAS:  He resigned effective -- sorry, Your

23   Honor, preliminary approval, June 26, 2020.

24             THE COURT:  In other words, during the entire class

25   period, he had not resigned.  He resigned at the day the

 1    class period ended.  Is that what you're saying?

 2              MR. THOMAS:  Yes, Your Honor, although that's not

 3    the relevant inquiry for this.

 4              THE COURT:  So what effect would his resignation on

 5    June 26 have on the merits of the case, because he didn't

 6    resign until he entered the class period?

 7              MR. THOMAS:  It would have to do with the Court's

 8    ability to exercise jurisdiction over American Web Loans.

 9              If American Web Loans is deemed an arm of the tribe,

10    the Court loses jurisdiction, and with Mr. Curry out, the

11    defendants have an improved argument that they are a true arm

12    of the tribe and, therefore, not subject to this Court's

13    jurisdiction.  That was ultimately the holding in *Big*

14    *Picture,* that the two tribal defendants were not subject to

15    this Court's jurisdiction.

16              The balance of the relief, Your Honor, is

17    prospective relief.  It requires American Web Loans to change

18    their loan agreements, to make full disclosure of interest

19    rates, finance charges, and payment schedules.  It prohibits

20    conditioning the loans on automatic electronic payments.  It

21    deletes negative credit reporting, and it prevents American

22    Web Loans from selling any of the class members' personal

23    identifying information.

24              THE COURT:  Does it prevent them from selling any of

25    the loans?

```
 1            MR. THOMAS:  The loans that are being forgiven, yes,
 2    Your Honor, the ones that are being --
 3            THE COURT:  I'm not talking about the ones that are
 4    being forgiven.  Now, by virtue of promising to tell the
 5    debtors what their interest rate is, that complies with the
 6    federal law.  Now, is there anything in the agreement that
 7    makes the loan subject to the state usury laws where
 8    applicable?
 9            MR. THOMAS:  Your Honor, the answer to that question
10    is no, except that hasn't been a component of any settlement,
11    any private-party settlement before this Court.
12            THE COURT:  Well, I'm looking at a settlement here
13    where the loans for the class period were all forgiven, for
14    the whole class period.
15            MR. THOMAS:  And, Your Honor, I'm not sure which
16    one --
17            THE COURT:  I'm looking right at it.  I've got it
18    here.
19            MR. THOMAS:  Yes, sir.  And I believe, if the Court
20    is referring to the most recent one, the class period ended
21    18 months prior to final approval.  So the loans that are
22    being forgiven for the class period are loans that, when the
23    Court issued final approval, were 18 months old or older.
24    That is significantly older than the loans in the collection
25    portfolio in this case.
```

1          So one can say, yes, Your Honor, all --

2          THE COURT:  Well, wait a minute.  Do you put a loan

3    in the collection folder -- you don't do that until it's

4    delinquent, do you, when it's in the collection folder?  How

5    long does it have to be delinquent before it goes into the

6    collection folder?

7          MR. THOMAS:  Your Honor, it varies by the -- as I

8    understand it, it varies by the internal loans.  It can be

9    anywhere from 90 days to 180 days or more.

10         THE COURT:  Well, the loan could be five years old,

11   and the person is still paying on it, and as long as they

12   keep paying on it, it doesn't go into delinquent, or the

13   collection department, whatever you call it.  Right?

14         MR. THOMAS:  Yes, Your Honor.  And that is

15   theoretically possible, but if it's true, it would represent

16   a tiny, tiny fraction of the roughly 30,000 loans that are

17   still outstanding that are not being forgiven or canceled in

18   this settlement.

19         THE COURT:  Okay.  So the settlement, the only thing

20   the settlement does, as far as those loans are concerned, is

21   it doesn't forgive them, or it doesn't even forgive the

22   usurious interest on them.  All it does is require the

23   defendants to notify them how much interest they're paying in

24   accordance with federal law.

25         So it doesn't change the interest that they're

1   charging the people.  They're still charging them the same

2   usurious interest on all those loans.  Isn't that right?

3           MR. THOMAS:  No, Your Honor, only on prospective

4   loans.

5           THE COURT:  What do you mean "prospective loans"?

6   What are prospective loans?

7           MR. THOMAS:  Loans issued after the date of

8   preliminary approval, Your Honor.

9           THE COURT:  Well, what about the loans that were

10  issued before the date of preliminary approval?  Aren't they

11  subject to the same provision in the settlement agreement?  I

12  mean, they're not being forgiven.

13          MR. THOMAS:  Well, half of them are, Your Honor.  Of

14  the roughly 90,000 loans that were outstanding, being paid

15  on, or were subject to collection by American Web Loans at

16  preliminary approval, half of them, roughly, are being

17  canceled as part of the collection portfolio.  The other half

18  were still outstanding.

19          And my best information is, of those roughly 45,000

20  that were still outstanding, approximately 30,000 are

21  outstanding as I stand here today.  So there were debt

22  cancellations for half of those loans that were outstanding

23  and still being collected upon by American Web Loans.

24          THE COURT:  The half that they were getting ready to

25  write off, correct.

1          Okay.  Let's move on to another topic.

2          MR. THOMAS:  I don't believe that's true, Your

3    Honor, because that is not in the record at all.  I

4    understand that somebody has argued that fact, but the

5    cancellation that is in this settlement, Your Honor, is,

6    frankly, better than the cancellation achieved in all of

7    these other cases in which the loans being forgiven were

8    18 months, two years, and three years old.

9          And all of the other courts gave weight to the value

10   of that settlement, and certain counsel in this hearing

11   argued to the Court that there was value in the forgiveness

12   of those 18-month, two-year-old loans.

13         THE COURT:  Well, based on what you've told me, I

14   don't think there's much value in those loans.  So let's move

15   on to another topic.

