IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

ROYCE SOLOMON, et al.,            )
Individually and on behalf of  )
all others similarly situated, )
                                 )
              Plaintiffs,         )
                                 )
v.                               )    Civil Action No.
                                 )        4:17cv145
AMERICAN WEB LOAN, INC.,          )
et al.,                          )
                                 )
              Defendants.         )

TRANSCRIPT OF VIDEO TELECONFERENCE PROCEEDINGS
(Hearing on Motion to Approve Settlement)

Norfolk, Virginia
March 24, 2021

BEFORE:     THE HONORABLE HENRY COKE MORGAN, JR.
            United States District Judge

Appearances: (Via Zoom.gov)

        CONSUMER LITIGATION ASSOCIATES
                By: LEONARD A. BENNETT
                -- **and** --
        BERMAN TABACCO
                By: KATHLEEN M. DONOVAN-MAHER
                    STEVEN J. BUTTACAVOLI
                    NORMAN BERMAN
                -- **and** --
        GRAVEL & SHEA PC
                By: MATTHEW B. BYRNE
                -- **and** --
        MICHIE HAMLETT
                By: DAVID W. THOMAS
                    Counsel for Plaintiffs

Paul L. McManus, RMR, FCRR Official Court Reporter

2

Appearances: (Continued.) (Via Zoom.gov)

       O'HAGAN MEYER PLLC
               By: CHARLES K. SEYFARTH
                   ELIZABETH S. TURNER
               -- **and** --
       WILMER CUTLER PICKERING HALE & DORR LLP
               By: JONATHAN PAIKIN
                   THOMAS L. STRICKLAND
               -- **and** --
       ROSETTE, LLP
               By: SABA BAZZAZIEH
               -- **and** --
       WILLIAMS & CONNOLLYT LLP
               By: ROBERT M. CARY
                   SIMON A. LATCOVICH
               -- **and** --
       PROSKAUER ROSE LLP
               By: CHRISTOPHER ONDECK
               -- **and** --
       FAEGRE DRINKER BIDDLE & REATH, LLP
               By: MARK H. M. SOSNOWSKY
                   MATTHEW J. FEDOR
                   Counsel for the Defendants


       THE SARRETT LAW FIRM PLLC
               By: DREW D. SARRETT
               -- **and** --
       LANCER GROGAN & DRIVER P.C.
               By: IRV ACKELSBERG
                   JOHN GROGAN
                   Counsel for Interested Party Diana Butler

       MOUNTAIN STATE JUSTICE, INC.
               By: BREN J. POMPONIO
               -- **and** --
       BORDAS & BORDAS, PLLC
               By: JASON A. CAUSEY
                   Counsel for Interested Party Charles P.
                   McDaniel

       KELLY GUZZO, PLC
               By: KRISTI C. KELLY
                   Counsel for Interested Party Adam Sublett

3

P R O C E E D I N G S

(Proceedings commenced at 2:32. p.m. as follows:)

COURTROOM DEPUTY CLERK:  Civil Action No. 4:17cv145, Royce Solomon, et al. v. American Web Loan, Inc., et al.

Counsel, are you ready to proceed?

(Affirmative responses.)

COURTROOM DEPUTY CLERK:  Okay.  Thank you.

THE COURT:  All right.  I assume that Mr. Bennett would be the one to speak on what, if anything, is happening with the remaining debt buyers.

MR. BENNETT:  Yes, Your Honor, if you would like to hear from me.

THE COURT:  Yes.

MR. BENNETT:  So Your Honor, I could give you the long version.  Mr. Ackelsberg is also on.  The debt buyers were concentrated, the purchases were concentrated through Debt Traders, as we previously noted for the Court.  Debt Trader had gone silent in its negotiations with Mr. Ackelsberg, with the objectors, until they reached out again a week, a little over a week ago with new counsel, actually, returning to their ordinary counsel with, still, an interest in engaging further.  We have not -- and Mr. Ackelsberg can tell us, he can correct me if I'm wrong, but we have not locked in any of the other debt buyers.

