IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

- - - - - - - - - - - - - - - - - - -
                                      )
ROYCE SOLOMON, individually and       )
on behalf of all others               )
similarly situated, et al.,           )    CIVIL ACTION NO.
                                      )    4:17cv145
          Plaintiffs,                 )
                                      )
v.                                    )
                                      )
AMERICAN WEB LOAN, INC., et           )
al.,                                  )
                                      )
          Defendants.                 )
- - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF VIDEO CONFERENCE PROCEEDINGS

Norfolk, Virginia

April 7, 2021

BEFORE:   THE HONORABLE HENRY C. MORGAN, JR.
          United States District  Judge

APPEARANCES:

          CONSUMER LITIGATION ASSOCIATES
          By: Leonard A. Bennett
                   And
          BERMAN TABACCO
          By: Kathleen M. Donovan-Maher
              Steven J. Buttacavoli
              Norman Berman
                   And
          GRAVEL & SHEA PC
          By: Matthew B. Byrne
                   And
          MICHIE HAMLETT
          By: David W. Thomas
                   And
          KELLY GUZZO, PLC
          By: Kristi C. Kelly
              Counsel for Plaintiffs

JODY A. STEWART, Official Court Reporter

APPEARANCES CONT'D:

      O'HAGAN MEYER PLLC
      By: Charles K. Seyfarth
          Elizabeth S. Turner
            And
      WILMER CUTLER PICKERING HALE & DORR LLP
      By: Jonathan Paikin
          Thomas L. Strickland
            And
      ROSETTE, LLP
      By: Saba Bazzazieh
          Robert A. Rosette
            And
      WILLIAMS & CONNOLLY LLP
      By: Simon A. Latcovich
            And
      PROSKAUER ROSE LLP
      By: Christopher Ondeck
            And
      FAEGRE DRINKER BIDDLE & REATH LLP
      By: Mark H. M. Sosnowsky
          Matthew J. Fedor
          Counsel for the Defendants


      THE SARRETT LAW FIRM PLLC
      By: Drew D. Sarrett
            And
      LANCER GROGAN & DRIVER P.C.
      By:  John Grogan
         Counsel for Interested Party Diana Butler


      MOUNTAIN STATE JUSTICE, INC.
      By: Bren J. Pomponio
           And
      BORDAS & BORDAS, PLLC
      By: Jason A. Causey
         Counsel for Interested Party Charles McDaniel

(Hearing commenced at 11:05 a.m.)

THE CLERK:  Civil action 4:17cv145, Plaintiff Royce Solomon, et al., versus American Web Loan, et al.

Your Honor, counsel for each side has checked in and made an appearance.

THE COURT:  All right.  The way I read the settlement agreement, which is Exhibit A, on Page 16, is that the members of the class whose loans were sold to entities other than Northwood give up their right to file a class action, collective action, or mass action against the release parties.

Is that correct, counsel for the defendant?

MR. PALKIN:  Yes, Your Honor.  That was, you know, as I set forth in the e-mail that I sent you yesterday, that was consistent with the MOU.

THE COURT:  Well, I spotted that in the MOU, and I told you it was not acceptable.  Then I sent you an e-mail, and I told you for a second time it was unacceptable.  I'm now telling you that for the third and last time, it's not acceptable.

MR. BENNETT:  Your Honor, this is Len Bennett on behalf of the objectors.

THE COURT:  Who?

MR. BENNETT:  Leonard Bennett on behalf of the objectors, Judge.

THE COURT:  Yes.

MR. BENNETT:  The Court is aware of how we got to where we are.  I had watched, or we had reviewed the communications between the Court's law clerk and the parties.  We have had multiple -- the objectors have had multiple communications off-line, of course, since those communications, but I wanted to at least give the Court our background and our take on this, if the Court is willing to hear us out.

THE COURT:  I don't have complete information on the number, the percentage of debts that were sold.  The chart that I got shows who bought what percentage of the loans that were sold, but it doesn't say what percentage of loans made by AWL were sold.  I would presume that they, at first glance, and I didn't analyze all of them, they seem to be sold for somewhere around $.10 on the dollar based on the principal.

I assume that those would have been loans, let's call them the worst ones, so the probability is that those loans, or the people that made those loans, probably made little, if any, payment on them so they would not pose a threat because they wouldn't have any damages.  However, no doubt some of those people in that group did make payments either before or after the debts were sold so foreclosing all of them from proceeding as a class.