16         MR. THOMAS:  Yes, sir.

17         And so, then, the balance of the non-monetary

18   relief, Your Honor, I've already mentioned that it will not

19   be required to preauthorize automatic withdrawals.

20         THE COURT:  Well, what about the people that have

21   already authorized it?  Is that canceled as to those people?

22         MR. THOMAS:  For the existing loans, Your Honor, as

23   of the preliminary approval?

24         THE COURT:  No.  For the loans that predate the

25   preliminary approval.  Are those --

1              MR. THOMAS:  And that are not being forgiven?

2              THE COURT:  Right.

3              MR. THOMAS:  I don't believe so, Your Honor, because

4    I don't believe this Court has the power to force a change in

5    contracts between the parties, in the same way that we can't

6    change interest on future loans.  That's just something that

7    is not within the power of private parties before this Court.

8              THE COURT:  A simple "no" would have done.

9              MR. THOMAS:  Yes, Your Honor, but I didn't think a

10   "no" was a fully truthful answer because saying "no" because

11   there's no power --

12             THE COURT:  Well, there's no power at this point,

13   no, but if the case is tried, there would be power.

14             What about your fees?  How did you compute your

15   fees?

16             MR. THOMAS:  Yes, Your Honor, we used 23 percent of

17   the common fund.

18             THE COURT:  Of what common fund?  What fund?

19             MR. THOMAS:  Yes, Your Honor, the 65 million in cash

20   and the 76 million in debt relief.  Although we place the

21   value, through expert affidavit, on the non-monetary relief,

22   we are not seeking any award based on the value of the

23   non-monetary relief.  So it is just on the two monetary

24   components of the settlement agreement.

25             THE COURT:  Well, the settlement I'm looking at, the

1   attorneys' fee was 5 million and some -- the attorneys' fees

2   and costs were 5 million and some.  Why is this case worth so

3   much more?  Because it doesn't grant as much relief.

4           MR. THOMAS:  Would Your Honor be willing to disclose

5   what that settlement agreement is?

6           THE COURT:  Well, I don't know what is a public

7   document and what isn't.  I've got information from the Court

8   in Richmond on various cases.  I don't know what is public

9   and what isn't.

10          But did you compute a lodestar figure for the time

11  that you spent on this case?

12          MR. THOMAS:  Yes, Your Honor, we did.  The lodestar

13  crosscheck in this case is 3.46, which I would note to the

14  Court is less than the 3.86 that Judge Novak approved in *Zest*

15  *Finance*.

16          THE COURT:  What do you mean by 3.46?

17          MR. THOMAS:  The lodestar multiplier is 3.46 on our

18  requested attorneys' fee.

19          THE COURT:  You mean 3.46 times the lodestar?  Is

20  that what you're saying?  I don't understand your

21  terminology.

22          MR. THOMAS:  Yes, I'm sorry.  I misunderstood the

23  Court's question.  Yes, there was $9,377,236.30 in attorneys'

24  fees, which times 3.46 comes out to the requested attorneys'

25  fee as the crosscheck, but it was calculated based on

1   23 percent.

2          THE COURT:  Where does that attorney fee -- where

3   does it come from?  The monetary, it's subtracted from the

4   cash relief of the 65 million?  Is that where it comes from?

5          MR. THOMAS:  Yes, Your Honor, it is paid out of the

6   cash portion of the award.

7          THE COURT:  Okay.

8          MR. THOMAS:  Your Honor, and like I said, I would

9   note that the lodestar -- the multiplier is below that which

10  Judge Novak approved, and even at 50 percent of the total

11  cash, that brings it in line with Judge Trenga's decision in

12  *Lumber Liquidators*, puts it below the District of South

13  Carolina's opinion in *Case vs. French Quarter*, and is similar

14  to that approved in *Kidrick*, which is out of the

15  West Virginia District Court, Your Honor.

16         THE COURT:  All right.

17         MR. THOMAS:  And I'm happy to run through the

18  requested expenses, Your Honor.  They are $421,735.  They are

19  laid out in the affidavits, the bulk of which are the

20  mediation costs and then other costs associated with this

21  matter.  So I'm happy to go into it in more detail if the

22  Court has particular questions about it.

23         THE COURT:  No.  I don't think we need to deal with

24  costs at this stage.

25         MR. THOMAS:  Yes, sir.

1          And then, finally, we are requesting service awards

2     for each of the four named plaintiffs of $5,000 apiece, which

3     is well within the range of service awards previously

4     approved in this district.

5          THE COURT:  All right.

6          MR. THOMAS:  And so, Your Honor, at the end of the

7     day, we're asking the Court to enter the final approval order

8     submitted to the Court -- it's at ECF 456-1 -- to overrule

9     the objections, certify the class for settlement purposes,

10    award counsel a fee of 23 percent of the total settlement --

11    total monetary settlement value, costs, as mentioned, with

12    service awards.

13         Your Honor, I'm happy to answer any other questions

14    that the Court might have at this point.

15         THE COURT:  I don't have any other questions at this

16    point.  I'll hear from whomever is speaking for the

17    defendants.

18         MR. THOMAS:  Thank you, Your Honor.

19         MR. PAIKIN:  Good morning, Your Honor.  This is

20    Jonathan Paikin.  I represent AWL, and I've been designated

21    to speak on behalf of the defendants.

22         Your Honor, there's been a substantial amount of

23    paper that's been submitted in connection with plaintiffs'

24    motion, and I just wanted to make three points from the

25    perspective of the defendants.

1          The first is that it's important to know that the

2    parties' negotiations, as we were going through mediation,

3    were guided by this Court's rulings on the motions for

4    immunity, to compel arbitration, and to dismiss.