4

Instead, over this last week, as I think the Court is aware from the correspondence of the parties, we had bilateral negotiations with the plaintiffs, with the defendants, in trying to come up with solutions and alternatives if we could not get the debt buyers in.  And then as the Court knows, we negotiated through Judge Novak and came to agreements on a Memorandum of Understanding.  Unbeknownst to us, one or both of the opposing parties, the plaintiffs or the defendants, reached out to Judge Novak who was kind enough, despite his busy schedule and docket, to have a series of conference calls on Monday, this Monday, in which he overruled in the mediation context the two big issues that we noted:  The plaintiffs had wanted everything to move to final approval and not provide now class notice, and nobody but the objectors wanted to include Northwood, which was the debt buyer we already transacted for 17 million of debt relief.  So the objectors against the world.  And Judge Novak instructed everyone that Northwood would be involved, and that the -- he agreed that he had no basis to suggest that the process for approval be different than is already scheduled, which is a preliminary approval process with due notice.

And then the other issue was that -- there were two other issues.  One of them was debt buyers.  And Judge Novak suggested -- instructed me, and I will do what Judge Novak says, I would for any judge, but even without legal authority I would do what he says -- but he says it's done.  Len, it's time to get

Paul L. McManus, RMR, FCRR Official Court Reporter

this thing papered and move on.  And so the other debt buyers were not in.  And my response to Judge Novak, which I put in the email to Your Honor's judicial assistant was, well, of course if Judge Morgan wants the debt buyers in, then Judge Novak cannot suggest otherwise, and Judge Novak said, look, it's Judge Morgan's case.  As a mediator, this is what I'm telling you.

The other issue that Judge Novak apparently received some concern about from the defendant was the possibility that -- really to personalize it -- me, were that the Virginia folks might arrange for more objectors if we didn't get our way about the debt buyers.  And I reassured Judge Novak, as I have the parties here, that we are behind a deal.  This deal, whether we liked how it got here or not, is the best deal for the class subject to what the Court decides about the debt buyers, and we do not intend to object.  We do intend to be candid with the Court in this case and in every case about our, about these events.

So that's more than Your Honor probably asked for, but, one, if the Court would indulge me and allow Mr. Ackelsberg to correct me if I'm wrong with respect to where things stand with Debt Trader.

MR. ACKELSBERG:  Your Honor, Irv Ackelsberg.  I have nothing, really, more to add than what Mr. Bennett has said.  We are in discussions with Debt Trader.  They understand that this may be a train that's long left the station and that if they

6

want to make any kind of deal, them and/or their customers, it may happen in the context of a different case.  But we have nothing further to add to, in terms of anything concrete with any of the debt buyers other than the one that we did deliver, Northwood, which was one of the seven mentioned in the letter to Your Honor yesterday.

THE COURT:  Who would like to speak for the defendants about why they objected to Northwood being included?

MR. PAIKIN:  Your Honor, this is Jonathan Paikin.  I represent AWL.

We had a lengthy conversation with Mr. Bennett, Mr. Ackelsberg and Ms. Kelly Thursday night, and defendants did not object to Northwood being included in the deal.  We did not. We've had continuing negotiations going back to the original settlement conference.  The issue of debt buyers was an issue that Judge Novak spent a great deal of time on.  The settlement -- and this is set forth in the letter that he sent to Your Honor -- the settlement agreement and the MOU which the parties agreed to and Mr. Bennett signed on behalf of the objectors says that the releases do not extend to the debt buyers, and in fact, Mr. Ackelsberg has started a separate lawsuit, the Butler case, to pursue claims against those debt buyers.

In addition, Mr. Curry contributed an additional $21 million specifically because it was to provide additional

compensation with respect to class members whose debt was sold. Those things were all part of it.  At the time that we had --

THE COURT:  Well, why, why is that 21 -- you're saying the reason that 21 million was added was because of the additional debt buyers who didn't sign off on this agreement? Is that what you're saying?

MR. PAIKIN:  Counsel for Mr. Curry can elaborate, but yes, Your Honor.  Judge Novak, in the course of the settlement conference, leaned very hard on all of the parties, and he insisted that Mr. Curry contribute $21 million for purpose of class members whose debt was sold.  And that is why he contributed the money.  That's why, fast-forward to when Northwood came in, everybody agreed, and defendants had no objection, that the objectors would have until February 5th to shake the trees, as it were, to --

THE COURT:  All right.  I don't want to go back into that.  I'm familiar with that.

MR. PAIKIN:  Okay.  Well, so just to the point that when we spoke to Mr. Bennett and Ms. Kelly and Mr. Ackelsberg on Thursday we made clear that defendants, including Mr. Curry, were not objecting to Northwood coming into the settlement, and that Mr. Curry also would not seek a reduction in his contribution, which was based on, you know, on no debt buyers coming in.  When this issue was presented to Judge Novak, the objector -- the defendants had no issue with Northwood coming

8

in.  We still don't.  We think that the memorandum of understanding that the parties agreed to and signed which gave a period of time to see whether or not any debt buyers can come in has long since passed.  They have had three months to talk to the debt buyers, and at this point Northwood has come out, there's no reason to think anybody else is going to come out.