After all, all of the plaintiffs' attorneys have said that it's impractical for anybody to proceed in any manner other than as a class.  So to preserve their right to proceed as individuals is an empty basket.  But no doubt some of those people did make payments over the 10-year period.  So if the risk has to fall on either the defendants or the members of that class that did make some payments, the Court believes it should fall on the defendants.

If the plaintiffs had -- I mean, it's pretty obvious, it should have been obvious from the outset, that these sold loans were going to be a loose end in their settlement.  But it doesn't appear that any efforts were made to resolve this loose end until very late in the proceeding, of which I don't quite understand.

So if you want to make an argument, Mr. Bennett, you can undertake it, but you're swimming very much upstream.

MR. BENNETT:  Your Honor, I've had multiple discussions with the parties.  I recall prior to the fairness hearing --

THE COURT:  First of all, let's say the fact that it's an MOU is of no consequence so --

MR. BENNETT:  Yes, sir.

THE COURT:  -- let's move on from there.

MR. BENNETT:  Yes, sir.  The objectors don't feel

bound to make a position that they don't believe in because of the MOU.  We do feel bound to act in ways we said we would act, but we've reserved, and it's very clear in our discussions with Judge Novak, that he understands that if we have an opinion, we will state our opinion, and that's really what I'm suggesting here.

You said, Your Honor, in the run-up to the last fairness hearing, your actual quote was, "There is a zero percent chance I approve the settlement on Wednesday."

THE COURT:  Well, you didn't have anything ready.

MR. BENNETT:  No, sir.

THE COURT:  You had nothing to approve.

MR. BENNETT:  I mean, but so I am hesitant, and that should be some indication of my commitment to this argument to take live fire on this question given that the Court has been very clear about the release.  But I want to give you full information and let you know from our perspective, of course, maybe we've got a lot of adversaries in this case, but on this question of whether the release is acceptable and should be approved, I think we are in agreement, for different reasons, with the defendants and with the plaintiffs.

There is a lot of value that's been produced with respect to the debt buyers and in terms of empowering that group of people and others that are seeking to help them as

part of this settlement.  So, for example, one of the additions to the settlement that's occurred over the last several weeks is the addition of a portal on the website to inform this group, let's call them uncompensated, right. I'm going to call this group uncompensated class members. They just don't receive cash.  They get other consideration but not cash.

THE COURT:  Well, the other consideration doesn't amount to anything.

MR. BENNETT:  Well, it does in the way I'll explain.

THE COURT:  What value is it to these people that something will be removed from their credit report?

MR. BENNETT:  I agree.

THE COURT:  I doubt that -- there is probably enough other things in their credit report that that would be inconsequential.

MR. BENNETT:  But here is what you are facing, Judge.

THE COURT:  And that their names are not going to be put on a separate list for other predatory lenders.

MR. BENNETT:  A hundred percent agree.  But you have a group of individuals who have not -- really, the harm that we are talking about, this uncompensated, uncashed compensated group, are a group of individuals that have not

currently suffered harm because they have not paid these loans or else they would be eligible for cash.  But they have the prospect of harm from collection by these abusive debt buyers, and that's the harm we are trying to address, is how do we protect this group of individuals from what harm can occur because their loans were sold?

The solution that we have come up with, and, candidly, we have not faced -- since the last interactions with the Court, the defendants have been more agreeable.  We have a portal to provide information to these individuals to empower them against the debt buyers.  You have a contractual term that obligates --

THE COURT:  How do we know that they haven't made any payments to the debt buyers?

MR. BENNETT:  Well, that's the issue.

THE COURT:  I mean, they haven't made any payments to AWL.  I don't know if they haven't made any payments to AWL, I don't know that, or whether they have made payments, but the payments don't --

MR. BENNETT:  We, candidly --

THE COURT:  -- reach the principal -- don't talk over me, Mr. Bennett.

MR. BENNETT:  I'm sorry, Your Honor.

THE COURT:  We don't know if they paid anything to AWL over and above a portion of the principal.  I don't know

JODY A. STEWART, Official Court Reporter

whether we know that or whether the loans that they sold they sold them because no payments of any nature had been made.  Maybe that's why they sold it.  But I don't have that information, if that's the case.  But even if we had that information, we don't know if they've made any payments subsequent to the sale to the debt buyers.  There must have been some payments made.

I mean, there were all of these thousands of loans sold, there had to have been some payment made.

MR. BENNETT:  Yes, sir.

THE COURT:  But we don't have any current way to learn that.