5          Front and center throughout those -- throughout that

6    mediation was plaintiffs' insistence that part of the deal

7    satisfy the concerns that were raised by the Court.  The

8    settlement does that, and let me explain the three ways that

9    it does.

10         The first is, putting aside -- and I understand Your

11   Honor does not want to address the *Big Picture* decision.

12   Putting aside the *Big Picture* decision and going back solely

13   to what was then the Tenth Circuit *Breakthrough* decision,

14   which was the --

15         THE COURT:  Well, the *Big Picture* decision predated

16   the settlement negotiations in this case.  Is that right?

17         MR. PAIKIN:  I believe the *Big Picture* decision came

18   down in the middle of settlement negotiations.

19         THE COURT:  You mean during the three days that you

20   were mediating?

21         MR. PAIKIN:  The parties had been talking for a very

22   long time --

23         THE COURT:  Did it come down before the three days

24   you spent with the mediator?

25         MR. PAIKIN:  Yes, it did.

Carol L. Naughton, Official Court Reporter

```
1            THE COURT:  All right.
2            MR. PAIKIN:  But even putting aside Big Picture,
3   Your Honor, and just applying the test, the immunity test
4   that this Court applied in its decision denying immunity, the
5   settlement satisfies the concerns that the Court raised in
6   its decision, and specifically, the Court expressed concerns
7   over the structure, ownership, and management of the company,
8   and expressed concerns about the financial relationship
9   between the tribe and the company.
10           And one of the things that this settlement does is
11  address and, I believe, satisfy the concerns that were
12  raised.  You asked earlier about the ownership of AWL.  The
13  Otoe-Missouria Tribe has always owned AWL.  They have always
14  owned it from the beginning, 100 percent.  Mr. Curry has
15  never been a stockholder of AWL.  The relationship with
16  Mr. Curry --
17           THE COURT:  Is that the same relationship he had
18  with the lender in the -- well, what is this settlement?  The
19  one that Judge Lauck is involved with?
20           MR. PAIKIN:  I believe that that was the Gibbs
21  settlement, Your Honor, and I believe Mr. Curry in that --
22           THE COURT:  I think that Mr. Curry's involvement was
23  with Mobiloans?
24           MR. PAIKIN:  I believe that Mr. Curry had -- in that
25  settlement, Your Honor, Mr. Curry had -- one of his companies
```

Carol L. Naughton, Official Court Reporter

1  had a consulting relationship with Great Plains Lending,

2  which was one of the defendants in that case.

3        THE COURT:  The same type of consulting agreement he

4  had in this case?

5        MR. PAIKIN:  I don't know the details but --

6        THE COURT:  You don't?  You represented him, didn't

7  you?

8        MR. PAIKIN:  No, Your Honor, I have never once

9  represented Mr. Curry.

10        THE COURT:  Didn't your firm represent him in that

11  case?

12        MR. PAIKIN:  No, Your Honor.  My firm is WilmerHale.

13  We did not represent Mr. Curry.  Mr. Curry was represented by

14  Williams & Connolly and is represented by Williams & Connolly

15  here today, as well.

16        THE COURT:  Okay.  Well, maybe they can tell me

17  whether it was the same or substantially the same agreement,

18  consulting agreement.

19        MR. PAIKIN:  I believe that the key -- the key point

20  I want to make here is that, as part of this settlement,

21  Mr. Curry will have no involvement in AWL going forward.  As

22  was already discussed, he resigned as CEO.  He resigned from

23  the board.  The promissory note and the consulting agreement,

24  which are the contractual relationship that Mr. Curry had

25  with the company and that this Court spent a lot of time

1    examining in your decisions, those have been suspended, and

2    they will be terminated on the effective date of the

3    settlement.

4              THE COURT:  Well, I know, but the thing is that they

5    were in effect during the class period.  So canceling it when

6    the class period is over doesn't affect what was going on

7    during the class period.

8              MR. PAIKIN:  Yes, Your Honor.  And the point that

9    I'm making here is that the concern that Your Honor expressed

10   about Mr. Curry's involvement, one of the areas of relief --

11   and this was a major concession on Mr. Curry's part -- is

12   that he is not going to have any involvement in the company

13   going forward.  So going forward, this entity, AWL, is going

14   to be, as it always has been, a wholly owned tribal entity,

15   but now Mr. Curry is going to have no involvement in the

16   company whatsoever.

17             The point I'm trying to make, Your Honor, is that

18   we, in structuring what the conditions of the settlement

19   would be, included as part of that that Mr. Curry would have

20   no involvement.  We can't change the past, Your Honor, but we

21   can change the future.  And it's part of this settlement that

22   that was a requirement.

23             The second way we address Your Honor's concerns, you

24   had concerns about the arbitration agreement and whether

25   there was a prospective waiver of federal rights.  The

1    defendants believe that there never was, but to address Your

2    Honor's concerns, the language has been clarified to make

3    100 percent clear that there's been -- that there's no

4    prospective waiver of federal rights.  So we addressed that

5    concern.

6         Other modifications -- and these are laid out in

7    some of the plaintiffs' papers -- concern with other issues

8    that were addressed; EFT payments, disclosures, and the like.

9         The main point I want to make to Your Honor is that,

10   front and center, as we were negotiating this mediation

11   before with a mediator, your decisions were guiding much of

12   the conditions that the plaintiffs were negotiating for, and

13   at the end of the day, the settlement that we have reached,

14   if you were to decide the initial set of motions that were

15   before you back in February, based on the state of facts, and

16   applying only those standards, we believe we would prevail

17   because this settlement satisfies the concerns that the Court

18   raised.

19        The second big issue I wanted to -- big point that I

20   wanted to make is that, at the beginning of this case, Your

21   Honor, and still today, there are fights among various

22   plaintiffs groups as to who is going to be in charge of this

23   litigation, who is going to be setting the course, who is

24   going to determine how to negotiate the settlement.