THE COURT:  Is the $21 million earmarked for the people whose debt's not been canceled by the debt buyers?

MR. PAIKIN:  The plaintiff, the class counsel and the objectors have been working through the distribution methodology, and defendants have not really taken a position on how they're going to distribute the money.  But as Mr. Curry's counsel can tell you, the purpose of why Mr. Curry was strongly encouraged by Judge Novak to put in, agree to this $21 million, was for this purpose.  And maybe I'll let Mr. Latcovich speak to that.

THE COURT:  Well, you gave me the figures on Northwood down to a hundredths of a percentage point as far as the percentage of debt in which they were involved.  I asked you for specific information on the other seven debt buyers, and all I got was estimates.  Why can't you give me the same information as to the other seven debt buyers as you did for Northwood?

MR. PAIKIN:  Your Honor, the information that I gave you was for all of the debt buyers.  It was for all of the loans that were sold since 2018.

9

THE COURT:  So all of the loans sold constituted one percent of the loss?

MR. PAIKIN:  I don't, I don't know.  I'm not sure how to answer Your Honor's question.

THE COURT:  Well, isn't that what you told me Northwood's share was?  One percent?

MR. PAIKIN:  Oh, I believe class counsel said that the -- and this was not something that defendant said -- said that the loans that were sold to Northwood represent one percent of the overall bucket of loans that are in the settlement all together.

THE COURT:  Well, which is it?  Is one percent the amount that was sold all-told, or is one percent the amount that was sold to Northwood?  Which is it?  I mean, you ought to know that, you represent AWL.

MR. PAIKIN:  Your Honor, I think the answer is, is neither.  The amount of loans that were sold is what I put in the letter.

THE COURT:  Well, you didn't put it in the letter. You put estimates.  You put something very specific as to Northwood, you put estimates as to the other.  I didn't ask for estimates.  I want the precise percentage of loans that each of the other loan buyers bought as well as the dollar amount of the principal and interest.  And if we have it for Northwood, why don't we have it for everybody?

Paul L. McManus, RMR, FCRR Official Court Reporter

10

MR. PAIKIN:  Your Honor, again, the information that I provided to you was all of the loans that were sold to any --

THE COURT:  I want each one itemized per sale as to the percentage of loans it represents as to the dollar amount of the principal.  And I don't know what to say about the interest.  But I want the dollar amount of the principal and I want the percentage of loans that each of the other loan buyers bought, and I want confirmation that what Northwood bought is what was in the papers, which was one percent.

Now, I don't understand why you didn't give that to me when I asked for it.

MR. PAIKIN:  Well, understood, Your Honor.  I understood your questions to be the amount of debt that was sold to third-party loan buyers.  I did not provide information --

THE COURT:  Well, you gave me what you classified as an estimate.  Now, obviously your client knows how much he sold.  Obviously he knows how much he received for what he sold.  And I would also like to know whether there's any provision for him to receive any other compensation for the loans he sold based on what the buyer collects.  And I want that at noon on Friday.  Is that understood?

MR. PAIKIN:  It is, Your Honor.

THE COURT:  All right.

MR. PAIKIN:  I will endeavor to get --

THE COURT:  Well, don't endeavor to do it.  Do it.

Paul L. McManus, RMR, FCRR Official Court Reporter

11

Now, one of the provisions of the loan agreement says that the costs and attorney's fees shall not exceed $16 million. And that doesn't apply to the objector's attorney's fees. What costs does that include? Can you tell me that, Mr. Thomas?

MR. THOMAS: Yes, Your Honor. That relates to all of the costs of the additional notice, the new Rule 23 notice that's going to be issued as a result of the revised settlement agreement or Judge Novak's decision of Monday. So essentially out of that, plaintiff's counsel will pay the additional costs of the new notice.

THE COURT: Who paid for the first notice?

MR. THOMAS: Well, the money was advanced by class counsel, Your Honor.

THE COURT: Well, is that money going to be deducted as well? It says "and costs".