MR. BENNETT:  Well, what we have tried to construct in the settlement, the objectors have tried to construct with the settlement, is a way to provide legal advice at no cost to the class members.  That is, we are committed by contract to provide the legal advice to every consumer who seeks it in this debt buyer category as part of the settlement.

In addition, the parties, the defendant has agreed to provide objectors' counsel access to the information regarding class members and debt buyers so that we can affirmatively reach out to those individuals.

THE COURT:  Well, why hasn't class counsel done that?  Why are you doing it?  Why wasn't there any to begin

with?

MR. BENNETT:  Judge, yes, sir, I understand that. Class counsel can defend its own efforts here.  I tell you, frankly, that even if class counsel had an effective settlement originally, I would want Mr. Ackelsberg and Ms. Kelly and the Mountain State Justice folks in West Virginia to handle this.  They're the literally top lawyers in the country in this field, bar none, no hyperbole.

So in terms of getting those individuals signed up for free legal advice, as part of settlement, the settlement obligates those lawyers to help those consumers figure out this morass and what to do about it, and affirmatively, and candidly, Judge, it's because of the recent communications from Your Honor's law clerk to the defendants, the defendants agree to give us the information where we can affirmatively reach out, for example, if there are Norfolk, Virginia, consumers whose loans have been sold in this group, we are able to reach out and bring them back in front of this Court in an action against the debt buyer.  That is a tremendous amount of consideration.  It's better than just offering them $10.

THE COURT:  But you have to do it on an individual basis?

MR. BENNETT:  No, sir.  We can sue debt buyers on a class basis, which it matters a lot more than the class --

and let's -- if the Court considers what is being given up, in terms of the right to bring a new class action against American Web Loan, it is an academic right because the statute of limitations is tolled while this class action is pending based on a Supreme Court case, *American Pipe*.

Subsequent decisions after *American Pipe* have found that the tolling of a punitive class member rights to bring an action, based on the existence of a pending class action, does not necessarily extend to a new subsequent class action.

So class action one doesn't toll the statute of limitations to file class action two.  It does toll the rights of individuals to bring their individual claims, but it does not -- so that what is being given up here is only a class action right against American Web Loan by people that have not paid these loans.  And the trade-off of that academic right is that these individuals have lawyers who know what they are doing, can represent them without cost, and will be able to affirmatively reach out, find them, and take care of the debt buyers.

We've got 17 million loans already released with Northwood.  We will get them all.  The Court has empowered us to do that.  The settlement has empowered us to do that.  Our conscience and skills enable us to do that.

THE COURT:  But why should you do that?  Why

shouldn't class counsel do that?  Why should you do that?  Why should you have to contribute your time basically free?  You're not getting any compensation.

MR. BENNETT:  We know it will be done.  Because it will be done, Judge.  I'm well compensated in other cases.  We played a long game.

THE COURT:  But why should I compensate class counsel in the amount of compensation they are seeking when it does not appear that they made any effort to take care of this portion of the class, which creates a potential conflict of interest, and place that burden on the objectors' counsel who are giving up all of their fees?  That doesn't make any sense to me.  If I do that, then I should make an adjustment to the fee.

MR. BENNETT:  Obviously, we are not the biggest fans of plaintiffs, but the Court will note that the fee adjustment has already occurred.

THE COURT:  Well, not --

MR. BENNETT:  And the reason it occurred, Your Honor, was because --

THE COURT:  Well, there was an adjustment.  I mean, the first fee request was -- I won't use any adjectives, but I'll say it was unacceptable to the Court, and the current one is very suspect.  I mean, it wasn't that much work done, as far as I can see, by class counsel to justify a fee which

will end up being in excess of $15 million, particularly if other counsel has to undertake to cover this loose end for something that, in the Court's opinion, should have been done by class counsel.

MR. BENNETT: Judge, again --

THE COURT: Well, do you want to talk to class counsel and see how much they would transfer to counsel who's going to take care of this loose end?

MR. BENNETT: Well, for Virginia, Judge --

THE COURT: You want to have a chance to discuss it there?

MR. BENNETT: Well, Judge, Virginia won't --

THE COURT: It doesn't make sense to me, Mr. Bennett.

MR. BENNETT: Judge, from our perspective, Ms. Kelly's firm and my firm won the state bar *pro bono* award a year ago, but it's what we do. We are not in this for the money. With respect to the plaintiffs' fee, which would be considered a final fairness, the way that number arose is as a third of the net cash that the plaintiffs brought in, and they brought net cash in.

I mean, there is no doubt our original objection did not say they didn't bring enough cash, and the net cash, 45, $46 million or so, is what would be needed to support a one-third fee. They can answer everything else. We aren't,

14

you know...