25        Our very first appearance before Your Honor, that

1    was the date of play, and one of the first things that the

2    Court did was it appointed interim class counsel under

3    Rule 23(g)(3).  At that time, defendants took no position as

4    to who the Court-appointed settlement class counsel should

5    be.  I have great respect for Mr. Bennett, great respect for

6    Mr. Thomas, and all of the plaintiffs' lawyers here.

7            But the defendants' main point was that we needed to

8    know who we should deal with, who should we negotiate any

9    kind of settlement with on the other side, and the Court

10   appointed three firms -- the Berman Tabacco, MichieHamlett,

11   and the Gravel & Shea firm -- and we relied on the Court's

12   appointment.  That's why we spent months and months

13   negotiating with them, and the settlement reflects that.

14           I raise that today because I think it's important

15   that we were operating in good faith to reach a deal with the

16   lawyers that the Court appointed here and invested with the

17   expertise that they have in this area, and we reached the

18   settlement.  Tradeoffs were made.  Different plaintiffs'

19   lawyers may have made different decisions; clearly,

20   Mr. Bennett would, but Mr. Bennet is not the Court-appointed

21   settlement class counsel here.

22           And so I just want to make that point, that we have

23   negotiated with the lawyers that Your Honor appointed for

24   that purpose.

25           The last, third point that I want to make is to

1    harken back to what Mr. Thomas said, that the settlement is a
2    compromise.  And I think that's important to keep in mind
3    here.  There's an old saying that in any good compromise,
4    nobody is happy, and I can tell you that is true from the
5    defendants' perspective as well.
6              Three points, Judge:
7              One, defendants are paying more money than any other
8    settlement in the Eastern District of Virginia for a case
9    like this.  It's notable that of all of the issues that the
10   objectors have raised, not one of them has suggested that the
11   amount of money is inadequate.  In fact, Mr. Bennett said in
12   his supplemental filing that plaintiffs are to be commended
13   and that $65 million is a lot of money.
14             So, Your Honor, there is no settlement in all the
15   papers that have been pointed to that have this amount of
16   money in it.
17             Second point:
18             When we agreed to that amount of money, that was
19   before COVID.  That was before the world changed and we had
20   this pandemic.  Candidly, Your Honor, the deal almost fell
21   apart because of the pandemic.
22             One of the reasons why there was a whole nother
23   round of negotiations in front of Judge Phillips, who was the
24   mediator in this case, is because we were briefing issues of
25   commercial impracticability and force majeure and the effect

1   of trying to be able to fund and meet that obligation in the

2   face of the economic challenges.

3        The deal has held together.  We've continued.  We're

4   moving on, but I think it's important for the Court to

5   understand that not only is this more money, but that this is

6   a lot of money for the defendants to be paying.

7        The third point I want to make -- and Your Honor has

8   a lot of questions.  You focused on the interest payments and

9   the amount of money that has been paid, but that's not the

10  question of legality that's before the Court.  That is not

11  what the Fourth Circuit says matters in cases like this.

12       The question of the legality of the loans turns on

13  whether or not the company is a tribal sovereign entity that

14  is making those loans.  That's the question.  And let me just

15  quote from the *Williams* case -- this is from the Fourth

16  Circuit -- because I think it's an important quote.  This is

17  at 929 F.3d Page 185.

18       The Fourth Circuit said:  "An entity's entitlement

19  to tribal immunity cannot and does not depend on the Court's

20  evaluation of the respectability of the business in which a

21  tribe has chosen to engage.  Accordingly, the potential merit

22  of the borrower's claims against the parties in that case and

23  the lack of a remedy for those alleged wrongs does not sway

24  the tribal immunity analysis.  It is Congress, not the

25  Courts, that has the power to abrogate tribal immunity."

1          Broadly speaking, Your Honor, this is a tribal

2     entity.  Where I started, we've made changes, changes to the

3     company, to make it even more clear that it's subject to

4     immunity.  And in light of *Big Picture*, if this case were to

5     go up on appeal in your decision, we believe that the Fourth

6     Circuit would apply the same standard that it did there and

7     find that this company was a tribal government entity that

8     was issuing loans and is entitled to all the immunity.

9          The federal government sits on top of the state and

10    sits on top of those tribal entities, but the federal

11    government, Congress, has not acted to impose a federal usury

12    law, and so as the Fourth Circuit said, it is for Congress,

13    not the Courts, to abrogate that tribal immunity.

14         Why does that matter?  Because, Your Honor, the

15    interest that was paid, that relief, that's not the right

16    question.  If we go forward, at the very least, there's a

17    substantial risk that the plaintiffs will recover nothing

18    here and that nobody will ever reach the question of the

19    amount of interest because the Court, the Fourth Circuit,

20    will find that this was a government entity that was issuing

21    the loans, entitled to immunity, and the officers that were

22    working for that company are similarly entitled to immunity.

23         So the real question, Judge, that the plaintiffs are

24    facing is, not whether they could recover $471 million, but

25    very much a high likelihood that they're going to recover

1    zero dollars.  That's why I can tell you that the defendants

2    are not particularly happy with this settlement and having to

3    pay $65 million.

4         We entered into an agreement with plaintiffs.  We

5    contractually agreed that we would come here today and that

6    we would support the settlement, and I'm here to say that we

7    do support the settlement.  We join with the plaintiffs in

8    their motion and ask the Court to approve it.

9         Thank you, Your Honor.

10        THE COURT:  All right.  I designated Mr. Bennett to

11   speak for the objectors because I found his brief to be the

12   most persuasive.

13        So, Mr. Bennett?

14        THE CLERK:  Mr. Bennett, you're on mute.

15        MR. BENNETT:  It was the most persuasive point I was

16   going to make, Judge, is the one I've just said on mute.