MR. BUTTACAVOLI: Your Honor, if I may? This is Steven Buttacavoli from Berman Tabacco. The costs that class counsel have incurred to date -- we discussed this with Judge Novak at the settlement conference back in December -- we collectively had somewhere between 450 and $500,000 in expenses in the case to date which did not include the original class notice which was provided under -- the initial settlement agreement was advanced from the escrow account provided by the defendants. So the initial notice is not part of that cost structure, but we did have --

Paul L. McManus, RMR, FCRR Official Court Reporter

THE COURT:  Well, the agreement doesn't tell me that.

MR. BUTTACAVOLI:  It was detailed in our initial submission back in connection with the --

THE COURT:  Well, it should have been in what I got.

MR. BUTTACAVOLI:  Correct.  All that information is before the Court.  In our prior submissions we had provided information --

THE COURT:  Well, what I want by noon Friday is what costs are to be included in the 16 million, what costs are not included, and how much the other costs are.  And since you spoke up, you can give me that information.

MR. BUTTACAVOLI:  We'll do, Your Honor.

THE COURT:  Now, I don't know if you can project what the costs of a new notice will be, but I assume it would be somewhere in the neighborhood of what the first one was.  But there seems to be some dispute -- I don't know whether it remains a dispute -- as to what ought to go in the notice about the loans that presumably are not going to be discharged by the buyers of those loans.  Now, I assume those buyers include the objectors and also numerous members of the original class; is that correct?

MR. BENNETT:  Yes, Your Honor.  This is Leonard Bennett.  Some of the debt buyer consumers are objectors.

THE COURT:  All right.  Now, I notice you've hired a third party to decide how the money's going to be split up.  Or

13

an independent party.  I'm not familiar with that procedure. Why is it necessary to hire an independent person to decide how the money's going to be split up?

MR. BENNETT:  Your Honor, this is Leonard Bennett. Respectfully Judge, we didn't -- we, the objectors, consulted with the National Consumer Law Center, which is the, I think, undisputed heavyweight in this field, that writes the primary treatise on state-by-state predatory state lending laws.  They didn't decide it, but we consulted them.  And it's part -- if the Court awards any costs or fees, objectors are covering it. It's part of our -- no matter what, we're responsible for it. But we believe that we should have as comprehensive a breakdown of the tiering system by state remedies as can be made available, particularly given the time constraints with plaintiffs wanting to get to the finish line quickly and everything else.  So we worked with the National Consumer Law Center.  We used the same --

THE COURT:  Who is paying them?

MR. BENNETT:  We are.  It's out of my pocket, out of Mr. Ackelsberg's pocket.

THE COURT:  It's out of whose pocket?

MR. BENNETT:  It's out of the objectors' lawyers' pocket.  We're paying for it.

THE COURT:  And these people are going to make --

MR. BENNETT:  They already have, Judge.  We've already

Paul L. McManus, RMR, FCRR Official Court Reporter

14

put together -- and I think that every -- I think the plaintiffs

and the objectors have worked through I think the

best-in-practice class structure for paying, and they used their

own knowledge, expertise, they used the knowledge and expertise

from the National Consumer Law Center, and there is no longer a

dispute about payment structures subject, of course, to Your

Honor's approval of that.

THE COURT:  Well, to what extent did they take into

consideration the status of the loans that were sold and the

fact that they're not being waived or whatever the proper word

is?

MR. BENNETT:  So Judge, the payment structure is

mostly focused on the amount of money that consumers paid.  To

the extent that a loan was sold and not paid by the consumer,

then that consumer would not have incurred any cash loss.

THE COURT:  Well, when we say it was not paid by the

consumer, I guess do we mean that nothing was paid on it?  Do we

know that nothing was paid on it or that something less than

what was owed on it was paid on it?

MR. BENNETT:  Yes, sir.  Well, there's a continuum.

So you have some consumers that didn't pay anything; you have

some that paid principal and exorbitant interest on top, paid it

all; you have some that have multiple loans; you have some that

paid partial interest or partial principal.  And the payment

structure that's proposed, that will be proposed to Your Honor

for a approval, attempts to weight the amount of money that a class member would get based on where they are in that continuum.  And to the extent that a loan was sold to a debt buyer, the Court is aware of the objectors' concerns there, we have worked as a backstop to the extent that we've been, we've been swimming against the current here to try to get this in. The current is everybody else on that gallery Zoom gallery here. To the extent we're unsuccessful and we can't proceed as to the other six debt buyers in this settlement, then we have proposed -- and we still have not heard from American Web Loans, their position on this -- but we've proposed a portal within the website, settlement website, where class members could determine if they still have a loan that's owned by a debt buyer versus just had their loan canceled as part of the new settlement term, and who that debt buyer is, and we've proposed that there be information provided to the consumer by which the Legal Aid link or the State Bar Association referral links could be made available for these consumers if they can't have their debt buyer concerns fixed as part of this settlement.