THE COURT:  What magic is a one-third fee at?  I don't look upon one-third as being a magic number in a case like this.

MR. BENNETT:  I guess in the silence, the only -- I would -- I don't want the Court to be misled to think despite our significant acrimony that the plaintiffs' lawyers have sat silent during this re-settlement -- new settlement process.  I know that Mister -- I'm sorry, Steve, Mr. Beckovali and Mr. Ackelsberg have put in significant time to develop the payment scheme that will support --

THE COURT:  The payment scheme?  I thought that was done by the people they hired, not by them.

MR. BENNETT:  Well, it was the National Consumer Law Center provided its survey of states, and then Mr. Ackelsberg led the construction of the tiers and negotiation and implementation of that within the settlement agreement with Mr. Buttacavoli.

THE COURT:  Well, that's hardly $16 million worth of work.  I mean, the case was never even argued before the Fourth Circuit.  It was argued here.

MR. BUTTACAVOLI:  Your Honor, if I may.

THE COURT:  It was briefed before.  It wasn't even argued before the Fourth Circuit.  In this case they keep citing it's a big threat.  I don't see it as a big threat.

The case is now back with additional fact finding in the District Court, and so I don't think that case is *de minimis*, as far as this Court is concerned. I know the judge, he's an excellent judge, and if it goes back before him for fact finding, he'll get to the bottom of it, and that will be the end of that decision.

The one thing that concerns the Court is that delay in the case damages the rest of the class. That's what I'm worrying about. In other words, if we put this off, and that's why I said that I didn't feel that I should put this off until you have an opportunity to go after the loan buyer, so I am worried about delay. And I realize a lot of attorneys who handle cases on contingent fees make up for no fee cases with other cases. That's what enables them to make a living.

But I have never been comfortable with the fee to class counsel as it now stands, particularly since there's another big chunk of money, up to $350,000, that's going to be paid out of the fee that goes to objectors' counsel, which is not really going to objectors' counsel. It is going to various cy pres individuals.

I don't see $16 million worth of value that's been delivered in this case by any stretch of the imagination.

MR. THOMAS: Your Honor, this is David Thomas. I'm local counsel or settlement class counsel. I did, I guess,

a couple of things for the -- I'd ask the Court to consider is that, one, 16 million is the maximum in the MOU.  Class counsel hasn't actually made a fee application yet.  We would do that once the Court has preliminarily approved the settlement, and we wouldn't ask the Court to pass on that for another 90 or 100 days, at which point in time we will, I guess, do our best to explain to the Court why we think whatever fee award is requested is reasonable in light of the value delivered by settlement class counsel, which previewing it for the Court was always going to be based on the $65 million in cash that was delivered prior to the settlement with Judge Novak.

So that would be the first thing, is I would just ask the Court to withhold judgment until it has actually had a chance to look at the fee petition because it is going to be less than $60 million in fees because of the costs that are being paid out of that.

THE COURT:  I know it's going to be less.  I guess it's what, maybe 5, 600,000 less, something like that.  I didn't add up all those costs.  But you see my problem is I'm not going to be here in 90 days or 60 days or maybe even 30 days.  I was supposed to retire last summer, and because of the pandemic and because of one particular case I had, plus this case and another case, I decided I would try to stay around and resolve these cases.  I don't want to dump

this decision on another judge.  If I'm going to make somebody mad, I want to do it myself.  I don't want to pass that mantle off to somebody else so --

MR. THOMAS:  Yes, sir.

THE COURT:  -- that's the problem I have.

MR. THOMAS:  Yes, sir.

THE COURT:  I appreciate what you're saying, Mr. Thomas, and were the situation different, I would say that, but I feel like I've got to solve this problem in the here and now, both for the sake of the majority of the class members, who are receiving relief, and I understand we are just talking about a minority of class members who may not even have a cause of action because they may not have even paid the principal to anybody.

MR. THOMAS:  Yes, sir.  And that was --

THE COURT:  It's entirely theoretical, and we don't have any way of finding that out until we get the purchasers of the loans before the Court, and I've already said I'm not going to wait for that eventuality.  That will greatly multiply the cause to everybody concerned, not to mention the value of everybody's time.

MR. THOMAS:  Yes, sir.  I guess the other -- couple of clarifications is, we do know that none of the people we are talking about paid more than they received in principal, because if a class member paid more to American Web Loan

than it received on the loan, they are getting a cash award under the settlement agreement.  So even if they --

THE COURT:  We don't know what they paid the buyers.