17        What I was going to begin with, Your Honor, is that,

18   if I could initially address a question that was posed that

19   Your Honor then asked of counsel and that sort of defines

20   what I think should happen.

21        And when I say "I," that means I've had to talk to a

22   lot of people.  I've had to talk to the objectors; it may be

23   that I've talked to other people besides the objectors.  And

24   the suggestion that defense counsel has that we're trying to

25   take the case over, he knows that to be flatly wrong for

1   reasons I'm not, because of the mediation privilege, able to

2   share.

3           We, the objectors which I've had to negotiate with,

4   we know each other from other cases, from -- they're all

5   members of the National Association of Consumer Advocates,

6   and it's taken arm-twisting to get them on the same page.

7           I have negotiated previously with the Tribe's

8   counsel, with Jonathan Paikin, who negotiated, in one of the

9   Judge Lauck *Think Finance* cases, a deal that eliminated the

10  tribal lending entity, released all of the debt, and gave all

11  of the assets of that tribal lending entity to the Tribe.

12          I've negotiated with Mr. Seyfarth, who is also one

13  of the tribal defense lawyers.  Mr. Seyfarth, in fact, in the

14  recent settlement that is pending before Judge Lauck, but

15  which she's not yet approved, in the *Sequoia* settlement, his

16  client, a debt buyer, has agreed to give up the couple

17  hundred millions of debt that was purchased and collected by

18  the debt buyer, debt which none of us are seeking to value,

19  and never have in any of our cases, for purposes of a fee;

20  ever, not one case.  But hundreds of millions -- Mr. Seyfarth

21  was also involved in other of these cases.

22          Mr. Cary is an exceptional lawyer, who represents

23  Mr. Curry, which is a total and distinct entity.  He and I

24  worked together, Judge, to negotiate Mr. Curry's kicking in

25  $10 million in the *Think Finance* settlement.  In that

1    instance, he was not, like here, a major principal.  He was a

2    side actor.  The *Think Finance* entities were the equivalent

3    of Mr. Curry here, and he paid the 10 million.  He was a

4    fantastic negotiator and advocate.  But we know these people.

5           Mr. Rosette, who you may not know, Mr. Rosette is

6    one of the nation's top tribal attorneys.  He and I have

7    negotiated multiple matters, and I'm very confident we'd be

8    able to here.

9           So what I'm asking, what I've got the objectors to

10   agree to do, and I would challenge defense counsel to

11   contradict, that if we -- if this settlement is not approved

12   and you send this to Judge Novak, Judge Krask, who is our

13   Magistrate Judge, you tell all the parties, "Work it out,"

14   stay this case for however long it takes to get a date with

15   one of the -- with either the Magistrate Judge or

16   Judge Novak, and you let us try to fix this in a way that

17   solves fatal conflicts, not one of which was addressed by

18   counsel; the fact that a significant percentage, a majority

19   of the class, maybe, gets neither debt relief nor cash.

20   They're not even eligible for it.

21          You let us fix this, and I promise you -- I'm on the

22   record -- I come back and I tell you how much value that I've

23   produced and I show you my time, I will do what I've done in

24   other cases, like before Judge Brinkema, and I will on the

25   record donate it to a public-interest source.  So nobody on

1    my end, none of the objectors and none of the Virginia

2    people, are trying to take over this case.

3          Now, the issues -- Your Honor, the challenge here, I

4    think there are two things that are being missed in this

5    discussion, and they're not raised at all.  Mr. Thomas, I

6    think this is probably his first final approval hearing.  I

7    think he did a great job.

8          But there are two things at issue.  Number one,

9    there are multiple defendants.  Mr. Curry, as you noted --

10   when you asked Mr. Paikin if he represented Mr. Curry, he

11   said no.  It's true.  He represents the tribal defendants.

12   Mr. Cary represents the moneyman, the person that can fund

13   the settlement, that was to get 200 million, roughly, dollars

14   out of this deal.

15         And if you do what we've done in these other cases,

16   like in *Think Finance*, we only had a limited release, where

17   all told, in total cash, we're coming up on $100 million

18   already.  We have other defendants we're still in litigation

19   with, and each one is responsible to the degree they're

20   responsible.

21         And *Big Picture Loans*, even after the tribal entity

22   is the only entity that got a jurisdictional stay from the

23   Fourth Circuit before certification, we are now going after

24   where all the money is, where the many tens and tens and

25   scores of millions of dollars are, Mr. Martorello, who is the

1    equivalent of Mr. Curry.  There's no reason why the fact that

2    there is tribal immunity available, possibly, with the right

3    facts, for the tribal lending entity, you have to release

4    everyone else under the sun, including those that have no

5    immunity.

6            Every single decision that has come before a

7    District Court in Virginia, in the Eastern District of

8    Virginia, of which I'm aware, certainly in the last five, six

9    years -- everyone that I'm aware of to come before the Fourth

10   Circuit, other than *Williams v. Big Picture*, found in favor

11   of the consumer.

12           We've cited these cases, and I apologize to

13   Ms. Ward.  I'm not offering the spellings of the cites here,

14   but they're in our papers, but you have *Hayes vs. Delbert*,

15   our case where we had sued not the tribal lending entity, but

16   we sued the debt buyer and the financier, and the Fourth

17   Circuit, Judge Wilkinson, reversed the grant that Judge

18   Gibney had made of arbitration.  And you know how the Fourth

19   Circuit is normally excited about arbitration.  They reversed

20   it and found the arbitration clause unenforceable and the

21   class action waiver unenforceable.

22           And that is true, as well, in *Dillon vs. BMO*, which

23   was not our case.  The Fourth Circuit was very harshly

24   critical of the non-tribal entities.