We're objectors, we're not class counsel.  Judge Novak's correct in cautioning us that.  We're just trying to fix as best we can.  And if we can't get debt buyers, then the proposal that's outstanding in the draft settlement agreement that's been offered with those consumers is to give them as much information as possible so they can effect and obtain relief

16

against that loan.

THE COURT:  Well, I certainly agree that that needs to be done.  It's just a question of how you do it.  Somebody made the comment that the Court had previously observed that that didn't have any value as to loans that were excessively delinquent being canceled; however, that doesn't mean that people who owe the loans won't suffer any damage, whether they paid any money or not.  Their credit has been impugned, probably.  They might get dunning letters.  They may even get sued for these debts.  We don't know what's going to happen to them.  And I don't know why the class counsel didn't try to find out more about them than they did.  But obviously something has to be done for them.

Now, there's another third party administrator in here in addition to the one that -- there's somebody else named in here as the settlement administrator.  Who is that?  A.B. Data?

MR. BUTTACAVOLI:  The settlement administrator is the firm A.B. Data who we retained as class counsel for purposes of providing class notice and claims administration services to the class.  They currently have a data set that was updated by AWL on March 4th comprised of the entirety of all class period loan information, and it was updated recently to indicate information about the additional cancelation provided by AWL effective January 15th, the remaining, I think it was -- the remaining loans that are all owned by AWL.

17

If I could go back to the point that Mr. Bennett was explaining and just --

THE COURT:  Who is that speaking?

MR. BUTTACAVOLI:  Sure.  This is Steven Buttacavoli from Berman Tabacco here in Boston.

We are in 99 percent agreement with the objectors on the distribution formula.  I've been working closely with Mr. Ackelsberg on finalizing that.  That will provide -- and I think there's two sort of related issues.  One is for all class members who paid more on their loans than the original loan amount.  They will be allocated the cash proceeds of the settlement according to a formula that we are almost 100 percent lined up on that will take --

THE COURT:  Doesn't do me any good until I've seen it.

MR. BUTTACAVOLI:  Right.  Well, it'll be submitted with the revised settlement agreement.

THE COURT:  Where is the revised settlement agreement?

MR. BUTTACAVOLI:  Well, that's what we're in the process of trying to finalize, then we're hopeful to have --

THE COURT:  Well, how can I finalize it today when I don't even have the final settlement agreement or the distribution?

MR. BUTTACAVOLI:  It's these last final issues, Your Honor, that we're hopeful to resolve.

The separate piece is what would occur with someone --

Paul L. McManus, RMR, FCRR Official Court Reporter

18

so even if your loan was sold to a debt buyer, if you paid more on that than the original face value of the loan, you're eligible to receive a cash recovery under our settlement.

THE COURT:  All right.  Now there's some people who are not getting anything but they're releasing their claims as a class member?

MR. BUTTACAVOLI:  They will no longer be releasing their claim under the settlement agreement that's --

THE COURT:  Well, that applies to the debt buyers, but not the other class members.

MR. BUTTACAVOLI:  It applies to, it applies to everyone who is neither receiving cash awards or loan cancelation.  It is not releasing any claims against any of the released parties in the case.

THE COURT:  Well, that was a point that isn't clear in this MOU.

MR. BUTTACAVOLI:  To get back to the issues, we agree that for anyone whose loan is not being canceled pursuant to this settlement, whether it's an AWL customer or someone whose loan was sold to a third party, they should be told through the existing web portal that we have set up, that their loan is not being canceled.  We received, only a day or two ago, a proposal of some language to put in there because we had not resolved this issue as to whether or not debt buyers were included in the first instance.  But we're confident that we can work out

19

instructions to the class members advising them that they are not covered by the settlement for debt cancelation purposes and that we can provide appropriate direction to them with respect to what their rights are.  So that's something that we're conscious of, that we're working on.  I believe that the presentation that Mr. Bennett provided were -- we don't disagree with anything that he provided there.  The question is just whether we're proceeding with this settlement with just Northwood or whether there's some additional non-parties that will be pulled in.