MR. THOMAS:  Yes, sir.  That is absolutely true, and that is the subject of the pending proposed class action in the Eastern District of Pennsylvania, and the release that's in the settlement agreement is crafted, in large part, to ensure that those claims, which is American Web Loan issued loans, sold to third parties other than Northwood, all of those members of the class who may have a claim would be members of the proposed class in the Eastern District case.

THE COURT:  Are the loan buyers party to that case?

MR. THOMAS:  Yes, sir.  Or the -- at least, I'm sorry, the broker is.  I'm sorry, I misspoke, and Mr. Bennett can clarify, but I believe the broker is the defendant.

MR. BENNETT:  Yes, Your Honor, the broker is the defendant.  The challenge for us is needing to have actual individual clients who can assert the claim here or in Pennsylvania against a specific debt buyer.  As part of this settlement, we have the means to do that.  We are committed to doing that.

This solution, Judge, those individuals that have

claims against other debt buyers besides Northwood, to be candid, are now in a better position than those as to Northwood because they're not inhibited, and they can go after them for money under multiple statutes, this statute, state statutes, the Fair Debt Collection Practices Act, we can do that, and we can do it if this Court approves the settlement because, as part of the settlement, the information that is needed to help those people is provided.

I'm hopeful, given the Court's admonitions, that we are able to corral plaintiffs' counsel to help in that effort.  I'm confident now that we can after this hearing, but, again, these are not just individuals that only have theoretical claims against American Web Loan.  They likely don't have a class claim because the statute of limitations tolling would not apply to a subsequent class action, and so giving up this claim, which is a right to bring a follow-on class action against the same defendant, American Web Loan, is not a sacrifice, not giving up anything, and they are getting --

THE COURT:  Well, wait a minute.  They are giving it up against American Web Loan and Curry and a number of other defendants.  I don't know what relationship, if any, any of the other defendants have to this class action in Pennsylvania.

MR. BENNETT:  Well, we have carved out all those

other defendants.  That is, for example, Debt Trader, the broker, when we negotiated the definition of released parties, we made sure that that debt bot trader was not included, that no debt broker was included, generically, for the term debt broker, and none of the debt buyers are included.

We know that the debt buyers have sought indemnification from American Web Loan to pay them back.  So everybody on this call, I think, has an incentive to get the debt buyers on board.  We now have the tools to do that if the settlement is approved because we have the information necessary to go and enforce that, and it may be -- you know, frankly, I think our strong preference would be if the Court would allow us to make monthly status reports on whether and what is going on with that effort with respect to the debt buyers.

But as of 10:48 this morning, before the hearing, I was on the phone with counsel for American Web Loan, and I insisted and received an e-mail confirmation that we will be able to receive the information necessary to identify those individual consumers and go reach out and affirmatively help them instead of just waiting and hoping they come to us.

I'm hopeful, given the need for the class counsel to keep everybody on board for a final fairness hearing for fees, we are not going to have a problem drafting and using

and working with the plaintiffs' lawyers, and that certainly -- that's between the Court, the class. Certainly, we have done our part as to the fee fight, but I'm hopeful now that we have lots of bodies, lots of legal minds, and consumers will get free legal advice as part of this.

In addition, they are set up to have their rights enforced by the best lawyers in this area in the country, I mean, in this field in the country. But we've got to have a settlement now because, you know, the longer that we go on, one of the considerations that the objectors had was the ability to contact class members. It deteriorates each time that each day that passes. A lot of these folks, they don't have, you know, a big giant family home that they have been in for generations.

THE COURT: Well, I understand that these are the kind of people who a lot of them will never be found, obviously, and I understand that, particularly, in the sub-class of people we are talking about that didn't pay much of anything, if anything. They're the type of people as a group, I can't say anything bad about any particular individual, but as a group, they tend to move around without being able to trace them. I know that's going to be a problem.

I know that you've got that covered. In other

words, if the cash is not distributed in the first round, then there is going to be a second round of distribution.  I did wonder whether in the second round of distributions there should be additional consideration given to the tier two defendants, I mean, victims, because they're getting less because of state law.  This is a federal case.  I understand why they are getting less because of state law, but before we are giving away the money at cy pres, it seems to me that we ought to think about a second round of cash payments to the tier two defendants.

MR. BUTTACAVOLI:  Your Honor, if I may explain that.  That is precisely the plan here, is we would attempt to distribute the entirety of the settlement fund without need for a cy pres distribution.  The *pro ratas* will continue using the same formula.  To the extent they are unclaimed funds, they will be distributed to participating class members according to their share and as long as we have.