25           Our recent decisions, which were never addressed

Carol L. Naughton, Official Court Reporter

today, in *Gibbs v. Sequoia* and *Gibbs v. Haynes*, were also
brought against the non-tribal defendants.  You have *Hengle*
*vs. Asner*, *Gibbs vs. Stinson*, that have occurred over the
last year in the Richmond District courthouse.

In every instance, the non-tribal party has been
found -- has had their attempt to hide within the covered
wagon and sneak out of the case in tribal immunity denied or
rejected by the courts, both by the District Court and by the
Courts of Appeal.

You also have *Gingras vs. Think Finance*, a case
that's been cited in this district.  *Gingras vs. Think*
*Finance* was a Second Circuit case that said even if you get
tribal immunity, the tribe into the entities, that doesn't
extend to the tribal officials.  And Judge Payne has
indicated his view that that is a legal conclusion he
believes correct.

And so you have lots of parties that are either not
kicking any money in or that do not need to be released, and
I think all of us here do a disservice to the value of the
class and their $472 million of usurious interest, then
statutory claims on top of that, if we ignore the fact that
the protections that could be available for Mr. Paikin's
client are not available for Mr. Cary's.

The second thing, Judge, is that in none of those
settlements did we obligate consumers to release all their

1    claims, particularly, for nothing.  So, for example, in the

2    *Big Picture Loans* settlement that we negotiated with

3    Mr. Rosette, who on my screen is right in the middle of it,

4    to the left box, we negotiated a release which I would bet

5    you these defendants -- I would intelligently bet you these

6    defendants would agree to.

7         That would not require the release of individual

8    causes of action for consumers unless they got cash.  That

9    was the deal that we've structured in these other cases.  And

10   so you're comparing apples to pineapples here when you

11   suggest 65 million, because it's what you purchased.  And for

12   65 million, they're purchasing a release of all the

13   individual claims, the West Virginia causes of action, the

14   Virginia usury statute, Pennsylvania -- every statute is

15   released, every RICO claim, everything.  Every defense, a

16   consumer couldn't say, "This is not correct, I do not owe

17   this money because the loan is illegal," and assert either a

18   recoupment or setoff, a counterclaim.  All of that is

19   released, and it wasn't in any of these comparable ones.

20        And it's plainly untrue that this is the largest

21   settlement.  And I do respect that it's a large settlement,

22   Judge.  These cases are hard.  And when you have a team like

23   the plaintiffs' lawyers, that this is their first one,

24   that -- they're to be commended.

25        But you're talking about pricing $470 million of

1    usurious interest.  Virginia, the loans themselves are void,
2    so whatever the principal is.  You're not doing anything
3    about the debt buyers who are still collecting and still
4    credit reporting and still doing everything else.
5           You are requiring consumers to give up all their
6    claims, and so it isn't -- the 65 million, even in raw
7    dollars, is not the largest, because in the *Think Finance,*
8    we're close to 100, and we're still suing.  And in the case
9    of *Big Picture*, we could have settled to get a lot more money
10   if we settled Mr. Martorello, but we're litigating, as the
11   dockets that we've cited in our papers show.
12          Now, even if the Court was motivated to approve this
13   settlement, in the interest of trying to move things along, I
14   have to respectfully do something I have rarely done.  In my
15   career here, maybe three times have I appealed district
16   judges.  But the conflicts here are so fatal, and that's the
17   argument that Courts of Appeal and the United States Supreme
18   Court are really focused on.
19          When you take a release from one part of the class
20   and sell that release for nothing as a way to get other
21   people in the class cash, that's a conflict.  It's a fatal
22   conflict.  It renders the plaintiffs, it renders the lawyers
23   advocating that, inadequate.
24          And so the best option here is certainly to leave
25   people on their own, to let these consumers continue to

1   litigate their cases in other actions -- none of which are

2   mine, Your Honor -- because they will get more, they will

3   have the right to prosecute their claim, and they will get

4   zero out of here.  The Pennsylvania people, the West Virginia

5   people, our clients -- most of them get absolutely nothing;

6   no debt relief, no cash.

7          I would footnote a comment for the record here.  It

8   is a challenge in our cases to try to estimate and tell

9   consumers how much money they will get.  So they know it's

10  $50, it's $1,000.  The most I've ever gotten in a class

11  settlement is 4,500 bucks, and I told those people in that

12  case, back before one of my favorites, back -- one of his

13  last cases, Judge Williams, but our notice told the class

14  that assume that it would be much lower than that.

15         But here, you have -- the lawyers for the objectors

16  have asked the plaintiffs' lawyers, and copied the

17  defendants, to say, How much would our clients get?  And

18  no one could tell them.  And if they can't tell us, knowing

19  we're going to sit here on Zoom and, Your Honor, tell the

20  Court this, they have no idea how much money anybody would

21  get.  Maybe it's the $80, and maybe it's less.  Maybe it's

22  nothing.

23         The other issue is, Judge, we have -- in this

24  particular instance, you have several other points that were

25  made.  The plaintiffs' lawyers are no longer -- and I think

1    this is appropriate -- attempting to sell Your Honor this

2    smoke and mirrors, the Court's words, but appropriately so;

3    we promise we will not commit what is literally a crime.  One

4    of these federal statutes, it's a crime to violate it.  So

5    you have the defendants saying, We will not break the law

6    further.

7           You have this statement that, now, to clarify, in

8    the arbitration clause, the defendants are saying that they

9    will acknowledge they have to comply with federal law.  They

10   don't acknowledge you have to comply with state law.  And

11   frankly, as a consumer advocate who lives this stuff, I would

12   prefer if the contract does not include that statement or the

13   contract says that the defendant doesn't have to comply with

14   state or federal law.  The Fourth Circuit has now three times

15   said, in our cases, that's unenforceable, completely.