THE COURT:  Is it your understanding, Mr. Bennett, that the defendants are not objecting to Northwood being released?

MR. BENNETT:  Your Honor, until we got a email from Judge Novak, we didn't know who was objecting or not objecting. I think I -- my understanding today is that class counsel was objecting because it didn't want to go through a new notice process, and that Judge Novak having resolved that issue with respect to the defendants in our favor and with respect to class counsel, we don't think that anybody is fighting any longer.  I think that -- I understand in our discussions with Mr. Curry's counsel that there's some really, a principle rather than a legally substantive complaint, because Judge Novak, apparently, I've learned this from opposing counsel, was very forceful in arguing why Mr. Curry should pay more money.  And one of the

20

arguments for why he should pay more money, apparently, was because not everybody's debt was being released.  But I want to be clear to the Court --

THE COURT:  Well, you say it's one of the arguments. The other side says that was the entire reason.  It makes more sense that it was one of the arguments.

MR. BENNETT:  Of course we weren't in that room and that was not part of any settlement term.  And you can imagine, Judge, there were arguments made against us -- or not against us, but there are arguments made by the mediator or by Judge Novak, who is great at his job there too, and his arguments were very different against the objectors, I'm sure, than they were as to the other parties.  So I don't know what Mr. Curry's counsel heard, but that is not part of the settlement discussion.  The $21 million was because we were concerned that Mr. Curry hadn't paid anything, and now he has.  We were concerned that there was a release for people, even when they didn't get anything, and that term has been fixed.  We were concerned about -- the debt buyer issue for us was a very big deal in the mediation, it was what we came into this fighting about, and in some regards it's fixed and in some regards we're still where we are.

I want to be clear, Your Honor:  I want to do what's right for the class, but I want to obey two U.S. District Court judges that are involved here.  And Judge Novak went out of his

Paul L. McManus, RMR, FCRR Official Court Reporter

way, and of course the Court is aware of the docket he's holding in Norfolk.  He went out of his way to hold these mediations for us and I don't want to be disrespectful to that.  We will not object to a settlement without debt buyers, and I'll bite my tongue on it.  But we, to the extent the Court gives us any leeway, we can't guarantee that we're going to get the debt buyers done, but we -- the more information we have, then the better off we are in trying to lever it.  I've been seeking from AWL's counsel that information since the first time you heard me speak, since before the first time you heard me speak at the fairness hearing.  And the most information that we've received is comparable to what you received in the recent letter.  This is a much better deal no matter what.  If we papered it, Your Honor, if you say it is done, this is it, I want it before you, it is still a much better deal.  The release is narrow, the ceiling on attorney's fees is much lower.  There are debt buyers.  We got rid of all of AWL's debt, not just the uncollectible part.  And there's a lot more cash.  So this is a much better deal, and I don't want to lose the good in pursuit of the perfect.  But...

THE COURT:  Well, I understand what you're saying.  Judge Novak not only did all of you a big favor, he did me a big favor.  He's normally the -- what we call settlement conferences, we don't call it mediation, we use another term, we call it a settlement conference, are usually conducted by the

22

magistrate judges.  And it is the general rule that any judge who conducts a settlement conference does not make any substantive decision in the case.  And I'm sure Judge Novak intended that.  And I think Judge Novak has done a great job. He knows a lot more about it than I do, and that's why I wanted him to do it.  Actually, I didn't call up asking him to conduct the mediation, I called up Judge Novak just to get his input on where we should go after the Court declined to accept the initial proposed settlement, and he volunteered to do it.  Which was beyond the call of duty, because district judges have generally not done that.  But he said he'd do it, and he's obviously done an excellent job.

I'm not going to hold up the settlement indefinitely or require that the debt buyers be made parties or anything like that as a prerequisite for approving the settlement, because obviously Judge Novak doesn't think that's practical and I yield to his opinion on that, as much as I'd like to see that loose end resolved.  So I can't approve the settlement today.  I don't even have what the distribution is.  And you're 99 percent agreeing.  Well, 99 percent doesn't do it.  When you 100 percent agree the Court will deal with it, what the proposed distribution is and the allocation of costs.

Now, I don't know how much it costs to pay that professor who filed that report stating how much the settlement was worth that I rejected at the last hearing, but whatever he

23

charges will be deducted from class counsel's attorney's fees as a cost.  It did not in any way benefit the class or have the potential to do so.