We have been assured by the settlement administrator that the electronic payment system that we are planning on using here have a high participation rate, and we can continue to make, unlike paper checks, where there is an economic limitation at some point how much of a check you can send to someone, these electronic payments topping up an account can be done in incremental amounts such that there

are continual top-ups made to these accounts without substantial additional costs so that the entirety of the funds can be distributed to the class. So that's not a problem.

We are hopeful that there is no need to return for cy pres because the entirety of the settlement fund can be distributed to class members. It would be irrespective of their position in the tier one, tier two designations. The proportion that they would receive would be the same. It would just continue to go out in smaller amounts until the settlement is exhausted.

THE COURT: Okay. Thank you for clearing that up. I, obviously, didn't have time to examine it that carefully. Haven't had as much time as I would like to go through all these papers. I have been through them all, but you can't go through a set of papers like these one time and expect to remember everything.

This is a very complex situation, and I want to do the right thing. It's hard to come to grips with exactly what is the right thing. Okay. It's about 12 minutes to 12:00. Let's take a recess until 12 noon, and let me think about all of the unresolved issues that are concerning me. We will resume at 12 noon.

(Recess from 11:48 a.m. to 12:01 p.m.)

THE COURT: Okay. Please be seated.

24

I have thought about it, and if we looked at it from the standpoint that class counsel got 64 million and objectors' counsel was primarily responsible for getting another 21 million plus additional debt cancellation, and, of course, there was additional -- I mean, there was debt cancellation in the first settlement.

Tried to look at it in that manner and also recognize that the objectors' counsel have volunteered their time. How much is the total amount objectors' counsel is getting -- I can't remember that -- which you say you're going to give it away.

MR. BENNETT: I believe it's 2.5 is the collective amongst the three states of objectors.

THE COURT: All right. I thought that's what it was. Okay. So we can look at the amount of the attorneys' fees, adding some relationship to the 64 million plus the debt relief and other counsel having primary -- well, if it wasn't for objecting, I mean, I guess that 21 million wouldn't have happened, and if it wasn't for Judge Novak as well.

So I think it's incumbent upon me to set some limits. I don't know whether this case will -- probably will not be reassigned to Judge Novak because it's the custom in this court that when somebody conducts what we call a settlement conference, and it's been called

JODY A. STEWART, Official Court Reporter

mediation, whatever you want to call it, the judge that does that usually does not make any decisions in the case after conducting that sort of negotiation. So it will probably go to a different judge than Judge Novak. So if there is any toes to be stepped on, I don't want to dump that on another judge. I want to do it myself, as I said.

So with all that thought in mind, and also I have to bear in mind that this dispute over this release issue is not the fault of the defendants or counsel for the defendants, and they have stuck to their guns in the face of pressure from the Court, which their clients appreciate.

So I'm not going to hold off the settlement because of that relief, class action relief against the release parties. But you talked about AWL being a defendant in the Pennsylvania action, right? They're not.

MR. BENNETT: They're not, Your Honor.

THE COURT: Is Curry a defendant?

MR. BENNETT: No, sir, Debt Trader and Northwood, which Northwood now being released, are the current defendants in the Pennsylvania action.

THE COURT: The broker?

MR. BENNETT: Yes, sir.

THE COURT: And who else?

MR. BENNETT: And Northwood, the debt buyer that it has decided to settle as part of this. We expect as soon as

we can sue the other debt buyers, that they will want to settle but...

THE COURT:  Okay.  First of all, I want the agreement changed.  I don't know what the date of payment meant in here.  It said on some date attorneys' fees will be paid.  I want attorneys' fees to be paid in proportion to the cash awards being paid, distributed.  Let's say we will start with when 20 percent of the cash is paid, 25 percent of the attorneys' fees will be paid.

MR. BENNETT:  Your Honor, this is Len Bennett.  The original timing of payments by the defendant, by the defendants, has become moot because the effective date will occur after, which -- so all the payments have to be made -- they will have been made by the effective date.

So a hundred percent of the cash will have been paid as of the time that checks would start going out to class members.

THE COURT:  A hundred percent of the attorneys will be paid before the checks start going out?

MR. BENNETT:  A hundred percent of the money from the defendants.  The date certain for Mr. Curry's contribution is August of 2021.  If the Court approves this today, the effective date will happen roughly 90 to 120 days from now.  So there is not going to be a delay like there was in the original settlement.  So the cash will be in the

fund -- will have been paid by the defendants pretty much right away, right after the fairness hearing, the final settlement.