16          So it's -- you're not doing any favors to the

17   consumers.  That is a term which I am very confident the

18   defendants put in there as soon as our other cases came out

19   of the Court of Appeals.  And other than that, here today,

20   there's no attempt to suggest any non-monetary value.

21          The debt relief, Judge, the papers have gotten very

22   vitriolic.  There's a statement in there that I somehow gave

23   money to our party, my political party, and that's why the

24   Attorney General objected to fees.  And I will represent to

25   the Court I did not speak to General Herring about this case,

1    never have, not once, didn't -- that is false, untrue.  And I
2    did not respond in papers, and I attempted to tone the
3    vitriol, but I do have to say that.
4         But you have a team of lawyers here who survived a
5    motion to dismiss and didn't take it up on appeal.  I mean,
6    we lost *Williams v. Big Picture* for Williams and went back to
7    the Court and kept fighting.  But all these cases you see
8    from us that were before the Fourth Circuit, we fought these
9    cases.
10        Here, you had a first-file decision by this Court,
11   well-reasoned.  I mean, it was certainly quite proper and
12   appointed class counsel to these folks.  They survived the
13   motions; on appeal, did nothing, did only very modest deep
14   discovery -- you see the questions you couldn't even get
15   answers to today -- and now claim they have $10 million of
16   lodestar, and from that $10 million, they want to use that to
17   support a percentage of common fund.
18        And the percentage of common fund is asserted to be
19   the debt relief, the collection portfolio, plus the cash, and
20   I've never heard of that.  Debt relief is a coupon, Judge.
21   You have the Class Action Fairness Act.  If they're taking a
22   percentage of debt relief, then give them 23 percent of debt
23   relief, if that were somehow possible.  That's improper.
24        And none of the settlements, not one -- we've gotten
25   near total debt relief in almost every single one of those

1   cases that were in our papers, and not a single time have we

2   priced debt relief to support our fee.  We have, in some

3   papers, said there's debt relief, and we say it's obviously

4   not worth 100 cents on the dollar, but it's important that we

5   include that in a term of settlement.

6           In fact, in the *Gibbs* cases and in the *CashCall*

7   settlements, Judge, our team -- and this is also in the

8   papers -- we committed to continue to go after the debt

9   buyers without getting additional fees, to get relief on

10  behalf of the class members.

11          Now, if you want -- this question that was posed by

12  Your Honor is whether or not the collection portfolio is, in

13  fact, just charged-off debts, and the response was a

14  suggestion that somebody has lied here, and I resent that.  I

15  have not lied.  And it's in our papers, and I put it up -- I

16  put it before Your Honor.

17          But it's at Page 2 of Docket Number 466, and I cite

18  in actual quotes and bold and single-spaced block quote from

19  Docket Number 456-3 and 415-1 where we ask -- where the

20  objectors ask, Where does this come from?  And the statement

21  that we were given and that was in the document says,

22  quote -- it was that "The 'Collection Portfolio' consists

23  solely of AWL loans that were charged off and remained

24  written off more than 90 days prior to the date the parties

25  initially negotiated this term."

1          So 90 days before the date of settlement,

2    assuming -- and that assumes the best.  That assumes they're

3    meeting the date of settlement.  That would be April 15,

4    2020.  That means the debts were charged off at least -- at

5    least -- 90 days before that, which puts it as December 19,

6    2019.  And to be charged off, typically, you charge off at

7    six months late.

8          And so if you're talking about a debt that hasn't

9    been paid for six months prior to December 19, 2019, which is

10   in the papers that they gave us, that is valueless.  Not even

11   a debt buyer would buy that debt.  And the charge-off rate

12   already on these types of loans, Judge, is -- the nonpayment

13   rate is 50 percent.  I would bet you the nonpayment rate for

14   that type of loan is zero, statistically zero, anyway.

15         And we've got a lot of boxes on the screen, and I

16   would challenge anyone if they believe otherwise, to suggest,

17   including Mr. Thomas, to tell me what those matters are

18   worth.

19         Now, there are other issues, Judge, in our papers.

20   In particular, some of the other objectors -- their clients

21   have unique problems, and I would at least like to mention

22   those, if the Court please.

23         Certainly, the conflicts issue is the biggest, and

24   it runs -- it permeates the settlement and runs throughout

25   all three of the objector positions.

1          You have the fact that a number of these people

2     receive no cash.  They don't have loans.  They don't have

3     debt relief.  And so that certainly creates a conflict

4     because you're giving money to the plaintiff because that

5     plaintiff would be eligible to receive a cash payment, and

6     you're not giving it to other class members who are forced to

7     give a broad general release.

8          There are other matters and other objections, Judge,

9     and they haven't come up in the plaintiffs' or the

10    defendants' position, but I've talked for quite some time,

11    and I would answer any questions the Court may have.

12         THE COURT:  Well, there were tiers of class members

13    in one of these settlements, depending on what state they

14    were in and what relief would be available in a particular

15    state.  The way this settlement is structured, there's no way

16    to figure that out, that I know of.  I don't know how many

17    states are a part of the class, even.  I haven't been given

18    that.

19         But you've got people from where?  West Virginia?

20         MR. BENNETT:  Judge, we have -- the Virginia team

21    has them from Virginia, California, and Connecticut.  You

22    also have objectors represented by the same firm that

23    represented the Pennsylvania Attorney General.  They

24    represent, in this case, a Pennsylvania consumer, and then

25    you have the legal aid organization, Mountain State Justice,

1    and its counsel who represent a West Virginia consumer.

2              THE COURT:  All right.  I don't have any other

3    questions.

4              The Court is not going to approve the settlement.

5    There are a combination of problems that the Court has.  I

6    don't think the debt relief has any value.  The clause that

7    says that they will conform with federal law with respect to

8    certain outstanding loans has very little value.  It valued

9    at $300 million.