The information I'm going to get Friday may be of some help in dealing with the buyers, other buyers.  It may not.  I don't know.  But I want to know it for my own information.  Obviously I cannot agree on the distribution since I don't know what it is.  But as I understand it, no class member will release his or her ability to proceed either individually or as a member of a class who is not receiving either cash compensation or loan relief; is that correct?  I expect it to be correct.  I don't want to approve a settlement and bar somebody from any other class action if that person didn't receive any form of compensation either in the form of payment or loan relief.  Now, there was something in there that touched on that issue, but I want to make sure that that's specifically covered in any agreement that's submitted to the Court for approval.

Well, does anybody have any questions that they want from the Court?  When I receive the proposed distribution and 100 percent agreement between counsel I will schedule a hearing to approve it, which will then trigger the distribution.

Now, it's my thought that -- there was something in here about some issue of quick pay of attorney's fees which was dropped.  The request was apparently dropped.  It seems to me that the first thing that should be done with any funds received

24

is the payment of reimbursement of any costs, out-of-pocket costs by counsel.  Apparently counsel has advanced some costs, or will in the new -- will advance additional costs when the new notice goes out.  So it seems to me is what ought to happen is the first -- and I didn't know -- the first anybody told me about the existence of some escrow fund -- if somebody told me about that before, I must have forgotten it or overlooked it. But I don't know if that escrow fund is going to cover this or not.  I don't know how much it is, obviously, but that should be the first thing that's paid.  And of course you've got to pay these third-party providers.  So the first thing that ought to happen is that any costs advanced be paid.

Now, when it comes to attorney's fees and payments to the persons receiving them, it seems to me that that ought to be arranged on some sort of *pro rata* basis.  I don't know when this agreement is going require that the whole, what is it, 85 million now, be paid in cash, but when that comes in, if it doesn't come in all at one time, then it ought to be prorated between attorney's fees and payment to the victims.  I don't see any reason why one should take precedence over the other, although I'm not making a decision on that issue because I haven't heard what anybody has to say about it or given it a great deal of thought.  But it seems to me that would be the best way to do it.  And I would like the amount of the costs to be set out in the agreement.

25

Now, all you can do about future costs is estimate, but the costs that have been incurred, I want to know exactly what they are and have them included in or attached as an exhibit to the proposed agreement.  So that means that you would attach the actual costs and an estimate of what the costs of an additional notice would be.

It seems that that MOU was pretty vague about what the objectors' counsel fees would be.  And who -- there was something in there about Freeman being paid first.  What's that all about, Mr. Bennett?  Free-something?

MR. BENNETT:  Oh, Judge, I'm not sure what that is. The attorney's fee amount, we objectors agreed that we wouldn't seek past a certain number.  I think it was 2.8 total.  The Virginia part of it has also committed that we intend to give all, any fee that the Court were to award us in Virginia to non-profits that we would like to direct it to.  One of those is, if the first $500,000 -- the Court may award us zero, but the first $500,000 we would give to a specific food bank.  The Virginia lawyers aren't -- we are seeking attorney's fees, but we are also going -- and mainly because we wanted everyone involved in the case to understand that our commitments here are not for our own economic enrichment.  They are, of course to the extent we can help causes that we care about, they are for our own benefit because we care about these other non-profits.  And West Virginia, for example, is largely represented by Legal Aid.

Pennsylvania has gone back and forth about whether it intends to even seek a fee, with me arguing most strenuously to the amount of work that they've done, the advancement of $8,000 to the National Consumer Law Center, that we should seek a fee. But we expect that we will follow the law with respect to Rule 23(h), non-class counsel seeking fees. We will petition Your Honor, we will tell you the value that we think we've produced. We aren't seeking 20 percent, a third or anything, but we are not permitted -- we didn't ask to -- seek more than 2.8 million inclusive of our fees, our costs, our contributions to third parties all in as part of that number divided between every one of the objector groups.

And Judge, I'm speaking a lot, but almost half of this group consists of our objector team on this screen, and every one of us has worked on this, even if I'm taking all the credit.

THE COURT: All right. Well of course I have no way of knowing about any of that. You just have to advise me of what you're requesting and why when I get the rest of the agreement.

Now, when can you get the rest of the agreement to me?

MR. BENNETT: Your Honor, as of maybe, I don't know, 11:00 or midnight last night I sent the objectors' counter to the most recent draft. Mr. Curry's counsel countered this morning with small changes which I think are largely agreed. So if we can get the defendants and the American Web Loan

27

defendants and the plaintiffs to respond to my late-night and Mr. Curry's counsel counter today, we would get it out today to try get this done quickly.  We certainly would like to be able to receive and review the data that we have also not seen in detail from American Web Loans regarding the debt buyers.  The only holdup, Your Honor, that is still in negotiation is the notice, specifically the notice issue regarding consumers whose loans are not going to be canceled.