THE COURT: What are you saying?

MR. BENNETT: That the original concern -- there were two original concerns. One, was that there was a payment plan. American Web Loan could contribute its cash over a period of time. I think that's been resolved. American Web Loan will pay the cash. And then the other concern, which was addressed over the last month, was whether or not the attorneys' fees could somehow be paid before the class was paid. That term is no longer at all in the settlement. There is no quick pay clause, so the attorneys would not be paid already until after the settlement.

THE COURT: You said on the effective date, and I didn't know. As I said, I didn't have time to read and re-read and check things. All it said was the effective date, and I didn't know what that meant.

MR. BENNETT: Yes, sir. The effective date would be -- so, Judge, the effective date would be, essentially, as a practical matter, the date after which no ordinary appeal to the Fourth Circuit could occur. So if there is some other objections, our team wouldn't be there, but then in theory that could delay the effective date, but

essentially it's the appeal period running after the date that this Court enters final approval.

THE COURT:  Are you saying that the checks would be sent out and simultaneously the attorneys' fees would be paid?

MR. BENNETT:  Yes, sir.

THE COURT:  But we don't know what the amount of the checks going out would be at that time?

MR. BENNETT:  But we would.  I mean, that is, all of the cash that would be contributed by --

THE COURT:  The first payment would go out.  Would the second payment go out?

MR. BENNETT:  The second payment would just be uncashed checks from the first payment, and then a new payment would go out after that so that -- but the money would be essentially in the hands of the class on the effective date, and it's just a matter of when the class member opens their electronic transfer and gets their money.

But the effective date, the money has to be paid to the class administrator, and the class administrator has the same obligations to pay the attorneys as the class.  The attorneys don't get paid any quicker under this settlement.

THE COURT:  Okay.

MR. BENNETT:  Mr. Buttacavoli, he has been deep into this and could correct me, but he's been -- you know,

he and I were the ones that edited these payment terms, and there was no disagreement in our most recent edits.

MR. BUTTACAVOLI:  Your Honor, Mr. Bennett is correct.  The timing of these payment to the class is now coincident with the payment of attorneys' fees.  There is not an issue with this version of the revised settlement agreement that is before the Court.

THE COURT:  Okay.  All right.

MR. BUTTACAVOLI:  And our application for attorneys' fees will come -- our application and objectors' counsel's application for attorneys' fees will come prior to the final fairness hearing date.

THE COURT:  All right.

MR. BUTTACAVOLI:  Well, it's 20 or 30 days before.

THE COURT:  Okay.  Well, that apparently is a non-issue now.  I just didn't know what the effective date meant.

Okay.  Well, let's talk about the money.  The Court would adjust the fees to be paid for original class counsel from a maximum of 16 million to a maximum of 15 million. The Court will also require that all expenses associated with the settlement and the hiring of the entity doing the distribution, and any other entities hired, will be paid out of class counsel's portion of the fee.  It will not be paid by objectors' counsel.

The Court will order that objectors' counsel, the fee $1 million deducted from the 16 million will be paid to the objectors' counsel and not to any cy pres benefit that they pass it on to, since they're taking on the obligation of -- they've already done a lot of work, and they are going to be taking on the obligation to do additional work.

So the Court's going to order that $1 million of the attorneys' fees be transferred to objectors' counsel, and that the objectors' counsel are not liable for any of the costs of the people hired to do the various administrative tasks or the mailing or any other costs associated with the distribution of the money or the logistics that go with the debt release and that that be paid to them in such proportion as they determine is appropriate, and not be paid, as I say, to some charitable-type institution.

I don't know if the order -- I know in the settlement agreement they talk about that case out of Richmond.  I don't recall if it was also in the order, proposed order.  Is it in the proposed order?

MR. THOMAS:  Your Honor, David Thomas.  No, sir, it's not recited in the proposed order.

THE COURT:  Because I don't want the Court on record as saying that that case has any impact on the Court's decision.

All right.  Is the reason why the loans between February 10th of 2010 and December 31st of 2011, is the reason why those loans were treated slightly differently because there is a lack of records of those loans?  Is that why you did it?

MR. BUTTACAVOLI:  That's correct, Your Honor.

MR. BENNETT:  Yes, sir.

THE COURT:  All right.  Well, all the other issues I had with the documents had to do with the release issue. But I'm not going to insist on any further amendment to the release issue based on what's going on in Pennsylvania, and, plus, it's highly improbable that there would be enough people in that particular class who paid more than the principal back on the loan to constitute a class.