10             I don't understand that.  I don't think it has

11   anywhere near that value.  I don't know how it could possibly

12   have that value.  If the total interest they charged was

13   472 million, how is that going to be worth 300 million?

14   You've got the non-monetary relief adding up to more than the

15   entire interest that you admit to receiving.

16             I think that to approve this settlement would just

17   be a total loss to the class as well as the objectors, and it

18   does not come anywhere close to equaling the debt relief

19   offered in similar settlements.  And I think the attorneys'

20   fee is excessive.  By the time you subtract that from the

21   cash, the only real value in the settlement is the cash.

22   Nothing else really has any value.

23             I mean to say that the non-monetary relief -- I've

24   got it added up here.  You've got non-monetary relief which

25   you valued at $700 million, and you only admit to receiving

1    472 million in interest.  Those figures do not compute.  It's
2    not even close.
3          I'm very disturbed about the way that the settlement
4    has been argued and presented.  And I don't place the blame
5    on Mr. Thomas, who has to suffer what I have to say, as the
6    proponent on behalf of the plaintiffs, but I think it's not,
7    certainly, all on him by any means.  But this is just totally
8    unsatisfactory.
9          We have a case here which is a hornbook case for
10   relief for borrowers.  The Court didn't base any of its
11   reasoning in denying the jurisdictional arguments of the
12   defendants on the type of business the person was in.  The
13   Court's rationale had simply to do with what was disclosed in
14   discovery on the issue of jurisdiction.
15         That amount of discovery didn't take place in the
16   *Big Picture* case because, I suppose, it appeared so obvious
17   to Judge Payne that he ruled as he did, and I think that
18   ruling will eventually be upheld or settled.
19         You had extensive discovery on the jurisdictional
20   issue, and the Court based its findings on the degree of
21   control exercised by Mr. Curry over the entire operation as
22   well as the amount of money he was receiving as opposed to
23   how much the tribe was receiving.
24         So it's an entirely different case on the record
25   that goes before the Fourth Circuit in this case than in the

1    *Big Picture* case, which is why I made the reference to I

2    didn't think *Big Picture* applied because it was just an

3    entirely different factual scenario that went before the

4    Fourth Circuit.

5         I can only imagine the cost of trying a case like

6    this.  I mean, we've got 26 lawyers, maybe more than that by

7    now, on this call.  26 lawyers.  Maybe they're not all

8    lawyers.  Maybe some of them are -- but whoever it is, there

9    are 26 meters running.

10        And so I think that the Court shouldn't push this

11   case in the direction of litigation.  The mediation that took

12   place was after the Fourth Circuit decision.  So that

13   decision was hanging over everyone's head during that

14   mediation.

15        With all of the other decisions that the Fourth

16   Circuit has made in this area, I think that that particular

17   case will not carry the weight that the defendants and the

18   plaintiffs think that it will, and it shouldn't carry that

19   weight during negotiations.

20        I think the best result here would be to refer it to

21   either Judge Krask or Judge Novak for mediation.  There's

22   very little discovery that's taken place on financial matters

23   in this case.  I would think that the class would want to

24   know the profits that the company made during the class

25   period.

1          I would want tax returns for the entity, as well as

2     Mr. Curry.  I would think that they would want real debt

3     relief.  And I think that applying the fee in the way it did

4     and coming up with this -- what did I figure it was? -- about

5     $700 million in non-monetary benefits for $472 million in

6     interest is -- I don't know what adjective to apply to it,

7     but it's certainly not persuasive.

8          I don't know about Judge Novak's availability.  He's

9     a District Judge.  Judge Krask is a Magistrate Judge, and the

10    cases I've referred to him, he's done an excellent job, but I

11    don't know what background he has in handling these kind of

12    cases, so unless somebody has some information that he's

13    handled cases of this nature before, I think the first thing

14    I should do is see if Judge Novak can schedule a mediation.

15         As somebody says, there's no reason for me to

16    schedule further mediation if the defendants are not going to

17    show up for it, if they're just going to ask the Fourth

18    Circuit to act.

19         I think it's just frightening to think how much it

20    would cost with all these lawyers involved on the defense

21    side, but to approve this settlement would be totally unfair

22    to the class.  As counsel points out, people would receive no

23    benefit, but yet they would release all their claims.

24              MS. DONOVAN-MAHER:  Your Honor --

25              THE COURT:  Those that do receive some -- no.  No.

1              MS. DONOVAN-MAHER:  Thank you.

2              THE COURT:  Those that do receive something, it

3      would be a pittance.  It would be like the postcards I get in

4      the mail that say if I can send something in, I'd get $15

5      because of something I bought or some stock I bought at a

6      certain time.  I mean, to approve this settlement would make

7      virtually every member of the class a loser.  They really

8      have very little to lose if this case goes to litigation.

9              So that's why I'm suggesting that it should go to --

10     well, my first option would be Judge Novak.  If nobody

11     objects, I'm going to contact Judge Novak and determine what

12     his availability would be to talk about this.  But I really

13     don't think enough discovery has taken place on the financial

14     side of this case.  I just don't know how somebody could take

15     the information that's currently available and do a good job

16     in mediation, but I'll leave that to the mediator.

17             Does anybody object to my calling Judge Novak?

18     Hearing no objection, I'll call Judge Novak and determine his

19     availability.

20              All right.  That will conclude the hearing.

21              (Off the record at 1:23 p.m.)

22

23

24

25

1                          CERTIFICATION

2

3       I certify that the foregoing is a correct transcript

4  from the record of proceedings in the above-entitled matter.

5

6

7              _____/s/_____

8                        Carol L. Naughton

9                        November 6, 2020

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carol L. Naughton, Official Court Reporter