THE COURT:  Well, I thought that the defendant said that they had agreed to cover that, it's just a question of how?

MR. BENNETT:  Yes, sir.  We agree.  It's been a moving target.  Before the --

THE COURT:  Well, I don't want to set some date that's unachievable.  When does counsel for everyone think that they -- bearing in mind you're going get some additional information Friday noon, of course that information should not only be sent to the Court but all counsel of record, but you'll be getting some additional information Friday at noon, so it obviously can't be before then, but what is a reasonable date that you can get it to me?

MR. BENNETT:  Your Honor, you're asking -- this is Len Bennett, the objectors.  I think we have to hear from American Web Loans and class counsel to know that.  Mr. Curry's counsel has been quick to respond.

THE COURT:  Well, Mr. Thomas?  Mr. Paikin?

28

MR. THOMAS:  Yes, sir, Your Honor.  This is David Thomas.  I was going to suggest that the Court could, by the end of the month, really, a week from today, Wednesday, March 31st, direct the parties to file the finalized settlement agreement, and I believe that we could also have the motion for preliminary approval ready on that same, by the end of that same day.  So seven days from today, Your Honor.

THE COURT:  AWL?

MR. PAIKIN:  Your Honor, I suggested that very date in the letter that I sent to you, so that timing works for us.

THE COURT:  All right.  Let's say noon on that date, March 31st, and I will schedule another hearing.  I hate to keep scheduling hearings because so many people are involved.  So I hope the next hearing will be the end of it.  But as I said, I'm not going to hold it up because of the absence of any of the remaining debt buyers.  It would be my wish that we could get that loose end tied up.  I think it would result in a much more equitable distribution of relief to all the members of the class and the objectors if we could get all of that taken care of in the same proceeding, because it's difficult to weigh the value of a contingency.  But on the other hand, I think Judge Novak is right, that we can't just keep pushing the cart down the street, we've got to bring this to a conclusion.

So I'll expect to get the information requested on noon Friday, and then get the final papers representing the

29

agreement, and not an MOU, but an agreement, which obviously would have to include the release in the form that the Court has specified and the distribution.

And it's been a while since I went all the way through a class action case, but do we usually decide attorney's fees at the hearing that results in the notice going out or at the final hearing closing the case after that?

MR. BENNETT:  Your Honor, this is Leonard Bennett, if the Court may?

It is most common, in almost all instances, the Court would decide it at the time of the final fairness hearing.  The preliminary approval hearing tends -- in fact some courts don't even have hearings, almost all do, but some don't -- but the preliminary approval is usually more focused on the facial fairness of the settlement and on whether a class can be certified under Rule 23(a), and then notice has to go out to the class, but it also has to go out to the governmental agencies. That notice, the CAFA notice, has to go out within 10 days of when the formal settlement agreement is filed on Your Honor's docket regardless of when you approve it.  And then you cannot, the Court cannot approve for final approval a settlement until 90 days have passed from when that notice went to the Attorneys General and the government agencies under CAFA.  But you would decide that final approval -- and I know you're aware of that, but at final approval you would decide both the fairness and

adequacy of the settlement again, and you would decide attorney's fees and objections, including any, if objectors seek fees, objector fees, but certainly always class counsel fees.

THE COURT:  All right.  So we'll be prepared to deal with fees whenever that hearing is set.  And I would like to do it hopefully, let's say, within a week of when I receive all the documents.  So if I receive all the documents on March 31st, which is a Wednesday, I think that the following Wednesday would be April 7th.  So if the Court finds everything in order, I'll try to schedule that hearing on April 7th so we can get the notice periods starting to run.

Does anybody have any other questions about what the Court expects to receive from you and when?

All right.  If not, then we'll adjourn the hearing at this point.

(Whereupon, proceedings concluded at 3:32 p.m.)

Paul L. McManus, RMR, FCRR Official Court Reporter

31

*CERTIFICATION*

*I certify that the foregoing is a true, complete and correct transcript of the proceedings held in the above-entitled matter.*

_____

Paul L. McManus, RMR, FCRR

_____

Date

Paul L. McManus, RMR, FCRR Official Court Reporter