So as counsel has argued, my concern may be only academic because it's highly unlikely that they would have a class action against the defendants being released in this case in any event, and the fact that the buyers of the loan are being pursued in other litigation, coupled with the odds are that they wouldn't have a class action, realistically, is enough to persuade the Court to allay the Court's concerns about how they are treated in the settlement.  So the only change that the Court would make its approval contingent upon would be the change in fees and costs, which I outlined.

JODY A. STEWART, Official Court Reporter

So do plaintiffs' counsel agree to make those changes?

MR. THOMAS:  Your Honor, this is Dave Thomas.  I think the answer is yes, sir, but my only suggestion might be that it may be easier logistically to address that in the fee petition.

THE COURT:  No, I'm not going to address it in the fee petition.  I'm not fixing their fees.  I'm just saying that the maximum will be 15 million instead of 16 million, and, as I told you, I'm not going to dump that decision on whoever takes over the case for me.  I'm going to make it.

MR. BUTTACAVOLI:  Your Honor, so I'm clear about what the Court is asking, do you want the notice to be modified so that it reflects that different application or do you want the parties to re-submit a revised settlement agreement and full set of papers?

THE COURT:  I just want you to make that change or just tell me that you will agree to make that change to the settlement agreement and make the same change wherever else it appears in the settlement documents.

MR. BUTTACAVOLI:  We will certainly do that, Your Honor.  I'm just thinking logistically for purposes of, we are, under the Class Action Fairness Act, required to provide a notice to the Attorney General within ten days of submission of the settlement agreement.

33

THE COURT:  Okay.

MR. BUTTACAVOLI:  Which that date counts from when we filed on the 31st of March.  If we are to revise the agreement and re-submit it to the Court, it restarts that period.  But if we are simply amending the text of the notice to be provided to the class, it wouldn't implicate that, we could certainly change the notice.  We have committed to agree to the Court's modification here today. The question is whether we need to re-submit the papers and start that clock again.  Do you understand my question?

MR. BENNETT:  Your Honor --

THE COURT:  Yes.

MR. BENNETT:  -- this is Leonard Bennett.  The terms of the settlement agreement say that the parties will agree -- that the parties will follow the settlement if a preliminary approval order is entered by the Court, and if the parties do not object to the changes as a result, I believe, logistically, if all the parties here say on the record that they do not object to the change, then you don't need a whole new set of documents.  Counsel has done a lot of work, Steve has done a lot of work to corral the signatures and everything else.  To the extent that everybody on the record, every party can say they accept this change, then that would be satisfactory under Rule 23 and under the terms of the existing settlement agreement.

JODY A. STEWART, Official Court Reporter

34

THE COURT:  Well, if that's the case, I can issue an order that says that today and save -- there's no sense making everybody go through all of that exercise again if we can avoid it.  So I can put that in my order, if all counsel agree to it.

How about, does counsel AWL agree to that?

MR. SEYFARTH:  Your Honor, Chuck Seyfarth for AWL, no objection.

THE COURT:  Counsel for Mr. Curry?

MR. LATCOVICH:  Your Honor, Simon Latcovich for Mr. Curry, no objection.

THE COURT:  All right.  The other defendants, I can't remember all the other defendants.  Are they all represented here?

MR. ONDECK:  Your Honor, this is Chris Ondeck.  I represent the Medley defendants, and no objection for those defendants.

MR. FEDOR:  Your Honor, Matthew Fedor.  I represent the Middlemarch defendants, no objection.

THE COURT:  Are there any other defendants?  Now, we've dismissed one of the defendants who filed bankruptcy, I know.

MR. ONDECK:  Yes, Your Honor. It's Chris Ondeck again.  That was one of the seven Medley defendants. They -- that dismissed entity does not object, to the extent

JODY A. STEWART, Official Court Reporter

it's relevant as well.  I'm its lawyer.

THE COURT:  All right.  Well, does that cover everyone?

MR. BUTTACAVOLI:  I believe so, Your Honor.  Thank you for that, avoiding the logistical challenge.  We will revise the class notice accordingly pursuant to the Court's instructions just now.  Thank you.

THE COURT:  All right.  Well, I'll draft an order. I will try to get that done today and electronically sent to counsel.  If there is any problem with the order, let me know by e-mail.

All right.  If there is nothing further, then the hearing will be adjourned.

(Hearing adjourned at 12:29 p.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

X_____/s/_____x

Jody A. Stewart

X_____4-8-2021 _____x

Date

JODY A. STEWART, Official Court Reporter